2022-1451, 2022-1452

**IN THE**
**UNITED STATES COURT OF APPEALS FOR**
**THE FEDERAL CIRCUIT**

**AXONICS, INC.,**
*Appellant*

v.

**MEDTRONIC, INC.,**
*Appellee*

APPEALS FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN IPR NOS. IPR2020-00679 & IPR2020-00715

**APPELLANT AXONICS, INC.'S PRINCIPAL BRIEF AND ADDENDUM**

Matthew D. Powers
William P. Nelson
Gina Cremona
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone: (650) 802-6000
Facsimile: (650) 802-6001

Azra Hadzimehmedovic
Aaron M. Nathan
Samantha Jameson
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102
Telephone: (703) 940-5032
Facsimile: (650) 802-6001

*Counsel for Appellant*
*Axonics, Inc.*

Mav 20, 2022

## PATENT CLAIMS AT ISSUE

**U.S. Patent No. 8,626,314 B2, Claims 1–2, 4, 7, 10-12, 14, 18-24:**

The following claims of the 314 Patent are illustrative:

1. A system comprising: an implantable medical lead comprising: a lead body extending between a proximal end and a distal end; a plurality of conductors within the lead body; a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by a lumen of an introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn to release the plurality of tines, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes.

11. A system comprising: an implantable pulse generator configured to generate electrical stimulation; and an implantable medical lead configured to be electrically coupled to the implantable pulse generator and introduced through and released into body tissue via an introducer defining an introducer lumen, the implantable medical lead comprising: a lead body extending between a proximal end and a distal end; a plurality of conductors within the lead body; a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by the lumen of the introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn proximally, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes.

18. A method comprising: introducing an introducer into body tissue, the introducer defining a lumen extending between a lumen proximal end and a lumen distal end; advancing a medical lead through the lumen of the introducer, the medical lead comprising: a lead body extending between a proximal end and a distal end; a plurality of conductors within the lead body; a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending through a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by the lumen of the introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn proximally, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes; and withdrawing the introducer from the body tissue to deploy the plurality of tine elements.

**U.S. Patent No. 8,036,756 B2, Claims 1-2, 5, 7, 13-15, and 18**

The following claims of the 756 Patent are illustrative:

1. A method of providing electrical stimulation of body tissue at a stimulation site employing an implantable pulse generator, the method comprising: percutaneously introducing an introducer having an introducer lumen extending between an introducer lumen proximal end opening and an introducer lumen distal end opening through body tissue to locate the introducer lumen distal end opening adjacent to the stimulation site; disposing an implantable medical lead within the introducer lumen, wherein the implantable medical lead comprises: a lead body extending between a lead proximal end and a lead distal end; P connector elements formed in a connector array along a first segment of the lead body proximate to the lead proximal end; P stimulation electrodes arranged in an electrode array extending along a second segment of the lead body proximate to the lead distal end; P lead conductors extending between the P connector elements and the P stimulation electrodes; and a plurality of M tine elements formed in a tine element array extending along a third segment of the lead body between the second segment of the lead body and the lead proximal end, each tine element comprising N flexible tines, each tine having a tine width and a tine thickness and extending through a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body at a tine attachment site and supporting the tine extending outwardly of the lead body and

toward the lead proximal end, whereby the M.times.N tines are adapted to be folded inward against the lead body when fitted into and constrained by the introducer lumen, wherein the plurality of M tine elements are separate from and axially displaced from each other and from each of the P stimulation electrodes, and wherein all of the P stimulation electrodes are between the plurality of M tine elements and the lead distal end, and wherein disposing the implantable medical lead within the introducer lumen comprises disposing the implantable medical lead within the introducer lumen with the M.times.N tines folded inward against the lead body by constraint imposed by the introducer lumen without overlapping one another; withdrawing the introducer proximally from the tine element array to successively release the N tines of each of the M tine elements to deploy outward and toward the lead proximal end to engage body tissue and inhibit axial dislodgement of the P stimulation electrodes; and coupling the P connector elements to the implantable pulse generator.

14. A method comprising: percutaneously introducing an introducer comprising an introducer lumen extending between an introducer lumen proximal end opening and an introducer lumen distal end opening through body tissue to locate the introducer lumen distal end opening adjacent to a stimulation site; disposing an implantable medical lead within the introducer lumen, wherein the implantable medical lead comprises: a lead body extending between a lead proximal end and a lead distal end;

a plurality of connector elements formed in a connector array adjacent the lead proximal end; a plurality of stimulation electrodes arranged in an electrode array extending along a first segment of the lead body proximate to the lead distal end; a plurality of lead conductors extending between the connector elements and the stimulation electrodes; and a plurality of tine elements attached to the lead body along a second segment of the lead body between the first segment of the lead body and the lead proximal end, each tine element comprising a plurality of flexible tines that are adapted to be folded inward against the lead body when fitted into and constrained by the introducer lumen and adapted to deploy outward to engage body tissue when the introducer is withdrawn, wherein the plurality of tine elements are separate from and axially displaced from each of the stimulation electrodes, and wherein the plurality of stimulation electrodes is between the plurality of tine elements and the lead distal end; and withdrawing the introducer toward the lead proximal end from the plurality of tine elements to release the plurality of tines.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1451, 2022-1452

**Short Case Caption** Axonics, Inc. v. Medtronic, Inc.

**Filing Party/Entity** Axonics, Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/20/2022

Signature: /s/ Matthew D. Powers

Name: Matthew D. Powers

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Axonics, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Babak Sani, A, Kilpatrick Townsend & Stockton LLP | Naveen Modi, Paul Hastings LLP | A, James Isbester, Kilpatrick Townsend & Stockton LLP |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Medtronic, Inc. et al v. Axonics Modulation Technologies, Inc. Case #: 8:19-cv-02115-DOC-JDE | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE ........ i
CERTIFICATE OF INTEREST ........ vii
TABLE OF CONTENTS ........ x
TABLE OF AUTHORITIES ........ xii
I. INTRODUCTION ........ 1
II. STATEMENT OF JURISDICTION ........ 3
III. STATEMENT OF THE ISSUES ........ 4
IV. STATEMENT OF THE CASE AND FACTS ........ 4
A. Introduction ........ 4
B. The 314 and 756 Patents ........ 5
C. The Prior Art ........ 11
1. Young ........ 11
2. Gerber ........ 14
3. Lindegren ........ 15
4. Akerstrom ........ 16
5. Hauser ........ 17
D. The *Inter Partes* Reviews ........ 19
1. 314 Patent ........ 19
2. 756 Patent ........ 24
V. SUMMARY OF ARGUMENT ........ 27
VI. ARGUMENT ........ 29
A. Legal Standards ........ 29

B. The FWDs Err In Finding No Motivation To Combine For 314 Patent Grounds 1 and 2, And 756 Patent Ground 1 ............................30

1. The FWDs Erred In Failing to Find A Motivation To Combine From The Shared Nature Of The Problem To Be Solved, In The Same Field Of Pertinent Art ....................................................31

2. The Board Committed Legal Error In Requiring The Physical Combination Of The References To Be Operable For The Unclaimed Purpose of Trigeminal Nerve Stimulation .............41

VII. CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................54

## TABLE OF AUTHORITIES

### Cases

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC,*
825 F.3d 1373 (Fed. Cir. 2016) ........................................................3, 43, 44, 48

*Belden Inc. v. Berk-Tek LLC,*
805 F.3d 1064 (Fed. Cir. 2015) ..........................................................................29

*ClassCo, Inc. v. Apple, Inc.*,
838 F.3d 1214 (Fed. Cir. 2016) ...................................................................42, 45

*Consol. Edison Co. v. N.L.R.B.*,
305 U.S. 197 (1938)..........................................................................................29

*Dome Patent L.P. v. Lee,*
799 F.3d 1372 (Fed. Cir. 2015) ........................................................2, 33, 36, 39

*Donner Tech., LLC v. Pro Stage Gear,* LLC,
979 F.3d 1353 (Fed. Cir. 2020) ..........................................................................40

*Facebook, Inc. v. Windy City Innovations, LLC*,
973 F.3d 1321 (Fed. Cir. 2020) ..........................................................................45

*In re Dembiczak,*
175 F.3d 994 (Fed. Cir. 1999) ............................................................................38

*In re Gartside,*
203 F.3d 1305 (Fed. Cir. 2000) ..........................................................................30

*In Re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ............................................................................51

*In re Urbanski,*
809 F.3d 1237 (Fed. Cir. 2016) ......................................................44, 46, 47, 50

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ...................................................................passim

*KSR Int'l Co. v. Teleflex Inc.,*
*550 U.S. 398* (2007)...................................................................................3, 32, 45

*PersonalWeb Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ....................................................................47

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
780 F. App'x 880 (Fed. Cir. 2019)...............................................31, 35, 43, 53

*Tokai Corp. v. Easton Enters., Inc.*,
632 F.3d 1358 (Fed. Cir. 2011) ..................................................................36

*Trivascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016) ..............................................................51, 52

## STATEMENT OF RELATED CASES

No separate appeal from *Inter Partes* Review ("IPR") 2020-00679 or IPR2020-00715 has previously been before this Court or any other court. The pending action in district court, *Medtronic, Inc. et al v. Axonics Modulation Technologies, Inc.*, Case No. 8:19-cv-02115-DOC-JDE, will be directly affected by this Court's decision in this appeal.

# I. INTRODUCTION

The Board correctly found that the relevant prior art references disclose all limitations of the independent claims of the 314 and 756 Patents. The elements of those limitations – a tined lead, with multiple rows of tines, for implantation through an introducer, with multiple electrodes at the tip positioned after the tines, and corresponding electrical connectors and conductors – were all well known in the art, as the 314 and 756 Patents admit.

The Board nonetheless found that Petitioners had not demonstrated unpatentability, based solely on its finding that a skilled artisan would not have been motivated to combine the references. The Board's conclusions regarding motivation to combine are legally erroneous, and lack substantial evidence.

First, the Board erred in rejecting Petitioner's proposed motivation to combine based on the asserted Grounds addressing the same problem, from the same field of pertinent art, as the 314 and 756 Patents. The Final Written Decisions' ("FWD") conclusion that the 314 and 756 Patents were narrowly directed to the problem of medical leads for sacral neuromodulation, and that the field of pertinent art was also limited to sacral neuromodulation, was unsupported by substantial evidence. The evidence before the Board showed the opposite was true: the challenged patents and the asserted references each address the same general problem, which the 314 and 756 Patents characterize as "problems associated with implanting and maintaining

electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrodes in relation to a particular body site" (Appx152, 5:48-53). The Board thereby erroneously failed to credit Petitioners' showing that motivation to combine would "flow from 'the nature of the problem to be solved,'" and a POSITA would have been motivated to combine references in the same field, that address the same problem of effective lead implantation in body tissue that the 314 and 756 Patents address, to achieve the claimed invention. *See, e.g., Dome Patent L.P. v. Lee,* 799 F.3d 1372, 1380 (Fed. Cir. 2015) (finding motivation to combine from shared problem of oxygen permeability in contact lenses).

Second, the Board committed legal error when it failed to find a motivation to combine from the express suggestions of the asserted references themselves. The FWDs specifically addressed only one such teaching: the unmistakable suggestion in Petitioner's primary reference (Young) to modify its single-electrode tined lead "to provide multiple active stimulation sites near the tip" of the lead to "permit greater flexibility in activation of a wider area" of the stimulation site (Appx2410), which Petitioners demonstrated would have led a POSITA to modify Young's lead to have multiple electrodes as disclosed in the secondary Gerber reference, thereby achieving the 314 and 756 Patent claims. The Board rejected this suggestion as a persuasive motivation to combine because it credited Patent Owner's position that the resultant physical combination would not be operable for trigeminal nerve

stimulation – a requirement not recited in the 314 and 756 Patents. That was legal error; no authority requires the prior art to be physically combinable to satisfy an unclaimed purpose, and it was not Petitioner's contention in any event. Rather, the test for obviousness asks "whether a '***skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention***.'" *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC,* 825 F.3d 1373, 1381 (Fed. Cir. 2016). Under the correct standard, Petitioners showed that a POSITA would have followed the express suggestion in Young to modify its lead to have multiple stimulation sites, and in doing so, would have exercised their ordinary skill and ordinary creativity to ***adapt*** Gerber's teaching of multiple electrodes for sacral neuromodulation. *See, e.g., KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398,* 421, 127 S. Ct. 1727, 1742 (2007) ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").

The Board's Final Written Decisions should be reversed and remanded.

## II. STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board ("PTAB" or "Board") of the United States Patent and Trademark Office ("USPTO") issued Final Written Decisions ("FWD") in *Inter Partes* Review ("IPR") 2020-00679 and IPR2020-00715 under 35 U.S.C. § 318(a) on September 13, 2021. Appx1-127. On remand from this Court, on December 6, 2021, Andrew Hirshfeld, Commissioner for Patents, Performing the

Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the USPTO, summarily denied Axonics' request for rehearing. Appx136-138. Axonics filed timely notices of appeal under 35 U.S.C. §§ 141(c), 142 and 319 on February 4, 2022. Appx1387-1523. This Court has jurisdiction under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A). The decisions appealed from are final.

## III. STATEMENT OF THE ISSUES

Did the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office err in determining in its Final Written Decisions (Paper Nos. 64 and 65) to Appellant's Petitions for Inter Partes Review (Paper No. 1) that Petitioner has not shown that Claims 1, 2, 4, 7, 10-12, 14, and 18-24 of U.S. Patent 8,626,314 B2 are unpatentable, under Grounds 1 and 2; and that Petitioner has not shown Claims 1, 2, 5, 7, 13-15 and 18 of U.S. Patent 8,036,756 B2 are unpatentable, under Ground 1?

## IV. STATEMENT OF THE CASE AND FACTS

### A. Introduction

This consolidated appeal arises from FWDs issued by the PTAB concerning U.S. Patent Nos. 8,036,756 (the "756 Patent") and 8,262,314 (the "314 Patent"), finding that Axonics had not shown that the challenged claims of those related patents are unpatentable.

### A. Technical Background To The 314 And 756 Patents

Operative neurostimulation, also known as neuromodulation, involves altering the electrical signals of nerves through the use of an implanted device to produce therapeutic effects. Appx2138-2139, ¶24. Neurostimulation has been studied since the 1800s, and by the late 1960s, numerous different implanted devices had been developed, including nerve stimulators for the heart, brain, and peripheral nerve, along with other applications. *Id.* ¶¶25-26. As these implantations showed therapeutic effect, there was significant research and development that led to improved neurostimulation device designs well before the claimed inventions of the 314 and 756 Patents, including in electrode designs, various fixing mechanisms to anchor the lead into position, and introducers to place the lead into the human body. *Id.* ¶¶27-33.

**B. The 314 and 756 Patents**

The 314 and 756 Patents are both continuations of U.S. Patent Application No. 10/004,732; as such, they share the same specification. Appx139-157, Appx158-175. As discussed in more detail below, the claims of the 314 and 756 Patents challenged in the IPRs are nearly identical, and the Final Written Decisions turned on the same issues.

The 314 and 756 Patents are directed to an implantable medical electrical lead that purports to address "problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more

lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques." Appx152 at 5:48-53[1]. For sacral nerve stimulation, the preferred embodiments of the 314 and 756 Patent address a purported "need in the art for a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient's skin to locate stimulation electrodes in casual contact with a sacral nerve, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period."[2] *Id.* at 5:34-44.

The specification of the 314 and 756 Patents describes several embodiments of an implantable medical lead comprising a lead body 15 and **P** number of electrodes on the distal end[3] of the lead body, "where **P**=one or more" electrodes

---

[1] All patent citations herein are to the 314 Patent, unless otherwise noted.
[2] "IPG" refers to an implantable pulse generator, which "is programmed to deliver stimulation pulse energy to the electrode providing the optimal nerve response." *See* Appx150, 2:20-22, 2:63-64.

[3] In the 314 and 756 Patents, the "distal" direction refers to being closer to the tip of the lead that is placed in the body, while the "proximal" direction refers to being closer to the physician who is inserting the lead percutaneously (through the skin). *See* Appx152, 5:65-6:5 (referring to "distal electrode" at a site in the body).

arranged in an array spaced apart from one another. Appx152, 6:26-30; Appx154, 9:25-30; *see also id.* at 12:51- 53 (P=one); Fig. 1. Each electrode (25, 30, 35, 40) is electrically coupled to a wire lead conductor within the lead body and the conductor is coupled to connector elements (65, 70, 75, 80) at the proximal end. *Id.* at 9:41-49; Fig. 1. Those connector elements are adapted to be coupled to an IPG, including Medtronic InterStim Neurostimulator Model 3023. Appx154, 9:62-67.

In the disclosed embodiments, the electrodes are affixed through "[t]he fixation mechanism compris[ing] a plurality **M** of tine elements [125, 130, 135, 140] arrayed in a tine element array [120]…. Each tine element comprises at least N flexible, pliant, [sic] tines [145, 150, 155, 160], each tine having a tine width and thickness and extending through a tine length from an attached tine end [165 annotated in Fig. 3] to a free tine end [170]." Appx152, 5:65-6:12; 6:42-47; Appx154, 10:12-32; 10:42-52; Figs. 1, 3.







The 314 and 756 Patents disclose that its lead is introduced through an introducer such that the tines are adapted to be folded inward against the lead body when constrained in the introducer lumen. Appx153, 7:1-35; Appx154, 10:59-64; Appx155, 11:22-28; Figs. 5-8. The lead is advanced to the stimulation site and the electrode array of the lead is "advanced distally out of the introducer lumen." Appx153, 7:36-43; Appx155, 11:28-36. Then, the introducer is retracted proximally (and withdrawn completely) and the tines are successively released from the introducer lumen to bear against the tissue to inhibit proximal retraction. Appx153, 7:43-55; Appx155, 11:9-15; 12:6-22.

Notably, the shared specification of the 314 and 756 Patents admits that each of the components of its implantable medical lead – electrodes, conductors, connectors, tines, use of an introducer – were known in the prior art.

- **Implantable leads:** The shared specification acknowledges that many different permanent neurostimulation leads had been implanted. Appx150, 2:7- 3:21.
- **Electrodes, conductors, connectors:** The specification admits that "current lead designs used for permanent implantation ... have a number, e.g. *four, ring-shaped stimulation electrodes* spaced along a distal segment of the lead body.... Each distal stimulation electrode is electrically coupled to the distal end of a lead conductor within the elongated lead body that extends proximally through the lead body. The proximal ends of the separately insulated lead conductors are each coupled to a ring- shaped connector element in a proximal connector element array along a proximal segment of the lead body that is adapted to be coupled with the implantable neurostimulation pulse generator." *Id.*, 2:47-59 (emphasis added).
- **Tines and tine elements:** The specification further admits that in the cardiac space, the prior art used multiple tines on a tine element array. Appx151, 4:28-63 (discussing patents incorporated by reference,

including U.S. Patent No. 3,939,843 that was "directed to the first atrial tined leads, longitudinally extending rows of elongated tines"). It also admits these tines "fold against the introducer lumen and the vein wall after the lead distal end exits the introducer lumen." Appx152, 5:3-4.

- **Percutaneous implantation through an introducer:** The specification admits that in the prior art, a "lead bearing a distal stimulation electrode is percutaneously implanted through the dorsum and the sacral foramen (a singular foramina) of the sacral segment S3 for purposes of selectively stimulating the S3 sacral nerve. The lead is advanced through the lumen of a hollow spinal needle extended through the foramen." Appx150, 2:29-36. Similarly, the specification admits that, in the cardiac field, it was known to use "[p]ercutaneous lead introducers . . . to access the puncture site." Appx152, 5:1-3.

The 314 Patent has 24 claims, of which Claims 1, 11 and 18 are independent claims. Claims 1 and 11 are system claims that describe the implantable medical lead comprising essentially (a) a plurality of electrodes that is electrically connected via conductors and connectors to a pulse generator and (b) a plurality of tines on a plurality of tine elements that are adapted to fold within the lumen of the introducer and then deploy at a stimulation site. The method Claim 18 requires the use of an

introducer through which the medical lead of Claims 1 or 11 are advanced to the stimulation site.

The 756 Patent has 19 method claims, with two independent claims (1 and 14) that are very similar to each other, and to the claims of the 314 Patent. Claims 1 and 14 both describe percutaneously implanting a medical lead via the lumen of an introducer, wherein the implantable medical lead comprises of (a) a plurality of electrodes that is electrically connected via conductors and connectors and (b) plurality of tine elements with tines that are adapted to fold within the introducer lumen and deploy outward at the simulation site. Claim 1 additionally requires coupling the lead to the IPG.

### C. The Prior Art

#### 1. Young

"Electrical Stimulation of the Trigeminal Nerve Root for the Treatment of Chronic Facial Pain," written by Dr. Ronald F. Young and published publicly in the Journal of Neurosurgery in July 1995 ("Young"), discusses a study of 23 patients percutaneously implanted with a Medtronic electrical lead that had two sets of tines and Medtronic's ITREL IPG, for stimulation of the trigeminal nerve for the treatment of facial pain. Appx2401-2411. Like the 314 and 756 Patents' desire to improve existing leads (Appx152, 5:48-53), Young states its desire "to expand our knowledge of this potentially useful technique [*i.e.,* percutaneous implantation of

stimulating electrodes] and to extend the application of electrical stimulation for treatment of chronic pain." Appx2405. For its electrical lead, Young discloses using Medtronic's "Quintatrigeminal" lead that "consisted of a monopolar platinum-iridium lead with two sets of four 'tines' located 5 and 10 mm from the distal tip of the electrode and a central stylet (Fig. 1). The purpose of the tines was to prevent the electrode from becoming dislodged after implantation." Appx2406.

**Fig. 1 (distal tip of Young's lead) (Appx2406):**



**Fig. 3 (showing the complete system with the lead with distal and proximal end, connected to the connector array of the extension lead, connected to an IPG) (Appx2407)**




Like the 314 and 756 Patents, Young discloses a percutaneous implantation technique where a hollow needle was first inserted to the stimulation site, then "the electrode was inserted and advanced under fluoroscopic guidance" to the stimulation site, and "[s]ubsequently, the introducing needle and central stylet were removed and the proximal end of the electrode [i.e. lead] was tunneled subcutaneously around the mandible and connected to the percutaneous extension lead" and the distal end of that lead was connected to the ITREL IPG. Appx2406-2407. Young further teaches that its lead can be improved by adding "multiple active stimulation sites," *e.g.,* electrodes, near the tip, "which would permit greater flexibility in activation of a wider area." Appx2410.

### 2. Gerber

Like the 314 and 756 Patents, U.S. Patent No. 6,055,456 ("Gerber") discloses that a "problem associated with the prior art electrical stimulation to control incontinence is positioning and maintaining the discrete electrode in casual contact or in close proximity to the nerve to provide adequate stimulation of the sacral nerves." Appx2430, 1:64-2:13. Also like the 314 and 756 Patents, Gerber notes the risks associated with the use of general anesthesia for lead implantation. Appx2430, 1:65-2:2.

To solve these problems, Gerber discloses an implantable medical lead for stimulation of the sacral nerves, comprising a lead body which includes one or more electrodes located at the distal end, and different types of anchoring mechanisms that are located between the most proximal electrode and the proximal end of the lead. Appx2426, Abstract; Appx2430, 2:4-5 ("current lead design used for sacral nerve stimulation uses 4 electrodes"); Appx2431, 3:39-4:52 (disclosing two electrodes and different anchoring means on a lead body); Appx2427, Figs. 2-3. Gerber thus discloses the exact location for the anchoring mechanism that is required by the 314 and 756 Patents. See, *e.g.,* 314 Patent Claims 1, 11 ("a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body"). Appx156-157.

Gerber further discloses that the proximal end of the lead body can be connected to an IPG, including Medtronic's InterStim Neurostimulator Model 3023 (Appx2431, 3:48-52), which was also identified in the 314 and 756 Patents. Appx154, 9:47-49; Appx172, 9:27-35.

### 3. Lindegren

Like the 314 and 756 Patents, WO98/20933 ("Lindegren") acknowledges the problem of electrical lead migration after implementation, in this instance for cardiac implantation. Appx2448, 1:20-27. To solve this problem, Lindegren discloses that different anchoring means, including tines (or projections), can be used, with the number of such tines dependent on the level of anchoring capability desired. Appx2451, 4:32-5:7. From a manufacturing point of view, Lindegren teaches that it is preferable if its tines are "devised as an integral part of a one-piece ring-shaped means and evenly distributed around the circumference of the ring-shaped means" and "made of an elastic material such as silicone rubber". Appx2452, 5:17-22; *see also* Appx2454, 7:1-27 (describing preferred embodiments in Figs. 2 and 3 with electrode 4 and ring-shaped means 10 with projections 12 that "consist of tine-like position-fixation means").




FIG.1




FIG. 3

Appx2459.

### 4. Akerstrom

United States Patent No. 4,407,303 ("Akerstrom") addresses problems with emplacement of prior endocardial leads with stiff tines that were too big for delivery through a small vein, and which had limited tissue area to anchor in the heart wall. Appx2465, 1:5-31, 35-39. To solve these problems, Akerstrom discloses a lead with a distal electrode and multiple proximal anchors, each comprising resilient, tine-like loops mounted on collars or sleeves to anchor the lead. Appx2465, 1:5-14; 2:34- 61; Figs. 1-3. These loops are used to secure the lead. Appx2465, 2:46-49.




FIG 1




FIG 2




FIG 3

Appx2464.

### 5. Hauser

Like the 314 and 756 Patents, United States Patent No. 5,052,407 ("Hauser") discloses the problem of major surgeries for implantation of medical leads due in part for need of precise placement of the electrodes: "Presently, many defibrillation electrodes require major surgical procedures for insertion due to the complex structure of the electrode and the need for precise placement ofthe electrodes on the heart." Appx2439, 1:26-31. Hauser further notes that "attempts to provide simplified placement procedures and lead configurations" are well known in the art. *Id.*

Accordingly, Hauser discloses an implantable defibrillation/cardioversion lead with a non-invasive method for implantation. The distal end of the lead has a spiral active region with a conductive element. Proximal to that region is a fixation

means 19 that anchors the lead at a location determined by the surgeon during implantation. Appx2440, 4:3-8, 4:21-25; Appx2438 (Fig. 12). Hauser discloses that the "anchoring means" can be three sets of tines as shown in Figures 1 and 12, or a suture sleeve. Appx2440, 4:9-19.







Like the 314 and 756 Patents, Hauser further discloses a percutaneous implantation method. Appx2440, 4:32- 55; Appx2442, 7:8-12.

### D. The *Inter Partes* Reviews

#### 1. 314 Patent

Petitioners asserted that Claims 1, 2, 4, 7, 10-12, 14, 18-24 of the 314 Patent were obvious in view of the prior art, on three separate grounds.

- **Ground 1** asserted that Claims 1, 2, 4, 7, 10-12, 14, 18-24 are obvious over Young in view of Gerber and Lindegren;
- **Ground 2** asserted that Claims 18, 20 and 21 are obvious over Young, Gerber, and Lindegren in view of Hauser; and
- **Ground 3** asserted that Claims 1, 2, 4, 7, 10-12, 14, 18-24 are obvious over Gerber in view of Hauser and Akerstrom. Appx200.

In its decision instituting review, the Board concluded that Petitioners "demonstrated a reasonable likelihood" for each asserted Ground that the challenged claims are unpatentable. Appx492, Appx494, Appx502, Appx516, Appx518. The Board further concluded for Ground 1 that "Petitioner also has articulated sufficient reasoning for why a person of ordinary skill would have combined the teachings of Young, Gerber, and Lindegren in the manner set forth in the Petition for purposes of this Decision" (Appx492), and found that Axonics had shown sufficient motivation to combine for Grounds 2 and 3 as well. Appx502, Appx516.

**a. Ground 1**

In its FWD for the Ground 1 combination of Young, Gerber and Lindegren, the Board found that each limitation of independent claim 1 is disclosed in the proposed combination of references, (Appx36), and did not deny that the same combination teaches every limitation of independent claims 11 and 18. Appx36. However, the Board still found the claims had not been shown to be unpatentable, based on its finding that "Petitioner . . . has not persuaded us that a POSITA would have had a reason to combine" the teachings of these references. Appx36. The Board's conclusion regarding motivation to combine rests on three rationales.

First, although it adopted a definition of a person of ordinary skill in the art ("POSITA") that closely tracked the educational requirements proposed by Axonics, the Board defined the pertinent art for that ordinarily skilled artisan narrowly, as "medical leads specifically for sacral neuromodulation," rather than the broader category of "implantable medical devices" as proposed by Axonics. Appx13. The Board did so in unsupported disregard of the following:

- No claim of the 314 and 756 Patents is limited to sacral neuromodulation, but instead each recites "implantable medical leads" generally;
- The summary of the invention in the 314 and 756 Patents states that the invention addresses "problems associated with implanting and maintaining

electrical leads in body tissue" generally, for which sacral nerve stimulation is described merely as a "preferred embodiment" Appx152, 5:48-53;

- The 314 and 756 Patents themselves disclose that one of skill in the art would draw not only from the field of implantable leads for sacral neuromodulation, but also from implantable leads for other parts of the body, including the heart and the spine. *See* Appx151-152, 4:24-5:33 (stating the "prior art discloses a number of configurations of implantable medical electrical leads other than neurostimulation leads that employ fixation mechanisms to maintain a stimulation electrode in relation to a body organ or tissue," and discussing cardiac and spinal implantable medical leads); and
- The 314 and 756 Patents disclose that their implantable medical lead is suitable for use outside of sacral neuromodulation, including for use as "an intramuscular lead where the tines can engage against muscle and assist in preventing dislodgement of the distal electrode(s)," such as in the stomach or in connection with the anal sphincter muscle. Appx156, 13:32-39.

Second, the Board rejected Petitioners' contention that a POSITA would be motivated to combine these references because each addresses the same problems addressed by the 314 Patent – namely, "problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site" (Appx152, 5:48-53).

Appx31. Instead, the Board found that "the '314 patent describes a more specific problem": namely, that the "'314 patent addresses the need for a percutaneously implantable lead that is properly and securely positioned to ***provide sacral nerve stimulation, whereas the references do not.***" Appx31. Based on its narrow definition of the 314 Patent's field of art, the Board then distinguished the problems addressed by Young, Gerber, and Lindegren as specifically relevant to lead implantation in trigeminal nerves, sacral nerves, and cardiac leads, respectively – and therefore different than the problems addressed by the 314 Patent, which (the Board said) pertained specifically to sacral neuromodulation. Appx31.

Third, the Board rejected Petitioner's showing of a motivation to combine from the express teachings of the references. Despite conceding that Young discloses that its lead "could be improved to provide multiple active stimulation sites near the tip," Appx32, the Board found that "Petitioner has not persuaded us that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines" as disclosed by Gerber, and as the independent claims require. Appx35. The Board arrived at this result by crediting Medtronic's contention that "Young's disclosure of improving its lead to provide multiple active stimulation sites, i.e., electrodes, near the tip would not have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines

***because such an arrangement would not be feasible in the complex anatomy of the trigeminal nerve region***" – a concern of Young, but not a requirement of the 314 Patent claims. Appx101. The Board failed to address Petitioner's further contention that Lindegren discloses a manufacturing preference to have tines mounted on a ring-shaped means like a rubber band encircling the lead body, which would have led a POSITA to adapt band-mounted tine elements like those of the 314 and 756 Patents for use with Young and Gerber. Appx30.

Although the Board did not deny that the Ground 1 combination also disclosed every limitation of independent claims 11 and 18, having rejected Petitioners' motivation to combine for the reasons set out above, it found that "Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claims 11 and 18 would have been obvious." Appx36. Having made this finding for the independent claims, the FWD did not reach the dependent claims. Appx36.

**b. Ground 2**

For the Ground 2 combination of Young, Gerber, Lindegren, and Hauser as to Claims 18, 20, and 21, the Board summarily disposed of Petitioners' contentions regarding motivation to combine, on the same basis as Ground 1. Specifically, the FWD found that "Petitioner's reasoning for modifying Young's lead to include Gerber's multiple electrodes so that the electrodes are distal to all of the lead's tines

is the same in both of these asserted grounds" (Appx37); accordingly, "[f]or the reasons discussed above," the FWD found that "Petitioner has not persuaded us that a POSITA would have had a reason to combine Young's lead with Gerber's plurality of electrodes so the plurality of electrodes is distal to all of the lead's tines." Appx38.

#### c. Ground 3

For the Ground 3 combination of Gerber, Hauser, and Akerstrom as to Claims 1, 2, 4, 7, 10–12, 14, and 18–24, the FWD again found that the proposed combination discloses each limitation of independent Claim 1. Appx43-51, Appx58. However, the FWD also again found that Petitioner had not demonstrated a sufficient motivation to combine the references. Appx58.[4]

### 2. 756 Patent

Petitioners asserted that Claims 1, 2, 5, 7, 13-15, and 18 of the 756 Patent were obvious in view of the prior art, on three separate grounds.

- **Ground 1** asserted that the claims are obvious over Young in view of Gerber, Lindegren and Akerstrom; and
- **Ground 2** asserted that these claims are obvious Claims 18, 20 and 21 are obvious over Gerber in view of Hauser and Akerstrom. Appx280.

[4] As Petitioners do not appeal the Board's decision on Ground 3, or on Ground 2 of the 756 Patent, these decisions are discussed only briefly and for completeness.

In its decision instituting review, the Board concluded that Petitioners showed a "reasonable likelihood" for each asserted Ground that the challenged claims are unpatentable. Appx538, Appx571-572, Appx589. The Board further concluded for each ground that "Petitioner also articulates sufficient reasoning for why a person of ordinary skill would have combined the teachings" of the references. Appx571, Appx589.

**a. Ground 1**

In its FWD for the Ground 1 combination of Young, Gerber, Lindegren, and Akerstrom for the 756 Patent, the Board found that each limitation of independent claim 1 is disclosed by the proposed combination of references, and does not deny that the same combination teaches every limitation of independent claim 14. Appx103-104. However, the Board found that "Petitioner has not persuaded us that a POSITA would have had a reason to combine" the teachings of these references. Appx103-104.

The FWD's conclusion regarding motivation to combine rests on the same three bases as its identical conclusion as to Ground 1 for the 314 Patent: 1) a determination that the pertinent art for the 314 and 756 Patents is narrow and limited to sacral neuromodulation, despite the contrary evidence; 2) a rejection of the contention that a POSITA would be motivated to combine these references because each addresses the same problems addressed by the 314 Patent; and 3) approval of

Patent Owner's contention that "Young's disclosure of improving its lead to provide multiple active stimulation sites, i.e., electrodes, near the tip would not have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines ***because such an arrangement would not be feasible in the complex anatomy of the trigeminal nerve region***" – which does not appear in the 756 Patent claims. Appx101, Appx103.

Although the FWD did not deny that the Ground 1 combination disclosed every limitation of independent Claim 14, having rejected Petitioners' motivation to combine for the reasons set out above, the FWD found that "Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claim 14 would have been obvious over combined teachings of Young, Gerber, Lindegren, and Akerström." Appx104. Having made this finding for the independent claims, the FWD did not reach the dependent claims. Appx104-105.

#### b. Ground 2

In its FWD for Ground 2, the Board found that "Petitioner has demonstrated each limitation of independent claim 1 in its proposed combination of Gerber, Hauser, and Akerström," and did not deny that the same combination teaches every limitation of independent claim 14. Appx124. However, the FWD found that Petitioner "has not persuaded us that a POSITA would have had a reason to combine the teachings of these references as Petitioner proposes." Appx124.

## V. SUMMARY OF ARGUMENT

The FWD for the 314 Patent errs in finding that no challenged claims of the 314 Patent are unpatentable under Grounds 1 and 2, and the FWD for the 756 Patent repeats the same errors in reaching the same conclusion for Ground 1.

First, the FWDs err in rejecting Petitioners' demonstration that a POSITA would be motivated to combine these references because each addresses the same problems addressed by the 314 and 756 Patents, relating to implanting and maintaining electrical leads in body tissue, and are analogous art from the same field as the challenged patents. Specifically, the FWDs insupportably contend that, because Young discloses lead implantation in trigeminal nerves, and Lindegren discloses lead implantation in the cardiac region, they therefore concern different "problems" than the 314 and 756 Patents, which disclose lead implantation in the sacral nerves. The Board's limitation of these references to a specific body site for implantation is unsupported by the evidence, which shows that each of these references are specific instances which address the general problem addressed by the 314 and 756 Patents: "problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques." Appx152 at 5:46-54. Accordingly, a POSITA would find

motivation to combine these references from the shared nature of the problem to be solved, as Petitioners demonstrated.

Second, in rejecting the express suggestion in Young to modify its lead to provide multiple stimulation sites, the FWDs commit legal error by requiring Axonics to demonstrate a motivation to combine the references to achieve features that are not claimed in the 314 and 756 Patents. The FWDs rely on a distorted reading of this Court's decision in *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) to support their conclusion that a POSITA would find no motivation to combine the references, because the bare, rote physical combination of Young's unmodified lead with the unadapted multiple electrodes of Gerber would supposedly render the resultant device incapable of operating for trigeminal stimulation as intended. That is legal error. Neither *Intelligent Bio-Sys* nor any other authority advanced by the Board or Medtronic requires that a motivation to combine the references be limited to achieving one specific purpose ***not claimed*** in the 314 and 756 Patents, like trigeminal nerve stimulation. Instead, the test for obviousness asks whether a POSITA would have been motivated to combine the teachings of the prior art references ***to achieve the claimed invention***. Under the proper standard, Axonics more than sufficiently showed the necessary motivation for a skilled artisan to exercise that ordinary skill to adapt Gerber's multiple electrodes for use with Young. Further, the Board's decision ignores that

***its*** POSITA, as proposed by Medtronic and adopted by the Board, would be specifically motivated to apply the teachings of the prior art to the stimulation of the sacral nerve; as such, the Board's concerns about operability for trigeminal stimulation would be irrelevant to its POSITA.

Based on these repeated errors, the FWDs' finding that no challenged claims of the 314 Patent and 756 Patent are unpatentable should be reversed, the independent claims should be found unpatentable under at least Ground 1, and the matters should be remanded to the PTAB for findings on the remaining challenged dependent claims, consistent with the Court's reversal.

## VI. ARGUMENT

### E. Legal Standards

Obviousness is a legal question based on underlying factual determinations. *Belden Inc. v. Berk-Tek LLC,* 805 F.3d 1064, 1073 (Fed. Cir. 2015). This Court "review[s] the Board's compliance with the governing legal standards de novo and its underlying factual determinations for substantial evidence." *Id.* "Substantial evidence is more than a mere scintilla." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). Substantial evidence review asks "whether a reasonable fact finder could have arrived at the agency's decision" and requires examination of the "record as a whole, taking into account evidence that

both justifies and detracts from an agency's decision." *In re Gartside,* 203 F.3d 1305, 1312 (Fed. Cir. 2000).

### F. The FWDs Err In Finding No Motivation To Combine For 314 Patent Grounds 1 and 2, And 756 Patent Ground 1

The FWDs' conclusion that Axonics had not shown that a POSITA would be motivated to combine the disclosure of Young with Gerber and Lindegren (314 Patent Ground 1 and 756 Patent Ground 1), or with Gerber, Lindegren, and Hauser (314 Patent Ground 2) rests on two fundamental errors. First, the Board erred in rejecting Petitioner's proposed motivation to combine based on the asserted Grounds addressing the same problem, from the same field of pertinent art, as the 314 and 756 Patents. The FWDs' finding that the references were directed to different problems, each limited to a specific anatomical site, from different fields of art from the 314 and 756 Patents, was unsupported by substantial evidence. Second, the Board committed legal error in imposing the requirement that, to show a motivation to combine, the resultant physical combination must be operable for an unclaimed purpose—here, for trigeminal nerve stimulation. Each erroneous basis for the FWDs' conclusion that Petitioners had not shown a motivation to combine independently requires reversal of the FWDs as to these Grounds.

### 3. The FWDs Erred In Failing to Find A Motivation To Combine From The Shared Nature Of The Problem To Be Solved, In The Same Field Of Pertinent Art

The FWDs erred in rejecting Petitioner's contention that a POSITA would be motivated to combine Young, Gerber, Lindegren and Hauser to achieve the challenged claims because each of the references addressed the same problem as the 314 and 756 Patents of limiting implantable lead migration while providing adequate nerve stimulation, and are art from within the same field as the 314 and 756 Patents—implantable medical leads. Appx29-32. No substantial evidence supports the FWDs' finding that the references were directed to different problems, each limited to a specific anatomical location, and were thus outside the field of pertinent art for a POSITA.

"[E]vidence of a motivation to combine need not be found in the prior art references themselves, but rather may be found in 'the ***knowledge of one of ordinary skill in the art***, or, in some cases, ***from the nature of the problem to be solved.'"*** *Polygroup Ltd. MCO v. Willis Elec. Co.,* 780 F. App'x 880, 884 (Fed. Cir. 2019) (remanding to Board because it "failed to explain its decision to discount Polygroup's evidence concerning the knowledge and skill of a POSITA and failed to consider the nature of the problem when analyzing the sufficiency of the proposed rationales."). Here, Petitioners explained that the 314 and 756 Patents, in the specification's own words, addressed "problems associated with implanting and maintaining electrical

leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques." Appx152 at 5:48-53. *See* Appx206, Appx226, Appx290. Petitioners further explained that the references identified for each Ground addressed the same problem of implanting and maintaining electrical leads in body tissue; each was simply an instance of that general problem, as applied at a "particular body site" as the 314 and 756 Patents state. Appx201-208, (314 Patent - Young, Gerber, and Lindegren); Appx224-227 (314 Patent - Hauser); Appx282-292 (756 Patent - Young, Gerber, Lindegren, Akerstrom); Appx308-310 (756 Patent – Hauser). Petitioners further explained that, given the shared problem of medical lead implantation, "it is not surprising and actually obvious to a POSITA to look to the designs (and materials) of previously commercially-approved products for application in a new area of the body." Appx2861-2862, ¶31. For example, modifications of Young to have additional electrodes in the distal direction from the tines would have been "applications of a known technique to a piece of prior art ready for the improvement," because it simply "arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement." Appx2183, ¶94. *See KSR*, 550 U.S. at 417. Accordingly, a POSITA would have been motivated to combine these references that addressed the same problem, to achieve the claimed inventions. See

Appx206, Appx226, Appx290, Appx310. *See Dome Patent L.P. v. Lee,* 799 F.3d 1372, 1380 (Fed. Cir. 2015)(finding motivation to combine from shared problem of oxygen permeability in contact lenses).

The FWDs' far narrower conclusion that the the 314 and 756 Patents address "the need for a percutaneously implantable lead that is properly and securely positioned to ***provide sacral nerve stimulation, whereas the references do not***" (Appx31) relies principally on the following statement in the 314 and 756 Patent specification:

> [T]here remains a need in the art for ***a permanently implantable electrical sacral nerve stimulation lead*** that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient's skin to locate stimulation electrodes in casual contact with a sacral nerve, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period. Appx31, Appx99 (quoting from Appx150, 5:19-29).

The FWDs either ignore or brush aside the great weight of evidence from the 314 and 756 Patents that defines the problems they address more broadly, as limiting implantable lead migration while providing adequate nerve stimulation at a site in the body. This evidence includes the "summary of the invention" section of the 314 and 756 Patent, which unmistakably states that the patents address the broader problem articulated by Petitioners:

> The present invention recognizes and provides a solution to ***the***

> ***problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site***, through use of minimally invasive implantation techniques. Appx152 at 5:48-53.

That same section of the 314 and 756 Patents makes clear that its disclosure of leads for sacral neuromodulation is merely a ***preferred embodiment:*** **"**In a preferred embodiment, the present invention maintains one or ***more sacral nerve stimulation electrode*** in close proximity or casual contact with discrete nerve fibers of the sacral nerves by providing a unique solution that allows minimally invasive, percutaneous, implantation near to, but avoiding compressive contact with, the sacral nerves and fixation of the lead body in subcutaneous tissues." Appx152 at 5:53-59. Elsewhere, the FWDs ***credit*** this broad statement of the problems addressed by the 314 and 756 Patents, reciting that "[t]he invention of the '314 patent "provides a solution to the ***problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site***, through use of minimally invasive implantation techniques." Appx4. *See also* Appx64 (same description of the problem solved by the 756 Patent). The FWDs never explain the basis for their differing descriptions of the problem addressed by the Patents, or why a narrower problem definition was selected when they rejected Petitioner's motivation to combine. This Court "do[es] not regard such internally inconsistent findings as supported by

substantial evidence." *Polygroup Ltd. MCO v. Willis Elec. Co.,* 780 F. App'x 880, 884 (Fed. Cir. 2019)

In keeping with this broad scope of the problem, not one of the 314 or 756 Patent Claims limits the claimed "implantable medical lead," or its implantation, to a particular site in the body or particular set of nerves, and the specification explicitly recites uses for its disclosed lead ***outside*** of sacral neuromodulation, including for use as "an intramuscular lead where the tines can engage against muscle and assist in preventing dislodgement of the distal electrode(s)," such as in the stomach or in connection with the anal sphincter muscle. Appx156 at 13:32-39.

Moreover, the 314 and 756 Patent's "Description of Related Art" (Appx150 at 1:45) discusses implantable medical lead implementations not only in connection with sacral nerves (Appx150-151 at 1:46-4:24), but also in connection with many other types of body tissue, disclosing that the "prior art discloses a number of configurations of implantable medical electrical leads ***other than neurostimulation leads*** that employ fixation mechanisms to maintain a stimulation electrode in relation to a body organ or tissue." Appx151 at 4:24-28. The patents' description of such pertinent art includes implantable cardiac pacing leads (Appx151-152 at 4:29-5:8), implantable sensing leads for cardiac monitors (Appx152 at 5:9-34), and "certain spinal cord stimulation leads" which "have been proposed employing tines and/or vanes as stand-offs to urge the stimulation electrode in the epidural space

toward the spinal cord . . . and to stabilize the stimulation electrode in the epidural space." Appx151 at 4:43-48.

The overwhelming weight of this evidence demonstrates that the Board erred in limiting the problem addressed by the 314 and 756 Patents to sacral neuromodulation. Had the Board adopted the broader formulation supported by the evidence, the inevitable conclusion which follows is that each of the proposed Grounds addressed the same problem as the 314 and 756 Patents, differing only on the site of the body being addressed. As such, given the shared problem, a POSITA would "look to the designs (and materials) of previously commercially-approved products for application in a new area of the body." Appx2861-2862, ¶31. *Dome Patent L.P. v. Lee,* 799 F.3d 1372, 1380 (Fed. Cir. 2015).

The FWDs also fail to credit Petitioners' showing that the asserted references are all from within the same field of pertinent art as the 314 and 756 Patents—the field of implantable medical leads. "A claimed invention is unpatentable if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the ***pertinent art***." *Tokai Corp. v. Easton Enters., Inc.,* 632 F.3d 1358, 1366 (Fed. Cir. 2011) (citing 35 U.S.C. § 103(a)). This error arises from the FWDs' adoption of an insupportably narrow definition of the "pertinent art" for the 314 and 756 Patents as "medical leads ***specifically for sacral neuromodulation,***"

rather than such implantable medical devices generally and without regard to their intended stimulation site. *See* Appx13 (314 Patent), Appx73-74 (756 Patent)).

The FWDs' limitation of the field of pertinent art to leads for sacral neuromodulation is unsupported by substantial evidence, for the reasons described above, including: 1) the 314 and 756 Patents' own "Description of ***Related Art***", which discusses implantable medical lead implementations not only in connection with sacral nerves (Appx150-151 at 1:46-4:23), but also in connection with many other types of body tissue, including the heart and the spine; 2) the broad scope of the 314 and 756 Patent claims, which do not reference sacral neuromodulation at all; 3) the specification's clear statement that it concerns "the problems associated with implanting and maintaining electrical leads in body tissue" Appx152 at 5:49-50; and 4) the specification's disclosure of intended uses for its disclosed invention outside of sacral neuromodulation, such as the stomach or the anus.

The FWDs point out that "the Specification describes the invention with respect to the sacral anatomy," observing that the drawings depict sacral nerve stimulation leads (Appx13, Appx74), but as discussed, the 314 and 756 Patents describe those as "preferred embodiments," and are careful to recite other proposed uses for the disclosed leads. The FWDs concede "the claims' lack of a recitation of sacral anatomy or sacral neuromodulation," but suggest that fact "does not override the Specification's express description of the field of the invention because the

claims' purpose is not to describe the subject matter of the patent but rather to define the boundary of the patent monopoly." Appx 13-14, Appx74. That distinction between the claims and the specification is irrelevant: the Board here incorrectly conflates the "subject matter of the patent" with the art that is pertinent to that subject matter, which the specification indisputably identifies is broader than sacral neuromodulation. In any event, that same disclosure of the "subject matter of the patent" unmistakably describes it in far broader terms than medical leads for sacral neuromodulation, as discussed above.

The Board's error here is far from harmless. As the FWDs state, "[t]he level of ordinary skill in the art is 'a prism or lens' through which we view the prior art and the claimed invention." Appx12, Appx73. By adopting an improperly narrow scope of the pertinent art, the Board necessarily used a distorted lens to view the prior art and Petitioner's contentions about it. Where, as here, the sole basis for the FWDs' denial of unpatentability was a purported failure to demonstrate a sufficient motivation to combine the references, the Board's error necessarily affects its conclusion, since that inquiry asks whether a person of ordinary skill in the ***pertinent art*** would have been motivated to combine the references. *See In re Dembiczak,* 175 F.3d 994, 999 (Fed. Cir. 1999) ("[E]vidence of a suggestion, teaching, or motivation to combine may flow from the prior art references themselves, the knowledge of one of ordinary skill in the art, or, in some cases, from the nature of the problem to be

solved, although 'the suggestion more often comes from the teachings of the ***pertinent*** references.'")(internal citations omitted).

The Board's erroneous narrowing of the field of pertinent art forms an unmistakable part of its erroneous conclusion that no motivation to combine can be found from the shared nature of the problem addressed by the asserted Grounds and the 314 and 756 Patents. Had the Board viewed the references through the lens of a person of ordinary skill in the pertinent art, properly defined as medical leads for implantation in body tissue, its POSITA would have regarded these references as all addressing different examples of the same problem disclosed in the 314 and 756 Patents—"implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site" (Appx152 at 5:48-53). *See Dome Patent L.P. v. Lee,* 799 F.3d 1372, 1380 (Fed. Cir. 2015)(finding motivation to combine from shared problem of oxygen permeability in contact lenses).

Even if the artificially narrow fields of pertinent art adopted by the Board were supported by substantial evidence—which they are not—the Board further erred when it arbitrarily rejected the premise that a POSITA focused on sacral neuromodulation would look to the teachings of art in *analogous* fields for neurostimulation at other sites in the body, as Petitioners contended. Appx206, Appx289. *Donner Tech., LLC v. Pro Stage Gear,* LLC, 979 F.3d 1353, 1359 (Fed.

Cir. 2020)("***The scope of the prior <u>art includes all analogous art</u>.*** Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether ***the reference still is reasonably pertinent to the particular problem with which the inventor is involved.***")(internal citations omitted). The FWD erred by never addressing this contention in concluding that no motivation to combine existed, and no substantial evidence would have supported rejecting that contention if the Board had not simply failed to address it at all. *See Donner Tech.,* 979 F.3d at 1358 (remanding to Board where FWD failed to consider Petitioner's contention that references were analogous art, stating that while the "Board is not required to discuss every piece of evidence," it cannot "disregard [evidence] without explanation" or "short-cut its consideration of the factual record before it"). Had the Board not failed to address that the art is in any case analogous to the narrow field the Board adopted, it would have appreciated that a POSITA working in that narrow field of sacral neuromodulation would have looked to the teachings of analogous references even if those references addressed different nerve sites, and would have been motivated to do so to improve lead anchoring techniques for sacral neuromodulation.

Accordingly, the FWDs erred in their failure to credit Petitioner's showing that a POSITA would be motivated to combine Young, Gerber, Lindegren and

Hauser to achieve the challenged claims because each of the references addressed the same problem of limiting implantable lead migration while providing adequate nerve stimulation, and within the same field of pertinent art as the 314 and 756 Patents, and were at least analogous art. The Board's conclusion as to Grounds 1 and 2 of the 314 Patent, and Ground 1 of the 756 Patent, should be reversed, and remanded with instructions to proceed in a manner consistent with that ruling.

#### 4. The Board Committed Legal Error In Requiring The Physical Combination Of The References To Be Operable For The Unclaimed Purpose of Trigeminal Nerve Stimulation

The Board committed legal error in disregarding Young's unmistakable suggestion to modify its tined lead to add the multiple electrodes of Gerber to achieve the claimed invention of the 314 and 756 Patents, on the basis that (so the Board believed) the resulting physical combination of the two references would no longer be capable of operating as intended for trigeminal stimulation. Appx34-35, Appx100-103. No authority supports categorically rejecting any motivation to combine where the physical combination of two embodiments would render that combination unsuitable for a purpose or function not found in the claims. Likewise, no authority supports categorically rejecting motivation to combine merely because the combination would require more than the rote assembly of two perfectly fitting puzzle pieces, but instead would require only the ordinary creativity and understanding of a skilled artisan. The binding authority is to the contrary. *See, e.g.,*

*ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016) ("The rationale of *KSR* does not support [the] theory that a person of ordinary skill can only perform combinations of a puzzle element A with a perfectly fitting puzzle element B."). But the Board committed both legal errors, in the process drawing conclusions that are nakedly contradicted by the erroneously narrow definition of the field of pertinent art that the Board relied upon to support them.

The sole basis for the Board's rejection of the sufficiency of Young's express suggestion to combine was its reliance on Patent Owner's argument that "Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would not have suggested to a POSITA (which the Board had previously concluded was a POSITA in sacral neuromodulation) to modify Young's lead to include a plurality of electrodes distal to all of the tines because such an arrangement ***would not be feasible in the trigeminal nerve region."*** Appx32-35, Appx100-103. Specifically, Medtronic contended (and the Board credited) that if a POSITA were to perfunctorily and unthinkingly tack Gerber's electrodes onto the distal end of Young's lead, the resulting distal stimulation portion would be long enough to move Young's tines out of the cistern area of the trigeminal nerve into an area of "hard tissue" where they could not anchor. Appx33, Appx35; Appx101, Appx103. The Board accordingly found no motivation to combine, but that is not the law, and not what Petitioners contended in any event.

"'The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference,' but rather whether 'a ***skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention***.'"*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC,* 825 F.3d 1373, 1381 (Fed. Cir. 2016)(internal citations omitted). *See also Polygroup Ltd. MCO v. Willis Elec. Co.,* 780 F. App'x 880, 884 (Fed. Cir. 2019)(confirming that "prior art inventions need not be physically combinable to render a claim obvious."). In *Allied Erecting,* the patent owner contended that the Board erred in finding a motivation to combine the asserted references, because the combination would require "a massive, nonobvious reconstruction of the device" disclosed in the primary reference "that ***not only changes its principle of operation, but renders the device inoperable as a result***." *Allied Erecting,* 825 F.3d at 1380. Such evidence is irrelevant, the Court confirmed, because "[a] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine," and the evidence showed a POSITA would have been motivated to modify the primary reference to provide the benefits of the wider range of motion disclosed in the secondary reference, even if it "may impede the quick change functionality" which was the central purpose of the primary reference. *Id.* at 1377, 1381.

Similarly, in *In re Urbanski,* 809 F.3d 1237 (Fed. Cir. 2016), the Court rejected Patent Owner's contention that a POSITA would not be motivated to combine the asserted references because the combination "would have rendered the modified process inoperable for [the primary reference's] intended purpose." "As the Board properly found, one of ordinary skill would have been motivated to pursue the desirable properties taught by [the secondary reference], even if that meant foregoing the benefit taught by [the primary reference]." *Id.* at 1243-1244. In summary, the Board erred here because it did not apply the proper test for obviousness, which asks whether a "skilled artisan would have been motivated to combine the teachings of the prior art references ***to achieve the claimed invention***"—not, *e.g.,* whether the physical combination would still operate to accomplish some purpose not found in the claims, such as quick change functionality in *Allied Erecting,* or trigeminal stimulation here. *Allied Erecting,* 825 F.3d at 1381.

Under the proper test, which asks whether a POSITA would have been motivated by Young's suggestion to combine the ***teachings*** of the prior art references to achieve the claimed invention, the POSITA is not assumed to mindlessly graft two references together, as the premise of the FWDs would suggest. Instead, "'[a] person of ordinary skill is also a person of ordinary creativity, not an automaton,' so the fact that it would take some creativity to carry out the combination does not defeat a finding of obviousness." *Facebook, Inc. v. Windy City*

*Innovations, LLC*, 973 F.3d 1321, 1343 (Fed. Cir. 2020)(quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007)). *See also ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1219 (Fed. Cir. 2016) ("The rationale of *KSR* does not support [the] theory that a person of ordinary skill can only perform combinations of a puzzle element A with a perfectly fitting puzzle element B.").

That is exactly what Petitioners demonstrated. Young unmistakably discloses a suggestion to combine its lead with the multiple electrodes disclosed by Gerber: it states that its single-electrode lead "could be improved to provide multiple active stimulation sites near the tip" of the lead, as Gerber discloses and the 314 and 756 Patent claims recite, because it "***would permit greater flexibility in activation of a wider area***" of the stimulation site. Appx2410. Petitioners explained how Young's suggestion would have motivated a POSITA "to look for multiple electrodes that provide greater flexibility for electrode placement," which would lead them to Gerber's complementary disclosure of "multiple electrodes [on/for] implanted leads for sacral nerve stimulation." Appx207, Appx290. *See also* Appx2180-2181, ¶90 (Young's suggestion would motivate a POSITA to look for disclosures of multiple electrodes, "such as Gerber which discloses multiple electrodes at the distal end of the leads for sacral nerve stimulation."). Since a POSITA is deemed to know the prior art, the POSITA would also know that "it had been a common practice to add

electrodes at the distal tip of the lead for percutaneous implantations before 2001, because it is easier to place the distal tip of the lead to the desired neural target than for example, a place in the middle of the lead to be adjacent to a neural target." Appx2180-2181, ¶90. Moreover, a POSITA would understand Young's suggestion to be "applicable to other nerves than trigeminal, since it had been a common practice and understanding that greater the number of electrodes or electrode regions lead[s] to greater flexibility in placement and in activation of a wider area for stimulation." Appx2174-2175, ¶79.

Accordingly, Young's suggestion would motivate a POSITA to exercise their ordinary creativity to adapt Gerber's multiple electrodes for sacral neuromodulation to operate with Young's lead to achieve the claimed inventions of the 314 and 756 Patents, "even if that meant foregoing the benefit" taught by Young of trigeminal stimulation. *See In re Urbanski,* 809 F.3d at 1243-44. In view of a POSITA's understanding that Young's suggestion would be "applicable to other nerves than trigeminal," Appx2174-2175, ¶79, and Gerber's complementary disclosure that its multiple electrodes are effective for sacral nerve stimulation, the POSITA would have been "motivated to pursue the desirable properties" of these suggestions beyond functionality for trigeminal stimulation. Appx2180-2181, ¶90.[5] *See*

---

[5] Moreover, the FWDs' conclusion is based solely on purported failures of Young's disclosure to motivate a combination, which was not Petitioner's argument. *See, e.g.,*

Appx206-208, Appx289-292 (Petitions); Appx1305 (Hearing Transcript). *See In re Urbanski,* 809 F.3d at 1243-44.

The FWDs rely on *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.,* 821 F.3d 1359, 1367 (Fed. Cir. 2016), to contend that Axonics' position that the continued operability of Young for trigeminal stimulation is irrelevant "conflates the obviousness requirements of motivation to combine and reasonable expectation of success, which are distinct inquiries." Appx34, Appx102. That is because, according the FWDs, "[a]lthough an unclaimed purpose is irrelevant to reasonable expectation of success, it may be pertinent to motivation to combine." *Id.*

The FWDs both misread *Intelligent Bio-Sys* and misapply it to the facts here. While *Intelligent Bio-Sys* explained that reasonable expectation of success and motivation to combine are "two different legal concepts," 821 F.3d at 1367, it did

---

Appx32 ("Petitioner's reasoning is premised on Young"); Appx35 ("Petitioner has not persuaded us that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would have suggested to a POSITA to modify Young's lead . . ."). As discussed above, Petitioner actually contended that Young's suggestion would have motivated a POSITA "to look for multiple electrodes that provide greater flexibility for electrode placement," which would lead them to Gerber's complementary disclosure of "multiple electrodes [on/for] implanted leads for sacral nerve stimulation." Appx207, Appx290. The FWDs' failure to address the contention Petitioner actually made, which is based on the teachings of both references, is a separate error that independently requires reversal and remand. *See, e.g., PersonalWeb Techs., LLC v. Apple, Inc.,* 848 F.3d 987, 993 (Fed. Cir. 2017)(remanding FWD where Board did not address reference actually relied upon by Petitioner).

***not*** hold that a proposed motivation to combine must be a motivation to achieve something more than what is recited in the claimed invention (*i.e.,* to also continue to "operate" as intended for Young's purpose of trigeminal stimulation). *See, e.g. Allied Erecting,* 825 F.3d at 1381 (test for obviousness asks *"*whether 'a skilled artisan would have been ***motivated to combine*** the teachings of the prior art reference***s to achieve the claimed invention***.'"). Instead, the Court in *Intelligent Bio-Sys* upheld the Board's determination of nonobviousness where "the petitioner's *sole* argument for why one of skill in the art would be motivated to combine" the asserted references was the principal reference's disclosure of a "quantitative deblocking requirement" (not recited in the challenged claims), which Petitioner contended would have motivated a POSITA to look to the secondary reference's disclosure of a chemical group that was recited in the challenged claims. 821 F.3d at 1368 (stating that "the petitioner's *sole* argument for why one of skill in the art would be motivated to combine Zavgorodny's azidomethyl group with Tsien's SBS method was because it would meet Tsien's quantitative deblocking requirement"). Petitioner's problem was that other prior art of record made clear that the chemical group proposed by the secondary reference was unsuitable for the "quantitative deblocking" disclosed in the principle reference, because it was less efficient than the near-100% efficiency required for "quantitative deblocking". *Id.* at 1364-1365. That unsuitability was the basis for the Board's finding of nonobviousness. *Id.* at 1365.

Petitioner protested that, because the challenged claims do not require quantitative deblocking, "the Board erred by imposing such a requirement through the reasonable expectation of success analysis." *Id.* at 1367. This Court explained that, "[t]o the extent the Board's decision is based on the 'reasonable expectation of success' requirement," it agreed, since that issue "refers to the likelihood of success in combining references to meet the limitations of the claimed invention," and an unclaimed element has no relevance to that question. *Id.* Instead, the Court explained, the Petition was a classic example of failure to show a motivation to combine: the principal reference's disclosure of a quantitative deblocking requirement would not have motivated a POSITA to look to the secondary reference's disclosure of a chemical group recited in the claims, because the POSITA would know that chemical group would not have accomplished quantitative deblocking. *Id.* at 1368-1369.

That decision and its operative facts have nothing to do with Young's suggestion that its single-electrode lead "could be improved to provide multiple active stimulation sites near the tip" of the lead (Appx2410), and whether it would have led a POSITA to a combination with Gerber's multiple electrodes. Unlike *Intelligent Bio-Sys*, where the matter disclosed in the secondary reference would not have been able to accomplish the suggestion in the principal reference, and would therefore not have led a POSITA to combine them, here, there can be no meaningful

dispute that Gerber's disclosure of multiple electrodes at the distal end was a configuration directly suggested by Young's statement that its lead "could be improved to provide multiple active stimulation sites near the tip" of the lead, to "***permit greater flexibility in activation of a wider area***" of the stimulation site.[6] Appx2410. Nor did *Intelligent Bio-Sys* concern complementary disclosures in the primary and secondary references which, as Petitioners contend here, would have motivated a POSITA to exercise their ordinary creativity to adapt Gerber's multiple electrodes for sacral neuromodulation to operate with Young's lead to achieve the claimed inventions of the 314 and 756 Patents, "even if that meant foregoing the benefit" taught by Young of trigeminal stimulation. *See In re Urbanski,* 809 F.3d at 1243-44.

None of the other authority relied upon by the FWDs would require that Young's lead, perfunctorily grafted with Gerber's electrodes, continue to operate as

[6] For the same reason, no substantial evidence supports the FWDs' further conclusion that, because Young suggests providing "multiple active sites *near* the tip, not at the tip or distal to the tines," this would not have "suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines." Appx35, Appx103. First, ***Young's*** single electrode is distal to all of the tines, which would lead a POSITA to consider that same location for multiple electrodes. Second, "distal to the tines" is what Young suggests by suggesting multiple active sites "near the tip" – the ***end*** of the lead. Third, as Petitioners explained, it had been a common practice to add electrodes at the distal tip of the lead for percutaneous implantations before 2001, because it is easier to place the distal tip of the lead to the desired neural target than for example, a place in the middle of the lead to be adjacent to a neural target." Appx2180-2181, ¶90.

intended for trigeminal stimulation in order to motivate a POSITA to combine them. In *In Re Gordon,* the basis of the Court's finding of nonobviousness was that (unlike Young) the prior art apparatus provided no express suggestion that it could be modified, nor would it be obvious absent such an express suggestion to attempt the modification (turning the apparatus upside down), since it would no longer operate. *In Re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984). In that circumstance, the court found no motivation to combine, since the "mere fact that the prior art could be so modified would not have made the modification obvious ***unless the prior art suggested the desirability of the modification***." Here, Young expressly suggests the desirability of adding multiple active stimulation sites near the tip of the lead. In *Trivascular, Inc. v. Samuels*, relied upon by the FWDs, this Court found that the primary reference ***taught away*** from the proposed combination, since the tissue-penetrating barbs that would be replaced with non-penetrating protrusions were "the primary objective of the reference." *Trivascular, Inc. v. Samuels,* 812 F.3d 1056, 1069 (Fed. Cir. 2016). As such, the Court's affirmation that there was no motivation to combine these references under those facts has no bearing on this case, where Young explicitly suggests that its primary objective of a lead that provides therapeutic stimulation "could be improved to provide multiple active stimulation sites near the tip." Appx2410. The proposed combination does not destroy the "basic objective" of Young; it seeks to improve it, based on Young's express

suggestion to do so. Moreover, the proposed combination in *Trivascular* would not have achieved the challenged claim in any event, because the claim required "inflatable protrusion(s)," and Petitioner proposed to replace the principal reference's inflatable barbs with hollow, ***non-inflatable*** protuberances. 812 F.3d. at 1068-69.

When the Board's erroneous limitation of the POSITA's field of pertinent art to medical leads ***for sacral neuromodulation*** is corrected, the conclusion that Young's suggestion to modify its lead would have motivated a POSITA to look to Gerber's disclosure of multiple electrodes and adapt it for use with Young's lead is ummistakable and inevitable. As Petitioners explained, a person of ordinary skill in the pertinent art, properly defined as medical leads for implantation in body tissue, would have regarded Young and Gerber as different examples of the same problem disclosed in the 314 and 756 Patents—"implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site" (Appx152 at 5:48-53)—and would "look to the designs (and materials) of previously commercially-approved products for application in a new area of the body." Appx2861-2862, ¶31.

However, even under the FWDs' narrow definition of the pertinent field of art as leads for sacral neuromodulation, the Board commited legal error when it imposed a requirement of trigeminal operability on the motivation of a POSITA in ***sacral***

***neuromodulation***. By definition, a sacral neuromodulation POSITA would be unconcerned with the continued operability of Young's lead for trigeminal stimulation. Instead, that POSITA would look to Young to find what is useful for sacral neuromodulation, and be motivated to adapt Gerber's multiple electrodes for sacral neuromodulation for use with Young's tined lead. The Board made no finding that its POSITA in sacral neuromodulation would be deterred by any understanding of the nuances of trigeminal anatomy, let alone that they had any such understanding. Accordingly, the FWDs' conclusion that their (erroneously defined) POSITA would find no motivation to combine because a modified Young lead would not operate as intended in the trigeminal area was unsupported by substantial evidence. The FWDs' conclusion in this regard requires reversal. *Polygroup Ltd. MCO v. Willis Elec. Co.,* 780 F. App'x 880, 884 (Fed. Cir. 2019) (Court "do[es] not regard such internally inconsistent findings as supported by substantial evidence.").[7]

[7] Even accepting for the sake of argument the Board's legally wrong proposition that Young's intended purpose of trigeminal stimulation would be relevant to whether its POSITA in sacral neuromodulation would be motivated to combine these references, there is still no substantial evidence to support the FWDs' conclusion that its POSITA would not be motivated to combine Young with Gerber, for effectively the same reason. By definition, that POSITA would not be aware of the considerations advanced by Medtronic and its expert concerning the considerations of trigeminal anatomy (*see, e.g.,* Appx4530-4533, ¶¶62-64) which the Board credited and concluded meant that the combination would not work for trigeminal stimulation.

Because the FWDs' erroneous standard for demonstrating a motivation to combine was the sole basis for rejecting Petitioner's motivation to combine based on the express teachings of the references, the FWDs' conclusion as to Grounds 1 and 2 of the 314 Patent, and Ground 1 of the 756 Patent, should be reversed, the independent claims found unpatentable, and the matter remanded to the Board for further proceedings consistent with that ruling.

## VII. CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the Court should reverse the Patent Trial and Appeal Board's determination that Claims 1, 2, 4, 7, 10-12, 14 and 18-24 of U.S. Patent No. 8,626.314 B2 are unpatentable under 35 U.S.C. § 103 on Grounds 1 and 2, and Claims 1, 2, 5, 7, 13-15 and 18 of U.S. Patent No. 8,036,756 B2 are unpatentable on Ground 1 under 35 U.S.C. § 103.

Dated: May 20, 2022

Respectfully submitted,

*<u>/s/ Matthew D. Powers</u>*

Matthew D. Powers
William P. Nelson
Gina Cremona
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, California 94065
Telephone: (650) 802-6000
Facsimile: (650) 802-6001

Azra Hadzimehmedovic
Aaron M. Nathan

Samantha Jameson
TENSEGRITY LAW GROUP, LLP
8260 Greensboro Drive, Suite 260
McLean, VA 22102
Telephone: (703) 940-5032
Facsimile: (650) 802-6001

*Counsel for Appellant Axonics, Inc.*

## ADDENDUM TABLE OF CONTENTS

| ITEM # | APPX NO: | PAPER/ EXHIBIT | DATE FILED: | DESCRIPTION: |
|---|---|---|---|---|
| 1 | Appx1-60 | Paper 064 | 9/13/21 | PUBLIC: JUDGMENT Final Written Decision Regarding IPR2020-00679 Determining No Challenged Claims Unpatentable *35 U.S.C. § 318(a)* |
| 2 | Appx61-127 | Paper 065 | 9/13/21 | PUBLIC: JUDGMENT Final Written Decision Regarding IPR2020-00715 Determining No Challenged Claims Unpatentable 35 U.S.C. § 318(a) |
| 3 | Appx136-138 | Paper 073 Paper 074 | 12/6/21 | PUBLIC: Order Denying Request for Director Review |
| 4 | Appx463-521 | Paper 008 | 9/15/20 | PUBLIC: DECISION Granting Institution of *Inter Partes* Review 2020-00679, 35 U.S.C. § 314; 37 C.F.R. § 42.4 |
| 5 | Appx537-592 | Paper 010 | 9/15/20 | PUBLIC: DECISION Granting Institution of Inter Partes Review 2020-00715, 35 U.S.C. § 314; 37 C.F.R. § 42.4 |
| 6 | Appx139-157 | Ex1001 | 3/16/20 | PUBLIC: U.S. Patent No. 8,626,314 |
| 7 | Appx158-175 | Ex1001 | 3/16/20 | PUBLIC: U.S. Patent No. 8,036,756 |

Trials@uspto.gov
571.272.7822

Paper: 64
Date: September 13, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AXONICS, INC.,
Petitioner,

v.

MEDTRONIC, INC.,
Patent Owner.

IPR2020-00679
Patent 8,626,314 B2

Before JAMES A. TARTAL, ERIC C. JESCHKE, and
ALYSSA A. FINAMORE, *Administrative Patent Judges.*

FINAMORE, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

Petitioner, Axonics, Inc.,[1] filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1, 2, 4, 7, 10–12, 14, and 18–24 of U.S. Patent No. 8,626,314 B2 ("the '314 patent") (Ex. 1001). Pet. 1. On September 15, 2020, we granted institution of an *inter partes* review. Paper 8.

During the trial, Patent Owner, Medtronic, Inc., filed a Response (Paper 28, "PO Resp."). Petitioner filed a Reply (Paper 47, "Reply"), and Patent Owner filed a Sur-reply (Paper 55, "Sur-reply"). Oral argument took place on June 17, 2021, and we have entered the transcript (Paper 63, "Tr.").

This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we conclude Petitioner has not proven by a preponderance of the evidence that claims 1, 2, 4, 7, 10–12, 14, and 18–24 are unpatentable.

# II. BACKGROUND

## *A. Real Parties in Interest*

Petitioner asserts that it is the real party in interest. Pet. 67; *see also* Paper 51 (notifying the Board of the name change from Axonics Modulation Technologies, Inc. to Axonics, Inc.). Patent Owner maintains that it is the real party in interest. Paper 4, 1. Patent Owner further maintains that "Medtronic plc is the ultimate parent of Medtronic, Inc." (*id.*), and that

[1] During the trial, the name of Petitioner when the Petition was filed, Axonics Modulation Technologies, Inc., was changed to Axonics, Inc. *See* Paper 51.

"Medtronic, Inc. has granted certain rights with respect to the patent-at-issue to Medtronic Puerto Rico Operations Co., which in-turn has granted certain rights to Medtronic Logistics, LLC, which in-turn has granted certain rights to Medtronic USA, Inc." (*id.* at 1 n.1).

*B. Related Matters*

The parties identify *Medtronic, Inc. v. Axonics Modulation Technologies, Inc.*, No. 8:19-cv-02115 (C.D. Cal. filed Nov. 4, 2011) and *Axonics Modulation Technologies, Inc. v. Medtronic, Inc.*, IPR2020-00715 (PTAB filed Mar. 16, 2020) (challenging U.S. Patent No. 8,036,756 B2) as related matters. Pet. 67–68; Paper 4, 2.

*C. The '314 Patent*

The invention "relates generally to a method and apparatus that allows for stimulation of body tissue, particularly sacral nerves." Ex. 1001, 1:34–36. More specifically, the invention "relates to an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead." *Id.* at 1:36–41.

Leads typically have a number of ring-shaped stimulation electrodes spaced along a distal segment of the lead body, which is adapted to be passed into the foramen along a selected sacral nerve. *Id.* at 2:47–51. Each distal stimulation electrode is coupled to a lead conductor extending proximally through the lead body. *Id.* at 2:52–54. The proximal end of each lead conductor is coupled to a connector that is adapted to be coupled with an implantable pulse generator (IPG). *Id.* at 2:54–59.

The ’314 patent describes that “[a] problem associated with implantation of permanent and temporary neurostimulation leads involves maintaining the discrete ring-shaped electrode(s) in casual contact . . . or in close proximity to the sacral nerve to provide adequate stimulation of the sacral nerve, while allowing for some axial movement of the lead body.” *Id.* at 3:22–28. According to the ’314 patent, “physicians spend a great deal of time with the patient under general anesthetic placing the leads due to the necessity of making an incision exposing the foramen and due to the difficulty in optimally positioning the small size stimulation electrodes relative to the sacral nerve.” *Id.* at 3:29–33.

The invention of the ’314 patent “provides a solution to the problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques.” *Id.* at 5:48–53. A sacral nerve stimulation lead of the invention is shown in Figure 1, reproduced below.




Figure 1 is a plan view showing implantable medical lead 10 for sacral nerve stimulation. *Id.* at 8:51–52, 9:25–26. Implantable medical lead 10 includes lead body 15 with electrode array 20 that extends proximally from lead distal end 45 and comprises P stimulation electrodes. *Id.* at 6:26–30, 9:25–30. As shown in Figure 1, electrode array 20 includes stimulation electrodes 25, 30, 35, 40 such that P=4. *Id.* at 9:25–30. Each stimulation electrode 25, 30, 35, 40 is electrically coupled to the distal end of a coiled wire lead conductor extending proximally through distal portion 50 and proximal portion 55 of lead body 15. *Id.* at 9:41–45. The proximal end of each lead conductor is coupled to one of P connector elements 65, 70, 75, 80 in proximal connector element array 60 along proximal portion 55 adjacent proximal end 85. *Id.* at 6:33–37, 9:45–49. Connector elements 65, 70, 75, 80 are adapted to be coupled with a neurostimulator IPG. *Id.* at 9:62–65.

To inhibit axial movement of lead body 15 and dislodgement of stimulation electrodes 25, 30, 35, 40, a fixation mechanism adapted to engage subcutaneous tissue is formed on lead body 15 proximal to electrode array 20 in distal portion 50. *Id.* at 5:65–6:5, 10:12–16. The fixation mechanism comprises M tine elements in tine element array 120. *Id.* at 6:5–8, 10:16–19. As shown in Figure 1, tine element array 120 includes tine elements 125, 130, 135, 140 such that M=4. *Id.* at 10:16–19.

A tine element is shown in Figure 3, reproduced below.

FIG. 3




Figure 3 is an expanded perspective view showing one of tine elements 125, 130, 135, 140. *Id.* at 8:59–60. Each tine element comprises N flexible, pliant tines. *Id.* at 6:8–9, 10:26–27. As shown in Figure 3, the tine element includes tines 145, 150, 155, 160 such that N=4. *Id.* at 10:26–29. Each tine extends through a tine length from attached tine end 165 to free tine end 170. *Id.* at 10:29–32. Attached tine end 165 is attached to lead body 15 at a tine attachment site so that the tine extends outwardly of lead body 15 and proximally toward lead proximal end 85. *Id.* at 10:32–35. The tines are adapted to be folded inward against lead body 15 when fitted into and constrained by the lumen of an introducer, and the folded tines do not overlap one another. *Id.* at 6:15–19, 10:35–41.

The steps of implanting lead 10 are illustrated in Figures 6 and 7, reproduced below.

FIG. 6




FIG. 7




Figures 6 and 7 are cross-section views of the sacrum schematically illustrating the steps of implanting lead 10. *Id.* at 9:1–9. Introducer 200 can

be advanced into position over a guide wire previously percutaneously advanced into the foramen from a skin incision. *Id.* at 11:46–48. Lead 10 is advanced through the introducer lumen proximal end opening into the introducer lumen. *Id.* at 11:58–61. Electrode array 20 and tine element array 120 are disposed within the pre-positioned introducer lumen for implantation in relation to the sacral nerve accessed through the foramen and in the subcutaneous tissue, respectively. *Id.* at 11:61–65. As shown in Figure 6, lead 10 is advanced distally out of the introducer lumen distal end opening to advance electrode array 20 into or through the foramen from the posterior entrance into casual contact with the more anterior sacral nerve. *Id.* at 11:66–12:6. After electrical testing to establish optimal positioning, introducer 200 is retracted proximally, and distal-to-proximal tine elements 125, 130, 135, 140 are successively released from the introducer lumen, as shown in Figure 7. *Id.* at 12:6–11. Once introducer 200 is completely removed, proximal portion 55 of lead body 15 is bent laterally and implanted through a subcutaneously tunneled path to the neurostimulator IPG. *Id.* at 12:20–25.

### *D. Challenged Claims*

Petitioner challenges claims 1, 2, 4, 7, 10–12, 14, and 18–24 of the ’314 patent. Pet. 1, 16. Claims 1, 11, and 18 are independent. Ex. 1001, 13:51–14:11, 14:54–15:20, 15:55–16:31. Independent claim 1 is illustrative and reproduced below, adding Petitioner’s labels for the limitations.

> 1. [1.0] A system comprising:
> [1.a] an implantable medical lead comprising:
>> [1.b] a lead body extending between a proximal end and a distal end;
>> [1.c] a plurality of conductors within the lead body;

> [1.d] a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and
>
> [1.e] a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, [1.f] each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, [1.g] wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by a lumen of an introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn to release the plurality of tines, [1.h] wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes.

*Id.* at 13:51–14:11.

Like independent claim 1, independent claim 11 recites a system comprising an implantable medical lead having a lead body, a plurality of conductors, a plurality of electrodes, and a plurality of tine elements. *Id.* at 14:54–15:20. Independent claim 11 additionally recites that the system comprises an implantable pulse generator, and that the implantable medical lead is configured to be introduced through and released into body tissue via an introducer defining an introducer lumen. *Id.* Independent claim 18 recites a method with similar limitations to those of independent system claims 1 and 11. *Id.* at 15:55–16:31.

Claims 2, 4, 7, 10, and 22 depend from independent claim 1. *Id.* at 14:12–16, 14:20–25, 14:37–38, 14:52–53, 16:49–51. Claims 12, 14 and 23 depend from independent claim 11 (*id.* at 15:21–24, 15:28–33, 16:52–54), and claims 19–21 and 24 depend from independent claim 18 (*id.* at 16:32–48, 16:56–59).

*E. Asserted Grounds of Unpatentability and Evidence*

Petitioner asserts that claims 1, 2, 4, 7, 10–12, 14, and 18–24 are unpatentable on the following three grounds:

| **Claims Challenged** | **35 U.S.C. §[2]** | **References** |
|---|---|---|
| 1, 2, 4, 7, 10–12, 14, 18–24 | 103(a) | Young[3], Gerber[4], Lindegren[5] |
| 18, 20, 21 | 103(a) | Young, Gerber, Lindegren, Hauser[6] |
| 1, 2, 4, 7, 10–12, 14, 18–24 | 103(a) | Gerber, Hauser, Akerström[7] |

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended certain sections of this statute, including §§ 102 and 103, and the effective date of the relevant amendment is March 16, 2013. The '314 patent was filed on July 14, 2011 (Ex. 1001, code (22)), and there is no dispute that the challenged claims of the '314 patent have an effective filing date before March 16, 2013. Accordingly, we apply the pre-AIA version of the statute.

[3] Ronald F. Young, *Electrical Stimulation of the Trigeminal Nerve Root for the Treatment of Chronic Facial Pain*, Journal of Neurosurgery 83:72–78 (July 1995) ("Young") (Ex. 1010).

[4] Gerber, US 6,055,456, issued Apr. 25, 2000 ("Gerber") (Ex. 1012).

[5] Lindegren, WO 98/20933, published May 22, 1998 ("Lindegren") (Ex. 1013).

[6] Hauser et al., US 5,052,407, issued Oct. 1, 1991 ("Hauser") (Ex. 1014).

[7] Akerström, US 4,407,303, issued Oct. 4, 1983 ("Akerström") (Ex. 1015).

Pet. 16. In support of its asserted grounds of unpatentability, Petitioner relies on Declarations of Benjamin Pless (Exs. 1003, 1023). Patent Owner deposed and cross-examined Mr. Pless and submits transcripts of these depositions (Exs. 2026, 2072).

Patent Owner proffers a Declaration of Dr. Konstantin Slavin (Ex. 2029), a Declaration of Dr. Steven Siegel (Ex. 2030), and a Declaration of Charles Thomas Bombeck (Ex. 2035). Petitioner deposed and cross-examined each of Patent Owner's declarants and submits transcripts of Dr. Slavin's deposition (Ex. 1021), Dr. Siegel's deposition (Ex. 1022), and Mr. Bombeck's deposition (Ex. 1024).

Additionally, Patent Owner provides evidence of objective indicia of non-obviousness of the claimed invention. Patent Owner identifies this evidence in its briefing. PO Resp. 60–71; Sur-reply 16–30.

## III. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

Petitioner maintains a person of ordinary skill in the art ("POSITA") would have had "(1) at least a bachelor's degree in biomedical engineering, electrical engineering, mechanical engineering, or equivalent coursework, and (2) at least two years of experience researching or developing active, implantable medical devices." Pet. 12 (citing Ex. 1003 ¶ 52). Patent Owner proposes its own level of ordinary skill in the art. PO Resp. 14. According to Patent Owner, a POSITA "would have been a physician with at least two years of experience in sacral neuromodulation" or "would have been an implantable medical lead designer with at least three years of experience designing and researching leads for use in sacral neuromodulation, and

working in close collaboration with a physician having two years of experience in sacral neuromodulation." *Id.* (citing Ex. 2029 ¶¶ 21–22; Ex. 2030 ¶ 64). Patent Owner further contends "[m]ore education can substitute for practical experience and *vice versa*." *Id.* (citing Ex. 2029 ¶ 21; Ex. 2030 ¶ 64).

Patent Owner argues that we should reject Petitioner's proposed level of ordinary skill in the art because it requires no understanding of the sacral anatomy or sacral neuromodulation, which, according to Patent Owner, is the context of the '314 patent. PO Resp. 14–15 (citing Ex. 1001, 1:33–44; Ex. 2029 ¶¶ 23–24; Ex. 2030 ¶¶ 65–66). Patent Owner further argues that Mr. Pless "does not possess the appropriate skill in sacral neuromodulation or the requisite knowledge of the sacrum, sacral nerves, and surrounding tissues" (*id.* at 15 (citing Ex. 2026, 216:12–21)), and that "Mr. Pless'[s] testimony in this proceeding is not grounded in the perspective of a POSITA" (*id.*). Petitioner replies that the challenged claims do not recite sacral anatomy or sacral neuromodulation (Reply 2–3 (citing Ex. 1021, 35:24–36:11, 37:10–48:24; Ex. 1022, 92:17–97:22; Ex. 1023 ¶¶ 9–16)), and that the '314 patent describes uses of the invention outside of sacral anatomy (*id.* at 3 (citing Ex. 1021, 27:5–29:25, 31:4–17, 35:2–37:8; Ex. 1022, 89:8–90:22)).

The level of ordinary skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). The POSITA is a hypothetical person presumed to have known the relevant art at the time of the invention. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In determining the level of ordinary skill in the art, we may consider certain factors, including the "type

of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *Id.*

The parties dispute not only the level of ordinary skill, but also the relevant art. Beginning with the relevant art, Petitioner's proposed level of ordinary skill suggests the relevant art is implantable medical devices generally (Pet. 12 (citing Ex. 1003 ¶ 52)), whereas Patent Owner's proffered level of ordinary skill indicates the relevant art is medical leads specifically for sacral neuromodulation (PO Resp. 14 (citing Ex. 2029 ¶¶ 21–22; Ex. 2030 ¶ 64)). We find it is the latter. The Specification of the '314 patent defines the field of the invention as medical electrical leads for sacral neuromodulation:

> 1. Field of the Invention
>
> This invention relates generally to a method and apparatus that allows for stimulation of body tissue, *particularly sacral nerves*. More specifically, this invention relates to *an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves* for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead. Moreover, this invention relates to the method of implantation and anchoring of *the medical electrical lead electrodes in operative relation to a selected sacral nerve to allow for stimulation*.

Ex. 1001, 1:33–44 (emphases added). Apart from a reference to applications outside of sacral neuromodulation (*id.* at 13:37–39), the Specification describes the invention with respect to the sacral anatomy (*see, e.g., id.* at 8:51–9:20 (describing each of the drawings as depicting a sacral nerve stimulation lead)). Moreover, the claims' lack of a recitation of sacral anatomy or sacral neuromodulation does not override the Specification's

express description of the field of the invention because the claims' purpose is not to describe the subject matter of the patent but rather to define the boundary of the patent monopoly. *See, e.g.*, *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1358 (Fed. Cir. 2004) ("One important purpose of the written description is to provide notice to the public as to the subject matter of the patent, while the claim provides notice as to the scope of the invention."); *In re Vogel*, 422 F.2d 438, 442 (CCPA 1970) ("A claim is a group of words defining only the boundary of the patent monopoly.").

Turning to the level of ordinary skill, each party's proposed level of ordinary skill requires a combination of formal education and experience. Pet. 12 (citing Ex. 1003 ¶ 52); PO Resp. 14 (citing Ex. 2029 ¶¶ 21–22; Ex. 2030 ¶ 64). Patent Owner's proposed level is higher than Petitioner's proposed level in that Patent Owner's proposed level requires a POSITA to either be a physician with at least two years of experience in sacral neuromodulation or a sacral neuromodulation lead designer working in close collaboration with such a physician. PO Resp. 14 (citing Ex. 2029 ¶¶ 21–22; Ex. 2030 ¶ 64). Drs. Slavin and Siegel testify that this requirement for a physician with at least two years of experience in sacral neuromodulation is necessary for the knowledge of human anatomy and surgical procedures involved in sacral neuromodulation lead placement. Ex. 2029 ¶ 24; Ex. 2030 ¶ 66. Mr. Pless, however, testifies that a lead designer developing leads for sacral neuromodulation would have similar knowledge:

> [O]ne of the things that engineers who develop products for implantation in the body pay attention to is the anatomy, and we had lots of books on anatomy, both, you know, photographic depictions as well as, you know, more schematic. You know, Netter was a great resource for that. And occasionally we would do cadaver studies as well.

Ex. 2026, 24:7–15. Although a physician with at least two years of experience in sacral neuromodulation would have knowledge of human anatomy and surgical procedures involved in sacral neuromodulation lead placement, we disagree with Patent Owner that a POSITA must be a physician with at least two years of experience in sacral neuromodulation or a sacral neuromodulation lead designer working in close collaboration with such a physician to have this knowledge.

In view of the foregoing, the relevant art is medical leads for sacral neuromodulation. This art is sophisticated and requires knowledge of human anatomy of the sacral area and the surgical procedures involved in sacral neuromodulation. Both lead designers and physicians work in this field. With these considerations, we find a POSITA would have had at least the following two qualifications: (1) a bachelor's degree, or coursework equivalent, in biomedical engineering, electrical engineering, or mechanical engineering, or a medical degree, and (2) at least two years of experience researching and developing medical leads for sacral neuromodulation. We further find that more education can substitute for practical experience and vice versa.

Regarding Patent Owner's criticism of Mr. Pless's testimony as not being grounded in the perspective of a POSITA, our Trial Practice Guide[8] explains that there is no requirement between a declarant's experience and the relevant field. TPG 34 (citing *SEB S.A. v. Montgomery Ward & Co.*, 594

[8] USPTO, *Patent Trial and Appeal Board Consolidated Trial Practice Guide November 2019*, https://www.uspto.gov/TrialPracticeGuideConsolidated ("TPG"); *see also* Office Patent Trial Practice Guide, November 2019 Edition, 84 Fed. Reg. 64,280 (Nov. 21, 2019) (notifying the public of the availability of the Consolidated Trial Practice Guide).

F.3d 1360, 1373 (Fed. Cir. 2010)). We generally permit testimony where the declarant's scientific, technical, or other specialized knowledge will help the Board understand the evidence or to determine a fact in issue. *Id.* (citing Fed. R. Evid. 702(a)). Given his education as an electrical engineer and his experience as a medical lead designer (Ex. 1003 ¶¶ 4–10), we find Mr. Pless's testimony helpful in deciding factual issues in this proceeding. Moreover, when assigning weight to a declarant's testimony, we consider the underlying facts or data upon which the testimony is based. TPG 40–41. In our analysis of the asserted grounds of unpatentability, we weigh Mr. Pless's testimony accordingly.

### *B. Claim Construction*

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore, we expressly construe the claims to the extent necessary to determine whether Petitioner has proven that the challenged claims are unpatentable. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner argues the claim term "a plurality of tine elements" should be construed as "at least two or more structures that mount to the lead body, each structure comprising of multiple tines attached to the structure."

Pet. 15. Patent Owner disagrees with Petitioner's proposed construction, and also asserts the Board can resolve the dispute in this proceeding without construing the term. PO Resp. 16–18.

We agree with Patent Owner that an express construction of the claim term "a plurality of tine elements" is unnecessary to resolve the dispute. For the reasons set forth in our analysis of the asserted grounds of unpatentability, we determine that no claim term requires an express construction for us to ascertain whether Petitioner has shown the challenged claims to be unpatentable.

*C. Obviousness Based on Young, Gerber, and Lindegren*

Petitioner challenges claims 1, 2, 4, 7, 10–12, 14, and 18–24 under 35 U.S.C. § 103(a), contending the claimed subject matter would have been obvious over Young, Gerber, and Lindegren. Pet. 17–39; Reply 3–10. Patent Owner argues Petitioner's proposed combination of Young, Gerber, and Lindegren would not have resulted in a system or method comprising all of the claim limitations. PO Resp. 18–20; Sur-reply 1–5. Patent Owner also argues that there would not have been a motivation to combine the teachings of the references as Petitioner proposes. PO Resp. 20–36; Sur-reply 5–10.

We begin our analysis of this asserted ground of unpatentability with an overview of the references, and then discuss the parties' contentions for each of the claims. For the reasons below, Petitioner has not shown, by a preponderance of the evidence, that the subject matter of claims 1, 2, 4, 7, 10–12, 14, and 18–24 would have been obvious over the combined teachings of Young, Gerber, and Lindegren.

### *1. Young*

Young details "the author's experience with the placement of a totally implanted, percutaneously placed electrode system for chronic electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain in 23 patients between 1990 and 1993." Ex. 1010, 73. The trigeminal stimulating electrode[9] is shown in Figure 1, reproduced below.



FIG. 1.

Figure 1 is a photograph of the tip of the trigeminal stimulating electrode. *Id.* The trigeminal stimulating electrode consists of a monopolar platinum-iridium lead with two sets of four tines located 5 and 10 mm from the distal tip of the electrode and a central stylet. *Id.* The purpose of the tines is to prevent the electrode from becoming dislodged after implantation. *Id.*

The electrode is inserted percutaneously through a No. 14 needle via a puncture of the foramen ovale. *Id.* Subsequently, the introducing needle and central stylet are removed, and the proximal end of the electrode is tunneled subcutaneously around the mandible and connected to a percutaneous extension lead. *Id.* The distal end of the extension lead is

---

[9] The trigeminal stimulating electrode disclosed in Young is Patent Owner's Quintatrigeminal electrode. Ex. 1010, 73.

connected to a completely implanted pulse generator system. *Id.* at 74. The implanted pulse generator system[10] is shown in Figure 3 below.



Figure 3 is a photograph of the complete component system for trigeminal stimulation, including the electrode, the implanted pulse generator, and an extension lead. *Id.*

The patients with the implanted electrode system did not have any major complications but instead only a few minor problems. *Id.* at 77. Nonetheless, "[t]he electrode could be improved to provide multiple active stimulation sites near the tip," which "would be particularly useful for achieving stimulation-induced paresthesias in patients with pain in all three trigeminal divisions." *Id.*

2. *Gerber*

Gerber discloses "an implantable medical lead having at least one electrode contact wherein the lead is implanted near the sacral nerves for stimulation of a bundle of nerve fibers." Ex. 1012, 1:9–12. An implantable

---

[10] The implanted pulse generator system disclosed in Young is Patent Owner's ITREL. Ex. 1010, 74.

medical lead for stimulation of the sacral nerves is shown in Figure 1, reproduced below.




FIG. 1

Figure 1 is a plan view showing implantable medical lead 10 comprising lead body 15 having at least one electrode contact 20 at distal end 25. *Id.* at 3:21–22, 3:40–43. Proximal end 35 of lead body 15 may be coupled to a pulse generator, and lead body 15 includes at least one conductor wire within an insulating sheath. *Id.* at 3:49–51, 4:6–7.

Implantable medical lead 10 may have an anchoring mechanism to fixate the lead in the desired position, as shown in Figure 2, reproduced below.




FIG. 2

Figure 2 is a plan view of implantable medical lead 10 having anchoring mechanism 50, which is a molded part, integral to medical lead 10. *Id.* at 3:23–25, 4:13–17. A physician can pass sutures through the molded part to attach medical lead 10 to the human anatomy. *Id.* at 4:17–19. Alternatively, anchoring mechanism 50 allows medical lead 10 to fibrose in naturally using the human body's natural reaction to a foreign body or healing. *Id.* at 4:27–30.

Implantable medical lead 10 may include two electrode contacts, as shown in Figure 3 below.




FIG.3

Figure 3 is a plan view of implantable medical lead 10 having two electrode contacts 20, 40 to provide for a bipolar configuration. *Id.* at 3:26–27, 4:32–33.

The medical lead has a smaller than typical diameter. *Id.* at 2:64–66. The smaller diameter allows for less invasive implantation techniques, such as via a cannula, imparts less trauma to the patient during implantation, and enables a physician to use local, instead of general, anesthesia. *Id.* at 2:66–3:6. When the medical lead is implanted with a cannula, a stylet is useful to straighten the medical lead for passing through the cannula. *Id.* at 5:15–17, 5:26–28.

3. *Lindegren*

Lindegren discloses an implantable electrode lead with "an electrode head equipped with external anchoring means, such as tine-like position-fixation means." Ex. 1013, 1:6–11. The position-fixation means consists of a position-fixation groove encircling the exterior of the electrode head, and the groove is sized to receive a ring-shaped tine-bearing means. *Id.* at 5:11–15. Figure 3, reproduced below, shows the ring-shaped means mounted in the position-fixation groove.




FIG. 3

Figure 3 is a perspective view of the distal end section of implantable electrode lead 2. *Id.* at 6:30–32, 7:7–8. Received in position-fixation groove 8, ring-shaped means 10 encircles electrode head 6 and includes four projections 12 extending at an angle outward and to the rear. *Id.* at 7:18–23. From a manufacturing point of view, it is preferable to have projections 12 integral with ring-shaped means 10 and evenly distributed around the circumference of ring-shaped means 10. *Id.* at 5:17–22, 7:30–8:1. Furthermore, ring-shaped means 10 and projections 12 are preferably made of an elastic material such as silicone rubber. *Id.* at 5:20–22, 8:5–8.

*4. Independent claim 1*

*a. Undisputed claim limitations (limitations 1.0–1.f and 1.h)*

The preamble of independent claim 1, i.e., Petitioner's designated limitation 1.0, recites "[a] system." Ex. 1001, 13:51. Petitioner contends that, to the extent the preamble is a limitation, Young, Gerber, and Lindegren disclose a system. Pet. 24.

Independent claim 1 further recites "an implantable medical lead comprising: a lead body extending between a proximal end and a distal end,"

i.e., limitations 1.a–1.b. Ex. 1001, 13:52–54. Petitioner argues Young's lead discloses these limitations. Pet. 24–25 (citing Ex. 1010, 73–74, Figs. 1–3).

Independent claim 1 next recites "a plurality of conductors within the lead body," i.e., limitation 1.c. Ex. 1001, 13:55. Petitioner contends Young inherently discloses one conductor connecting the electrode to the IPG so that the electrode can function and stimulate a patient's nerve. Pet. 25 (citing Ex. 1010, 73–74). Petitioner further contends Gerber teaches "lead body 15 of the present invention comprises one or more conductor wire(s) within an insulating sheath." *Id.* (quoting Ex. 1012, 4:6–7).

Independent claim 1 also recites "a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors," i.e., limitation 1.d. Ex. 1001, 13:56–58. Petitioner argues: "Young discloses one electrode, but states '[t]he electrode could be improved to provide multiple active stimulation sites near the tip.' Ex. 1010 at 77. Multiple active stimulation sites mean that there will be multiple electrodes. Ex. 1003 at 68." Pet. 25–26. Petitioner further argues Gerber teaches multiple electrodes that are each electrically connected to a conductor for carrying stimulation pulses from the IPG to the electrode. *Id.* at 26 (citing Ex. 1003, 67–68[11]; Ex. 1012, Abstract, 1:57–58, 2:4–5, 3:52–56, 4:32–33, claim 1, Fig. 3).

---

[11] In arguing that Gerber teaches limitation 1.d, Petitioner cites to pages 68–69 of Mr. Pless's Declaration. Pet. 26. Mr. Pless, however, discusses this limitation on pages 67–68 of his Declaration. Thus, we understand that the citation to pages 68–69 is a typographical error, and that Petitioner is relying on pages 67–68 of Mr. Pless's Declaration to support its argument that Gerber teaches limitation 1.d. Moreover, as we note

Independent claim 1 further recites "a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body," i.e., limitation 1.e. Ex. 1001, 13:59–62. Petitioner contends Young's electrode includes at least two tine elements located between the electrode and the lead proximal end. Pet. 26 (citing Ex. 1010, 73, Fig. 1). Petitioner further contends Gerber teaches an anchoring mechanism located between the most proximal electrode and the proximal end of the lead body. *Id.* at 27. According to Petitioner, Gerber teaches the anchoring mechanism allows the medical lead to fibrose naturally into the human body, and a POSITA would have known that tines are a widely used fibrosing anchoring means. *Id.* (citing Ex. 1003, 69[12]; Ex. 1012, 4:13–30, Fig. 3).

Independent claim 1 next recites:

> each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end,

i.e., limitation 1.f. Ex. 1001, 13:63–14:3. Petitioner argues each of Young's tines has a width, thickness, and length, and is attached to the lead body so

---

throughout this Decision, many of Petitioner's citations to Mr. Pless's Declaration are off by one page.

[12] Mr. Pless's testimony regarding an ordinarily skilled artisan's understanding that tines are a known fibrosing anchoring means is on page 69 of his Declaration. We consider Petitioner's citation to page 70 for this testimony to be a typographical error, and we understand Petitioner to have intended to cite page 69.

that one end extends outwardly from the lead body towards the lead proximal end. Pet. 27–28 (citing Ex. 1010, Fig. 1). Petitioner also argues Lindegren teaches a plurality of proximally extending tines mounted on rings. *Id.* at 28 (citing Ex. 1013, Fig. 3). Petitioner further asserts that proximally oriented tines were common before 2001, especially for use with an introducer into which the tine ends enter first, because such an orientation does not risk damaging the free tine ends. *Id.*; Ex. 1003 ¶ 32.

The last limitation of independent claim 1 recites "wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes," i.e., limitation 1.h. Ex. 1001, 14:9–11. Petitioner argues Young discloses two sets of tines that are separate from and axially displaced from the one electrode. Pet. 29 (citing Ex. 1010, Fig. 1). Petitioner also argues Gerber teaches two electrodes, as well as an anchoring mechanism located separate from and spaced apart from an electrode. *Id.* (citing Ex. 1012, Fig. 2).

Patent Owner does not dispute Petitioner's contentions with respect to what Petitioner designates as limitations 1.0–1.f and 1.h. Petitioner's arguments and Mr. Pless's testimony find support in Young, Gerber, and Lindegren. Young discloses a percutaneously placed electrode system for chronic electrical stimulation of the trigeminal sensory root to treat chronic facial pain. Ex. 1010, 73. Young's electrode system includes an implantable medical lead having a lead body, an electrode, and plurality of tine elements made up of a plurality of tines and located proximal to the electrode. *Id.* at 73, Fig. 1. Young's electrode system further includes an IPG connected to the end of the lead body opposite the electrode so that the lead body conducts electrical pulses from the IPG to the electrode. *Id.* at 74,

Fig. 3. Gerber teaches an implantable medical lead having a lead body, a plurality of conductors, a plurality of electrodes that are each electrically connected to a conductor of the plurality of conductors, and an anchoring mechanism located separate and axially displaced from an electrode. Ex. 1012, Abstract, 3:39–42, 52–56, 4:6–7, 4:13–15, 4:32–33, Figs. 2–3. Lindegren teaches ring-shaped means including a plurality of proximally extending, elastic tines. Ex. 1013, 5:17–22, Fig. 3. In view of the foregoing, Petitioner has persuasively identified what it designates as limitations 1.0–1.f and 1.h in its proposed combination of Young, Gerber, and Lindegren.

*b. Tines that are adapted to fold inward against the lead body without overlap and deploy outward when the introducer is withdrawn (limitation 1.g)*

Independent claim 1 further recites

> wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by a lumen of an introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn to release the plurality of tines,

i.e., limitation 1.g. Ex. 1001, 14:3–9. In view of Young's teaching of the electrode being inserted into a No. 14 needle, Petitioner contends Young discloses this limitation. Pet. 28–29. In particular, Petitioner asserts:

> Since Young's electrode is "inserted and advanced" in the needle, the tines are adapted to and do fold inward against the lead body without overlapping one another. Tines are purposefully designed to fold inward when constrained in a lumen because if they did not, they are likely damaged when the lead is advanced. Ex. 1003 ¶32. In Young Figure 1, the length of each tine is shorter than the distance between the two sets, i.e.

> two tine elements. Thus, the tines cannot overlap one another. *Id.* [at 70–71].[13]

Pet. 29.

Patent Owner argues "[Petitioner's] assertion that Young discloses this limitation, in effect, amounts to an unsupported and legally improper inherency argument that should be rejected because there is no evidence that Young's tines necessarily fold inward against the lead body." PO Resp. 19 (internal quotation omitted). Patent Owner maintains that even if inserting Young's lead into a needle causes the tines to fold inwardly, the tines would not necessarily touch the lead body. *Id.* at 19–20; Sur-reply 3–5. According to Patent Owner, Dr. Slavin testifies that whether Young's tines fold inwardly against the lead body depends on multiple factors, including the diameter of the electrode, length and diameter of the tines, diameter of the needle through which the tined electrode is introduced, and the material of the tines (PO Resp. 19 (citing Ex. 2029 ¶¶ 48–52)), and Dr. Slavin provides an example of how a tine can fold inwardly without being against the lead body (Sur-reply 3–4 (citing Ex. 2029 ¶ 50)). Patent Owner also contends Mr. Pless admits that he could not say for sure whether Young's tines would touch the lead body. PO Resp. 19–20 (citing Ex. 2026, 112:14–113:11); Sur-reply 4.

Petitioner replies that limitation 1.g recites tines adapted to be folded against the lead body and thus does not require the tines to actually be folded against the lead body but simply tines capable of being folded against the

---

[13] Mr. Pless's testimony regarding limitation 1.g is on pages 70–71 of his Declaration. We consider Petitioner's citation to pages 71–72 for this testimony to be a typographical error, and we understand Petitioner to be citing pages 70–71.

lead body. Reply 3–4. Petitioner further replies that Mr. Pless's opinion regarding Young's tines being adapted to be folded against the lead body is based on his measurements of Young's tines and the inner diameter of a No. 14 needle. *Id.* at 4 (citing Ex. 1023 ¶ 24; Ex. 2029, 109:14–110:16).

We agree with Petitioner that limitation 1.g recites tines adapted to be folded against the lead body and therefore does not require the tines to actually be folded against the lead body. Consequently, Dr. Slavin's testimony that there is insufficient evidence to conclude Young's tines touch the lead body when constrained by the needle's lumen (Ex. 2029 ¶¶ 49–51) and Mr. Pless's admission that he could not say for sure whether Young's tines would touch the lead body (Ex. 2026, 112:25–113:11) are not commensurate with the scope of limitation 1.g and thus not probative.

Moreover, contrary to Patent Owner's argument, Petitioner is not alleging it is inherent that Young's tines fold inwardly against the lead body when fitted into a No. 14 needle. Rather, Petitioner argues that, given the disclosed dimensions of Young's tined lead relative to the inner diameter of a No. 14 needle and Young's disclosure of inserting the tined lead into a No. 14 needle, a POSITA would understand that Young teaches tines capable of folding against the lead body. Pet. 28–29; Reply 4. In particular, Mr. Pless testifies:

> I did look up the size of a No. 14 needle and compared that against Young's disclosed dimensions, which were that the tines were 5 mm apart. Using that as a scale, the diameter of the tines (tip to tip) appears to be about 4mm. While I couldn't recall the dimensions during my deposition, I looked up the size of a No. 14 needle afterwards. I confirmed that inner diameter of a No. 14 needle is typically around 1.6 mm. Thus, when the lead is advanced through the No. 14 needle, it is difficult to see how that could happen without the tines (which have a considerably

> larger span than the inside diameter of the needle) being adapted to be folded against the lead body.

Ex. 1023 ¶ 24 (footnote omitted).

In view of Young's disclosure of its tines being spaced 5 mm apart (Ex. 1010, 73), we credit Mr. Pless's testimony that, based on the photograph of the lead shown in Figure 1, the tines extend, tip to tip, approximately 4 mm. *See In re Aslanian*, 590 F.2d 911, 914 (CCPA 1979) (holding that drawings must be evaluated for what they reasonably disclose and suggest to a POSITA); *cf. Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (holding that arguments based on measurements taken from a reference's drawings are of little value when the reference does not disclose the drawings are to scale and is silent as to dimensions). We also credit Mr. Pless's uncontested testimony that the inner diameter of a No. 14 needle is approximately 1.6 mm. Given Young's disclosure of its tined electrode being inserted through a No. 14 needle, which has an inner diameter that is less than half the length of the tines measured tip to tip, Young's tines must be flexible and bend significantly to fit in the No. 14 needle and therefore capable of folding inwardly against the lead body. Accordingly, Petitioner has persuaded us that Young discloses tines adapted to be folded inwardly against the lead body, as limitation 1.g. requires, and Petitioner has shown limitation 1.g in its proposed combination of Young, Gerber, and Lindegren.

*c. Reasons for combining the teachings*

Petitioner argues a POSITA would have been motivated to combine the teachings of Young, Gerber, and Lindegren. Pet. 22–24; Reply 7–8. Petitioner contends a POSITA would have modified Young's electrode system to include a lead with multiple electrodes, as Gerber teaches, because

Young teaches that the single electrode could be improved to provide multiple active stimulation sites near the tip. Pet. 23; Reply 7–8. Petitioner also contends a POSITA would have modified Young's electrode system to include Lindegren's tine-mounted rings because Lindegren teaches that it would be preferable for manufacturing to have tines mounted on a ring-shaped means, like a rubber band encircling the lead body. Pet. 23 (citing Ex. 1003 ¶ 91); Reply 8. Petitioner further asserts "it would have been easy and feasible to utilize Lindegren's tine-mounted rings with tines extending proximally and spaced apart as shown in Young to further prevent dislodgement after implantation, which is a purpose of the tines stated in Young." Pet. 24. Additionally, Petitioner argues a POSITA would have combined the teachings of Young, Gerber, and Lindegren because each of these references solve the same problem as the '314 patent in the same field. *Id.* at 22 (citing Ex. 1010, 73; Ex. 1012, 1:64–2:13; Ex. 1013, 1:20–27, 4:32–5:7; *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1371 (Fed. Cir. 2011)); Reply 8.

Patent Owner maintains Petitioner's proposed combination of Young, Gerber, and Lindegren is based on impermissible hindsight. PO Resp. 20–22. Patent Owner argues there would not have been a motivation to modify Young's lead to include Gerber's multiple electrodes so that the electrodes are distal to all of the lead's tines, as limitation 1.e requires. *Id.* at 22–28; Sur-reply 6–8. Patent Owner also argues there would not have been a motivation to combine the teachings of Young's lead with Lindegren's proximally extending tines, as recited in limitation 1.f. PO Resp. 28–32; Sur-reply 8. Patent Owner additionally argues Petitioner's

general reasons for combining the teachings of the references are insufficient. PO Resp. 33–36.

Beginning with Petitioner's reasoning premised on the references solving the same problem as the '314 patent, Patent Owner argues none of these references solve the same problem as the '314 patent. PO Resp. 35 (citing Ex. 2029 ¶¶ 76–83). We agree with Patent Owner. Petitioner characterizes the problem addressed in the '314 patent as "leads adequately stimulating the nerves while limiting electrode migration" (Pet. 22), but the '314 patent describes a more specific problem. According to the '314 patent:

> [T]here remains a need in the art for *a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient's skin to locate stimulation electrodes in casual contact with a sacral nerve*, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period.

Ex. 1001, 5:34–44 (emphasis added). The '314 patent addresses the need for a percutaneously implantable lead that is properly and securely positioned to provide sacral nerve stimulation, whereas the references do not. Young addresses placement of an implanted, percutaneously placed electrode system for electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain. Ex. 1010, 73. Gerber contemplates the positioning and securement of an electrode that is implanted in the sacral area via a non-percutaneous surgical procedure. Ex. 1012, 2:9–13. Lindegren addresses the need for a cardiac lead that can be easily detached from the

anchoring means and allow the lead to be replaced despite the anchoring means being stuck in the heart. Ex. 1013, 4:16–22. Moreover, the nature of the problem to be solved is typically pertinent to the motivation for combining the teachings of simpler mechanical technologies. *Tokai*, 632 F.3d at 1371 ("We have consistently stated that courts may find a motivation to combine prior art references in the nature of the problem to be solved, and that [t]his form of motivation to combine evidence is particularly relevant with simpler mechanical technologies." (alternation in original) (citations and internal quotations omitted)). The technologies in this proceeding involve medical devices implanted in the body for neurostimulation, not simple mechanical technologies. *See, e.g.*, Ex. 1001, 1:36–41 (describing the field of the invention for '314 patent as "an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead"). Accordingly, Petitioner's reasoning premised on Young, Gerber, and Lindegren solving the same problem as the '314 patent does not persuade us that a POSITA would have had a reason to combine the teachings of the references.

Turning to Petitioner's reasoning for modifying Young's lead to include Gerber's multiple electrodes so that the electrodes are distal to all of the lead's tines, Petitioner's reasoning is premised on Young, which discloses "[t]he electrode could be improved to provide multiple active stimulation sites near the tip." Ex. 1010, 77. Petitioner argues this disclosure suggests multiple electrodes arranged distal to all of the tines because "[t]he tip referenced here is the distal tip where Young's original

electrode was located, which is distal to all of the tines of Young." Reply 8; *see also* Ex. 2026, 168:12–21 (Mr. Pless testifying "I think a person of ordinary skill in the art would see that Young is recommending multiple distal electrodes, and at least to me the natural thing would be to add the electrodes where the current electrode in Young is, which is distal to the tines").

Patent Owner argues Young's disclosure of improving its lead to provide multiple active stimulation sites, i.e., electrodes, near the tip would not have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines because such an arrangement would not be feasible in the complex anatomy of the trigeminal nerve region. PO Resp. 23 (citing Ex. 2029 ¶¶ 58–65); *see also* Sur-reply 6–8 (arguing that adding electrodes distal to all of the tines would render Young's tines inoperable for their intended purpose). Patent Owner's argument is based on Dr. Slavin's testimony:

> If, as Mr. Pless appears to assume, that Young is suggesting adding electrode(s) distal to the tines in figure 1, then the tines would have to get pushed back in the proximal direction (i.e., towards the foramen ovale) to accommodate the additional electrode(s). This means the tines would be out of the cistern, but moving the tines outside the cistern would result in them being in contact with, for example, the hard tissue of the trigeminal ganglion. Tines cannot anchor in such hard tissue, which would have prevented the tines from performing their intended function of stabilizing the lead electrode within the cistern.

Ex. 2029 ¶ 62 (footnote omitted). Patent Owner also argues that we should give no weight to Mr. Pless's opinion that a POSITA would have been motivated to combine the teachings of Young with other references because Mr. Pless lacks an understanding of the trigeminal nerve anatomy pertinent

to Young's disclosure. PO Resp. 24–26. Patent Owner further argues that "[e]ven if a POSITA were motivated to try to improve the lead in Young—they would look to modify Young's lead to *remove* tines and would certainly *not* consider rearranging them to arrive at the claimed invention." *Id.* at 26 (citing Ex. 2029 ¶ 65).

Petitioner replies that it is incorrect for Patent Owner to require Young's lead, as modified to include Gerber's multiple electrodes, to operate as intended in the trigeminal area. Reply 5–6. According to Petitioner, the proper inquiry is whether the proposed combination would achieve what is in the '314 patent claims. *Id.* at 6.

Petitioner, however, conflates the obviousness requirements of motivation to combine and reasonable expectation of success, which are distinct inquiries. *See, e.g.*, *Intelligent Bio–Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) (explaining "two different legal concepts—reasonable expectation of success and motivation to combine"). Reasonable expectation of success contemplates the likelihood of success in combining the references to meet the limitations of the claimed invention, and failure to consider the appropriate scope of the claimed invention in evaluating a reasonable expectation of success constitutes a legal error. *Id.* In contrast, motivation to combine considers whether there would have been a suggestion or motivation to make the proposed combination of references. *Id.* at 1368. Although an unclaimed purpose is irrelevant to reasonable expectation of success, it may be pertinent to motivation to combine. *Id.* ("While [the deblocking of the prior art's azidomethyl group] is irrelevant to a finding that there was no reasonable expectation of success in meeting the claims of the '537 patent, which do not require quantitative deblocking at

all, it is central to a finding of no motivation to combine."); *see also In re Gordon*, 733 F.2d 900, 902 Fed. Cir. 1984) (reversing a determination of obviousness because the proposed modification would have rendered the prior art device inoperable for its intended purpose); *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) ("We find no error in the Board's rejection of TriVascular's argument that it would have been obvious to substitute the recessed barbs of Samuels '851 with the protuberances of Todd, since TriVascular's proposed substitution would destroy the basic objective of the barbs, which is to *penetrate* surrounding tissue.").

As the purpose of Young's lead, which is electrical stimulation of the trigeminal sensory root (Ex. 1010, 73), is relevant to assessing whether there would have been a motivation to combine, we credit Dr. Slavin's testimony that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would not have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines because such an arrangement would not be feasible in the trigeminal nerve region. Moreover, contrary to Petitioner's argument, Young discloses multiple active sites *near* the tip, not at the tip or distal to the tines. In view of Young simply disclosing multiple active sites near the tip, without any relation to the tines, and Dr. Slavin's testimony that a POSITA would not understand Young to suggest multiple electrodes distal to all of the tines, Petitioner has not persuaded us that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines.

*d. Conclusion of independent claim 1*

Petitioner has demonstrated each limitation of independent claim 1 in its proposed combination of Young, Gerber, and Lindegren. Petitioner, however, has not persuaded us that a POSITA would have had a reason to combine Young's lead with Gerber's plurality of electrodes so the plurality of electrodes is distal to all of the lead's tines, as Petitioner proposes. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 60–71; Sur-reply 16–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claim 1 would have been obvious over the combined teachings of Young, Gerber, and Lindegren.

*5. Independent claims 11 and 18*

Petitioner relies on the same reasoning for combining the teachings of Young, Gerber, and Lindegren to result in the subject matter of independent claims 11 and 18 as for combining the teachings of these references to result in the subject matter of independent claim 1. Pet. 22–24. As discussed above in section III.C.4.c, Petitioner's reasoning is not persuasive. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 60–71; Sur-reply 16–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claims 11 and 18 would have been obvious over combined teachings of Young, Gerber, and Lindegren.

*6. Dependent claims*

For the reasons discussed above in sections III.C.4.c and III.C.5, Petitioner has not persuaded us that a POSITA would have had a reason to combine the teachings of Young, Gerber, and Lindegren to result in the

subject matter of independent claims 1, 11, and 18, from which claims 2, 4, 7, 10, 12, 14, and 19–24 depend. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 60–71; Sur-reply 16–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of dependent claims 2, 4, 7, 10, 12, 14, and 19–24 would have been obvious over combined teachings of Young, Gerber, and Lindegren.

### *D. Obviousness Based on Young, Gerber, Lindegren, and Hauser*

Petitioner challenges claims 18, 20, and 21 of the '314 patent under 35 U.S.C. § 103(a), contending the claimed subject matter would have been obvious over Young, Gerber, Lindegren, and Hauser. Pet. 39–47; Reply 11–12. Patent Owner argues this asserted ground of unpatentability fails for the same reasons as the asserted ground based on Young, Gerber, and Lindegren. PO Resp. 39. Patent Owner also argues that there would not have been a motivation to combine the teachings of Young, Gerber, Lindegren, and Hauser as Petitioner proposes. *Id.* at 40–42; Sur-reply 10.

This asserted ground based on Young, Gerber, Lindegren, and Hauser is similar to the asserted ground based on Young, Gerber, and Lindegren. In both of these asserted grounds, Petitioner relies on Gerber's multiple electrodes. *See* Pet. 43–45 (referencing the arguments for the asserted ground based on Young, Gerber, and Lindegren). Also, Petitioner's reasoning for modifying Young's lead to include Gerber's multiple electrodes so that the electrodes are distal to all of the lead's tines is the same in both of these asserted grounds. *See id.* at 42 (referring to the reasons for combining the teachings of the references with respect to asserted ground based on Young, Gerber, and Lindegren).

For the reasons discussed above in sections III.C.4.c and III.C.5, Petitioner has not persuaded us that a POSITA would have had a reason to combine Young's lead with Gerber's plurality of electrodes so the plurality of electrodes is distal to all of the lead's tines, as Petitioner proposes. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 60–71; Sur-reply 16–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claims 18, 20, and 21 would have been obvious over combined teachings of Young, Gerber, Lindegren, and Hauser.

### *E. Obviousness Based on Gerber, Hauser, and Akerström*

Petitioner challenges claims 1, 2, 4, 7, 10–12, 14, and 18–24 under 35 U.S.C. § 103(a), contending the claimed subject matter would have been obvious over Gerber, Hauser, and Akerström. Pet. 47–67; Reply 12–16. Patent Owner argues that Petitioner's proposed combination of Gerber, Hauser, and Akerström would not have resulted in all of the claim limitations. PO Resp. 43–46; Sur-reply 10–12. Patent Owner also argues that there would not have been a motivation to combine the teachings of the references as Petitioner proposes. PO Resp. 46–60; Sur-reply 12–16.

As we discuss Gerber above in section III.C.2, we begin our analysis of this asserted ground of unpatentability with an overview of Hauser and Akerström. We then turn to the parties' contentions for each of the claims. For the reasons below, Petitioner has not shown, by a preponderance of the evidence, that the subject matter of claims 1, 2, 4, 7, 10–12, 14, and 18–24 would have been obvious over the combined teachings of Gerber, Hauser, and Akerström.

*1. Hauser*

Hauser is directed to "an implantable defibrillation or cardioversion electrode and a method for placing the electrode on or about the heart to deliver electrical energy to the heart." Ex. 1014, 1:12–16. An electrode is shown in Figure 1, reproduced below.




Figure 1 is a perspective view of the electrode in a partially straightened position. *Id.* at 3:9–10. Electrode 10 is thin and elongated, and includes

distal active region 11 and proximal lead region 13. *Id.* at 3:50–52. Conductive discharge surface 12 and insulative surface 14 define and extend the entire length of distal active region 11, and tapered, soft, insulative tip 16 terminates the distal end of distal active region 11. *Id.* at 3:52–55. Conductive discharge surface 12 and insulative surface 14 are preformed so that distal active region 11 adopts a planar spiral patch shape when in its relaxed state. *Id.* at 3:62–66, Fig. 6. Conductive element 18 surrounded by insulator 15 extends the entire length of proximal lead region 13. *Id.* at 3:55–57. Conductive element 18 is a lead electrically connecting at one end with conductive discharge surface 12. *Id.* at 3:57–60.

Distal insulative tip 16 includes fixation means 17 to anchor and stabilize electrode 10 relative to the heart. *Id.* at 3:67–4:1. Electrode 10 is also provided with proximal fixation means 19 to anchor electrode 10 at the location of entrance into the pericardial space. *Id.* at 4:3–8.

The implantation procedure of electrode 10 is shown in Figures 3–5, reproduced below.




Figures 3–5 are views during various stages of implantation of the electrode. *Id.* at 3:12–13, 4:30–32. First, catheter 21, having a cross section only

slightly larger than the cross section of electrode 10, is introduced through the skin and into the pericardial space, and electrode 10 is inserted into catheter 21 using stylet 22 through a lumen in the body of electrode 10, thereby straightening distal active region 11, as shown in Figure 3. *Id.* at 4:32–39. With catheter 21 containing electrode 10 and in position in the pericardial space, distal active region 11 is urged out of catheter 21 with stylet 22. *Id.* at 4:39–43. Distal active region emerges from catheter 21 as stylet 22 is withdrawn, and begins to take a relaxed, coiled shape, as shown in Figure 4. *Id.* at 4:41–47. As distal active region 11 continues to emerge from catheter 21, it assumes more of its relaxed planar spiral shape, as shown in Figure 5, and deployment continues until the entire distal active region 11 of electrode 10 is in place in the pericardial space. *Id.* at 4:47–51. Stylet 22 and catheter 21 are then removed, and proximal lead region 13 of electrode 10 is tunneled to the location where it will be connected to a pulse generator of the defibrillation/cardioversion system. *Id.* at 4:51–55.

*2. Akerström*

Akerström relates to an endocardial electrode arrangement having an elongated electric conductor, an electrode head conductively connected to a distal end of the conductor for applying stimulation pulses to the heart, and means for placing the conductor or the electrode head on the heart wall. Ex. 1015, 1:5–13. The distal end of the endocardial electrode arrangement is shown in Figure 1, reproduced below.




FIG 1

Figure 1 illustrates the distal end of the endocardial electrode arrangement that comprises electric conductor 1 provided with electric insulation sheath 2. *Id.* at 2:15–16, 2:34–36. At the distal end of conductor 1, electrode head 3 is disposed. *Id.* at 2:36–38.

To securely retain the electrode in its position in the heart, the electrode includes loops 5 into which heart tissue can grow. *Id.* at 2:46–49. Loops 5 are located in close proximity to electrode head 3 and mounted on sleeve 6 slipped over insulation 2 of conductor 1. *Id.* at 2:46–50. As shown in Figure 1, loops 5 are attached along a helical-shaped line. *Id.* at 2:50–51. The loops can be fabricated from a soft, thin, body-fluid-resistant material, such as polyester and polypropylene. *Id.* at 2:66–68. As loops 5 consist of a soft, thin material, they rest closely against the electrode during insertion of the electrode into a vein. *Id.* at 3:8–11.

3. *Independent claim 1*

a. *Undisputed limitations (limitations 1.0–1.f and 1.h)*

In regard to what Petitioner designates as limitation 1.0, Petitioner contends that, to the extent the preamble is a limitation, Gerber, Hauser, and Akerström disclose a system. Pet. 50. For limitation 1.a, which recites an implantable medical lead, Petitioner argues Gerber discloses a single and multi-polar implantable lead for sacral nerve electrical stimulation. *Id.* at 51 (citing Ex. 1012, Title, Abstract).

For limitation 1.b reciting a lead body, Petitioner argues "Gerber discloses: 'An implantable medical lead for stimulation of the sacral nerves comprises a lead body which includes a distal end and a proximal end . . . .'" *Id.* (quoting Ex. 1012, Abstract). In regard to limitation 1.c, which recites a plurality of conductors within the lead body, Petitioner argues Gerber's lead body comprises at least one conductor wire within an insulating sheath. *Id.* (citing Ex. 1012, 4:6–7).

Regarding limitation 1.d, which requires a plurality of electrodes, each electrically connected to a conductor of the plurality of conductors, Petitioner argues Gerber discloses multiple stimulation electrodes, particularly two electrodes. *Id.* (citing Ex. 1012, Abstract, 1:57–58, 2:4–5, 4:32–33, claim 1, Fig. 3). Petitioner also argues that Gerber discloses stimulation pulses are carried from the pulse generator through the lead body to the distal having at least one electrode contact, and that each electrode must be electrically connected to a conductor for there to be stimulation pulses. *Id.* (citing Ex. 1003, 86–87[14]; Ex. 1012, 3:52–56).

For limitation 1.e, which requires a plurality of tine elements positioned between a most proximal electrode and the proximal end of the lead body, Petitioner argues Gerber discloses that an anchoring mechanism is located between the most proximal electrode and the proximal end of the lead body, and that the anchoring mechanism can provide for fibrosis. *Id.*

[14] Mr. Pless's testimony regarding limitation 1.d is on pages 86–87 of his Declaration. We consider Petitioner's citation to pages 87–88 for this testimony to be a typographical error, and we understand Petitioner to be citing pages 86–87.

at 52 (citing Ex. 1003, 87[15]; Ex. 1012, 4:13–30, Fig. 2). Petitioner further argues a POSITA knows tines affix by fibrosis. *Id.* (citing Ex. 1003, 87[16]). Petitioner also contends Hauser teaches fixation means 17, 19, which are made up of multiple sets of tines and can be placed at various locations on the lead as determined by the surgeon. *Id.* at 52–54 (citing Ex. 1003, 87–88[17]; Ex. 1014, Figs. 6, 12). Additionally, Petitioner asserts Akerström teaches various arrangements of fixation loops, including an arrangement where the loops are on several collars slipped on the insulation of the conductor and spaced apart from each other. *Id.* at 54 (citing Ex. 1015, 2:56–59, Fig. 3). Per Petitioner, Akerström teaches the loops are of sufficient stiffness to project above the surface of the electrode, and, as the loops look like tines, a POSITA could arrange tines as shown in Akerström. *Id.* (citing Ex. 1003, 90[18]; Ex. 1015, 3:6–8, 3:29–36, 3:52–55, Fig. 7).

In regard to limitation 1.f, which requires that each tine element comprises a plurality of flexible, pliant tines extending outwardly of the lead body and proximally toward the lead proximal end, Petitioner argues Hauser's fixation means 19 include a plurality of tine elements each made

---

[15] Mr. Pless's testimony regarding Gerber's disclosure of limitation 1.e is on page 87 of his Declaration. We consider Petitioner's citation to page 88 for this testimony to be a typographical error, and we understand Petitioner to be citing page 87.
[16] *See supra* note 15.
[17] Mr. Pless's testimony regarding Hauser's disclosure of limitation 1.e is on pages 87–89 of his Declaration. We consider Petitioner's citation to pages 88–89 for this testimony to be a typographical error, and we understand Petitioner to be citing pages 87–88.
[18] This testimony is on page 90 of Mr. Pless's Declaration, not page 91. We consider Petitioner's citation to page 91 to be a typographical error, and we understand Petitioner to be citing page 90.

up of a plurality of tines extending outwardly and proximally. *Id.* at 54 (citing Ex. 1003, 90–91[19]; Ex. 1014, Fig. 12). Petitioner also argues Akerström teaches flexible, pliant loops extending outwardly and proximally. *Id.* at 55 (citing Ex. 1003, 91[20]).

For limitation 1.h, which recites the plurality of tine elements are separate from and axially spaced from the plurality of electrodes, Petitioner argues Gerber's anchoring mechanism is located separate from and spaced apart from an electrode. *Id.* at 55–56 (citing Ex. 1003, 92[21]; Ex. 1012, Fig. 2). Petitioner also argues Gerber discloses multiple electrodes. *Id.* at 56 (citing *id.* at 51).

Patent Owner does not dispute Petitioner's contentions with respect to what Petitioner designates as limitations 1.0–1.f and 1.h. Petitioner's arguments and Mr. Pless's testimony find support in Gerber, Hauser, and Akerström. Gerber discloses an implantable medical lead having a lead body, a plurality of conductors, a plurality of electrodes that are each electrically connected to a conductor of the plurality of conductors, and an

---

[19] Mr. Pless's testimony regarding Hauser's disclosure of limitation 1.f is on pages 90–91 of his Declaration. We consider Petitioner's citation to pages 91–92 for this testimony to be a typographical error, and we understand Petitioner to be citing pages 90–91.

[20] Mr. Pless's testimony regarding Akerström's disclosure of limitation 1.f is on page 91 of his Declaration. We consider Petitioner's citation to page 92 to be a typographical error, and we understand Petitioner to be citing page 91.

[21] Mr. Pless's testimony regarding limitation 1.h is on page 92 of his Declaration. We consider Petitioner's citation to page 93 for this testimony to be a typographical error, and we understand Petitioner to be citing page 92.

anchoring mechanism located separate and axially displaced from an electrode. Ex. 1012, Abstract, 3:39–42, 3:52–56, 4:6–7, 4:13–15, 4:32–33, Figs. 2–3. Hauser teaches an electrode with proximal fixation means 19 made up of multiple sets of tines extending outwardly and proximally. Ex. 1014, 4:3–8, Fig. 12. Akerström teaches an electrode arrangement including flexible, proximally extending loops that are positioned on collars spaced apart from each other. Ex. 1015, 2:56–59, 3:52–59, Fig. 3. In view of the foregoing, Petitioner has persuasively identified what it designates as limitations 1.0–1.f and 1.h in its proposed combination of Gerber, Hauser, and Akerström.

*b. Tines that are adapted to fold inward against the lead body without overlap and deploy outward when the introducer is withdrawn (limitation 1.g)*

For limitation 1.g, which requires that the plurality of tines are adapted to fold inwardly against the lead body without overlap when constrained by a lumen of an introducer and deploy outwardly upon withdrawal of the introducer, Petitioner contends Hauser's "fixation means 19 include pliant tines such that placement of the lead constrained within the catheter would fold the tines inward against the lead body (Fig. 3) and [the tines] would deploy laterally outward when released from the catheter." Pet. 55. Petitioner acknowledges Hauser does not explicitly teach that the tines do not overlap, and contends Akerström teaches an arrangement where the set of loops on the first collar fold inward against the lead body without overlap. *Id.* (citing Ex. 1015, Fig. 3); Reply 12–13.

Patent Owner argues that Petitioner assumes Hauser's fixation means 19 are tines. PO Resp. 43; Sur-reply 10–11. Patent Owner further argues that one cannot draw any conclusions about fixation means 19 from

Figures 3–5 because these figures do not show fixation means 19. PO Resp. 43–44 (citing Ex. 2030 ¶¶ 96–99); Sur-reply 11.

We disagree with Patent Owner that Petitioner assumes Hauser's fixation means 19 are tines. Rather, Petitioner's argument is based on Mr. Pless's testimony that fixation means 19 are tines. Pet. 52–53 (citing Ex. 1003, 87–88[22]). Moreover, Hauser's fixation means 19 have a similar shape to tine elements 125, 130, 135, 140 in the '314 patent and other tines, such as Lindegren's tine-like projections 12. *Compare* Ex. 1014, Fig. 12, *with* Ex. 1001, Figs. 1–2; Ex. 1013, Fig. 3. Like tine elements 125, 130, 135, 140 in the '314 patent and Lindegren's tine-like projections 12, Hauser's fixation means 19 secure a lead in place in the body. Ex. 1001, 10:12–19; Ex. 1013, 7:18–27; Ex. 1014, 4:3–8. We also disagree with Patent Owner that a POSITA would not draw inferences regarding Hauser's fixation means 19 from Figures 3–5. According to Hauser, Figures 3–5 are "views during various stages of implantation of the electrode illustrated in F[igure] 1" (Ex. 1014, 3:12–13), and Figure 1 shows an electrode with fixation means 19 (*id.* at 4:3–8, Fig. 1). *See also* Reply 12 (citing Ex. 1022, 126:1–24 (Dr. Siegel testifying that Hauser's Figures 3–5 are views of the electrode of Figure 1)).

Patent Owner argues Petitioner's proposed combination of the references would not result in tines adapted to fold inward against the lead body, as recited in limitation 1.g. PO Resp. 44–45. According to Patent Owner, Hauser's lead, which is equipped with fixation means 19 and fits inside catheter 21, does not suggest that fixation means 19 are "adapted to be

[22] *See supra* note 17.

folded inward against the lead body when fitted into and constrained by a lumen of an introducer," as recited in limitation 1g. *Id.* at 44 (citing Ex. 2030 ¶¶ 96–99). Patent Owner also maintains that Hauser's fixation means would overlap, not fold against the lead body. *Id.* (citing Ex. 2030 ¶ 100). Regarding Akerström, Patent Owner contends that loops and tines are very different structures, and that loops folding against the lead body is not the same thing as tines folding against the lead body. *Id.* at 45 (citing Ex. 1015, 1:15–32; Ex. 2030 ¶¶ 94–95); Sur-reply 12.

We agree with Patent Owner that Hauser's fixation means 19 are not adapted to be folded inwardly against the lead body because the tines would overlap and thus be folded inwardly against each other, not the lead body. *See* Ex. 1014, Fig. 12 (showing the length of the tines of fixation means 19 being longer than the proximal spacing between the tines). In view of Hauser's Figure 12, we credit Dr. Siegel's testimony that "if fixation means 19 were bent or folded, they could not lie against the lead body because (except for the last two projections) the adjacent projections would interfere with folding against the lead body." Ex. 2030 ¶ 100.

Nonetheless, Patent Owner's argument that Hauser's fixation means 19 are not adapted to be folded inwardly against the lead body and its remaining arguments address Hauser and Akerström individually, whereas Petitioner is relying on their combined teachings to result in the subject matter of limitation 1.g. "[T]he test for obviousness is what the *combined teachings* of the references would have suggested to those having ordinary skill in the art." *See In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012) (emphasis added) (citing *In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981)). It matters not whether either Hauser's fixation means 19 or Akerström's

loop arrangement teaches tines that are adapted to fold inwardly against the lead body because Petitioner is relying on its proposed combination of Hauser and Akerström in which Hauser's fixation means 19 are arranged like Akerström's loops. *See* Pet. 50 (arguing it would have been obvious to use "multiple tined anchors, as taught in Hauser, and further to arrange such tines in accordance with the array design taught in Akerstr[ö]m" (citation omitted)), 55 ("Akerstr[ö]m['s] design from Figure 3 can be applied to Hauser's tine sets." (citation omitted)); Reply 12–13 ("[T]he Petition shows that Akerstr[ö]m teaches a design arrangement where the loops are adapted to be folded inward against the lead body without overlapping each other, and that tines of Hauser could be arranged in Akerstr[ö]m's design array." (citations omitted)). Hauser's fixation means 19 include a plurality of tine elements. Ex. 1014, Fig. 12. Akerström teaches an arrangement of loops that rest against the surface of an electrode during insertion of the electrode in a vein. Ex. 1015, 3:8–11, 3:52–59, Fig. 3. Petitioner has shown that combining the teachings of Hauser's fixation means 19 and Akerström's loop arrangement would result in a plurality of tine elements that are adapted to be folded inward against the lead body when the lead is fitted into an introducer, as limitation 1.g requires.

Patent Owner also argues that Petitioner's proposed combination of the references would not result in tines adapted to fold without overlap, as limitation 1.g requires, because no reference teaches non-overlapping tines. PO Resp. 54–55. Patent Owner, however, addresses the references individually when Petitioner relies on their combined teachings. Hauser's fixation means 19 include a plurality of tine elements (Ex. 1014, Fig. 12), and Akerström teaches an arrangement of loops that rest against the surface

of an electrode without overlap. Ex. 1015, 3:8–11, 3:52–59, Fig. 3. Petitioner has demonstrated that combining the teachings of Hauser's fixation means 19 and Akerström's loop arrangement would result in a plurality of tine elements that are adapted to be folded without overlap.

After considering the parties' arguments and evidence, Petitioner has persuaded us that its proposed combination of Gerber, Hauser, and Akerström would result in a plurality of tines that are adapted to fold inwardly against the lead body without overlap when constrained by a lumen of an introducer and deploy outwardly upon withdrawal of the introducer, as limitation 1.g requires. Petitioner has shown limitation 1.g was reasonably suggested by its proposed combination of Gerber, Hauser, and Akerström.

*c. Reasons for combining the teachings*

Petitioner maintains a POSITA would have modified Gerber's multi-electrode lead to have Hauser's tined anchors arranged on collars according to Akerström's array design. Pet. 49–50. Petitioner argues that Gerber discloses a multi-electrode lead with a proximal anchoring mechanism that anchors by fibrosis, and that a POSITA would have considered tines a leading candidate among the limited number of devices that anchor by fibrosis. *Id.* at 49 (citing Ex. 1003 ¶ 107). Petitioner also argues that Akerström's arrangements of loops for anchoring by fibrosis are applicable to tines, and that Akerström's arrangement shown in Figure 3, which has repeated sets of multiple loops extending from a collar without overlap, allows for easy manufacturing, adaptation to the needs of the stimulation site, and a smaller profile which is suited to percutaneous delivery. *Id.* (citing Ex. 1003 ¶ 105). Petitioner further maintains "it would have been obvious to a POSITA to improve anchoring within the soft tissue

near the sacrum to use multiple[] tined anchors, each mounted on collars (i.e. tine elements) to affix by fibrosis." *Id.*

Patent Owner contends Petitioner's reasoning for combining the teachings of Gerber, Hauser, and Akerström "is based on a hindsight driven compilation of claim elements from the prior art references that a POSITA would have had no reason to combine." PO Resp. 46 (citing Ex. 2030 ¶¶ 101–132). In particular, Patent Owner argues Petitioner has not shown that a POSITA would have replaced Gerber's anchoring mechanism with a plurality of tines as recited in limitation 1.e, much less proximally extending tines that are adapted to be folded inwardly against the lead body without overlap as recited in limitations 1.f and 1.g. *Id.* at 45–46, 48–60; Sur-reply 12–16.

Regarding the reasoning for replacing Gerber's anchoring mechanism with tines, such as those in Hauser, Patent Owner argues Petitioner fails to provide evidence that the use of tines would improve anchoring of Gerber's lead. PO Resp. 49; Sur-reply 14. According to Patent Owner, Gerber's disclosure of an implantable electrical lead that allows for some movement after implantation obviates the need for improved anchoring. PO Resp. 49 (citing Ex. 1012, 2:4–6, 2:9–17, 2:56–63, 3:39–58; Ex. 2030 ¶¶ 70–73); Sur-reply 15. Patent Owner also argues: "Gerber is not suggesting fibrosis as a standalone fixation mechanism; it is instead suggesting that the other disclosed anchoring mechanisms (namely, the bone screws or sutures; *see* Ex. 1012, 4:12-31) would become more fixated in the body over time due to fibrosis." PO Resp. 50 (citing Ex. 2030 ¶¶ 77–80, 111). Patent Owner further argues there is no factual support for Petitioner's allegation that tines were a leading candidate among the limited number of devices that anchor

by fibrosis. *Id.*; Sur-reply 14. Per Patent Owner, introducing any foreign body into a place where fibrosis can occur will result in fibrosis, and Akerström teaches that loops are better at allowing tissue ingrowth than tines. PO Resp. 50–51 (citing Ex. 1012, 4:27–30; Ex. 2030 ¶ 108). Patent Owner additionally contends Petitioner provides no evidence that a POSITA would have expected tines to work in Gerber's anatomy. *Id.* at 51–52; Sur-reply 14–15. Rather, according to Patent Owner, a POSITA would not have expected tines to work with Gerber's implantation procedure because the periosteum and the soft tissues surrounding the implantation site are dissected during the procedure, leaving them compromised of structural integrity and unsuitable for tines to affix thereto. PO Resp. 52 (citing Ex. 1012, 5:32–6:1, Fig. 6; Ex. 2030 ¶¶ 81, 105–107, 114–115); Sur-reply 14–15.

In regard to the reasoning for arranging Hauser's tines according to Akerström's arrangement so that the tines extend proximally and are adapted to be folded inwardly against the lead body without overlap, Patent Owner argues there would have been no motivation to include, in Gerber's lead, such an arrangement of tines. PO Resp. 55–58 (citing Ex. 2030 ¶¶ 123–126); Sur-reply 15–16. Patent Owner contends that Petitioner's reasoning for applying Akerström's arrangement—i.e., ease of manufacturing and a smaller profile for the lead—does not explain why a POSITA would have combined the teachings of the references to result in tines that are adapted to be folded inward against the lead body without overlap. PO Resp. 45–46, 56–57. Patent Owner also contends that Hauser illustrates fixation means projecting in both the proximal and distal directions (PO Resp. 58 (citing Ex. 1014, Figs. 1, 12)), and that Hauser

provides no guidance to a POSITA regarding the appropriate orientation for the tines (*id.* (citing Ex. 2030 ¶¶ 127–132)).

Petitioner replies that it is incorrect for Patent Owner to consider the intended purpose of Gerber's lead. Reply 14. This assertion is similar to Petitioner's argument that it is incorrect to consider the intended purpose of Young's lead when determining motivation to combine because the proper inquiry is whether the proposed combination would achieve what is in the '314 patent claims. *See id.* (referencing the arguments regarding the motivation to combine to the teachings of Young, Gerber, and Lindegren). As we explain above in section III.C.4.c, Petitioner conflates the separate requirements of motivation to combine and reasonable expectation of success. Although an unclaimed purpose is irrelevant to reasonable expectation of success, it may be pertinent to motivation to combine. *See Intelligent Bio–Sys.*, 821 F.3d at 1367–68 (explaining that, unlike reasonable expectation of success, motivation to combine does not contemplate the scope of the claimed invention).

Petitioner also replies that we should give Dr. Siegel's testimony, on which Patent Owner's arguments are based, very little, if any, weight. Reply 13–14. Per Petitioner, Dr. Siegel never analyzed the claims of the '314 patent, and his entire Declaration rests on the incorrect premise that the claims are limited to sacral neuromodulation. *Id.* (citing Ex. 1022, 94:2–13, 99:5–22, 111:14–19). Petitioner further alleges that Dr. Siegel's independence is questionable because he has been a consultant for Patent Owner in many other proceedings. *Id.* at 13–14 n.7.

Beginning with Dr. Siegel's independence, we take into account that Dr. Siegel has consulted for Patent Owner, but we disagree that Dr. Siegel's

relationship with Patent Owner depreciates his testimony. Patent Owner retained Dr. Siegel to testify regarding Petitioner's asserted obviousness based on Gerber, Hauser, and Akerström (Ex. 2030 ¶ 1), and Gerber is assigned to Patent Owner (Ex. 1012, code (73)). Patent Owner also retained Dr. Siegel to testify regarding Patent Owner's InterStim system. Ex. 2030 ¶ 1. Dr. Siegel's familiarity with Patent Owner's technologies is pertinent to the nature of his testimony. Moreover, Dr. Siegel testifies that "[m]y compensation is not contingent upon the outcome of this matter or the specifics of my testimony." *Id.* ¶ 2. We also disagree with Petitioner that we should grossly discount his testimony for lacking an understanding of the claims of the '314 patent. Dr. Siegel's testimony on which Patent Owner relies regards whether a POSITA would have added tines to Gerber's lead as Petitioner proposes. As we explain above, motivation to combine is a question disparate from the claimed invention. *See Intelligent Bio–Sys*., 821 F.3d at 1367–68 (explaining that, unlike reasonable expectation of success, motivation to combine does not contemplate the scope of the claimed invention).

With this, we turn to Petitioner's reasoning for combining the teachings of Gerber, Hauser, and Akerström. With respect to Petitioner's reasoning for replacing Gerber's anchoring mechanism with tines, contrary to Patent Owner's arguments regarding improved anchoring, Petitioner does not contend that a POSITA would have added tines to Gerber's lead to more securely affix the lead within the body. Rather, Petitioner contends a POSITA would have added tines to Gerber's lead because Gerber suggests anchoring its lead by fibrosis, for which tines are a leading candidate. *See* Pet. 49 ("Gerber discloses a multi-electrode lead with a proximal anchoring

mechanism that anchors by fibrosis instead of the depicted suture sleeve (Fig. 2). . . . [A] POSITA would have considered tines, a leading candidate among the limited number of devices that anchor by fibrosis."); *see also* Tr. 13:11–14 (Petitioner arguing "Gerber expressly suggests fixation mechanism by fibrosis and the most predominant use or the common use of that to actually fixate implantable medical leads by fibrosis was tines by the late 1990s").

Gerber indeed suggests anchoring its lead by fibrosis. Namely, Gerber discloses: "Yet another anchoring mechanism 50 is to allow the medical lead 10 to fibrose in naturally using the human body's natural reaction to a foreign body or healing." Ex. 1012, 4:27–30. Moreover, there is no dispute that tines secure via fibrosis. Petitioner, however, acknowledges that any foreign object introduced into the body will cause fibrosis. Tr. 12:8–13.

Nonetheless, Petitioner maintains that Gerber's disclosure of securing its lead by fibrosis would have led a POSITA to choose tines because tines were *a leading candidate* among the devices that anchor by fibrosis. Pet. 49 (citing Ex. 1003 ¶ 107) (emphasis added). Petitioner's argument relies on Mr. Pless's opinion that tines were a leading candidate for securement via fibrosis, and Mr. Pless's opinion is based his review of the conventional uses of tines. Tr. 12:18–24 (Petitioner explaining that pages 13–16 of Mr. Pless's Declaration provide support for his opinion that tines were most commonly used for fixation via fibrosis). According to Mr. Pless, "[b]efore 2001, tines were the most commonly used passive fixation, especially due to the predominant usage of tines in the cardiac space. Tines help to anchor the

lead immediately after implantation by engaging with the body tissue, and then by fibrosis." Ex. 1003, 15.

Gerber's lead, however, is for sacral nerve stimulation and is implanted in the sacral area via an open surgical procedure. Ex. 1012, 1:7–15, 5:32–39. We find credible Dr. Siegel's testimony that Gerber's device is implanted via an open surgical procedure in which the periosteum and soft tissues surrounding the implantation site are dissected, compromising their structural integrity and rendering tines, which initially anchor by engaging body tissue, ineffective. Thus, despite the prevalent use of tines in the cardiac space to secure leads by engaging body tissue and then by fibrosis, Petitioner has not persuaded us that Gerber's disclosure of securing its lead by fibrosis would have led a POSITA to replace Gerber's anchoring mechanism with tines.

Regarding Petitioner's reasoning for positioning tines according to Akerström's arrangement, Lindegren attributes a manufacturing preference to tines integrally formed and evenly spaced on rings, not proximally extending tines that are adapted to be folded inwardly against the lead body without overlap. Ex. 1013, 5:17–20 ("From the manufacturing point of view, having the projections devised as an integral part of a one-piece ring-shaped means and evenly distributed around the circumference of the ring-shaped means, should be preferable."). Moreover, according to Petitioner, a smaller profile is suited to percutaneous delivery (Pet. 49), but Gerber's lead is implanted via an open surgical procedure (Ex. 1012, 1:7–15, 5:32–39). Accordingly, Petitioner has not persuaded us that a POSITA would have had a reason to include, in Gerber's lead, Hauser's tines situated according to Akerström's arrangement.

*d. Conclusion of independent claim 1*

Petitioner has demonstrated each limitation of independent claim 1 in its proposed combination of Gerber, Hauser, and Akerström. Petitioner, however, has not persuaded us that a POSITA would have had a reason to combine the teachings of these references as Petitioner proposes. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 60–71; Sur-reply 16–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claim 1 would have been obvious over combined teachings of Gerber, Hauser, and Akerström.

*4. Independent claims 11 and 18*

Petitioner relies on the same reasoning for combining the teachings of Gerber, Hauser, and Akerström to result in the subject matter of independent claims 11 and 18 as for combining the teachings of these references to result in the subject matter of independent claim 1. Pet. 48–50. For the reasons discussed above in section III.E.3.c, Petitioner's reasons are not persuasive. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 60–71; Sur-reply 16–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claims 11 and 18 would have been obvious over combined teachings of Gerber, Hauser, and Akerström.

*5. Dependent claims*

For the reasons discussed above in sections III.E.3.c and III.E.4, Petitioner has not persuaded us that a POSITA would have had a reason to combine the teachings of Gerber, Hauser, and Akerström to result in the subject matter of independent claims 1, 11, and 18, from which claims 2, 4,

7, 10, 12, 14, and 19–24 depend. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 60–71; Sur-reply 16–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of dependent claims 2, 4, 7, 10, 12, 14, and 19–24 would have been obvious over combined teachings of Gerber, Hauser, and Akerström.

## IV. CONCLUSION

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 7, 10–12, 14, 18–24 | 103(a) | Young, Gerber, Lindegren | | 1, 2, 4, 7, 10–12, 14, 18–24 |
| 18, 20, 21 | 103(a) | Young, Gerber, Lindegren, Hauser | | 18, 20, 21 |
| 1, 2, 4, 7, 10–12, 14, 18–24 | 103(a) | Gerber, Hauser, Akerström | | 1, 2, 4, 7, 10–12, 14, 18–24 |
| **Overall Outcome** | | | | 1, 2, 4, 7, 10–12, 14, 18–24 |

## V. ORDER

In consideration of the foregoing, it is:

ORDERED that claims 1, 2, 4, 7, 10–12, 14, and 18–24 of the '314 patent have not been shown to be unpatentable, and

FURTHER ORDERED that, as this is a Final Written Decision, a party seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

A. James Isbester
Babak S. Sani
KILPATRICK TOWNSEND & STOCKTON LLP
jisbester@kilpatricktownsend.com
bsani@kilpatricktownsend.com

For PATENT OWNER:

Naveen Modi
Chetan R. Bansal
PAUL HASTINGS LLP
naveenmodi@paulhastings.com
chetanbansal@paulhastings.com

Trials@uspto.gov
571.272.7822

Paper: 65
Date: September 13, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

AXONICS, INC.,
Petitioner,

v.

MEDTRONIC, INC.,
Patent Owner.

---

IPR2020-00715
Patent 8,036,756 B2

---

Before JAMES A. TARTAL, ERIC C. JESCHKE, and
ALYSSA A. FINAMORE, *Administrative Patent Judges.*

FINAMORE, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

Petitioner, Axonics, Inc.,[1] filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1, 2, 5, 7, 13–15, and 18 of U.S. Patent No. 8,036,756 B2 ("the '756 patent") (Ex. 1001). Pet. 1. On September 15, 2020, we granted institution of an *inter partes* review. Paper 10.

During the trial, Patent Owner, Medtronic, Inc., filed a Response (Paper 30, "PO Resp."). Petitioner filed a Reply (Paper 43, "Reply"), and Patent Owner filed a Sur-reply (Paper 56, "Sur-reply"). Oral argument took place on June 17, 2021, and we have entered the transcript (Paper 64, "Tr.").

This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we conclude Petitioner has not proven by a preponderance of the evidence that claims 1, 2, 5, 7, 13–15, and 18 are unpatentable.

## II. BACKGROUND

### *A. Real Parties in Interest*

Petitioner asserts that it is the real party in interest. Pet. 69; *see also* Paper 52 (notifying the Board of the name change from Axonics Modulation Technologies, Inc. to Axonics, Inc.). Patent Owner maintains that it is the real party in interest. Paper 5, 1. Patent Owner further maintains that "Medtronic plc is the ultimate parent of Medtronic, Inc." (*id.*), and that "Medtronic, Inc. has granted certain rights with respect to the patent-at-issue

---

[1] During the trial, the name of Petitioner when the Petition was filed, Axonics Modulation Technologies, Inc., was changed to Axonics, Inc. *See* Paper 52.

to Medtronic Puerto Rico Operations Co., which in-turn has granted certain rights to Medtronic Logistics, LLC, which in-turn has granted certain rights to Medtronic USA, Inc." (*id.* at 1 n.1).

### *B. Related Matters*

The parties identify *Medtronic, Inc. v. Axonics Modulation Technologies, Inc.*, No. 8:19-cv-02115 (C.D. Cal. filed Nov. 4, 2011) and *Axonics Modulation Technologies, Inc. v. Medtronic, Inc.*, IPR2020-00679 (PTAB filed Mar. 16, 2020) (challenging U.S. Patent No. 8,626,314 B2). Pet. 69; Paper 5, 1–2.

### *C. The '756 Patent*

The invention "relates generally to a method and apparatus that allows for stimulation of body tissue, particularly sacral nerves." Ex. 1001, 1:18–20. More specifically, the invention "relates to an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead." *Id. at* 1:20–25.

Leads typically have a number of ring-shaped stimulation electrodes spaced along a distal segment of the lead body, which is adapted to be passed into the foramen along a selected sacral nerve. *Id.* at 2:32–36. Each distal stimulation electrode is coupled to a lead conductor extending proximally through the lead body. *Id.* at 2:37–39. The proximal end of each lead conductor is coupled to a connector that is adapted to be coupled with an implantable pulse generator (IPG). *Id.* at 2:39–44.

The '756 patent describes that "[a] problem associated with implantation of permanent and temporary neurostimulation leads involves

maintaining the discrete ring-shaped electrode(s) in casual contact . . . or in close proximity to the sacral nerve to provide adequate stimulation of the sacral nerve, while allowing for some axial movement of the lead body." *Id.* at 3:6–12. According to the '756 patent, "physicians spend a great deal of time with the patient under general anesthetic placing the leads due to the necessity of making an incision exposing the foramen and due to the difficulty in optimally positioning the small size stimulation electrodes relative to the sacral nerve." *Id.* at 3:13–17.

The invention of the '756 patent "provides a solution to the problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques." *Id.* at 5:33–38. A sacral nerve stimulation lead of the invention is shown in Figure 1, reproduced below.




Figure 1 is a plan view showing implantable medical lead 10 for sacral nerve stimulation. *Id.* at 8:34–35, 9:7–8. Implantable medical lead 10 includes lead body 15 with electrode array 20 that extends proximally from lead distal end 45 and comprises P stimulation electrodes. *Id.* at 6:10–14, 9:7–12. As shown in Figure 1, electrode array 20 includes stimulation electrodes 25, 30, 35, 40 such that P=4. *Id.* at 9:7–12. Each stimulation electrode 25, 30, 35, 40 is electrically coupled to the distal end of a coiled wire lead conductor extending proximally through distal portion 50 and proximal portion 55 of lead body 15. *Id.* at 9:23–27. The proximal end of each lead conductor is coupled to one of P connector elements 65, 70, 75, 80 in proximal connector element array 60 along proximal portion 55 adjacent proximal end 85. *Id.* at 6:17–21, 9:27–31. Connector elements 65, 70, 75, 80 are adapted to be coupled with a neurostimulator IPG. *Id.* at 9:44–47.

To inhibit axial movement of lead body 15 and dislodgement of stimulation electrodes 25, 30, 35, 40, a fixation mechanism adapted to engage subcutaneous tissue is formed on lead body 15 proximal to electrode array 20 in distal portion 50. *Id.* at 5:50–57, 9:61–65. The fixation mechanism comprises M tine elements in tine element array 120. *Id.* at 5:57–60, 9:65–10:1. As shown in Figure 1, tine element array 120 includes tine elements 125, 130, 135, 140 such that M=4. *Id.* at 9:65–10:1.

A tine element is shown in Figure, reproduced below.

FIG. 3




Figure 3 is an expanded perspective view showing one of tine elements 125, 130, 135, 140. *Id.* at 8:41–42. Each tine element comprises N flexible, pliant, tines. *Id.* at 5:60–61, 10:8–11. As shown in Figure 3, the tine element includes tines 145, 150, 155, 160 such that N=4. *Id.* at 10:8–11. Each tine extends through a tine length from attached tine end 165 to free tine end 170. *Id.* at 10:11–14. Attached tine end 165 is attached to lead body 15 at a tine attachment site and so that the tine extends outwardly of lead body 15 and proximally toward lead proximal end 85. *Id.* at 10:14–17. The tines are adapted to be folded inward against lead body 15 when fitted into and constrained by the lumen of an introducer, and the folded tines do not overlap one another. *Id.* at 5:66–6:3, 10:17–23.

Figures 6 and 7, reproduced below, illustrate steps of implanting lead 10. *Id.* at 11:4–6.

FIG. 6




FIG. 7




Figures 6 and 7 are cross-section views of the sacrum schematically illustrating steps of implanting lead 10. *Id.* at 8:50–57. Introducer 200 can

be advanced into position over a guide wire previously percutaneously advanced into the foramen from a skin incision. *Id.* at 11:28–31. Lead 10 is advanced through the introducer lumen proximal end opening into the introducer lumen. *Id.* at 11:40–43. Electrode array 20 and tine element array 120 are disposed within the pre-positioned introducer lumen for implantation in relation to the sacral nerve accessed through the foramen and in the subcutaneous tissue, respectively. *Id.* at 11:43–47. As shown in Figure 6, lead 10 is advanced distally out of the introducer lumen distal end opening to advance electrode array 20 into or through the foramen from the posterior entrance into casual contact with the more anterior sacral nerve. *Id.* at 11:48–54. After electrical testing to establish optimal positioning, introducer 200 is retracted proximally, and distal-to-proximal tine elements 125, 130, 135, 140 are successively released from the introducer lumen, as shown in Figure 7. *Id.* at 11:55–60. Once introducer 200 is completely removed, lead proximal portion 55 is bent laterally and implanted through a subcutaneously tunneled path to the neurostimulator IPG. *Id.* at 12:2–7.

### *D. Challenged Claims*

Petitioner challenges claims 1, 2, 5, 7, 13–15, and 18 of the ’756 patent. Pet. 1, 20. Claims 1 and 14 are independent. Ex. 1001, 13:33–14:18, 14:64–16:6. Independent claim 1 is illustrative and reproduced below, adding Petitioner’s labels for the limitations.

> 1. [1.0] A method of providing electrical stimulation of body tissue at a stimulation site employing an implantable pulse generator, the method comprising:
>
> > [1.a] percutaneously introducing an introducer having an introducer lumen extending between an introducer lumen proximal end opening and an introducer lumen

distal end opening through body tissue to locate the introducer lumen distal end opening adjacent to the stimulation site;

disposing an implantable medical lead within the introducer lumen, wherein the implantable medical lead comprises:

[1.b] a lead body extending between a lead proximal end and a lead distal end;

[1.c] P connector elements formed in a connector array along a first segment of the lead body proximate to the lead proximal end;

[1.d] P stimulation electrodes arranged in an electrode array extending along a second segment of the lead body proximate to the lead distal end;

[1.e] P lead conductors extending between the P connector elements and the P stimulation electrodes; and

[1.f] a plurality of M tine elements formed in a tine element array extending along a third segment of the lead body between the second segment of the lead body and the lead proximal end, [1.g] each tine element comprising N flexible tines, each tine having a tine width and a tine thickness and extending through a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body at a tine attachment site and supporting the tine extending outwardly of the lead body and toward the lead proximal end, whereby the MxN tines are adapted to be folded inward against the lead body when fitted into and constrained by the introducer lumen, [1.h] wherein the plurality of M tine elements are separate from and axially displaced from each other and from each of the P stimulation electrodes, and wherein all of the P stimulation electrodes are between the plurality of M tine elements and the lead distal end, and

> [1.i] wherein disposing the implantable medical lead within the introducer lumen comprises disposing the implantable medical lead within the introducer lumen with the MxN tines folded inward against the lead body by constraint imposed by the introducer lumen without overlapping one another;
>
> [1.j] withdrawing the introducer proximally from the tine element array to successively release the N tines of each of the M tine elements to deploy outward and toward the lead proximal end to engage body tissue and inhibit axial dislodgement of the P stimulation electrodes; and
>
> [1.k] coupling the P connector elements to the implantable pulse generator.

*Id.* at 13:33–14:18.

Independent claim 14 recites a method similar to that of independent claim 1. *Id.* at 14:64–16:6. Claims 2, 5, 7 and 13 depend from independent claim 1, and claims 15 and 18 depend from independent claim 14. *Id.* at 14:19–23, 14:30–32, 14:36–40, 14:61–63, 16:7–12, 16:22–23.

*E. Asserted Grounds of Unpatentability and Evidence*

Petitioner asserts that claims 1, 2, 5, 7, 13–15, and 18 are unpatentable on the following two grounds:

| Claims Challenged | 35 U.S.C. §[2] | References |
|---|---|---|
| 1, 2, 5, 7, 13–15, 18 | 103(a) | Young[3], Gerber[4], Lindegren[5], Akerström[6] |
| 1, 2, 5, 7, 13–15, 18 | 103(a) | Gerber, Hauser[7], Akerström |

Pet. 20. In support of its asserted grounds of unpatentability, Petitioner relies on Declarations of Benjamin Pless (Exs. 1003, 1023). Patent Owner deposed and cross-examined Mr. Pless and submits transcripts of these depositions (Exs. 2026, 2072).

Patent Owner proffers a Declaration of Dr. Konstantin Slavin (Ex. 2029), a Declaration of Dr. Steven Siegel (Ex. 2030), and a Declaration of Charles Thomas Bombeck (Ex. 2035). Petitioner deposed and cross-examined each of Patent Owner's declarants and submits transcripts of

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended certain sections of this statute, including §§ 102 and 103, and the effective date of the relevant amendment is March 16, 2013. The '756 patent was filed on February 13, 2006 (Ex. 1001, code (22)), and there is no dispute that the challenged claims of the '756 patent have an effective filing date before March 16, 2013. Accordingly, we apply the pre-AIA version of the statute.
[3] Ronald F. Young, *Electrical Stimulation of the Trigeminal Nerve Root for the Treatment of Chronic Facial Pain*, Journal of Neurosurgery 83:72–78 (July 1995) ("Young") (Ex. 1008).
[4] Gerber, US 6,055,456, issued Apr. 25, 2000 ("Gerber") (Ex. 1010).
[5] Lindegren, WO 98/20933, published May 22, 1998 ("Lindegren") (Ex. 1011).
[6] Akerström, US 4,407,303, issued Oct. 4, 1983 ("Akerström") (Ex. 1012).
[7] Hauser et al., US 5,052,407, issued Oct. 1, 1991 ("Hauser") (Ex. 1013).

Dr. Slavin's deposition (Ex. 1021), Dr. Siegel's deposition (Ex. 1022), and Mr. Bombeck's deposition (Ex. 1024).

Additionally, Patent Owner provides evidence of objective indicia of non-obviousness of the claimed invention. Patent Owner identifies this evidence in its briefing. PO Resp. 57–69; Sur-reply 15–30.

## III. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

Petitioner contends a person of ordinary skill in the art ("POSITA") would have had "(1) at least a bachelor's degree in biomedical engineering, electrical engineering, mechanical engineering, or equivalent coursework, and (2) at least two years of experience researching or developing active, implantable medical devices." Pet. 15 (citing Ex. 1003 ¶ 61). Patent Owner proposes its own level of ordinary skill in the art. PO Resp. 14. According to Patent Owner, a POSITA "would have been a physician with at least two years of experience in sacral neuromodulation" or "would have been an implantable medical lead designer with at least three years of experience designing and researching leads for use in sacral neuromodulation, and working in close collaboration with a physician having two years of experience in sacral neuromodulation." *Id.* (citing Ex. 2029 ¶¶ 21–22; Ex. 2030 ¶ 64). Patent Owner further contends "[m]ore education can substitute for practical experience and *vice versa*." *Id.* (citing Ex. 2029 ¶ 21; Ex. 2030 ¶ 64).

Patent Owner argues that we should reject Petitioner's proposed level of ordinary skill in the art because it requires no understanding of the sacral anatomy or sacral neuromodulation, which, according to Patent Owner, is

the context of the ’756 patent. PO Resp. 14–15 (citing Ex. 1001, 1:17–28; Ex. 2029 ¶¶ 23–24; Ex. 2030 ¶¶ 65–66). Patent Owner further argues that Mr. Pless “does not possess the appropriate skill in sacral neuromodulation or the requisite knowledge of the sacrum, sacral nerves, and surrounding tissues” (*id.* at 15 (citing Ex. 2026, 216:12–21)), and that “Mr. Pless’[s] testimony in this proceeding is not grounded in the perspective of a POSITA” (*id.*). Petitioner replies that the challenged claims do not recite sacral anatomy or sacral neuromodulation (Reply 3 (citing Ex. 1022, 92:25–102:4; Ex. 1023 ¶¶ 9–15)), and that the ’756 patent describes uses of the invention outside of sacral anatomy (*id.* (citing Ex. 1021, 27:5–29:25, 31:4–17, 35:2–37:8; Ex. 1022, 89:8–90:22, 99:25–102:4)).

The level of ordinary skill in the art is “a prism or lens” through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). The POSITA is a hypothetical person presumed to have known the relevant art at the time of the invention. *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In determining the level of ordinary skill in the art, we may consider certain factors, including the “type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field.” *Id.*

The parties dispute not only the level of ordinary skill, but also the relevant art. Beginning with the relevant art, Petitioner’s proposed level of ordinary skill suggests the relevant art is implantable medical devices generally (Pet. 15 (citing Ex. 1003 ¶ 61)), whereas Patent Owner’s proffered level of ordinary skill indicates the relevant art is medical leads specifically for sacral neuromodulation (PO Resp. 14 (citing Ex. 2029 ¶¶ 21–22;

Ex. 2030 ¶ 64)). We find it is the latter. The Specification of the '756 patent defines the field of the invention as medical electrical leads for sacral neuromodulation:

> 1. Field of the Invention
>
> This invention relates generally to a method and apparatus that allows for stimulation of body tissue, *particularly sacral nerves*. More specifically, this invention relates to *an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves* for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead. Moreover, this invention relates to the method of implantation and anchoring of *the medical electrical lead electrodes in operative relation to a selected sacral nerve to allow for stimulation*.

Ex. 1001, 1:17–28 (emphases added). Apart from a reference to applications outside of sacral neuromodulation (*id.* at 13:19–21), the Specification describes the invention with respect to the sacral anatomy (*see, e.g., id.* at 8:34–9:2 (describing each of the drawings as depicting a sacral nerve stimulation lead)). Moreover, the claims' lack of a recitation of sacral anatomy or sacral neuromodulation does not override the Specification's express description of the field of the invention because the claims' purpose is not to describe the subject matter of the patent but rather to define the boundary of the patent monopoly. *See, e.g.*, *PSC Comput. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1358 (Fed. Cir. 2004) ("One important purpose of the written description is to provide notice to the public as to the subject matter of the patent, while the claim provides notice as to the scope of the invention."); *In re Vogel*, 422 F.2d 438, 442 (CCPA 1970) ("A claim is a group of words defining only the boundary of the patent monopoly.").

Turning to the level of ordinary skill, each party's proposed level of ordinary skill requires a combination of formal education and experience. Pet. 15 (citing Ex. 1003 ¶ 61); PO Resp. 14 (citing Ex. 2029 ¶¶ 21–22; Ex. 2030 ¶ 64). Patent Owner's proposed level is higher than Petitioner's proposed level in that Patent Owner's proposed level requires a POSITA to either be a physician with at least two years of experience in sacral neuromodulation or a sacral neuromodulation lead designer working in close collaboration with such a physician. PO Resp. 14 (citing Ex. 2029 ¶¶ 21–22; Ex. 2030 ¶ 64). Drs. Slavin and Siegel testify that this requirement for a physician with at least two years of experience in sacral neuromodulation is necessary for the knowledge of human anatomy and surgical procedures involved in sacral neuromodulation lead placement. Ex. 2029 ¶ 24; Ex. 2030 ¶ 66. Mr. Pless, however, testifies that a lead designer developing leads for sacral neuromodulation would have similar knowledge:

> [O]ne of the things that engineers who develop products for implantation in the body pay attention to is the anatomy, and we had lots of books on anatomy, both, you know, photographic depictions as well as, you know, more schematic. You know, Netter was a great resource for that. And occasionally we would do cadaver studies as well.

Ex. 2026, 24:7–15. Although a physician with at least two years of experience in sacral neuromodulation would have knowledge of human anatomy and surgical procedures involved in sacral neuromodulation lead placement, we disagree with Patent Owner that a POSITA must be a physician with at least two years of experience in sacral neuromodulation or a sacral neuromodulation lead designer working in close collaboration with such a physician to have this knowledge.

In view of the foregoing, the relevant art is medical leads for sacral neuromodulation. This art is sophisticated and requires knowledge of human anatomy of the sacral area and the surgical procedures involved in sacral neuromodulation. Both lead designers and physicians work in this field. With these considerations, we find a POSITA would have had at least the following two qualifications: (1) a bachelor's degree, or coursework equivalent, in biomedical engineering, electrical engineering, or mechanical engineering, or a medical degree, and (2) at least two years of experience researching and developing medical leads for sacral neuromodulation. We further find that more education can substitute for practical experience and vice versa.

Regarding Patent Owner's criticism of Mr. Pless's testimony as not being grounded in the perspective of a POSITA, our Trial Practice Guide[8] explains that there is no requirement between a declarant's experience and the relevant field. TPG 34 (citing *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010)). We generally permit testimony where the declarant's scientific, technical, or other specialized knowledge will help the Board understand the evidence or to determine a fact in issue. *Id.* (citing Fed. R. Evid. 702(a)). Given his education as an electrical engineer and his experience as a medical lead designer (Ex. 1003 ¶¶ 4–10), we find Mr. Pless's testimony helpful in deciding factual issues in this proceeding. Moreover, when assigning weight to a declarant's testimony, we consider

---

[8] USPTO, *Patent Trial and Appeal Board Consolidated Trial Practice Guide November 2019*, https://www.uspto.gov/TrialPracticeGuideConsolidated ("TPG"); *see also* Office Patent Trial Practice Guide, November 2019 Edition, 84 Fed. Reg. 64,280 (Nov. 21, 2019) (notifying the public of the availability of the Consolidated Trial Practice Guide).

the underlying facts or data upon which the testimony is based. TPG 40–41. In our analysis of the asserted grounds of unpatentability, we weigh Mr. Pless's testimony accordingly.

*B. Claim Construction*

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore, we expressly construe the claims to the extent necessary to determine whether Petitioner has proven that the challenged claims are unpatentable. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Petitioner argues "a plurality of M tine elements" recited in independent claim 1 and "a plurality of tine elements" recited in independent claim 14 should be construed as "at least two or more structures that mount to the lead body, each structure comprising multiple tines attached to it." Pet. 20. Patent Owner disagrees with Petitioner's proposed construction, and also asserts the Board can resolve the dispute in this proceeding without construing these terms. PO Resp. 16–18.

We agree with Patent Owner that an express construction of each of the claim terms "a plurality of M tine elements" and "a plurality of tine elements" is unnecessary to resolve the dispute. For the reasons set forth in

our analysis of the asserted grounds of unpatentability, we determine that no claim term requires an express construction for us to ascertain whether Petitioner has shown the challenged claims to be unpatentable.

*C. Obviousness Based on Young, Gerber, Lindegren, and Akerström*

Petitioner challenges claims 1, 2, 5, 7, 13–15, and 18 under 35 U.S.C. § 103(a), contending the claimed subject matter would have been obvious over Young, Gerber, Lindegren, and Akerström. Pet. 22–47; Reply 3–10. Patent Owner argues Petitioner's proposed combination of Young, Gerber, and Lindegren would not have resulted in a method comprising all of the claim limitations. PO Resp. 19–23; Sur-reply 1–5. Patent Owner also argues that there would not have been a motivation to combine the teachings of the references as Petitioner proposes. PO Resp. 23–38; Sur-reply 5–10.

We begin our analysis of this asserted ground of unpatentability with an overview of the references, and then discuss the parties' contentions for each of the claims. For the reasons below, Petitioner has not shown, by a preponderance of the evidence, that the subject matter of claims 1, 2, 5, 7, 13–15, and 18 would have been obvious over the combined teachings of Young, Gerber, Lindegren, and Akerström.

*1. Young*

Young details "the author's experience with the placement of a totally implanted, percutaneously placed electrode system for chronic electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain in 23 patients between 1990 and 1993." Ex. 1008, 73. The trigeminal stimulating electrode[9] is shown in Figure 1, reproduced below.

[9] The trigeminal stimulating electrode disclosed in Young is Patent Owner's Quintatrigeminal electrode. Ex. 1008, 73.



FIG. 1.

Figure 1 is a photograph of the tip of the trigeminal stimulating electrode. *Id.* The trigeminal stimulating electrode consists of a monopolar platinum-iridium lead with two sets of four tines located 5 and 10 mm from the distal tip of the electrode and a central stylet. *Id.* The purpose of the tines is to prevent the electrode from becoming dislodged after implantation. *Id.*

The electrode is inserted percutaneously through a No. 14 needle via a puncture of the foramen ovale. *Id.* Subsequently, the introducing needle and central stylet are removed, and the proximal end of the electrode is tunneled subcutaneously around the mandible and connected to a percutaneous extension lead. *Id.* The distal end of the extension lead is connected to a completely implanted pulse generator system. *Id.* at 74. The implanted pulse generator system[10] is shown in Figure 3 below.

[10] The implanted pulse generator system disclosed in Young is Patent Owner's ITREL. Ex. 1008, 74.



Figure 3 is a photograph of the complete component system for trigeminal stimulation, including the electrode, the implanted pulse generator, and an extension lead. *Id.*

The patients with the implanted electrode system did not have any major complications but instead only a few minor problems. *Id.* at 77. Nonetheless, "[t]he electrode could be improved to provide multiple active stimulation sites near the tip," which "would be particularly useful for achieving stimulation-induced paresthesias in patients with pain in all three trigeminal divisions." *Id.*

2. *Gerber*

Gerber discloses "an implantable medical lead having at least one electrode contact wherein the lead is implanted near the sacral nerves for stimulation of a bundle of nerve fibers." Ex. 1010, 1:9–12. An implantable medical lead for stimulation of the sacral nerves is shown in Figure 1, reproduced below.




FIG. 1

Figure 1 is a plan view showing implantable medical lead 10 comprising lead body 15 having at least one electrode contact 20 at distal end 25. *Id.* at 3:21–22, 3:40–43. Proximal end 35 of lead body 15 may be coupled to a pulse generator, and lead body 15 includes at least one conductor wire within an insulating sheath. *Id.* at 3:49–51, 4:6–7.

Implantable medical lead 10 may have an anchoring mechanism to fixate the lead in the desired position, as shown in Figure 2, reproduced below.




FIG. 2

Figure 2 is a plan view of implantable medical lead 10 having anchoring mechanism 50, which is a molded part, integral to medical lead 10. *Id.* at 3:23–25, 4:13–17. A physician can pass sutures through the molded part to attach medical lead 10 to the human anatomy. *Id.* at 4:17–19. Alternatively, anchoring mechanism 50 allows medical lead 10 to fibrose in naturally using the human body's natural reaction to a foreign body or healing. *Id.* at 4:27–30.

Implantable medical lead 10 may include two electrode contacts, as shown in Figure 3 below.




FIG.3

Figure 3 is a plan view of implantable medical lead 10 having two electrode contacts 20, 40 to provide for a bipolar configuration. *Id.* at 3:26–27, 4:32–33.

The medical lead has a smaller than typical diameter. *Id.* at 2:64–66. The smaller diameter allows for less invasive implantation techniques, such as via a cannula, imparts less trauma to the patient during implantation, and enables a physician to use local, instead of general, anesthesia. *Id.* at 2:66–3:6. When the medical lead is implanted with a cannula, a stylet is useful to straighten the medical lead for passing through the cannula. *Id.* at 5:15–17, 5:26–28.

3. *Lindegren*

Lindegren discloses an implantable electrode lead with "an electrode head equipped with external anchoring means, such as tine-like position-fixation means." Ex. 1011, 1:6–11. The position-fixation means consists of a position-fixation groove encircling the exterior of the electrode head, and the groove is sized to receive a ring-shaped tine-bearing means. *Id.* at 5:11–15. Figure 3, reproduced below, shows the ring-shaped means mounted in the position-fixation groove.




FIG. 3

Figure 3 is a perspective view of the distal end section of implantable electrode lead 2. *Id.* at 6:30–32, 7:7–8. Received in position-fixation groove 8, ring-shaped means 10 encircles electrode head 6 and includes four projections 12 extending at an angle outward and to the rear. *Id.* at 7:18–23. From a manufacturing point of view, it is preferable to have projections 12 integral with ring-shaped means 10 and evenly distributed around the circumference of ring-shaped means 10. *Id.* at 5:17–22, 7:30–8:1. Furthermore, ring-shaped means 10 and projections 12 are preferably made of an elastic material such as silicone rubber. *Id.* at 5:20–22, 8:5–8.

*4. Akerström*

Akerström relates to an endocardial electrode arrangement having an elongated electric conductor, an electrode head conductively connected to a distal end of the conductor for applying stimulation pulses to the heart, and means for placing the conductor or the electrode head on the heart wall. Ex. 1012, 1:5–13. The distal end of the endocardial electrode arrangement is shown in Figure 1, reproduced below.




FIG 1

Figure 1 illustrates the distal end of the endocardial electrode arrangement that comprises electric conductor 1 provided with electric insulation sheath 2. *Id.* at 2:15–16, 2:34–36. At the distal end of conductor 1, electrode head 3 is disposed. *Id.* at 2:36–38.

To securely retain the electrode in its position in the heart, the electrode includes loops 5 into which heart tissue can grow. *Id.* at 2:46–49. Loops 5 are located in close proximity to electrode head 3 and mounted on sleeve 6 slipped over insulation 2 of conductor 1. *Id.* at 2:46–50. As shown in Figure 1, loops 5 are attached along a helical-shaped line. *Id.* at 2:50–51. The loops can be fabricated from a soft, thin, body-fluid-resistant material, such as polyester and polypropylene. *Id.* at 2:66–68. As loops 5 consist of a soft, thin material, they rest closely against the electrode during insertion of the electrode into a vein. *Id.* at 3:8–11.

5. *Independent claim 1*

   a. *Undisputed limitations (limitations 1.0–1.f, 1.h, 1.i, and 1.k)*

The preamble of independent claim 1, i.e., Petitioner's designated limitation 1.0, recites "[a] method of providing electrical stimulation of body tissue at a stimulation site employing an implantable pulse generator." Ex. 1001, 13:33–35. Petitioner contends that, to the extent the preamble is a limitation, Young discloses stimulating the electrode using the IPG to obtain paresthesia and pain relief. Pet. 32 (citing Ex. 1008, 73–75).

Independent claim 1 recites "percutaneously introducing an introducer having an introducer lumen extending between an introducer lumen proximal end opening and an introducer lumen distal end opening through body tissue to locate the introducer lumen distal end opening adjacent to the stimulation site," i.e., limitation 1.a. Ex. 1001, 13:36–41. Petitioner contends Young discloses percutaneous introduction of a No. 14 needle through which an electrode is passed to induce paresthesia near the trigeminal nerve. Pet. 32–33 (citing Ex. 1008, 73). According to Petitioner, "[p]aresthesia defines the stimulation site because it can only be achieved if the electrode is adjacent to the stimulation site, i.e. trigeminal nerve." *Id.* at 33 (citing Ex. 1003 ¶ 89). Petitioner further contends that Gerber teaches using a cannula to deliver the electrode into place, and that percutaneous use of a cannula as an introducer was well known prior to 2001. *Id.* (citing Ex. 1003 ¶ 96; Ex. 1010, 5:16–17, 5:26–28, 5:34–35).

Independent claim 1 also recites "a lead body extending between a lead proximal end and a lead distal end," i.e., limitation 1.b. Ex. 1001, 13:45–46. Petitioner argues that the electrode described in Young includes a lead body with two ends, and that a lead inherently has a body extending between proximal and distal ends. Pet. 33–34 (citing Ex. 1008, Figs. 1, 3).

Independent claim 1 further recites "P connector elements formed in a connector array along a first segment of the lead body proximate to the lead proximal end," i.e., limitation 1.c. Ex. 1001, 13:47–49. In support of its assertion that Young discloses this limitation, Petitioner provides an annotated version of Young's Figure 3, reproduced below. Pet. 34.




Petitioner annotated Young's Figure 3, which is a photograph of the complete component system for trigeminal stimulation, including an electrode, extension lead, and IPG (Ex. 1008, 74), to identify the distal and proximal ends of the electrode, the connector array of the extension lead, and the IPG. Petitioner argues Young discloses at least one connector along the lead proximal end because it teaches one electrode that connects to an IPG for stimulation. Pet. 34 (citing Ex. 1003, 72). Petitioner also argues Young's Figure 3 depicts a connector array with four possible connections on the extension lead that is connected to the IPG, thereby suggesting four connector elements in an array along the lead body is possible. *Id.*

Additionally, Petitioner asserts Gerber teaches existing leads have four electrodes built into the distal end of the lead to receive outputs from the IPG. *Id.* (citing Ex. 1010, 1:57–61, 3:48–50, 4:65–5:8). Per Petitioner, "in order to connect the electrodes at distal end to the IPG at the proximal end, Gerber inherently discloses up to four connectors proximate the lead proximal end, which is the first segment, between the IPG and electrodes." *Id.* (citing Ex. 1003, 72).

Independent claim 1 next recites "P stimulation electrodes arranged in an electrode array extending along a second segment of the lead body proximate to the lead distal end," i.e., limitation 1.d. Ex. 1001, 13:50–52. Petitioner argues: "Young discloses one electrode, but suggests multicontact electrodes or multiple active stimulation sites, which means there will be multiple electrodes." Pet. 34–35 (citing Ex. 1003 ¶ 104; Ex. 1008, 77). Petitioner further argues Gerber teaches leads having multiple electrodes, particularly two electrodes, arranged in an array at the distal end, which is a second segment of the lead body. *Id.* at 35 (citing Ex. 1010, Abstract, 1:57–58, 2:4–5, 4:32–45, 5:6–8, claim 1, Fig. 3).

Independent claim 1 further recites "P lead conductors extending between the P connector elements and the P stimulation electrodes," i.e., limitation 1.e. Ex. 1001, 13:53–54. Petitioner argues Young discloses one conductor wire between the electrode and a connector element for the electrode to function and provide pain relief. Pet. 35 (citing Ex. 1003 ¶ 106; Ex. 1008, 74). Petitioner also argues Gerber teaches that lead body 15 comprises at least one conductor wire within an insulating sheath, and that stimulation pulses are carried from the pulse generator through lead body 15 toward the distal end having at least one electrode contact. *Id.* at 35–36 (citing Ex. 1010, 3:52–56, 4:6–7). According to Petitioner, "where there are multiple electrodes as disclosed by Gerber, there will be multiple conductors extending between the connector elements attached to pulse generators at proximal end and the electrodes at the distal end." *Id.* at 36 (citing Ex. 1003, 73–74).

Independent claim 1 recites "a plurality of M tine elements formed in a tine element array extending along a third segment of the lead body

between the second segment of the lead body and the lead proximal end," i.e., limitation 1.f. Ex. 1001, 13:55–58. Petitioner contends Young's electrode includes at least two tine elements formed in a tine element array extending a third segment located between the electrode of the second segment and the lead proximal end. Pet. 36 (citing Ex. 1008, 73; Fig. 1). Petitioner also contends Gerber discloses multiple electrodes in the second segment. *Id.*

Independent claim 1 also recites "wherein the plurality of M tine elements are separate from and axially displaced from each other and from each of the P stimulation electrodes, and wherein all of the P stimulation electrodes are between the plurality of M tine elements and the lead distal end," i.e., limitation 1.h. Ex. 1001, 13:67–14:5. Petitioner argues Young discloses two sets of tines that are axially displaced from each other and also from the electrode. Pet. 37–38 (citing Ex. 1003, 75–76; Ex. 1008, 73, Fig. 1). Petitioner further argues that, to the extent Young does not disclose separate tine elements, Akerström teaches an arrangement of two spaced-apart series of loops. *Id.* at 38 (citing Ex. 1012, 2:56–59, Fig. 3). According to Petitioner, Akerström's loops look like tines, and a POSITA could have arranged tines as shown in Akerström. *Id.* (citing Ex. 1003, 76). Additionally, Petitioner asserts Gerber teaches two electrodes, as well as an electrode located between the anchoring mechanism and distal tip. *Id.* (citing Ex. 1010, Figs. 2–3). Per Petitioner, Gerber teaches the anchoring mechanism allows the medical lead to fibrose naturally into the human body, and a POSITA would have known that tines allow for anchoring by fibrosis and would have located the tines between all electrodes and the lead distal end. *Id.* at 38–39 (citing Ex. 1003, 76–77; Ex. 1010, 4:15–30, Fig. 2).

Independent claim 1 further recites "wherein disposing the implantable medical lead within the introducer lumen comprises disposing the implantable medical lead within the introducer lumen with the MxN tines folded inward against the lead body by constraint imposed by the introducer lumen without overlapping one another," i.e., limitation 1.i. Ex. 1001, 14:6–11. Petitioner contends Figure 1 of Young shows each tine is shorter than the distance between the two sets of tines such that the tines cannot overlap one another. Pet. 39 (citing Ex. 1003, 78).

The last limitation of independent claim 1 recites "coupling the P connector elements to the implantable pulse generator," i.e., limitation 1.k. Ex. 1001, 14:17–18. Petitioner contends Young discloses that, after the electrode tip is within millimeters of the stimulation site, the proximal end of the electrode is tunneled subcutaneously and connected to an extension lead, which is connected to an IPG. Pet. 40–41 (citing Ex. 1008, 73–74).

Patent Owner does not dispute Petitioner's contentions with respect to what Petitioner designates as limitations 1.0–1.f, 1.h, 1.i, and 1.k. Petitioner's arguments and Mr. Pless's testimony find support in Young, Gerber, and Akerström. Young discloses a percutaneously placed electrode system for chronic electrical stimulation of the trigeminal sensory root to treat chronic facial pain. Ex. 1008, 73. Young's electrode system includes an implantable medical lead having a lead body, an electrode, and plurality of tine elements made up of a plurality of tines and located proximal to the electrode. *Id.* at 73, Fig. 1. Young's electrode system further includes an IPG connected to the end of the lead body opposite the electrode so that the lead body conducts electrical pulses from the IPG to the electrode. *Id.* at 74, Fig. 3. To implant Young's electrode, a No. 14 needle is directed toward the

center of the foramen ovale. *Id.* at 73. Once cerebrospinal fluid flows through the needle, the electrode is inserted and advanced through the needle until paresthesias could be induced. *Id.* After several days of percutaneous trial stimulation, the percutaneous extension is removed and the proximal electrode is connected to the extension lead, the distal end of which is connected to the implanted IPG. *Id.* Gerber teaches an implantable medical lead having a lead body, a plurality of conductors, a plurality of electrodes that are each electrically connected to a conductor of the plurality of conductors, a plurality of connectors for connecting the plurality of electrodes to an IPG, and an anchoring mechanism located separate and axially displaced from an electrode. Ex. 1010, Abstract, 1:57–61, 3:39–42, 3:48–50, 3:52–56, 4:6–7, 4:13–15, 4:32–33, 4:65–5:8, Figs. 2–3. Akerström teaches an electrode arrangement including flexible, proximally extending loops that are positioned on collars spaced apart from each other. Ex. 1012, 2:56–59, 3:52–59, Fig. 3. In view of the foregoing, Petitioner has persuasively identified what it designates as limitations 1.0–1.f, 1.h, 1.i, and 1.k in its proposed combination of Young, Gerber, Lindegren, and Akerström.

*b. N flexible tines extending toward the lead proximal end and adapted to be folded inward against the lead body (limitation 1.g)*

Independent claim 1 further recites:

> each tine element comprising N flexible tines, each tine having a tine width and a tine thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and toward the lead proximal end, whereby the MxN tines are adapted to be folded inward against the lead body when fitted into and constrained by the introducer lumen,

i.e., limitation 1.g. Ex. 1001, 13:58–67. Petitioner argues each of Young's two tine elements includes four flexible tines having a width, thickness, and length from a free tine end to an attached tine end attached to the tine element and lead body. Pet. 36–37 (citing Ex. 1008, Fig. 1). Petitioner further argues: "All 8 tines (2M x 4N) are adapted to fold inward against the lead body when constrained into the No. 14 Needle, i.e. introducer. Tines inherently fold inward against the lead body when fitted into and constrained by the introducer lumen." *Id.* at 37 (citing Ex. 1003, 74–75). Petitioner acknowledges Young's tines may not be proximally oriented, and contends Lindegren teaches four tines attached to a structure similar to that of Young and extending toward the proximal end. *Id.* (citing Ex. 1011, Fig. 3). Petitioner also contends that proximally oriented tines were common before 2001, especially for use with an introducer into which the tine ends enter first, because such an orientation does not risk damaging the free tine ends. *Id.* (citing Ex. 1003, 75).

Patent Owner argues "[Petitioner's] assertion that Young discloses this limitation, in effect, amounts to an unsupported and legally improper inherency argument that should be rejected because there is no evidence that the tines in Young necessarily fold inward against the lead body." PO Resp. 20 (internal quotation omitted). Patent Owner maintains that even if inserting Young's lead into a needle causes the tines to fold inwardly, the tines would not necessarily touch the lead body. *Id.* at 20–21; Sur-reply 3–5. According to Patent Owner, Dr. Slavin testifies that whether Young's tines fold inwardly against the lead body depends on multiple factors, including the diameter of the electrode, length and diameter of the tines, diameter of the needle through which the tined electrode is introduced, and the material

of the tines (PO Resp. 20 (citing Ex. 2029 ¶¶ 45–51)), and Dr. Slavin provides an example of how a tine can fold inwardly without being against the lead body (Sur-reply 3–4 (citing Ex. 2029 ¶ 49)). Patent Owner also contends Mr. Pless admits that he could not say for sure whether Young's tines would touch the lead body. PO Resp. 21 (citing Ex. 2026, 112:14–113:11); Sur-reply 4.

Petitioner replies that limitation 1.g recites tines adapted to be folded against the lead body and thus does not require the tines to actually be folded against the lead body but simply tines adapted to be folded against the lead body. Reply 4. Petitioner further replies that Mr. Pless's opinion regarding Young's tines being adapted to be folded against the lead body is based on his measurements of Young's tines and the inner diameter of a No. 14 needle. *Id.* at 4 (citing Ex. 2029, 109:14–110:16).

We agree with Petitioner that limitation 1.g recites tines adapted to be folded against the lead body and therefore does not require the tines to actually be folded against the lead body. Consequently, Dr. Slavin's testimony that there is insufficient evidence to conclude Young's tines touch the lead body when constrained by the needle's lumen (Ex. 2029 ¶¶ 48–50) and Mr. Pless's admission that he could not say for sure whether Young's tines would touch the lead body (Ex. 2026, 112:25–113:11) are not commensurate with the scope of limitation 1.g and thus not probative.

Moreover, contrary to Patent Owner's argument, Petitioner is not alleging it is inherent that Young's tines fold inwardly against the lead body when fitted into a No. 14 needle. Rather, Petitioner argues that, given the disclosed dimensions of Young's tined lead relative to the inner diameter of a No. 14 needle and Young's disclosure of inserting the tined lead into a

No. 14 needle, a POSITA would understand that Young teaches tines capable of folding against the lead body. Pet. 36–37; Reply 4. In particular, Mr. Pless testifies:

> I did look up the size of a No. 14 needle and compared that against Young's disclosed dimensions, which were that the tines were 5 mm apart. Using that as a scale, the diameter of the tines (tip to tip) appears to be about 4mm. While I couldn't recall the dimensions during my deposition, I looked up the size of a No. 14 needle afterwards. I confirmed that inner diameter of a No. 14 needle is typically around 1.6 mm. Thus, when the lead is advanced through the No. 14 needle, it is difficult to see how that could happen without the tines (which have a considerably larger span than the inside diameter of the needle) being adapted to be folded against the lead body.

Ex. 1023 ¶ 24 (footnote omitted).

In view of Young's disclosure of its tines being spaced 5 mm apart (Ex. 1008, 73), we credit Mr. Pless's testimony that, based on the photograph of the lead shown in Figure 1, the tines extend, tip to tip, approximately 4 mm. *See In re Aslanian*, 590 F.2d 911, 914 (CCPA 1979) (holding that drawings must be evaluated for what they reasonably disclose and suggest to a POSITA); *cf. Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (holding that arguments based on measurements taken from a reference's drawings are of little value when the reference does not disclose the drawings are to scale and is silent as to dimensions). We also credit Mr. Pless's uncontested testimony that the inner diameter of a No. 14 needle is approximately 1.6 mm. Given Young's disclosure of its tined electrode being inserted through a No. 14 needle, which has an inner diameter that is less than half the length of the tines measured tip to tip, Young's tines must be flexible and bend significantly to

fit in the No. 14 needle and therefore capable of folding inwardly against the lead body.

In view of the foregoing, Petitioner has persuaded us that Young discloses tines adapted to be folded inwardly against the lead body. Petitioner also has persuaded us that Lindegren teaches tines extending toward the proximal end of the lead, as shown in Figure 3. Petitioner has shown limitation 1.g in its proposed combination of Young, Gerber, Lindegren, and Akerström.

*c. Withdrawing the introducer to successively release the N tines to deploy outward to engage body tissue (limitation 1.j)*

Independent claim 1 recites "withdrawing the introducer proximally from the tine element array to successively release the N tines of each of the M tine elements to deploy outward and toward the lead proximal end to engage body tissue and inhibit axial dislodgement of the P stimulation electrodes," i.e., limitation 1.j. Ex. 1001, 14:12–16. Petitioner argues that "[t]ines should not be deployed until the electrode placement is finalized because once deployed, they engage body tissue and can be damaged if the lead is moved within the body." Pet. 40 (citing Ex. 1003 ¶ 32). Petitioner also argues that, in view of Young's disclosure of the lead being advanced into place in the body and the tines working to prevent migration of the lead after the introducing needle was removed, a POSITA would have understood Young discloses withdrawing the needle deploys the tines successively so that the tines do not suffer damage and lose the ability to prevent electrode migration. *Id.* (citing Ex. 1003, 78–79; Ex. 1008, 73, 75).

Patent Owner argues that Young merely discloses advancing the lead and subsequently withdrawing the needle through which the lead was advanced, and that there is no evidence that withdrawing the needle deploys

the tines as limitation 1.j requires. PO Resp. 22 (citing Ex. 1008, 73; Ex. 2029 ¶¶ 34–41, 52–55); Sur-reply 2. According to Patent Owner, "[t]here is nothing in Young that prevents the tines from also coming out of the needle while the needle distal tip is maintained in the trigeminal cistern." PO Resp. 22 (citing Ex. 2029 ¶ 52). Patent Owner also argues the tines of Young do not engage body tissue once deployed because the tines are placed in the fluid cavity of the trigeminal cistern, which does not contain tissue. *Id.* at 22–23 (citing Ex. 2029 ¶ 54); Sur-reply 3.

Petitioner replies that Young discloses the tines prevent the electrode from dislodging. Reply 5. Petitioner further replies that a POSITA would have understood the tines deploy only after exact placement of the electrode is obtained. *Id.*

Beginning with whether Young discloses withdrawing the introducer to deploy the tines, Young's electrode is implanted by directing a No. 14 needle toward the center of the foramen ovale until cerebrospinal fluid flows through the needle, then inserting and advancing the electrode through the needle until paresthesias is induced, and subsequently removing the needle. Ex. 1008, 73. Petitioner's argument is based on Mr. Pless's testimony that

> a POSITA would understand Young to disclose that doctors observed the electrode advancement to the stimulation site, the electrode was out of the Needle to stimulate the nerve and exact placement location was obtained to induce paresthesia, and once paresthesia was obtained, the Needle was withdrawn proximally towards the lead proximal end and the physician to deploy the tines successively so the tines did not suffer damage and lose its intended function to prevent electrode migration.

Ex. 1003, 78–79. Patent Owner's argument is based on Dr. Slavin's opinion that "[t]here is nothing in Young that prevents the tines from also coming out of the needle while the needle distal tip is maintained in the trigeminal

cistern." Ex. 2029 ¶ 52. Dr. Slavin's opinion, however, ignores Young's express disclosure that "[t]he purpose of the tines was to prevent the electrode from becoming dislodged after implantation." Ex. 1008, 73. If the tines came out of the needle before the electrode was properly placed at the stimulation site to induce paresthesias, the tines would cause the electrode to be secured at the inexact location. In view of Young's disclosure that the tines are intended to prevent the electrode from becoming dislodged, we find credible Mr. Pless's testimony that a POSITA would understand Young's tines are deployed by withdrawing the introducer, which occurs after the electrode is positioned in the stimulation site by advancing the electrode through the needle.

Turning to whether Young's tines engage body tissue, Patent Owner's argument that Young's tines do not engage body tissue is based on Dr. Slavin's testimony regarding the anatomy of the trigeminal cistern into which Young's electrode is placed. According to Dr. Slavin:

> [Young's] needle is inserted until reaching cerebrospinal fluid. This signals to the physician that the needle has reached the trigeminal cistern which is filled with cerebrospinal fluid and that the needle should not be advanced further. (Ex. 1008, 73.) The lead is then fed through the needle and the tip is advanced deeper into the cistern. (*Id.*) The tines, being just behind the electrode, are thus placed within this fluid cavity of the trigeminal cistern. So contrary to the assertion that the tines engage body tissue like the '756 patent, Young's tines float among nerve rootlets. The trigeminal cistern simply does not contain tissue for the tines to "engage."

Ex. 2029 ¶ 54. Dr. Slavin's testimony, however, is contrary to Young's express disclosure that the tines prevent dislodgement of the electrode. Tines must engage body tissue to secure the electrode. Although Young's electrode is inserted into the trigeminal cavity, which is filled with fluid, the

trigeminal cavity itself is surrounded by body tissue and includes nerve rootlets therein. *See* Ex. 2029 ¶ 38 (Dr. Slavin's depiction of the anatomy of the trigeminal nerve area showing the trigeminal cistern being formed within body tissue and enclosing nerve rootlets therein).

After considering the parties' arguments and evidence, Petitioner has persuaded us that Young discloses withdrawing the introducer to deploy the tines to engage body tissue, as limitation 1.j requires. Petitioner has shown limitation 1.j in its proposed combination of Young, Gerber, Lindegren, and Akerström.

*d. Reasons for combining the teachings*

Petitioner argues a POSITA would have been motivated to combine the teachings of Young, Gerber, Lindegren, and Akerström. Pet. 29–32. Petitioner contends a POSITA would have modified Young's electrode system to include a lead with multiple electrodes, as taught by Gerber, because "Young teaches that the single electrode 'could be improved to provide multiple active stimulation sites near the tip' and that 'patients who discontinued stimulation due to ineffective pain relief might have benefitted from a multicontact electrode [i.e. lead with multiple electrodes], which would permit greater flexibility in activation of a wider area.'" *Id.* at 30 (alteration in original) (quoting Ex. 1008, 77) (citing Ex. 1003 ¶ 104). Petitioner also contends that Gerber teaches its lead could use various anchoring means that affix by fibrosis, and that Young's tines and Akerström's loops secure via fibrosis. *Id.* Petitioner further contends that Lindegren teaches it would be preferable for manufacturing to have tines mounted on a ring-shaped means like a rubber band encircling the lead body (*id.*), and that Akerström's arrangement of loops shown in Figure 3 looks

very similar to Lindegren's tine-mounted rings and allows for easy manufacturing and adaptation to the needs of the stimulation site (*id.* at 31 (citing Ex. 1003 ¶¶ 107, 117)). Per Petitioner,

> in order to improve anchoring within the soft tissue near the sacrum, it would have been obvious to a POSITA to use multiples of tines mounted on collars (i.e. tine elements) extending proximally and spaced them apart as shown in Young and Akerstr[ö]m to further prevent dislodgment after implantation, i.e., a purpose of tines taught by Young.

*Id.* Additionally, Petitioner argues a POSITA would have combined the teachings of Young, Gerber, Lindegren, and Akerström because each of these references solve the same problem as the '756 patent in the same field. *Id.* at 29 (citing Ex. 1008, 73; Ex. 1010, 1:64–2:14; Ex. 1011, 1:20–27; Ex. 1013, 1:5–14; *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1371 (Fed. Cir. 2011)).

Patent Owner maintains Petitioner's proposed combination of the references is based on impermissible hindsight. PO Resp. 23–25. Patent Owner argues there would not have been a motivation to modify Young's lead to include Gerber's multiple electrodes so that the electrodes are distal to all of the lead's tines, as independent claim 1 requires. *Id.* at 25–32; Sur-reply 6–8. Patent Owner also argues there would not have been a motivation to combine the teachings of Young's lead with Lindegren's proximally extending tines, as recited in limitation 1.g. PO Resp. 32–35; Sur-reply 8. Patent Owner additionally argues Petitioner's general reasons for combining the teachings of the references are insufficient. PO Resp. 35–38.

Beginning with Petitioner's reasoning premised on the references solving the same problem as the '756 patent, Patent Owner argues none of

these references solve the same problem as the ’756 patent. PO Resp. 37 (citing Ex. 2029 ¶¶ 74–81). We agree with Patent Owner. Petitioner characterizes the problem addressed in the ’756 patent as “leads adequately stimulating the nerves while limiting dislodgement” (Pet. 29), but the ’756 patent describes a more specific problem. According to the ’756 patent:

> [T]here remains a need in the art for *a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient’s skin to locate stimulation electrodes in casual contact with a sacral nerve*, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period.

Ex. 1001, 5:19–29 (emphasis added). The ’756 patent addresses the need for a percutaneously implantable lead that is properly and securely positioned to provide sacral nerve stimulation, whereas the references do not. Young addresses placement of an implanted, percutaneously placed electrode system for electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain. Ex. 1008, 73. Gerber contemplates the positioning and securement of an electrode that is implanted in the sacral area via a non-percutaneous surgical procedure. Ex. 1010, 2:9–13. Lindegren addresses the need for a cardiac lead that can be easily detached from the anchoring means and allow the lead to be replaced despite the anchoring means being stuck in the heart. Ex. 1011, 4:16–22. Akerström addresses the difficulties of inserting an endocardial lead with a voluminous electrode head into a vein. Ex. 1012, 1:20–28. Moreover, the nature of the problem to be solved is typically pertinent to the motivation for combining the teachings

of simpler mechanical technologies. *Tokai*, 632 F.3d at 1371 ("We have consistently stated that courts may find a motivation to combine prior art references in the nature of the problem to be solved, and that [t]his form of motivation to combine evidence is particularly relevant with simpler mechanical technologies." (alternation in original) (citations and internal quotations omitted)). The technologies in this proceeding involve medical devices implanted in the body for neurostimulation, not simple mechanical technologies. *See, e.g.*, Ex. 1001, 1:20–25 (describing the field of the invention for '756 patent as "an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead"). Accordingly, Petitioner's reasoning premised on Young, Gerber, Lindegren, and Akerström solving the same problem as the '756 patent does not persuade us that a POSITA would have had a reason to combine the teachings of the references.

Turning to Petitioner's reasoning for modifying Young's lead to include Gerber's multiple electrodes so that the electrodes are distal to all of the lead's tines, Petitioner's reasoning is premised on Young, which discloses "[t]he electrode could be improved to provide multiple active stimulation sites near the tip." Ex. 1008, 77. Petitioner argues this disclosure suggests multiple electrodes arranged distal to all of the tines because "[t]he tip referenced here is the distal tip where Young's original electrode was located, which is distal to all of the tines of Young." Reply 8; *see also* Ex. 2026, 168:12–21 (Mr. Pless testifying "I think a person of ordinary skill in the art would see that Young is recommending multiple

distal electrodes, and at least to me the natural thing would be to add the electrodes where the current electrode in Young is, which is distal to the tines”).

Patent Owner argues Young’s disclosure of improving its lead to provide multiple active stimulation sites, i.e., electrodes, near the tip would not have suggested to a POSITA to modify Young’s lead to include a plurality of electrodes distal to all of the tines because such an arrangement would not be feasible in the complex anatomy of the trigeminal nerve region. PO Resp. 26 (citing Ex. 2029 ¶¶ 56–63); *see also* Sur-reply 6–8 (arguing that adding electrodes distal to all of the tines would render Young’s tines inoperable for their intended purpose). Patent Owner’s argument is based on Dr. Slavin’s testimony:

> If, as Mr. Pless appears to assume, that Young is suggesting adding electrode(s) distal to the tines in figure 1, then the tines would have to get pushed back in the proximal direction (i.e., towards the foramen ovale) to accommodate the additional electrode(s). This means the tines would be out of the cistern, but moving the tines outside the cistern would result in them being in contact with, for example, the hard tissue of the trigeminal ganglion. But tines cannot anchor in such hard tissue, which would have prevented the tines from performing their intended function of stabilizing the lead electrode within the cistern.

Ex. 2029 ¶ 60 (footnote omitted). Patent Owner also argues that we should give no weight to Mr. Pless’s opinion that a POSITA would have been motivated to combine the teachings of Young with other references because Mr. Pless lacks an understanding of the trigeminal nerve anatomy pertinent to Young’s disclosure. PO Resp. 28–29. Patent Owner further argues that “[e]ven if a POSITA were motivated to try to improve the lead in Young—they would look to modify Young’s lead to *remove* tines and would certainly

*not* consider rearranging them to arrive at the claimed invention." *Id.* at 29 (citing Ex. 2029 ¶ 63).

Petitioner replies that it is incorrect for Patent Owner to require Young's lead, as modified to include Gerber's multiple electrodes, to operate as intended in the trigeminal area. Reply 6–7. According to Petitioner, the proper inquiry is whether the proposed combination would achieve what is in the '756 patent claims. *Id.* at 7.

Petitioner, however, conflates the obviousness requirements of motivation to combine and reasonable expectation of success, which are distinct inquiries. *See, e.g.*, *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016) (explaining "two different legal concepts—reasonable expectation of success and motivation to combine"). Reasonable expectation of success contemplates the likelihood of success in combining the references to meet the limitations of the claimed invention, and failure to consider the appropriate scope of the claimed invention in evaluating a reasonable expectation of success constitutes a legal error. *Id.* In contrast, motivation to combine considers whether there would have been a suggestion or motivation to make the proposed combination of references. *Id.* at 1368. Although an unclaimed purpose is irrelevant to reasonable expectation of success, it may be pertinent to motivation to combine. *Id.* ("While [the deblocking of the prior art's azidomethyl group] is irrelevant to a finding that there was no reasonable expectation of success in meeting the claims of the '537 patent, which do not require quantitative deblocking at all, it is central to a finding of no motivation to combine."); *see also In re Gordon*, 733 F.2d 900, 902 Fed. Cir. 1984) (reversing a determination of obviousness because the proposed modification would have rendered the

prior art device inoperable for its intended purpose); *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) ("We find no error in the Board's rejection of TriVascular's argument that it would have been obvious to substitute the recessed barbs of Samuels '851 with the protuberances of Todd, since TriVascular's proposed substitution would destroy the basic objective of the barbs, which is to *penetrate* surrounding tissue.").

As the purpose of Young's lead, which is electrical stimulation of the trigeminal sensory root (Ex. 1008, 73), is relevant to assessing whether there would have been a motivation to combine, we credit Dr. Slavin's testimony that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would not have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines because such an arrangement would not be feasible in the trigeminal nerve region. Moreover, contrary to Petitioner's argument, Young discloses multiple active sites *near* the tip, not at the tip or distal to the tines. In view of Young simply disclosing multiple active sites near the tip, without any relation to the tines, and Dr. Slavin's testimony that a POSITA would not understand Young to suggest multiple electrodes distal to all of the tines, Petitioner has not persuaded us that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines.

*e. Conclusion for independent claim 1*

Petitioner has demonstrated each limitation of independent claim 1 in its proposed combination of Young, Gerber, Lindegren, and Akerström. Petitioner, however, has not persuaded us that a POSITA would have had a

reason to combine Young's lead with Gerber's plurality of electrodes so the plurality of electrodes is distal to all of the lead's tines, as Petitioner proposes. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 57–69; Sur-reply 15–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claim 1 would have been obvious over the combined teachings of Young, Gerber, Lindegren, and Akerström.

6. *Independent claim 14*

Petitioner relies on the same reasoning for combining the teachings of Young, Gerber, Lindegren, and Akerström to result in the subject matter of independent claim 14 as for combining the teachings of these references to result in the subject matter of independent claim 1. Pet. 29–32. As discussed above in section III.C.5.d, Petitioner's reasoning is not persuasive. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 57–69; Sur-reply 15–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claim 14 would have been obvious over combined teachings of Young, Gerber, Lindegren, and Akerström.

7. *Dependent claims*

For the reasons discussed above in sections III.C.5.d and III.C.6, Petitioner has not persuaded us that a POSITA would have had a reason to combine the teachings of Young, Gerber, Lindegren, and Akerström to result in the subject matter of independent claims 1 and 14, from which claims 2, 5, 7, 13, 15, and 18 depend. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 57–69; Sur-reply 15–30), Petitioner has not shown, by a preponderance of the evidence, that the

subject matter of dependent claims 2, 5, 7, 13, 15, and 18 would have been obvious over combined teachings of Young, Gerber, Lindegren, and Akerström.

### *D. Obviousness Based on Gerber, Hauser, and Akerström*

As an alternative to its assertion that claims 1, 2, 5, 7, 13–15, and 18 are unpatentable over Young, Gerber, Lindegren, and Akerström, Petitioner challenges these claims under 35 U.S.C. § 103(a) as unpatentable over Gerber, Hauser, and Akerström. Pet. 48–68; Reply 10–14. Patent Owner argues that Petitioner's proposed combination of Gerber, Hauser, and Akerström would not have resulted in all of the claim limitations. PO Resp. 39–43; Sur-reply 10–11. Patent Owner also argues that there would not have been a motivation to combine the teachings of the references as Petitioner proposes. PO Resp. 43–57; Sur-reply 12–15.

As we discuss Gerber and Akerström above in sections III.C.2 and III.C.4, respectively, we begin our analysis of this asserted ground of unpatentability with an overview of Hauser. We then turn to the parties' contentions for each of the claims. For the reasons below, Petitioner has not shown, by a preponderance of the evidence, that the subject matter of claims 1, 2, 5, 7, 13–15, and 18 would have been obvious over the combined teachings of Gerber, Hauser, and Akerström.

*1. Hauser*

Hauser is directed to "an implantable defibrillation or cardioversion electrode and a method for placing the electrode on or about the heart to deliver electrical energy to the heart." Ex. 1013, 1:12–16. An electrode is shown in Figure 1, reproduced below.




Figure 1 is a perspective view of the electrode in a partially straightened position. *Id.* at 3:9–10. Electrode 10 is thin and elongated, and includes distal active region 11 and proximal lead region 13. *Id.* at 3:50–52.

Conductive discharge surface 12 and insulative surface 14 define and extend the entire length of distal active region 11, and tapered, soft, insulative tip 16 terminates the distal end of distal active region 11. *Id.* at 3:52–55. Conductive discharge surface 12 and insulative surface 14 are preformed so that distal active region 11 adopts a planar spiral patch shape when in its relaxed state. *Id.* at 3:62–66, Fig. 6. Conductive element 18 surrounded by insulator 15 extends the entire length of proximal lead region 13. *Id.* at 3:55–57. Conductive element 18 is a lead electrically connecting at one end with conductive discharge surface 12. *Id.* at 3:57–60.

Distal insulative tip 16 includes fixation means 17 to anchor and stabilize electrode 10 relative to the heart. *Id.* at 3:67–4:1. Electrode 10 is also provided with proximal fixation means 19 to anchor electrode 10 at the location of entrance into the pericardial space. *Id.* at 4:3–8.

The implantation procedure of electrode 10 is shown in Figures 3–5, reproduced below.




Figures 3–5 are views during various stages of implantation of the electrode. *Id.* at 3:12–13, 4:30–32. First, catheter 21, having a cross section only

slightly larger than the cross section of electrode 10, is introduced through the skin and into the pericardial space, and electrode 10 is inserted into catheter 21 using stylet 22 through a lumen in the body of electrode 10, thereby straightening distal active region 11, as shown in Figure 3. *Id.* at 4:32–39. With catheter 21 containing electrode 10 and in position in the pericardial space, distal active region 11 is urged out of catheter 21 with stylet 22. *Id.* at 4:39–43. Distal active region emerges from catheter 21 as stylet 22 is withdrawn, and begins to take a relaxed, coiled shape, as shown in Figure 4. *Id.* at 4:41–47. As distal active region 11 continues to emerge from catheter 21, it assumes more of its relaxed planar spiral shape, as shown in Figure 5, and deployment continues until the entire distal active region 11 of electrode 10 is in place in the pericardial space. *Id.* at 4:47–51. Stylet 22 and catheter 21 are then removed, and proximal lead region 13 of electrode 10 is tunneled to the location where it will be connected to a pulse generator of the defibrillation/cardioversion system. *Id.* at 4:51–55.

2. *Independent claim 1*

a. *Undisputed limitations (limitations 1.0–1.f, 1.h, 1.j, and 1.k)*

In regard to what Petitioner designates as limitation 1.0, Petitioner contends that, to the extent the preamble is a limitation, Gerber discloses stimulating an electrode near the sacral nerve with pulses produced by an IPG[11]. Pet. 52 (citing Ex. 1010, Abstract, 2:31–36, 3:48–56). For limitation 1.a, which recites percutaneously introducing an introducer having an introducer lumen and disposing an implantable medical lead within the introducer lumen, Petitioner argues Gerber discloses the lead is inserted by

[11] The pulse generator disclosed in Gerber is Patent Owner's InterStim Neurostimulator Model 3023. Ex. 1010, 3:51–52.

first making an incision and using a cannula. *Id.* at 53 (citing Ex. 1010, 5:16–17, 5:26–28, 5:34–37). Petitioner further argues "[p]ercutaneous use of cannula as introducer [was] well known prior to 2001." *Id.* (citing Ex. 1003, 87[12], ¶ 96). Petitioner also contends Hauser teaches introducing a catheter through the skin and into the pericardial space, inserting the electrode into the catheter, and, when the catheter containing the electrode is in position in the pericardial space, urging the active region of the electrode out of the catheter. *Id.* (citing Ex. 1013, 4:32–43). Per Petitioner, Hauser's catheter inherently has proximal and distal ends, and the distal end is adjacent the heart, i.e., the stimulation site. *Id.* (citing Ex. 1003, 87[13]).

For limitation 1.b reciting a lead body, Petitioner argues "Gerber discloses: 'An implantable medical lead for stimulation of the sacral nerves comprises a lead body which includes a distal end and a proximal end . . . .'" *Id.* (quoting Ex. 1010, Abstract). For limitations 1.c–1.e, which respectively recite P connector elements, P stimulation electrodes, and P lead conductors, Petitioner relies on its arguments regarding Gerber's disclosure of these limitations with respect to its asserted ground of unpatentability premised on Young, Gerber, Lindegren, and Akerström. *Id.* at 53–54.

For limitation 1.f reciting a plurality of M tine elements, Petitioner argues Gerber discloses that an anchoring mechanism is located between the most proximal electrode and the proximal end of the lead body, and that the anchoring mechanism can provide for fibrosis. *Id.* at 54–55 (citing

[12] Mr. Pless's identification of limitation 1.a in the cited references is on page 87 of his Declaration. We consider Petitioner's citation to page 86 for this testimony to be a typographical error, and we understand Petitioner to be citing page 87.
[13] *See supra* note 12.

Ex. 1010, 4:13–30, Figs. 2, 6). Petitioner further argues a POSITA would turn to tines to affix by fibrosis. *Id.* at 55 (citing Ex. 1003, 89–90). Petitioner also contends Hauser teaches fixation means 19, which is made up of three sets of tines and located between the electrode region and the lead proximal end. *Id.* at 55–57 (citing Ex. 1013, 4:1–25, Figs. 6, 12). Per Petitioner, Hauser teaches fixation means 19 can be placed at other locations on the lead as determined by the surgeon, and a POSITA would have understood to place tine elements proximal for sacral lead implantation where there are soft tissues near the sacrum. *Id.* at 57 (citing Ex. 1003, 90–92). Additionally, Petitioner asserts Akerström teaches various arrangements of loops, including an arrangement where the loops are on collars in an array. *Id.* at 57–58 (citing Ex. 1012, 2:56–59, Fig. 3). According to Petitioner, a POSITA would have considered loops a variation of tines, and instead of loops, tines can be as easily attached to collars, arranged in an array, and mounted on a lead. *Id.* at 58 (citing Ex. 1003, 92–94).

In regard to limitation 1.h, which recites the plurality of M tine elements are separate from and axially displaced from each other and from the P stimulation electrodes such that all of the P stimulation electrodes are between the plurality of M tine elements and the lead distal end, Petitioner argues Hauser teaches three tine elements separate from and axially displaced from each other and from the stimulation electrodes. *Id.* at 59 (citing Ex. 1013, Figs. 1, 12). Petitioner further argues that, to the extent Hauser does not disclose tine elements separate and axially displaced from each other, Akerström teaches an arrangement, which can be easily adapted to tine elements, of several spaced-apart collars 6 provided with loops 5 and

slipped on insulation 2 of conductor 1. *Id.* at 60 (citing Ex. 1003, 95–96; Ex. 1013, 2:56–59, Fig. 3). Additionally, Petitioner asserts Gerber discloses the electrodes are between anchoring mechanism 50, which can anchor via fibrosis, and the lead distal end. *Id.*

With respect to limitation 1.j, which recites withdrawing the introducer to successively release the N tines to deploy outwardly, Petitioner contends Hauser teaches that tined fixation means 19 remains in catheter 21 until catheter 21 is removed. *Id.* at 61–62 (citing Ex. 1003, 96–97, ¶ 113; Ex. 1013, 4:3–8, 4:49–52, Figs. 5, 12). Petitioner further contends "[i]t is inherent that tines adapted to engage body tissue would successively deploy when no longer constrained by the catheter lumen upon withdrawal of the catheter." *Id.* at 61 (citing Ex. 1003, 96).

For limitation 1.k reciting coupling the P connector elements to the IPG, Petitioner argues that Gerber discloses this limitation because it discloses carrying stimulation pulses from the IPG toward the distal end having at least one electrode contact. *Id.* at 62 (citing Ex. 1003, 97–98; Ex. 1010, 3:52–56). Petitioner also argues Hauser inherently teaches the IPG is connected to the lead at the connector elements. *Id.* (citing Ex. 1003, 97).

Patent Owner does not dispute Petitioner's contentions with respect to what Petitioner designates as limitations 1.0–1.f, 1.h, 1.j, and 1.k. Petitioner's arguments and Mr. Pless's testimony find support in Gerber, Hauser, and Akerström. Gerber teaches an implantable medical lead having a lead body, a plurality of conductors, a plurality of electrodes that are each electrically connected to a conductor of the plurality of conductors, a plurality of connectors for connecting the plurality of electrodes to an IPG,

and an anchoring mechanism located separate and axially displaced from an electrode. Ex. 1010, Abstract, 1:57–61, 3:39–42, 3:48–50, 3:52–56, 4:6–7, 4:13–15, 4:32–33, 4:65–5:8, Figs. 2–3. Gerber discloses the lead is inserted by first making an incision and using a cannula. *Id.* at 5:16–17, 5:26–28, 5:34–37. Hauser teaches an electrode with proximal fixation means 19 made up of multiple sets of tines extending outwardly and proximally. Ex. 1013, 4:3–8, Fig. 12. Hauser's electrode is implanted by introducing a catheter through the skin and into the pericardial space, inserting the electrode into the catheter, urging the active region of the electrode out of the catheter until the active region is in place in the pericardial space, and then removing the catheter. *Id.* at 4:32–55. Akerström teaches an electrode arrangement including flexible, proximally extending loops that are positioned on collars spaced apart from each other. Ex. 1012, 2:56–59, 3:52–59, Fig. 3. In view of the foregoing, Petitioner has persuasively identified what it designates as limitations 1.0–1.f, 1.h, 1.j, and 1.k in its proposed combination of Gerber, Hauser, and Akerström.

*b. N flexible tines extending toward the lead proximal end and adapted to be folded inward against the lead body (limitation 1.g)*

For limitation 1.g reciting N flexible tines extending proximally and adapted to be folded inwardly against the lead body, Petitioner argues Hauser's fixation means 19 include flexible tines such that placement of the lead constrained within catheter 21 would fold all of the tines inwardly against the lead body. Pet. 58–59 (citing Ex. 1003, 94; Ex. 1012, Figs. 3, 12). Petitioner further argues that, to the extent Hauser does not teach a tine end directly attached to the lead body, Akerström teaches flexible loops extending outwardly from both the lead body and the tine element in a proximal direction. *Id.* at 59 (citing Ex. 1013, Fig. 7). Per Petitioner, a

POSITA would have considered loops to be a variation of tines, and tines can be similarly mounted to a collar and lead body, as shown in Akerström's Figure 7. *Id.* (citing Ex. 1003, 94–95; Ex. 1013, 2:26–28).

Patent Owner argues that Petitioner assumes Hauser's fixation means 19 are tines. PO Resp. 39; Sur-reply 10–11. Patent Owner further argues that one cannot draw any conclusions about fixation means 19 from Figures 3–5 because these figures do not show fixation means 19. PO Resp. 39–40 (citing Ex. 2030 ¶¶ 96–99); Sur-reply 11.

We disagree with Patent Owner that Petitioner assumes Hauser's fixation means 19 are tines. Rather, Petitioner's argument is based on Mr. Pless's testimony that fixation means 19 are tines. Pet. 58–59 (citing Ex. 1003, 94). Moreover, Hauser's fixation means 19 have a similar shape to tine elements 125, 130, 135, 140 in the '756 patent and other tines, such as Lindegren's tine-like projections 12. *Compare* Ex. 1013, Fig. 12, *with* Ex. 1001, Figs. 1–2; Ex. 1011, Fig. 3. Like tine elements 125, 130, 135, 140 in the '756 patent and Lindegren's tine-like projections 12, Hauser's fixation means 19 secure a lead in place in the body. Ex. 1001, 9:61–10:1; Ex. 1011, 7:18–27; Ex. 1013, 4:3–8. We also disagree with Patent Owner that a POSITA would not draw inferences regarding Hauser's fixation means 19 from Figures 3–5. According to Hauser, Figures 3–5 are "views during various stages of implantation of the electrode illustrated in F[igure] 1" (Ex. 1013, 3:12–13), and Figure 1 shows an electrode with fixation means 19 (*id.* at 4:3–8, Fig. 1). *See also* Reply 10–11 (citing Ex. 1022, 126:1–24 (Dr. Siegel testifying that Hauser's Figures 3–5 are views of the electrode of Figure 1)).

Patent Owner argues Petitioner's proposed combination of the references would not result in tines adapted to fold inward against the lead body, as recited in limitation 1.g. PO Resp. 40–42. According to Patent Owner, Hauser's lead, which is equipped with fixation means 19 and fits inside catheter 21, does not suggest that fixation means 19 are "adapted to be folded inward against the lead body when fitted into and constrained by a lumen of an introducer," as recited in limitation 1g. *Id.* at 40 (citing Ex. 2030 ¶¶ 96–99). Patent Owner also maintains that Hauser's fixation means would overlap, not fold against the lead body. *Id.* (citing Ex. 2030 ¶ 100). Regarding Akerström, Patent Owner contends that, in the Petition, Petitioner does not rely on Akerström for teaching flexible loops that fold inwardly against the lead body. *Id.* at 41. Nonetheless, Patent Owner alleges that loops and tines are very different structures, and that loops folding against the lead body is not the same thing as tines folding against the lead body. *Id.* at 42 (citing Ex. 1012, 1:15–32; Ex. 2030 ¶¶ 94–95); Sur-reply 11.

We agree with Patent Owner that Hauser's fixation means 19 are not adapted to be folded inwardly against the lead body because the tines would overlap and thus be folded inwardly against each other, not the lead body. *See* Ex. 1013, Fig. 12 (showing the length of the tines of fixation means 19 being longer than the proximal spacing between the tines). In view of Hauser's Figure 12, we credit Dr. Siegel's testimony that "if fixation means 19 were bent or folded, they could not lie against the lead body because (except for the last two projections) the adjacent projections would interfere with folding against the lead body." Ex. 2030 ¶ 100.

Nonetheless, Patent Owner's argument that Hauser's fixation means 19 are not adapted to be folded inwardly against the lead body and its remaining arguments address Hauser and Akerström individually, whereas Petitioner is relying on their combined teachings to result in the subject matter of limitation 1.g. "[T]he test for obviousness is what the *combined teachings* of the references would have suggested to those having ordinary skill in the art." *See In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012) (emphasis added) (citing *In re Keller*, 642 F.2d 413, 425 (C.C.P.A. 1981)). It matters not whether either Hauser's fixation means 19 or Akerström's loop arrangement teaches tines that are adapted to fold inwardly against the lead body because Petitioner is relying on its proposed combination of Hauser and Akerström in which Hauser's fixation means 19 are arranged like Akerström's loops. Contrary to Patent Owner's argument, Petitioner proposes to modify Hauser's tines to be arranged according to Akerström's arrangement of flexible loops that fold inwardly against the lead body. *See* Pet. 51–52 (arguing that "[Akerström's] arrangement of non-overlapping loops that fold to the lead body due to the collars being spaced apart also has the advantage of a smaller profile, which is suited to percutaneous delivery," and that "it would have been easy to replace Gerber's anchoring mechanism with Hauser's tines arranged in Akerstr[ö]m's array design"); Reply 11 ("[The] Petition discloses Akerstr[ö]m for teaching a design arrangement where the loops are adapted to be folded inward against the lead body without overlapping each other, and that tines of Hauser could be arranged in Akerstr[ö]m's design array." (citations omitted)). Hauser's fixation means 19 include a plurality of tine elements. Ex. 1013, Fig. 12. Akerström teaches an arrangement of loops that rest against the surface of an electrode

during insertion of the electrode in a vein. Ex. 1012, 3:8–11, 3:52–59, Fig. 3. Petitioner has shown that combining the teachings of Hauser's fixation means 19 and Akerström's loop arrangement would result in a plurality of tine elements that are adapted to be folded inward against the lead body when the lead is fitted into an introducer, as limitation 1.g requires.

After considering the parties' arguments and evidence, Petitioner has persuaded us that its proposed combination of Gerber, Hauser, and Akerström would result in a plurality of tines that are adapted to fold inwardly against the lead body, as limitation 1.g requires. Petitioner has shown limitation 1.g was reasonably suggested by its proposed combination of Gerber, Hauser, and Akerström.

*c. Disposing the implantable medical lead within the introducer lumen with the MxN tines folded inward against the lead body without overlapping one another (limitation 1.i)*

For limitation 1.i, which requires the MxN tines folded inward against the lead body without overlap, Petitioner acknowledges Hauser does not teach non-overlapping tines, and asserts Akerström's arrangement in Figure 3 includes loops each having a length that is shorter than the distance between the two sets of loops. Pet 60–61. Per Petitioner, a POSITA could have used Akerström's arrangement for tine elements with no overlapping tines. *Id.* at 60 (citing Ex. 1003, 96).

Patent Owner argues that Petitioner's proposed combination of the references would not result in non-overlapping tines, as limitation 1.i requires, because no reference teaches non-overlapping tines. PO Resp. 52. Patent Owner, however, addresses the references individually when Petitioner relies on their combined teachings. Hauser's fixation means 19

include a plurality of tine elements (Ex. 1013, Fig. 12), and Akerström teaches an arrangement of loops that rest against the surface of an electrode without overlap (Ex. 1012, 3:8–11, 3:52–59, Fig. 3). Accordingly, Petitioner has persuaded us that its proposed combination of Gerber, Hauser, and Akerström would result in a plurality of non-overlapping tines, as limitation 1.i requires. Petitioner has shown limitation 1.i was reasonably suggested by its proposed combination of Gerber, Hauser, and Akerström.

*d. Reasons for combining the teachings*

Petitioner argues a POSITA would have combined the teachings of Gerber, Hauser, and Akerström to modify Gerber's multi-electrode lead to have Hauser's multiple tined anchors, each mounted on collars, as taught by Akerström. Pet. 51. Petitioner contends that Gerber discloses a multi-electrode lead with a proximal anchoring mechanism that anchors by fibrosis, and that a POSITA would have considered tines a leading candidate among the limited number of devices that anchor by fibrosis. *Id.* (citing Ex. 1003 ¶ 115). Petitioner also argues that Akerström's arrangements of loops for anchoring by fibrosis are applicable to tines, and that Akerström's arrangement with repeated sets of multiple loops extending from a collar without overlap allows for easy manufacturing, adaptation to the needs of the stimulation site, and a smaller profile which is suited to percutaneous delivery. *Id.* (citing Ex. 1015, Fig. 3; Ex. 1003 ¶ 116). Petitioner further maintains "it would have been obvious to a POSITA in order to improve anchoring within the soft tissue near the sacrum to use multiples of tines mounted on collars (i.e. tine elements) to affix by fibrosis." *Id.*

Patent Owner contends Petitioner's reasoning for combining the teachings of Gerber, Hauser, and Akerström "is based on a hindsight driven

compilation of claim elements from the prior art references that a POSITA would have had no reason to combine." PO Resp. 43 (citing Ex. 2030 ¶¶ 101–131). In particular, Patent Owner argues Petitioner has not shown that a POSITA would have replaced Gerber's anchoring mechanism with a plurality of tines as recited in limitation 1.f, much less proximally extending tines that do not overlap as recited in limitations 1.g and 1.i. *Id.* at 42–43, 45–57; Sur-reply 12–15.

Regarding the reasoning for replacing Gerber's anchoring mechanism with tines, such as those in Hauser, Patent Owner argues Petitioner fails to provide evidence that the use of tines would improve anchoring of Gerber's lead. PO Resp. 45–46; Sur-reply 13. According to Patent Owner, Gerber's disclosure of an implantable electrical lead that allows for some movement after implantation obviates the need for improved anchoring. PO Resp. 46 (citing Ex. 1010, 2:4–6, 2:9–17, 2:56–63, 3:39–58; Ex. 2030 ¶¶ 70–73); Sur-reply 14. Patent Owner also argues: "Gerber is not suggesting fibrosis as a standalone fixation mechanism; it is instead suggesting that the other disclosed anchoring mechanisms (namely, the bone screws or sutures; *see* Ex. 1010, 4:12-31) would become more fixated in the body over time due to fibrosis." PO Resp. 47 (citing Ex. 2030 ¶¶ 77–80, 111). Patent Owner further argues there is no factual support for Petitioner's allegation that tines were a leading candidate among the limited number of devices that anchor by fibrosis. *Id.*; Sur-reply 14. Per Patent Owner, introducing any foreign body into a place where fibrosis can occur will result in fibrosis, and Akerström teaches that loops are better at allowing tissue ingrowth than tines. PO Resp. 47–48 (citing Ex. 1010, 4:27–30; Ex. 2030 ¶ 108). Patent Owner additionally contends Petitioner provides no evidence that a POSITA

would have expected tines to work in Gerber's anatomy. *Id.* at 48–49; Sur-reply 14. Rather, according to Patent Owner, a POSITA would not have expected tines to work with Gerber's implantation procedure because the periosteum and the soft tissues surrounding the implantation site are dissected during the procedure, leaving them compromised of structural integrity and unsuitable for tines to affix thereto. PO Resp. 49 (citing Ex. 1010, 5:32–6:1, Fig. 6; Ex. 2030 ¶¶ 81, 105–107, 114–115); Sur-reply 14.

In regard to the reasoning for arranging Hauser's tines according to Akerström's arrangement so that the tines extend proximally and do not overlap, Patent Owner argues there would have been no motivation to include, in Gerber's lead, such an arrangement of tines. PO Resp. 52–56 (citing Ex. 2030 ¶¶ 122–124); Sur-reply 15. Patent Owner contends that Petitioner's reasoning for applying Akerström's arrangement—i.e., ease of manufacturing and a smaller profile for the lead—does not explain why a POSITA would have combined the teachings of the references to result in tines that are adapted to be folded inward against the lead body without overlap. PO Resp. 42–43, 54. Patent Owner also contends that Hauser illustrates fixation means projecting in both the proximal and distal directions (PO Resp. 56 (citing Ex. 1013, Figs. 1, 12)), and that Hauser provides no guidance to a POSITA regarding the appropriate orientation for the tines (*id.* (citing Ex. 2030 ¶¶ 125–131)).

Petitioner replies that it is incorrect for Patent Owner to consider the intended purpose of Gerber's lead. Reply 13. This assertion is similar to Petitioner's argument that it is incorrect to consider the intended purpose of Young's lead when determining motivation to combine because the proper

inquiry is whether the proposed combination would achieve what is in the ’756 patent claims. *See id.* (referencing the arguments regarding the motivation to combine to the teachings of Young, Gerber, Lindegren, and Akerström). As we explain above in section III.C.5.d, Petitioner conflates the separate requirements of motivation to combine and reasonable expectation of success. Although an unclaimed purpose is irrelevant to reasonable expectation of success, it may be pertinent to motivation to combine. *See Intelligent Bio–Sys.*, 821 F.3d at 1367–68 (explaining that, unlike reasonable expectation of success, motivation to combine does not contemplate the scope of the claimed invention).

Petitioner also replies that we should give Dr. Siegel’s testimony, on which Patent Owner’s arguments are based, very little, if any, weight. Reply 11–13. Per Petitioner, Dr. Siegel never analyzed the claims of the ’756 patent, and his entire Declaration rests on the incorrect premise that the claims are limited to sacral neuromodulation. *Id.* at 11–12 (citing Ex. 1022, 100:17–24, 103:6–16, 104:1–10, 109:7–14, 109:24–110:6, 111:14–19). Petitioner further alleges that Dr. Siegel’s independence is questionable because he has been a consultant for Patent Owner in many other proceedings. *Id.* at 12 n.6.

Beginning with Dr. Siegel’s independence, we take into account that Dr. Siegel has consulted for Patent Owner, but we disagree that Dr. Siegel’s relationship with Patent Owner depreciates his testimony. Patent Owner retained Dr. Siegel to testify regarding Petitioner’s asserted obviousness based on Gerber, Hauser, and Akerström (Ex. 2030 ¶ 1), and Gerber is assigned to Patent Owner (Ex. 1010, code (73)). Patent Owner also retained Dr. Siegel to testify regarding Patent Owner’s InterStim system. Ex. 2030

¶ 1. Dr. Siegel's familiarity with Patent Owner's technologies is pertinent to the nature of his testimony. Moreover, Dr. Siegel testifies that "[m]y compensation is not contingent upon the outcome of this matter or the specifics of my testimony." *Id.* ¶ 2. We also disagree with Petitioner that we should grossly discount his testimony for lacking an understanding of the claims of the '756 patent. Dr. Siegel's testimony on which Patent Owner relies regards whether a POSITA would have added tines to Gerber's lead as Petitioner proposes. As we explain above, motivation to combine is a question disparate from the claimed invention. *See Intelligent Bio-Sys*., 821 F.3d at 1367–68 (explaining that, unlike reasonable expectation of success, motivation to combine does not contemplate the scope of the claimed invention).

With this, we turn to Petitioner's reasoning for combining the teachings of Gerber, Hauser, and Akerström. With respect to Petitioner's reasoning for replacing Gerber's anchoring mechanism with tines, contrary to Patent Owner's arguments regarding improved anchoring, Petitioner does not contend that a POSITA would have added tines to Gerber's lead to more securely affix the lead within the body. Rather, Petitioner contends a POSITA would have added tines to Gerber's lead because Gerber suggests anchoring its lead by fibrosis, for which tines are a leading candidate. *See* Pet. 51 ("Gerber teaches that its anchoring means can be by fibrosis. . . . [A] POSITA would have considered tines, a leading candidate among the limited number of devices that anchor by fibrosis."); *see also* Tr. 13:11–14 (Petitioner arguing "Gerber expressly suggests fixation mechanism by fibrosis and the most predominant use or the common use of that to actually fixate implantable medical leads by fibrosis was tines by the late 1990s").

Gerber indeed suggests anchoring its lead by fibrosis. Namely, Gerber discloses: "Yet another anchoring mechanism 50 is to allow the medical lead 10 to fibrose in naturally using the human body's natural reaction to a foreign body or healing." Ex. 1010, 4:27–30. Moreover, there is no dispute that tines secure via fibrosis. Petitioner, however, acknowledges that any foreign object introduced into the body will cause fibrosis. Tr. 12:8–13.

Nonetheless, Petitioner maintains that Gerber's disclosure of securing its lead by fibrosis would have led a POSITA to choose tines because tines were *a leading candidate* among the devices that anchor by fibrosis. Pet. 51 (citing Ex. 1003 ¶ 115) (emphasis added). Petitioner's argument relies on Mr. Pless's opinion that tines were a leading candidate for securement via fibrosis, and Mr. Pless's opinion is based his review of the conventional uses of tines. Tr. 12:18–24 (Petitioner explaining that pages 13–16 of Mr. Pless's Declaration provide support for his opinion that tines were most commonly used for fixation via fibrosis). According to Mr. Pless, "[b]efore 2001, tines were the most commonly used passive fixation, especially due to the predominant usage of tines in the cardiac space. Tines help to anchor the lead immediately after implantation by engaging with the body tissue, and then by fibrosis." Ex. 1003, 15–16.

Gerber's lead, however, is for sacral nerve stimulation and is implanted in the sacral area via an open surgical procedure. Ex. 1010, 1:7–15, 5:32–39. We find credible Dr. Siegel's testimony that Gerber's device is implanted via an open surgical procedure in which the periosteum and soft tissues surrounding the implantation site are dissected, compromising their structural integrity and rendering tines, which initially

anchor by engaging body tissue, ineffective. Thus, despite the prevalent use of tines in the cardiac space to secure leads by engaging body tissue and then by fibrosis, Petitioner has not persuaded us that Gerber's disclosure of securing its lead by fibrosis would have led a POSITA to replace Gerber's anchoring mechanism with tines.

Regarding Petitioner's reasoning for positioning tines according to Akerström's arrangement, Lindegren attributes a manufacturing preference to tines integrally formed and evenly spaced on rings, not proximally extending tines that are adapted to be folded inwardly against the lead body without overlap. Ex. 1011, 5:17–20 ("From the manufacturing point of view, having the projections devised as an integral part of a one-piece ring-shaped means and evenly distributed around the circumference of the ring-shaped means, should be preferable."). Moreover, according to Petitioner, a smaller profile is suited to percutaneous delivery (Pet. 51), but Gerber's lead is implanted via an open surgical procedure (Ex. 1010, 1:7–15, 5:32–39). Accordingly, Petitioner has not persuaded us that a POSITA would have had a reason to include, in Gerber's lead, Hauser's tines situated according to Akerström's arrangement.

*e. Conclusion for independent claim 1*

Petitioner has demonstrated each limitation of independent claim 1 in its proposed combination of Gerber, Hauser, and Akerström. Petitioner, however, has not persuaded us that a POSITA would have had a reason to combine the teachings of these references as Petitioner proposes. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 57–69; Sur-reply 15–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent

claim 1 would have been obvious over combined teachings of Gerber, Hauser, and Akerström.

*3. Independent claim 14*

Petitioner relies on the same reasoning for combining the teachings of Gerber, Hauser, and Akerström to result in the subject matter of independent claim 14 as for combining the teachings of these references to result in the subject matter of independent claim 1. Pet. 50–52. For the reasons discussed above in section III.D.2.d, Petitioner's reasons are not persuasive. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 57–69; Sur-reply 15–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claim 14 would have been obvious over combined teachings of Gerber, Hauser, and Akerström.

*4. Dependent claims*

For the reasons discussed above in sections III.D.2.e and III.D.3, Petitioner has not persuaded us that a POSITA would have had a reason to combine the teachings of Gerber, Hauser, and Akerström to result in the subject matter of independent claims 1 and 14, from which claims 2, 5, 7, 13, 15, and 18 depend. Even without Patent Owner's proffered objective indicia of non-obviousness (PO Resp. 57–69; Sur-reply 15–30), Petitioner has not shown, by a preponderance of the evidence, that the subject matter of dependent claims 2, 5, 7, 13, 15, and 18 would have been obvious over combined teachings of Gerber, Hauser, and Akerström.

## IV. CONCLUSION

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 5, 7, 13–15, 18 | 103(a) | Young, Gerber, Lindegren, Akerström | | 1, 2, 5, 7, 13–15, 18 |
| 1, 2, 5, 7, 13–15, 18 | 103(a) | Gerber, Hauser, Akerström | | 1, 2, 5, 7, 13–15, 18 |
| **Overall Outcome** | | | | 1, 2, 5, 7, 13–15, 18 |

## V. ORDER

In consideration of the foregoing, it is:

ORDERED that claims 1, 2, 5, 7, 13–15, and 18 of the ’756 patent have not been shown to be unpatentable, and

FURTHER ORDERED that, as this is a Final Written Decision, a party seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

For PETITIONER:

A. James Isbester
Babak S. Sani
KILPATRICK TOWNSEND & STOCKTON LLP
jisbester@kilpatricktownsend.com
bsani@kilpatricktownsend.com

For PATENT OWNER:

Naveen Modi
Chetan R. Bansal
PAUL HASTINGS LLP
naveenmodi@paulhastings.com
chetanbansal@paulhastings.com

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

March 21, 2022

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

**AXONICS, INC.,**
**Petitioner,**

**v.**

**MEDTRONIC, INC.,**
**Patent Owner.**

**IPR2020-00679**
**Patent 8,626,314**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

***/s/ Candice Kilby***

***Certifying Officer***

## Prosecution History for IPR2020-00679

| Filing Date | Document |
|---|---|
| 03/16/2020 | Petition for *Inter Partes* Review of U.S. Patent 8,626,314 |
| 03/16/2020 | Petitioner Power of Attorney |
| 03/24/2020 | Notice of Filing Date Accorded to Petition |
| 04/06/2020 | Patent Owner Mandatory Notices |
| 04/06/2020 | Patent Owner Power of Attorney |
| 06/24/2020 | Patent Owner Preliminary Response |
| 06/24/2020 | Patent Owner Exhibit List |
| 09/15/2020 | Decision - Granting Institution of *Inter Partes* Review |
| 09/23/2020 | Scheduling Order |
| 11/02/2020 | Patent Owner Notice of Deposition of Benjamin Pless |
| 11/04/2020 | Patent Owner Notice of Deposition of Rachel J. Watters |
| 11/12/2020 | Order - Authorizing Patent Owner Motion for Additional Discovery |
| 11/12/2020 | Petitioner Motion for Pro Hac Vice Admission |
| 11/12/2020 | Order - Authorizing Patent Owner Motion for Additional Discovery |
| 11/12/2020 | Patent Owner Amended Notice of Deposition of Benjamin Pless |
| 11/13/2020 | Patent Owner Motion for Additional Discovery |
| 11/13/2020 | Patent Owner Exhibit List |
| 11/20/2020 | Petitioner Opposition to Motion for Additional Discovery |
| 11/23/2020 | Order - Granting Petitioner Motion for Pro Hac Vice Admission of Megan Chung |
| 11/24/2020 | Joint Stipulation to Revise Scheduling Order |
| 12/10/2020 | Order - Denying Patent Owner Motion for Additional Discovery |
| 12/17/2020 | Joint Stipulation to Revise Scheduling Order |
| 12/28/2020 | Joint Stipulation to Revise Scheduling Order |
| 12/30/2020 | Patent Owner Motion to Seal |
| 12/30/2020 | Patent Owner Exhibit List |
| 12/30/2020 | Patent Owner Response |
| 01/07/2021 | Petitioner Objections to Admissibility of Evidence Served with Patent Owner Response to Petition for *Inter Partes* Review |
| 02/05/2021 | Petitioner Notice of Deposition of Steven W. Siegel, M.D. |

| Filing Date | Document |
|---|---|
| 02/05/2021 | Petitioner Notice of Deposition of Charles Thomas Bombeck |
| 02/16/2021 | Petitioner Notice of Deposition of Konstantin Vladimirovich Slavin, M.D. |
| 02/18/2021 | Petitioner Amended Notice of Deposition of Steven W. Siegel, M.D. |
| 02/22/2021 | Joint Stipulation to Revise Scheduling Order |
| 03/01/2021 | Petitioner Second Amended Notice of Deposition of Steven W. Siegel, M.D. |
| 03/02/2021 | Panel Change Order - Conduct of the Proceedings |
| 03/16/2021 | Order - Granting Patent Owner Motion to Seal |
| 03/22/2021 | Joint Stipulation to Revise Scheduling Order |
| 04/01/2021 | Petitioner Motion to Seal |
| 04/01/2021 | Sealed Reply to Patent Owner Response and In Support of Petition |
| 04/01/2021 | Petitioner Reply to Patent Owner Response |
| 04/07/2021 | Petitioner Mandatory Notices |
| 04/07/2021 | Petitioner Power of Attorney |
| 04/19/2021 | Patent Owner Notice of Deposition of Benjamin Pless |
| 04/22/2021 | Joint Stipulation to Revise Scheduling Order |
| 04/26/2021 | Order - Conduct of the Proceeding Granting Petitioner Requested Relief as to Reply Filings |
| 04/27/2021 | Public Reply to Patent Owner Response and In Support of Petition |
| 05/07/2021 | Petitioner Request for Oral Argument |
| 05/07/2021 | Patent Owner Request for Oral Argument |
| 05/14/2021 | Order - Setting Oral Hearings |
| 05/14/2021 | Petitioner Mandatory Notices |
| 05/18/2021 | Joint Stipulation to Revise Scheduling Order |
| 05/21/2021 | Patent Owner Motion to Seal |
| 05/21/2021 | Patent Owner Sur-Reply |
| 05/21/2021 | Patent Owner Exhibit List |
| 06/14/2021 | Patent Owner Motion to Seal |
| 06/14/2021 | Patent Owner Exhibit List |
| 06/15/2021 | Petitioner Motion to Seal |
| 06/15/2021 | Petitioner Exhibit List |

| Filing Date | Document |
|---|---|
| 06/16/2021 | Patent Owner Mandatory Notices |
| 06/16/2021 | Petitioner Mandatory Notice |
| 06/17/2021 | Oral Hearing Transcript |
| 09/13/2021 | Final Written Decision |
| 09/13/2021 | Order - Denying Petitioner Motion to Seal |
| 09/13/2021 | Order - Denying Patent Owner Motion to Seal |
| 09/13/2021 | Order - Denying Patent Owner Motion to Seal |
| 09/13/2021 | Order - Denying Petitioner Motion to Seal |
| 09/23/2021 | Joint Motion to Seal |
| 09/23/2021 | Updated Public Petitioner Reply |
| 09/28/2021 | Order - Granting Joint Motion to Seal |
| 10/13/2021 | Petitioner Request for Rehearing by the Director |
| 12/06/2021 | Order - Denying Request for Director Review |
| 02/04/2022 | Petitioner Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

March 21, 2022

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes* Review proceeding identified below:

**AXONICS, INC.,**
**Petitioner,**

**v.**

**MEDTRONIC, INC.,**
**Patent Owner.**

**IPR2020-00715**
**Patent 8,036,756**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

***/s/ Candice Kilby***

***Certifying Officer***

## Prosecution History for IPR2020-00715

| Filing Date | Document |
|---|---|
| 03/16/2020 | Petition for *Inter Partes* Review of U.S. Patent 8,036,756 |
| 03/16/2020 | Power of Attorney |
| 04/06/2020 | Notice of Filing Date Accorded to Petition |
| 04/06/2020 | Patent Owner Mandatory Notices |
| 04/06/2020 | Patent Owner Power of Attorney |
| 06/17/2020 | Patent Owner Preliminary Response |
| 06/17/2020 | Patent Owner Exhibit List |
| 07/16/2020 | Order - Denying Petitioners Request for a Reply to the Preliminary Response |
| 09/15/2020 | Decision - Granting Institution of *Inter Partes* Review |
| 09/23/2020 | Scheduling Order |
| 11/02/2020 | Patent Owner Notice of Deposition of Benjamin Pless |
| 11/04/2020 | Patent Owner Notice of Deposition of Rachel J. Watters |
| 11/12/2020 | Petitioner Motion for Pro Hac Vice Admission |
| 11/12/2020 | Order - Authorizing Patent Owners Motion for Additional Discovery |
| 11/12/2020 | Patent Owner Amended Notice of Deposition of Benjamin Pless |
| 11/13/2020 | Patent Owner Motion for Additional Discovery |
| 11/13/2020 | Patent Owner Exhibit List |
| 11/20/2020 | Petitioner Opposition to Motion for Additional Discovery |
| 11/23/2020 | Order - Granting Petitioner Motion for Pro Hac Vice Admission of Megan Chung |
| 11/24/2020 | Joint Stipulation to Revise Scheduling Order |
| 12/10/2020 | Order - Denying Patent Owner Motion for Additional Discovery |
| 12/17/2020 | Joint Stipulation to Revise Scheduling Order |
| 12/28/2020 | Joint Stipulation to Revise Scheduling Order |
| 12/30/2020 | Patent Owner Motion to Seal |
| 12/30/2020 | Patent Owner Exhibit List |
| 12/30/2020 | Patent Owner Response |
| 01/07/2021 | Petitioner Objections to Admissibility of Evidence Served with Patent Owner Response to Petition for *Inter Partes* Review |
| 02/05/2021 | Petitioner Notice of Deposition of Steven W. Siegel, M.D. |

| Filing Date | Document |
|---|---|
| 02/05/2021 | Petitioner Notice of Deposition of Charles Thomas Bombeck |
| 02/16/2021 | Petitioner Notice of Deposition of Konstantin Vladimirovich Slavin, M.D. |
| 02/18/2021 | Petitioner Amended Notice of Deposition of Steven W. Siegel, M.D. |
| 02/22/2021 | Joint Stipulation to Revise Scheduling Order |
| 03/01/2021 | Petitioner Second Amended Notice of Deposition of Steven W. Siegel, M.D. |
| 03/02/2021 | Panel Change Order - Conduct of the Proceedings |
| 03/16/2021 | Order - Granting Patent Owner Motion to Seal |
| 03/22/2021 | Joint Stipulation to Revise Scheduling Order |
| 04/01/2021 | Petitioner Motion to Seal |
| 04/01/2021 | Reply to Patent Owner Response |
| 04/07/2021 | Petitioner Mandatory Notices |
| 04/07/2021 | Petitioner Power of Attorney |
| 04/19/2021 | Patent Owner Notice of Deposition of Benjamin Pless |
| 04/22/2021 | Joint Stipulation to Revise Scheduling Order |
| 04/26/2021 | Order - Conduct of the Proceeding Granting Petitioner Requested Relief as to Reply Filings |
| 05/07/2021 | Petitioner Request for Oral Argument |
| 05/07/2021 | Patent Owner Request for Oral Argument |
| 05/14/2021 | Order - Setting Oral Hearings |
| 05/14/2021 | Petitioner Mandatory Notices |
| 05/18/2021 | Joint Stipulation to Revise Scheduling Order |
| 05/21/2021 | Patent Owner Motion to Seal |
| 05/21/2021 | Patent Owner Sur-Reply |
| 05/21/2021 | Patent Owner Exhibit List |
| 06/14/2021 | Patent Owner Motion to Seal |
| 06/14/2021 | Patent Owner Exhibit List |
| 06/14/2021 | Petitioner Motion to Seal |
| 06/14/2021 | Petitioner Exhibit List |
| 06/16/2021 | Patent Owner Mandatory Notices |
| 06/16/2021 | Petitioner Mandatory Notices |
| 06/17/2021 | Oral Hearing Transcript |

| Filing Date | Document |
|---|---|
| 09/13/2021 | Final Written Decision |
| 09/13/2021 | Order - Denying Petitioner Motion to Seal |
| 09/13/2021 | Order - Denying Patent Owner Motion to Seal |
| 09/13/2021 | Order - Denying Patent Owner Motion to Seal |
| 09/13/2021 | Order - Denying Petitioner Motion to Seal |
| 09/23/2021 | Joint Motion to Seal |
| 09/23/2021 | Updated Public Petitioner Reply |
| 09/28/2021 | Order - Granting Joint Motion to Seal |
| 10/13/2021 | Petitioner Request for Rehearing by the Director |
| 12/06/2021 | Order - Denying Request for Director Review |
| 02/04/2022 | Petitioner Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |

Trials@uspto.gov
571.272.7822

Paper 74
Entered: December 6, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

---

AXONICS, INC.,
Petitioner,

v.

MEDTRONIC, INC.,
Patent Owner.

---

IPR2020-00679 (Patent 8,626,314 B2)
IPR2020-00715 (Patent 8,036,756 B2)

---

Before ANDREW HIRSHFELD, *Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

ORDER

The Office has received a request for Director review of the Final Written Decision in each of the above-captioned cases. Ex. 3100. The requests were referred to Mr. Hirshfeld, Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

It is ORDERED that the request for Director review in each case is denied; and

FURTHER ORDERED that the Patent Trial and Appeal Board's Final Written Decision in each case is the final decision of the agency.

For PETITIONER:

James Isbester
Babak Sani
KILPATRICK TOWNSEND & STOCKTON LLP
jisbester@kilpatricktownsend.com
bssani@kilpatricktownsend.com

For PATENT OWNER:

Naveen Modi
Chetan Bansal
PAUL HASTINGS LLP
naveenmodi@paulhastings.com
chetanbansal@paulhastings.com

US008626314B2

(12) **United States Patent**
**Swoyer et al.**

(10) **Patent No.: US 8,626,314 B2**
(45) **Date of Patent: Jan. 7, 2014**

(54) **IMPLANTABLE MEDICAL LEAD INCLUDING A PLURALITY OF TINE ELEMENTS**

(75) Inventors: **John M. Swoyer**, Andover, MN (US); **Keith R. Carlton**, Minneapolis, MN (US); **Martin T. Gerber**, Maple Grove, MN (US); **George J. Mamo**, Ellicott City, MD (US); **Michele Spinelli**, Milan (IT); **Steven D. Hartle**, Eden Prairie, MN (US)

(73) Assignee: **Medtronic, Inc.**, Minneapolis, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/183,289**

(22) Filed: **Jul. 14, 2011**

(65) **Prior Publication Data**

US 2011/0270269 A1 Nov. 3, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/589,407, filed on Oct. 30, 2006, now Pat. No. 8,000,805, which is a continuation of application No. 11/352,552, filed on Feb. 13, 2006, now Pat. No. 8,036,756, which is a continuation of application No. 10/004,732, filed on Nov. 9, 2001, now Pat. No. 6,999,819.

(60) Provisional application No. 60/316,582, filed on Aug. 31, 2001.

(51) **Int. Cl.**
*A61N 1/05* (2006.01)

(52) **U.S. Cl.**
USPC ............................ **607/117**; 607/118; 607/128

(58) **Field of Classification Search**
USPC .......................................... 607/116–118, 128
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,650,276 A 3/1972 Burghele et al.
3,902,501 A 9/1975 Citron et al.
3,939,843 A 2/1976 Smyth
4,033,357 A 7/1977 Helland et al.

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 3146182 | 6/1983 |
| DE | 3415410 | 10/1984 |
| EP | 1181948 | 2/2002 |

OTHER PUBLICATIONS

Office Action dated Dec. 11, 2007 for U.S. Appl. No. 11/352,552 (7 pgs.).

(Continued)

*Primary Examiner* — Joseph Stoklosa
(74) *Attorney, Agent, or Firm* — Shumaker & Sieffert, P.A.

(57) **ABSTRACT**

An implantable medical electrical lead comprises a lead body extending between a distal end and a proximal end, and the distal end having at least one electrode of an electrode array extending longitudinally from the distal end toward the proximal end. The lead body at its proximal end may be coupled to a pulse generator, additional intermediate wiring, or other stimulation device. A fixation mechanism is formed on or integrally with the lead body proximal to the electrode array that is adapted to be implanted in and engage subcutaneous tissue, particularly muscle tissue, to inhibit axial movement of the lead body and dislodgement of the stimulation electrodes. The fixation mechanism comprises a plurality of tine elements arrayed in a tine element array along a segment of the lead.

**24 Claims, 8 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

4,044,774 A * 8/1977 Corbin et al. ................ 607/117
4,236,529 A 12/1980 Little
4,262,678 A 4/1981 Stokes
4,269,198 A 5/1981 Stokes
4,289,144 A 9/1981 Gilman
4,301,815 A 11/1981 Doring
4,360,031 A 11/1982 White
4,393,883 A 7/1983 Smyth et al.
4,402,328 A 9/1983 Doring
4,402,329 A 9/1983 Williams
4,407,303 A 10/1983 Akerstrom
4,409,994 A 10/1983 Doring
4,414,986 A 11/1983 Dickhudt et al.
4,419,819 A 12/1983 Dickhudt et al.
4,432,377 A 2/1984 Dickhudt
4,437,475 A 3/1984 White
4,465,079 A 8/1984 Dickhudt
4,479,500 A 10/1984 Smits
4,488,561 A 12/1984 Doring
4,502,492 A 3/1985 Bomzin
4,506,679 A 3/1985 Mann
4,506,680 A 3/1985 Stokes
4,512,351 A * 4/1985 Pohndorf ..................... 607/117
4,538,624 A 9/1985 Tarjan
4,564,023 A 1/1986 Hess
4,569,351 A 2/1986 Tang
4,577,642 A 3/1986 Stokes
4,590,949 A 5/1986 Pohndorf
4,606,118 A 8/1986 Cannon et al.
4,607,739 A 8/1986 Kaiser
4,658,835 A 4/1987 Pohndorf
4,711,251 A 12/1987 Stokes
4,716,888 A 1/1988 Wesner
4,739,764 A 4/1988 Lue et al.
4,771,779 A 9/1988 Tanagho et al.
4,796,643 A 1/1989 Nakazawa et al.
4,860,446 A 8/1989 Lessar et al.
4,883,070 A 11/1989 Hanson
4,913,147 A 4/1990 Fahlstrom et al.
4,920,979 A 5/1990 Bullara
4,922,927 A 5/1990 Fine et al.
4,945,922 A 8/1990 van Krieken
4,957,118 A * 9/1990 Erlebacher ................... 607/128
4,989,617 A * 2/1991 Memberg et al. ............ 607/116
5,040,544 A 8/1991 Lessar et al.
5,207,672 A 5/1993 Roth et al.
5,231,996 A 8/1993 Bardy et al.
5,257,634 A * 11/1993 Kroll ............................ 607/122
5,282,844 A 2/1994 Stokes et al.
5,282,845 A 2/1994 Bush et al.
5,300,107 A 4/1994 Stokes et al.
5,313,953 A 5/1994 Yomtov et al.
5,336,253 A 8/1994 Gordon et al.
5,344,439 A 9/1994 Otten
5,376,108 A 12/1994 Collins et al.
5,385,577 A 1/1995 Maurer et al.
5,408,744 A 4/1995 Gates
5,411,545 A 5/1995 Breyen et al.
5,423,881 A 6/1995 Breyen et al.
5,433,744 A 7/1995 Breyen et al.
5,484,445 A 1/1996 Knuth
5,562,722 A 10/1996 Racz et al.
5,562,723 A 10/1996 Rugland et al.
5,578,068 A 11/1996 Laske et al.
5,653,742 A 8/1997 Parker et al.
5,733,322 A 3/1998 Starkebaum
5,755,767 A 5/1998 Doan et al.
5,796,044 A 8/1998 Cobian et al.
5,807,399 A 9/1998 Laske et al.
5,824,032 A 10/1998 Belden
5,827,296 A 10/1998 Morris et al.
5,843,149 A 12/1998 Ebert et al.
5,849,031 A 12/1998 Martinez et al.
5,885,258 A 3/1999 Sachdeva et al.
5,897,585 A 4/1999 Williams
5,902,330 A 5/1999 Ollivier et al.
5,902,331 A 5/1999 Bonner et al.
5,928,277 A 7/1999 Laske et al.
5,957,965 A 9/1999 Moumane et al.
5,957,966 A 9/1999 Schroeppel et al.
5,957,967 A 9/1999 Laske
5,957,970 A 9/1999 Shoberg et al.
5,968,086 A 10/1999 Bonner et al.
5,991,668 A 11/1999 Leinders et al.
6,006,139 A 12/1999 Kruse et al.
6,021,354 A 2/2000 Warman et al.
6,052,625 A 4/2000 Marshall
6,055,456 A 4/2000 Gerber
6,055,457 A 4/2000 Bonner
6,104,960 A 8/2000 Duysens et al.
6,149,678 A 11/2000 DiDomenico et al.
6,178,355 B1 1/2001 Williams et al.
6,185,464 B1 2/2001 Bonner et al.
6,240,322 B1 5/2001 Peterfeso et al.
6,510,347 B2 * 1/2003 Borkan ........................ 607/117
6,512,957 B1 1/2003 Witte
6,832,115 B2 12/2004 Borkan
6,999,819 B2 2/2006 Swoyer et al.
7,239,924 B2 7/2007 Kolberg
7,330,764 B2 2/2008 Swoyer et al.
7,912,555 B2 3/2011 Swoyer et al.
8,000,805 B2 8/2011 Swoyer et al.
8,036,756 B2 10/2011 Swoyer et al.
2004/0230279 A1 11/2004 Cates et al.

OTHER PUBLICATIONS

Response to Office Action filed Apr. 11, 2008 for U.S. Appl. No. 11/352,552 (12 pgs.).
Office Action dated Oct. 31, 2008 for U.S. Appl. No. 11/352,552 (10 pgs.)
Responsive Amendment dated Dec. 31, 2008 for U.S. Appl. No. 11/352,552 (13 pgs.).
Office Action dated Mar. 11, 2009 for U.S. Appl. No. 11/352,552 (10 pgs.).
Request for Continued Examination and Responsive Amendment dated May 12, 2009 for U.S. Appl. No. 11/352,552 (13 pgs.).
Office Action dated Jun. 11, 2009 for U.S. Appl. No. 12/023,817 (11 pgs.).
Responsive Amendment dated Aug. 11, 2009 for U.S. Appl. No. 12/023,817 (12 pgs.).
Office Action dated Jul. 6, 2009 for U.S. Appl. No. 11/352,552 (9 pgs.).
U.S. Appl. No. 12/023,817, filed Jan. 31, 2008, "Implantable Medical Electrical Stimulation Lead Fixation Method and Apparatus,".
Response dated Oct. 6, 2009 for U.S. Appl. No. 11/352,552 (7 pgs.).
Office Action dated Dec. 29, 2009 for U.S. Appl. No. 11/352,552 (8 pgs.).
Office Action dated Oct. 27, 2009 for U.S. Appl. No. 12/023,817 (9 pgs.).
Responsive Amendment dated Jan. 27, 2010 for U.S. Appl. No. 12/023,817 (8 pgs.).
Responsive Amendment dated Mar. 29, 2010 for U.S. Appl. No. 11/352,552 (10 pgs.).
Office Action dated Jul. 7, 2010 for U.S. Appl. No. 11/352,552 (10 pgs.).
Responsive Amendment dated Sep. 7, 2010 for U.S. Appl. No. 11/352,552 (12 pgs.).
Office Action dated Nov. 15, 2010 for U.S. Appl. No. 11/352,552, (5 pgs.).
Responsive Amendment dated Feb. 15, 2011 for U.S. Appl. No. 11/352,552, (15 pgs.).
Office Action dated Jun. 1, 2009 for U.S. Appl. No. 11/589,407, (13 pgs.).
Responsive Amendment dated Sep. 1, 2009 for U.S. Appl. No. 11/589,407, (13 pgs.).
Office Action dated Dec. 29, 2009 for U.S. Appl. No. 11/589,407, (9 pgs.).
Response dated Feb. 26, 2010 for U.S. Appl. No. 11/589,407, (7 pgs.).

(56) **References Cited**

OTHER PUBLICATIONS

Advisory Action dated Mar. 31, 2010 for U.S. Appl. No. 11/589,407, (4 pgs.).
Final Office Action dated Nov. 16, 2010 for U.S. Appl. No. 11/589,407, (7 pgs.).
Request for Continued Examination and Responsive Amendment dated Feb. 16, 2011 for U.S. Appl. No. 11/589,407, (10 pgs.).
Restriction Requirement dated Aug. 29, 2003 for U.S. Appl. No. 10/004,732, (4 pgs.).
Response dated Sep. 25, 2003 for U.S. Appl. No. 10/004,732, (2 pgs.).
Office Action dated Jan. 16, 2004 for U.S. Appl. No. 10/004,732, (8 pgs.).
Response dated Mar. 15, 2004 for U.S. Appl. No. 10/004,732, (10 pgs.).
Final Office Action dated May 4, 2004 for U.S. Appl. No. 10/004,732, (9 pgs.).
Request for Continued Examination and Responsive Amendment dated Jul. 29, 2004 for U.S. Appl. No. 10/004,732, (7 pgs.).
Office Action dated Nov. 3, 2004 for U.S. Appl. No. 10/004,732, (9 pgs.).
Response dated Feb. 3, 2005 for U.S. Appl. No. 10/004,732, (6 pgs.).
Final Office Action dated Jun. 16, 2005 for U.S. Appl. No. 10/004,732, (9 pgs.).
Response dated Aug. 16, 2005 for U.S. Appl. No. 10/004,732, (11 pgs.).

* cited by examiner

FIG. 1


100
105
110
85
80
75
70
65
60
15
55
95
140
135
130
125
120
90
40
35
30
25
45
20
50
10




FIG. 2

FIG. 3

FIG. 4


100
60
19
200
Dorsal surface
Superior articular process
Sacral canal
110
Promontory
Foramen
Pelvic surface
Foramen
Sacral hiatus
Median sagittal section

FIG. 5

FIG. 6




Axonics Modulation Technologies, Inc. - Ex. 1001

7 of 19

FIG. 7


60
10
200
95
120
20
90
Superior articular process
Sacral canal
Dorsal surface
Sacral hiatus
Median sagittal section
Pelvic surface
Foramen
Foramen
Promontory

FIG. 8



To IPG
55
10
95
Dorsal surface
Superior articular process
Sacral canal
20
90
50
20
Sacral hiatus
Median sagittal section
Pelvic surface
Promontory
Foramen
Foramen




FIG. 9


15
60
65
70
75
80
85
100
110
105
50
20
45
25
30
35
40
90
120
125
130
135
140
95
55
10"

FIG. 10

# IMPLANTABLE MEDICAL LEAD INCLUDING A PLURALITY OF TINE ELEMENTS

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 11/589,407 by Swoyer et al., filed Oct. 30, 2006 and entitled, "Implantable Medical Lead Including Tine Markers," which is a continuation of U.S. patent application Ser. No. 11/352,552 by Swoyer et al., filed on Feb. 13, 2006 and entitled, "Implantable Medical Electrical Stimulation Lead Fixation Method and Apparatus." U.S. patent application Ser. No. 11/352,552 by Swoyer et al. is a continuation of U.S. patent application Ser. No. 10/004,732 by Swoyer et al., filed Nov. 9, 2001 and entitled, "Implantable Medical Electrical Stimulation Lead Fixation Method And Apparatus," which claims the benefit of U.S. Provisional Patent Application No. 60/316,582, filed Aug. 31, 2001. U.S. patent application Ser. No. 11/589,407 published as U.S. Patent Application Publication No. 2007/0050004 on Mar. 1, 2007. U.S. patent application Ser. No. 11/352,552 published as U.S. Patent Application Publication No. 2006/0129218 on Jun. 15, 2006. U.S. patent application Ser. No. 10/004,732 issued as U.S. Pat. No. 6,999,819 to Swoyer et al. on Feb. 14, 2006. The entire content of U.S. Patent Application Publication Nos. 2007/0050004 and 2006/0129218, U.S. Pat. No. 6,999,819, and U.S. Provisional Patent Application No. 60/316,582 is incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates generally to a method and apparatus that allows for stimulation of body tissue, particularly sacral nerves. More specifically, this invention relates to an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead. Moreover, this invention relates to the method of implantation and anchoring of the medical electrical lead electrodes in operative relation to a selected sacral nerve to allow for stimulation.

2. Description of Related Art

Pelvic floor disorders such as, urinary incontinence, urinary urge/frequency, urinary retention, pelvic pain, bowel dysfunction (constipation, diarrhea), erectile dysfunction, are bodily functions influenced by the sacral nerves. Specifically, urinary incontinence is the involuntary control over the bladder that is exhibited in various patients. Incontinence is primarily treated through pharmaceuticals and surgery. Many of the pharmaceuticals do not adequately resolve the issue and can cause unwanted side effects, and a number of the surgical procedures have a low success rate and are not reversible. Several other methods have been used to control bladder incontinence, for example, vesicostomy or an artificial sphincter implanted around the urethea. These solutions have drawbacks well known to those skilled in the art. In addition, some disease states do not have adequate medical treatments.

The organs involved in bladder, bowel, and sexual function receive much of their control via the second, third, and fourth sacral nerves, commonly referred to as S2, S3 and S4 respectively. Electrical stimulation of these various nerves has been found to offer some control over these functions. Several techniques of electrical stimulation may be used, including stimulation of nerve bundles within the sacrum. The sacrum, generally speaking, is a large, triangular bone situated at the lower part of the vertebral column, and at the upper and back part of the pelvic cavity. The spinal canal runs throughout the greater part of the sacrum. The sacrum is perforated by the anterior and posterior sacral foramina that the sacral nerves pass through.

Neurostimulation leads have been implanted on a temporary or permanent basis having at least one stimulation electrode positioned on and near the sacral nerves of the human body to provide partial control for bladder incontinence. Temporary sacral nerve stimulation is accomplished through implantation of a temporary neurostimulation lead extending through the skin and connected with a temporary external pulse generator as described for example in commonly assigned U.S. Pat. Nos. 5,957,965 and 6,104,960. A permanent neurostimulator is implanted if stimulation is efficacious and it is possible to do so in the particular patient. Permanent implantation is accomplished by implanting a permanent neurostimulation lead, extending the proximal portion of the lead body subcutaneously, and connecting its proximal end with an implantable pulse generator (IPG) implanted subcutaneously.

For example, U.S. Pat. Nos. 4,771,779, 4,607,739 and 4,739,764 disclose implanting an electrode on at least one nerve controlling the bladder and applying nerve stimulation energy to the nerve through the electrode. Electrodes positioned within the sacrum to control bladder function are also disclosed in U.S. Pat. No. 4,569,351.

In one embodiment, a lead bearing a distal stimulation electrode is percutaneously implanted through the dorsum and the sacral foramen (a singular foramina) of the sacral segment S3 for purposes of selectively stimulating the S3 sacral nerve. The lead is advanced through the lumen of a hollow spinal needle extended through the foramen, the single distal tip electrode is positioned adjoining the selected sacral nerve. Stimulation energy is applied through the lead to the electrode to test the nerve response. The electrode is moved back and forth to locate the most efficacious location, and the lead is then secured by suturing the lead body to subcutaneous tissue posterior to the sacrum and attached to the output of a neurostimulator IPG. Despite the suture fixation, sacral nerve stimulation leads having a single discrete tip electrode can be dislodged from the most efficacious location due to stresses placed on the lead by the ambulatory patient. A surgical intervention is then necessary to reposition the electrode and affix the lead.

The current lead designs used for permanent implantation to provide sacral nerve stimulation through a foramen have a number, e.g., four, ring-shaped, stimulation electrodes spaced along a distal segment of the lead body adapted to be passed into or through the foramen along a selected sacral nerve. Each distal stimulation electrode is electrically coupled to the distal end of a lead conductor within the elongated lead body that extends proximally through the lead body. The proximal ends of the separately insulated lead conductors are each coupled to a ring-shaped connector element in a proximal connector element array along a proximal segment of the lead body that is adapted to be coupled with the implantable neurostimulation pulse generator or neurostimulator IPG.

Again, the electrode array is moved back and forth with respect to the sacral nerve while the response to stimulation pulses applied through one or more of the electrodes is determined. The IPG is programmed to deliver stimulation pulse energy to the electrode providing the optimal nerve response, and the selection of the electrodes can be changed if efficacy using a selected electrode fades over time due to dislodgement or other causes.

Electrical stimulation pulses generated by the neurostimulator IPG are applied to the sacral nerve through the selected one or more of the stimulation electrodes in either a unipolar or bipolar stimulation mode. In one unipolar stimulation mode, the stimulation pulses are delivered between a selected active one of the stimulation electrodes and the electrically conductive, exposed surface of the neurostimulator IPG housing or can providing a remote, indifferent or return electrode. In this case, efficacy of stimulation between each stimulation electrode and the neurostimulator IPG can electrode is tested, and the most efficacious combination is selected for use. In a further unipolar stimulation mode, two or more of the stimulation electrodes are electrically coupled together providing stimulation between the coupled together stimulation electrodes and the return electrode.

In a bipolar stimulation mode, one of the distal stimulation electrodes is selected as the indifferent or return electrode. Localized electrical stimulation of the sacral nerve is effected between the active stimulation electrode(s) and the indifferent stimulation electrode.

A problem associated with implantation of permanent and temporary neurostimulation leads involves maintaining the discrete ring-shaped electrode(s) in casual contact, that is in location where slight contact of the electrode with the sacral nerve may occur or in close proximity to the sacral nerve to provide adequate stimulation of the sacral nerve, while allowing for some axial movement of the lead body.

Typically, physicians spend a great deal of time with the patient under a general anesthetic placing the leads due to the necessity of making an incision exposing the foramen and due to the difficulty in optimally positioning the small size stimulation electrodes relative to the sacral nerve. The patient is thereby exposed to the additional dangers associated with extended periods of time under a general anesthetic. Movement of the lead, whether over time from suture release or during implantation during suture sleeve installation, is to be avoided. As can be appreciated, unintended movement of any object positioned proximate a nerve may cause unintended nerve damage. Moreover reliable stimulation of a nerve requires consistent nerve response to the electrical stimulation that, in turn, requires consistent presence of the stimulation electrode proximate the sacral nerve. But, too close or tight a contact of the electrode with the sacral nerve can also cause inflammation or injury to the nerve diminishing efficacy and possibly causing patient discomfort.

Once the optimal electrode position is attained, it is necessary to fix the lead body to retard lead migration and dislodgement of the electrodes from the optimal position employing sutures or a sacral lead fixation mechanism of the types described in the above-referenced '351 patent or an improved fixation mechanism of the type described in commonly assigned U.S. Pat. No. 5,484,445. However, it is desirable to avoid use of complex fixation mechanisms that require surgical exposure large enough to implant the fixation mechanism, in these cases requiring exposure and attachment to the sacrum.

Once fixation is completed, the proximal lead body is typically bent at about 90° and tunneled subcutaneously to a remote site where its proximal connector elements are coupled to the neurostimulator IPG which is then implanted at the remote site. In this process some axial and lateral dislodgement of the stimulation electrodes can also occur.

It is generally desirable to minimize surgical trauma to the patient through surgical exposure of the tissue and sacrum and use of sutures or fixation mechanisms to hold the electrodes in place. It is preferred to employ a minimally invasive, percutaneous approach in a path extending from the skin to the foramen that the neurostimulation lead is extended through.

The above-referenced '965 patent describes one such percutaneous approach for implantation of a temporary neurostimulation lead that extends through the patient's skin and is attached to an external pulse generator. Typically, the external pulse generator and exposed portion of the lead body are taped to the skin to inhibit axial movement of the lead body. When a stimulation time period ends, the lead is removed through the skin by application of traction to the exposed lead body, and the incision is closed. The neurostimulation lead bodies of the '965 patents are formed with surface treatment or roughening in a portion proximal to the neurostimulation electrode expected to extend from the foramen to the patient's skin that is intended to increase the resistance to unintended axial dislodgement of the lead body to stabilize the electrode. A length of the lead body is formed with indentations or spiral ridges or treated to have a macroscopic roughening. These surface treatments or geometries provide some acute fixation against the subcutaneous tissues, but they are necessarily insufficient to resist intentional retraction of the lead to remove it upon cessation of temporary stimulation.

The prior art discloses a number of configurations of implantable medical electrical leads other than neurostimulation leads that employ fixation mechanisms to maintain a stimulation electrode in relation to a body organ or tissue. Cardiac pacing leads are commonly provided with passive fixation mechanisms that non-invasively engage heart tissue in a heart chamber or cardiac blood vessel or active fixation mechanisms that invasively extend into the myocardium from the endocardium or epicardium. Endocardial pacing leads having pliant tines that provide passive fixation within interstices of trabeculae in the right ventricle and atrial appendage are well known in the art as exemplified by U.S. Pat. Nos. 3,902,501, 3,939,843, 4,033,357, 4,236,529, 4,269,198, 4,301,815, 4,402,328, 4,409,994, and 4,883,070, for example. Such tined leads typically employ three or four tines that extend outwardly and proximally from a band proximal to a distal tip pace/sense electrode and that catch in natural trabecular interstices when the distal tip electrode is advanced into the atrial appendage or the ventricular apex. Certain spinal cord stimulation leads have been proposed employing tines and/or vanes as stand-offs to urge the stimulation electrode in the epidural space toward the spinal cord as disclosed in U.S. Pat. Nos. 4,590,949 and 4,658,535, for example, and to stabilize the stimulation electrode in the epidural space as disclosed in U.S. Pat. No. 4,414,986, for example,

In the case of the '843 patent that was directed to the first atrial tined leads, longitudinally extending rows of elongated tines were provided within a 270° arc extending away from a distal tip electrode canted in the remaining 90° section. The multiple rows of tines were intended to lodge in the trabecular interstices and force the canted tip against the atrial endocardial wall. However, it was found in practice that the canted tip is unnecessary and that only three, much shorter, tines in the 270° arc or four tines spaced apart by 90° in a common circumference like a ventricular tined lead, are sufficient. The rows of tines shown in the '843 patent are necessarily closely spaced because of the small area of trabeculae in the right atrium, and more proximal tines simply typically do not engage anything and make it difficult to lodge any of the tines in the interstitial spaces.

Such endocardial tined leads are typically introduced from a puncture site of the venous system to the cardiac site employing a stiffening stylet with a tip that can be formed with a curve extended down the lead lumen to advance it

through the venous system and into the heart chamber. Percutaneous lead introducers are used to access the puncture site. The tines fold against the introducer lumen and the vein wall after the lead distal end exits the introducer lumen. However, the above-referenced '070 patent does describe thin, webbed, or scalloped tines adapted to be introduced through an introducer already advanced all the way into a heart chamber.

In certain cases, sensing leads that include electrogram (EGM) sense electrodes are implanted subcutaneously and coupled to implantable cardiac monitors. One such cardiac monitoring system as shown in U.S. Pat. No. 5,313,953, for example, employs elongated electrode supports at the distal ends of leads that are tunneled subcutaneously into a sense electrode array and affixed with sutures sewn through preformed suture holes to subcutaneous tissue. First and second rows of projections also extend outwardly and proximally from the opposed first and second side walls of the electrode supports whereby the projections are in a common plane with the sense electrode. It is expected that tissue growth will occur around the projections and stabilize the lead. However, it can also be seen that the leads are advanced subcutaneously between tissue layers expanded by tunneling. The projections would likely not engage tissue during the acute phase before they are encapsulated. For this reason, the elongated leads are sutured in place to maintain the electrode position until the projections are encapsulated by tissue ingrowth. Furthermore, it is less critical to maintaining exact positioning of the sense electrodes of such a subcutaneous cardiac monitor than maintaining stimulation electrodes in the implanted positions for cardiac or nerve or muscle stimulation because minute stimulation electrode movement can decrease efficacy and increase battery energy consumption or fail.

Accordingly, there remains a need in the art for a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient's skin to locate stimulation electrodes in casual contact with a sacral nerve, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period.

## SUMMARY OF THE INVENTION

The present invention recognizes and provides a solution to the problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques. In a preferred embodiment, the present invention maintains one or more sacral nerve stimulation electrode in close proximity or casual contact with discrete nerve fibers of the sacral nerves by providing a unique solution that allows minimally invasive, percutaneous, implantation near to, but avoiding compressive contact with, the sacral nerves and fixation of the lead body in subcutaneous tissues. Additionally, the invention provides apparatus and a method of implanting a medical electrical stimulation lead through the subcutaneous tissue and foramen for stimulating a bundle of nerve fibers of the sacral nerve anterior to the sacral nerve opening through the sacrum.

Briefly, preferred embodiments of the present invention comprise a permanently implantable lead comprising a distal electrode that is maintained at a site in the body by a fixation mechanism that is formed on or integrally with the lead proximal to the electrode that is adapted to be implanted in and engage subcutaneous tissue, particularly muscle tissue, to inhibit axial movement of the lead body and dislodgement of the stimulation electrode. The fixation mechanism comprises a plurality M of tine elements arrayed in a tine element array along a segment of the lead proximal to the stimulation electrode array. Each tine element comprises at least N flexible, pliant, tines, each tine having a tine width and thickness and extending through a tine length from an attached tine end to a free tine end. The attached tine end is attached to the lead body from a tine attachment site and supports the tine extending radially from the lead body and proximally toward the lead proximal end. The M×N tines are adapted to be folded inward against the lead body when fitted into and constrained by the lumen of an introducer such that the tine length is folded up against lead body, and the folded tines do not overlap one another.

A particular embodiment of the present invention comprises a permanently implantable neurostimulation lead adapted to be advanced percutaneously from a skin incision to the selected foramen of the sacrum wherein the tines of the tine elements engage muscle tissue between the incision and the foramen to inhibit retraction of the neurostimulation lead. The neurostimulation lead preferably comprises P distally disposed stimulation electrodes, where P=one or more, arranged in an electrode array spaced apart from one another along a distal segment of the lead body adapted to be inserted into the selected foramen. Each stimulation electrode is electrically coupled to the distal end of a lead conductor within the elongated lead body that extends proximally through the lead body. The proximal ends of the separately insulated lead conductors are coupled to one of P respective connector elements in a proximal connector element array along a proximal segment of the lead body adjacent the lead proximal end that are adapted to be coupled with a neurostimulator IPG. Electrical stimulation pulses generated by the neurostimulator IPG are applied to the sacral nerve through one or more of the P stimulation electrodes in either a unipolar or bipolar stimulation mode.

Preferably, each of the M tine elements comprises a plurality N tines extending from respective attached tine ends disposed apart from one another, preferably, but not necessarily, equally spaced apart, along a common circumference extending around the lead body. The N tine attachment points around the common circumference for a distal tine element are preferably offset radially from the N tine attachment points around the common circumference of the adjacent proximal tine element. This distribution insures that the retention forces exerted against the muscle layers by the tines are distributed more uniformly around the lead body than would be the case if the tines were in parallel rows along the length of the lead body. In this embodiment, the tine lengths can be longer than the distance between the common circumferences of the proximal and distal tine elements along the lead body length. The N tines of each more distal tine element can be interleaved between the N tines of each more proximal tine element when constrained within an introducer lumen.

In another embodiment, each of the M tine elements comprises a tine mounting band encircling the lead body with the N tines extending from respective attached tine ends disposed apart from one another, preferably at equal spacing, around the tine mounting band. The N tines have a tine thickness that enables folding of the tines against the lead body in the space between the tine mounting band and the adjoining proximal tine mounting band.

In accordance with methods of implantation of the present invention, the tines of the tine element array along the length of the lead body are folded against the lead body when the stimulation electrode array and the tine element array are inserted into the lumen of an introducer. Preferably, a stiffening stylet is inserted through a lead body lumen to stiffen the lead as it is advanced into and through the introducer lumen.

The folded tines attempt to resume their unrestrained angle proximally away from the lead body when the lead is released from the distal lumen end opening of the introducer lumen. The tines resist being folded or inverted distally and present a folded cross-section profile that exceeds the lumen diameter inhibiting retraction proximally back through the distal lumen end opening of the introducer lumen.

During introduction, an introducer and an internally disposed element are advanced percutaneously to the foramen at a selected angle, and the inner element is then removed. The lead, optionally stiffened by a stiffening stylet disposed in the lead lumen, is advanced through the introducer lumen proximal end opening into the introducer lumen. Alternatively, the introducer with the distal segment of the lead body including the electrode array and the tine element array lead disposed within the introducer lumen is advanced percutaneously at a selected angle until the introducer distal end is disposed at the selected foramen. The advancement is optionally over a guide wire previously percutaneously advanced from the skin incision into the foramen to establish the angle of advancement or with a stiffening stylet disposed in the lead body lumen. In either approach, the stimulation electrode array and the tine element array are disposed within the introducer lumen prepositioned to be implanted in relation to the sacral nerve and in the subcutaneous tissue, respectively. Both visual and radiographic markers are optionally disposed along the introducer, the guide wire, and/or the lead body to assist in prepositioning the lead for implantation.

The distal portion of the neurostimulation lead is then advanced distally out of the introducer lumen distal end opening to advance the stimulation electrode array lead through the foramen from the posterior entrance into casual contact with the more anterior sacral nerve. The positioning is observed employing radiographic imaging and visual observation of a proximal marker on the lead body aligned with the introducer proximal hub. The introducer is retracted proximally after electrical testing to establish optimal positioning is completed, whereby the distal-to-proximal tine elements are successively released from the introducer lumen distal end opening. When the tines of each tine element are released in subcutaneous tissue, they bear against the tissue and inhibit proximal retraction of the lead body through the subcutaneous tissue if traction is applied to the lead body since the tines resist inversion in the proximal direction. The introducer and lead stylet, if present, are completely removed, and the proximal portion of the lead body is bent laterally with respect to the distal portion of the lead body and implanted through a subcutaneously tunneled path to the neurostimulator IPG.

The tines engage subcutaneous muscle layers that are penetrated by the introducer, not a pre-existing anatomical structure or a subcutaneously tunneled space overlying muscle layers. The tines are designed specifically to engage the muscle tissue and are relatively short and stiffer than the soft, pliant tines or projections on endocardial leads that get entangled in the trabeculae. Short, stiff tines provide better acute fixation in the muscle layers, and relatively harp, non-tapered, tine edges are provided to “dig into” the muscle.

In an alternative embodiment, one or more or all of the P stimulation electrodes is preferably formed of a flexible elongated mesh or wire coil electrodes that can bend somewhat to fit through a foramen to locate the elongated electrode optimally with respect to a sacral nerve. The elongated electrode surface area of the mesh or coiled wire electrode creates a wider electric field which allows the lead to be placed in a less precise or gross manner while still providing adequate electrical stimulation to the sacral nerve.

Accordingly, the present invention advantageously provides a unique implantable medical neurostimulation lead that provides adequate stimulation of the sacral nerves for control of incontinence and other pelvic floor disorders with the sacral nerves and with less sensitivity to placement and dislodgement. The unique lead simplifies the implant procedure and reduces or eliminates the need to reprogram the implantable pulse generator stimulation levels or re-open the patient to re-position the stimulation electrodes since the electrodes are less likely to move.

The implantation method for implanting the lead of the present invention allows more rapid placement of the electrodes for the treatment of incontinence whereby the lead is placed near the sacral nerves. Implanting the medical electrical lead near the sacral nerves with less specificity as to location near the sacral nerves reduces the time for implantation. Currently, the implantation procedure for existing medical electrical leads stimulating the sacral nerve fibers takes approximately 20-60 minutes. The present invention allows for implantation near the sacral nerve bundle and reduces the time for implantation to approximately 5-10 minutes.

The full range of advantages, and features of this invention are only appreciated by a full reading of this specification and a full understanding of the invention. Therefore, to complete this specification, a detailed description of the invention and the preferred embodiments follow, after a brief description of the drawings, wherein additional advantages and features of the invention are disclosed.

This summary of the invention has been presented here simply to point out some of the ways that the invention overcomes difficulties presented in the prior art and to distinguish the invention from the prior art and is not intended to operate in any manner as a limitation on the interpretation of claims that are presented initially in the patent application and that are ultimately granted.

## BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the invention are illustrated in the drawings, wherein like reference numerals refer to like elements in the various views, and wherein:

FIG. **1** is a plan view of one embodiment of sacral nerve stimulation lead of the present invention having a tine element array and stimulation electrode array in a distal portion of the lead body;

FIG. **2** is an expanded perspective view of the tine element array and stimulation electrode array in the distal portion of the lead body of FIG. **1**;

FIG. **3** is an expanded perspective view of one embodiment of a tine element employed in the lead of FIGS. **1** and **2**;

FIG. **4** is an expanded perspective view of a further embodiment of a tine element employed in the lead of FIGS. **1** and **2**;

FIG. **5** is a cross-section view of the sacrum schematically illustrating an initial step of implanting a sacral nerve stimulation lead of the present invention with tines constrained within an introducer lumen;

FIG. **6** is a cross-section view of the sacrum schematically illustrating a further step of implanting a sacral nerve stimulation lead of the present invention extending the stimulation electrodes through a foramen;

FIG. **7** is a cross-section view of the sacrum schematically illustrating a further step of implanting a sacral nerve stimulation lead of the present invention retracting the introducer to release the tines in subcutaneous tissue;

FIG. **8** is a cross-section view of the sacrum schematically illustrating a further step of implanting a sacral nerve stimulation lead of the present invention subcutaneously routing the proximal portion of the lead body to the implantation site of the neurostimulator IPG;

FIG. **9** is an expanded perspective view of an alternative tine element array that can be substituted for the tine element array depicted in FIGS. **1** and **2**; and

FIG. **10** is a plan view of one embodiment of sacral nerve stimulation lead of the present invention having a tine element array and stimulation electrode array employing an elongated flexible electrode in a distal portion of the lead body.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIGS. **1** and **2**, an implantable medical lead **10** preferably for sacral nerve stimulation that allows for non-direct contact stimulation of the sacral nerves comprises a lead body **15**, wherein P=four, for example, ring-shaped electrodes **25**, **30**, **35**, and **40** in an electrode array **20** extending proximally from the lead distal end **45**. The lead body outer diameter is preferably in the range of about 0.5 mm to about 2 mm, and the lead **10** is preferably about 28.0 cm long. The electrode array **20** extends proximally longitudinally for a length of about 25.0 mm from the distal end **45**. In one preferred embodiment, the electrodes **25**, **30**, **35** and **40** are made of a solid surface, bio-compatible material, e.g., a tube formed of platinum, platinum-iridium alloy, or stainless steel, of about 3.0 mm in length that does not degrade when electrical stimulation is delivered through it separated by shorter insulator bands.

Each stimulation electrode **25**, **30**, **35**, and **40** is electrically coupled to the distal end of a coiled wire lead conductor within the elongated lead body **15** that extends proximally through the distal portion **50** and through the proximal portion **55** of the lead body **15**. The proximal ends of the separately insulated lead conductors are each coupled to respective ring-shaped connector elements **65**, **70**, **75**, and **80** in a proximal connector element array **60** along the proximal portion **55** of the lead body **15** adjacent the lead proximal end **85**. The conductor wires are preferably formed of an MP35N alloy and are insulated from one another within an insulating polymer sheath such as polyurethane, fluoropolymer or silicone rubber. A typical diameter of the lead body **15** is 1.3 mm but a smaller diameter is also acceptable. The lead conductor wires are separately insulated by an insulation coating and are wound in a quadra-filar manner having a common winding diameter within the outer sheath. The coil formed by the coiled wire conductors defines a lead body lumen of the lead body **15**. It will be understood that a further inner tubular sheath could be interposed within the aligned wire coils to provide the lead body lumen.

The connector elements **65**, **70**, **75**, and **80** are adapted to be coupled with a neurostimulator IPG, additional intermediate wiring, or other stimulation device adapted to be implanted subcutaneously. An example of such an implantable pulse generator is the Medtronic InterStim Neurostimulator Model 3023. Electrical stimulation pulses generated by the neurostimulator IPG are applied to the sacral nerve through one or more of the stimulation electrodes **25**, **30**, **35** and **40** in either a unipolar or bipolar stimulation mode.

The axial lead body lumen (not shown) extends the length of the lead body **15** between a lumen proximal end opening at lead proximal end **85** and a lumen distal end opening at lead distal end **45**. The straight wire **110** attached to the handle **105** of a guide wire or stiffening stylet **100** can be inserted through the lead body lumen to assist in implanting the lead **10** as described further below. The stylet wire **110** is preferably made of solid wire such as tungsten or stainless steel.

A fixation mechanism is formed on the lead body **15** proximal to the electrode array **20** in the distal lead portion **50** that is adapted to be implanted in and engage subcutaneous tissue to inhibit axial movement of the lead body **15** and dislodgement of the stimulation electrodes **25**, **30**, **35** and **40**. The fixation mechanism comprises four tine elements **125**, **130**, **135** and **140** arrayed in a tine element array **120** in the distal lead portion **50** of the lead body **15**. As shown in FIGS. **1** and **2**, the tine elements **125**, **130**, **135**, and **140** are separate from the stimulation electrodes **25**, **30**, **35**, and **40**. In the example shown in FIGS. **1** and **2**, the tine elements **125**, **130**, **135**, and **140** are axially displaced from the stimulation electrodes **25**, **30**, **35**, and **40**.

Exemplary tine elements are depicted in FIGS. **2-4**, where M=4 and N=4, for example. Each tine element **125**, **130**, **135** and **140** comprises at least one flexible, pliant, tine, and four such tines **145**, **150**, **155** and **160** or **145'**, **150'**, **155'** and 160', are depicted in these examples. Each tine, e.g., tine **155** in FIG. **3** or **155'** in FIG. **4**, has a tine width and thickness and extends through a tine length from an attached tine end **165** to a free tine end **170**. The attached tine end **165** is attached to the lead body **15** from a tine attachment site and supports the tine extending outwardly of the lead body **15** and proximally toward the lead proximal end **85**. The tines are adapted to be folded inward against the lead body **15** when fitted into and constrained by the lumen of an introducer such that the tine free ends of more distal tines of more distal tine elements are urged toward or alongside the attached tine ends of the adjacent more proximal tines of more proximal tine elements, and the folded tines do not overlap one another.

In the depicted preferred embodiments, the tine elements **125**, **130**, **135** and **140** or **125'**, **130'**, **135'** and **140'** preferably comprise a tine mounting band **175** or **175'** encircling the lead body with the tines extending from respective attached tine ends or roots disposed apart from one another, preferably at equal spacing, around the tine mounting band **175** or **175'**. The four tines **145**, **150**, **155** and **160** or **145'**, **150'**, **155'** and **160'**, have a tine thickness that enables folding of the tines against the lead body in the space between the tine mounting band and the adjoining proximal tine mounting band depicted in FIGS. **1** and **2**.

The mounting band **175**, **175'** is preferably about 0.062 inches in outside diameter and about 0.076 inches long. Each tine is preferably about 0.013 inches thick, is preferably about 0.069 inches long, and is preferably about 0.035 inches wide and extends radially outward and proximally at about 45° to the axis of the lead body and the mounting band **175**, **175'**.

In accordance with the method of implantation of the present invention, the tines of the tine element array **120** along the length of the lead body **15** are folded proximally against the lead body **15** when the stimulation electrode array **20** and the tine element array **120** are inserted into the lumen of an introducer. Preferably, the stiffening stylet **100** is inserted through the lead body lumen to stiffen the lead **10** as it is advanced into and through the introducer lumen. Visual and radiographic imaging bands **90** and **95** are formed around the

lead body **15** distal to and proximal to, respectively, the tine element array **120** to be employed in determining the location of the tine element array **120** within the introducer lumen and as the introducer is withdrawn to expose the tine element array **120**. Visual and radiographic markers are optionally disposed along the introducer, and any guide wire used in implantation and the stylet to assist in pre-positioning the lead for implantation.

The folded tines attempt to resume their unrestrained angle as shown in FIGS. **1-4** away from the lead body when the lead is released from the distal lumen end opening of the introducer lumen. The tines resist being folded or inverted distally and present a folded cross-section profile that exceeds the lumen diameter inhibiting retraction proximally back through the distal lumen end opening of the introducer lumen. In one preferred embodiment, the tine elements **125**, **130**, **135** and **140** are formed of a bio-compatible plastic, e.g., medical grade silicone rubber or polyurethane, that can be formulated to exhibit a desired degree of stiffness or flexibility. In a further preferred embodiment, the tine elements **125**, **130**, **135** and **140** are formed of a superelastic alloy material.

FIGS. **5-8** depict the primary steps of implanting the sacral nerve stimulation lead **10** of FIGS. **1-4** and variations thereof described herein. An introducer **200** receives the distal segment **50** of the lead body **15** including the electrode array **20** and the tine element array **120** disposed within the introducer lumen. The stylet **100** is disposed within the lead body lumen so that its distal tip closes the lumen distal end opening. The assembly is advanced percutaneously at a selected angle until the introducer distal end is disposed at the selected foramen as shown in FIG. **5**.

To determine the best location of the stimulation electrodes, an insulated needle with both ends exposed for electrical stimulation is used to locate the foramen and locate the sacral nerve by applying electrical stimulation through the needle using an external pulse generator. The efficacy of the location is tested by evaluating the physiologic response in relation to the electrical threshold energy required to elicit the response. For control of incontinence, the physician preferably implants the medical electrical lead **10** near the S3 sacral nerves. The implantable medical electrical lead **10** may, however, be inserted near any of the sacral nerves including the S1, S2, S3, or S4, sacral nerves accessed via the corresponding foramen depending on the necessary or desired physiologic response.

The advancement of the introducer **200** can be accomplished separately over a guide wire previously percutaneously advanced from the skin incision into the foramen to establish the angle of advancement. Also, a two-part introducer can be employed having an inner introducer element that may be first advanced to the site by itself or over a previously introduced guide wire, and an outer introducer can be introduced over the inner element to dilate the tissue, whereupon the inner element is removed. Any percutaneous introduction tools and techniques may be employed that ultimately provides the introducer **200** in the location depicted in FIG. **5**.

The lead **10**, optionally stiffened by the stiffening stylet **100** disposed in the lead lumen, is advanced through the introducer lumen proximal end opening into the introducer lumen. However it is accomplished, the stimulation electrode array **20** and the tine element array **120** are disposed within the introducer lumen pre-positioned to be implanted in relation to the sacral nerve accessed through the foramen and in the subcutaneous tissue, respectively.

The stylet **100** may be advanced distally through the foramen as depicted in FIG. **5** or the neurostimulation lead **10** and the stylet wire **100** can both be advanced distally out of the introducer lumen distal end opening to advance the stimulation electrode array **20** into or through the foramen from the posterior entrance into casual contact with the more anterior sacral nerve as shown in FIG. **6**.

The introducer **200** is retracted proximally after electrical testing to establish optimal positioning is completed, whereby the distal-to-proximal tine elements **125**, **130**, **135** and **140** or **125'**, **130'**, **135'** and **140'** are successively released from the introducer lumen distal end opening as shown in FIG. **7**. The marker, **90**, can be seen under fluoroscopy. This allows the physician to know that the tines are about to be deployed, as the marker **90** approaches the distal end of the fluoroscopically visible introducer sheath. When marker **95** passes the distal end of the sheath, all of the tines have been deployed. When the tines of each tine element are released in subcutaneous tissue, they bear against the tissue and inhibit proximal retraction of the lead body through the subcutaneous tissue if traction is applied to the lead body since the tines resist inversion in the proximal direction. The introducer **200** and lead stylet **100**, if present, are completely removed in FIG. **7**. As shown in FIG. **8**, the proximal portion **55** of the lead body is bent laterally with respect to the distal portion **50** of the lead body **15** and implanted through a subcutaneously tunneled path to the neurostimulator IPG.

Alternative embodiments of the arrangement of the tines of the tine element array of the sacral nerve stimulation lead are depicted in FIG. **9**. The N tine attachment points around the common circumference of a distal tine element are preferably offset radially from the N tine attachment points around the common circumference of the adjacent proximal tine element. In this embodiment, the tine lengths can be longer than the distance between the common circumferences of the proximal and distal tine elements along the lead body length because the N tines of each more distal tine element can be interleaved between the N tines of each more proximal tine element when constrained within an introducer lumen.

Exemplary tine elements are depicted in FIG. **9**, where M=4 and N=4, for example, mounted on a lead body **15** of lead **10'**. Thus, in FIG. **9**, the tine elements **225**, **230**, **235**, and **240** are formed as described above with respect to tine elements **125**, **130**, **135**, and **140** or **125'**, **130'**, **135'**, and **140'** as individual elements mounted in the tine element array **220** or integrally. The four tine attachment points around the common circumference of a distal tine element, e.g., tine element **240** are preferably offset radially by 45° from the N tine attachment points around the common circumference of the adjacent proximal tine element, e.g., tine element **235**, so that the distal tines fold down interleaved between proximal tines when constrained within an introducer lumen.

Furthermore, alternate stimulation electrodes can be substituted for one or more of the P stimulation electrodes, and P can be equal to one. In FIG. **10**, electrode **30'** of lead **10"** is preferably formed of a flexible elongated mesh or wire coil that can bend somewhat to fit through a foramen to locate the elongated electrode optimally with respect to a sacral nerve. The elongated electrode surface area of the flexible electrode **30'** is preferably in the range of about 10.0 mm to about 38.0 mm and creates a wider electric field which allows the lead to be placed in a less precise or gross manner while still providing adequate electrical stimulation to the sacral nerve. The elongated flexible electrode **30'** preferably comprises a wire coil and a band or ring-shaped electrode connector. The wire coil is formed of a platinum or platinum-iridium alloy wire having a diameter of about 0.1 mm wound over a mandrel. The outer diameter of the wire coil electrode **30'** is preferably about the same as the outer diameter of the outer tubular

sheath **15**, the ring electrodes and connector elements and the insulator bands between the electrodes so that the lead **10** has a common outer diameter through its length.

Further variations of the disclosed preferred embodiments will occur to those of skill in the art. It is within the scope of the present invention to form the tine elements **125**, **130**, **135** and **140** or **125'**, **130'**, **135'** and **140'** and **225**, **230**, **235**, and **240** as a single structure with a common tine mounting band extending the length of the tine element array **120** or as an integral section of the outer sheath of the lead body **15** extending through the length of the tine element array **120**. Furthermore, whereas the depicted N tines are equal in number, it will is also within the scope of the invention to make the number N not equal among the M tine elements. For example, in one tine element, N=1, another tine element N=2, a further tine element N=4, etc. Moreover, whereas the M tine elements are depicted as equally spaced in the tine element array, the spacing can be varied. It may be desirable to include one or more tine element more proximally disposed along the lead body to be disposed proximally to the bend depicted in the lead body in FIG. **8** to aid in securing the lead or preventing dislodgement of the stimulation electrodes.

Accordingly, the present invention advantageously provides a unique implantable medical electrical stimulation lead that provides adequate stimulation of the sacral nerves for control of incontinence and other pelvic floor disorders with the sacral nerves and with less sensitivity to placement. The unique leads simplify the implantation procedure and reduce or eliminate the need to reprogram the stimulation energy level provided by the neurostimulator IPG or to reposition the stimulation electrodes.

The medical electrical leads and procedures of the present invention can be used to stimulate multiple nerves or multiple sides of a single nerve bundle. In addition, the medical electrical lead **10** can also be used as an intramuscular lead where the tines can engage against muscle and assist in preventing dislodgement of the distal electrode(s). This may be useful in muscle stimulation such as dynamic graciloplasty or stomach stimulation for gastroparesis or obesity.

All patents and publications referenced herein are incorporated herein by reference in their entireties.

Although the invention has been described in detail with particular reference to a preferred embodiment and alternate embodiments thereof, it will be understood variations and modifications can be effected within the scope of the following claims. Such modifications may include substituting elements or components which perform substantially the same function in substantially the same way to achieve substantially the same result for those described herein.

The invention claimed is:

**1**. A system comprising:

an implantable medical lead comprising:

a lead body extending between a proximal end and a distal end;

a plurality of conductors within the lead body;

a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and

a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by a lumen of an introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn to release the plurality of tines, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes.

**2**. The system of claim **1**, wherein the tines of the tine elements are formed of a flexible, bio-compatible plastic selected from the group consisting of medical grade polyurethane compounds and silicone rubber compounds.

**3**. The system of claim **1**, wherein the tines of the tine elements are formed of a flexible, implantable grade superelastic alloy.

**4**. The system of claim **1**, wherein the tine attachment sites of the plurality of tine elements are separated longitudinally along the lead body by a distance that is greater than or equal to the tine length so that the tines are not overlapping one another when the tines are folded against the lead body towards the proximal end of the lead body.

**5**. The system of claim **1**, wherein tine lengths and tine widths of tines of a first tine element of the plurality of tine elements are configured to enable the tines of the first tine element to fold toward the proximal end of the lead body alongside and interleaved with tines of a second tine element of the plurality of tine elements, the second tine element being located closer to the proximal end of the lead body than the first tine element.

**6**. The system of claim **1**, wherein a number of tine elements in the plurality of tine elements is equal to a number of tines in the plurality of tines of each tine element.

**7**. The system of claim **1**, wherein each tine element in the plurality of tine elements comprises an equal number of tines.

**8**. The system of claim **1**, wherein at least one of the electrodes of the plurality of electrodes comprises an elongated, flexible electrode configured to assume a curve when implanted in relation to body tissue.

**9**. The system of claim **1**, wherein the tine attachment sites of each tine element of the plurality of tine elements are disposed in a common circumference of the lead body, and the tine attachment sites of adjoining tine elements along the lead body are radially offset from one another around the common circumference such that the tine free ends of the tines of each adjacent tine element are configured to engage against body tissue at radially and axially separated points along the lead body.

**10**. The system of claim **1**, further comprising the introducer.

**11**. A system comprising:

an implantable pulse generator configured to generate electrical stimulation; and

an implantable medical lead configured to be electrically coupled to the implantable pulse generator and introduced through and released into body tissue via an introducer defining an introducer lumen, the implantable medical lead comprising:

a lead body extending between a proximal end and a distal end;

a plurality of conductors within the lead body;

a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and

a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by the lumen of the introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn proximally, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes.

**12**. The system of claim **11**, wherein the tines of the tine elements are formed of a flexible, bio-compatible plastic selected from the group consisting of medical grade polyurethane compounds and silicone rubber compounds.

**13**. The system of claim **11**, wherein the tines of the tine elements are formed of a flexible, implantable grade super-elastic alloy.

**14**. The system of claim **11**, wherein the tine attachment sites of the plurality of tine elements are separated longitudinally along the lead body by a distance that is greater than or equal to the tine length so that the tines are not overlapping one another when the tines are folded against the lead body towards the proximal end of the lead body.

**15**. The system of claim **11**, wherein tine lengths and tine widths of tines of a first tine element of the plurality of tine elements are configured to enable the tines of the first tine element to fold toward the proximal end of the lead body alongside and interleaved with tines of a second tine element of the plurality of tine elements, the second tine element being located closer to the proximal end of the lead body than the first tine element.

**16**. The system of claim **11**, wherein at least one of the electrodes of the plurality of electrodes comprises an elongated, flexible electrode configured to assume a curve when implanted in relation to body tissue.

**17**. The system of claim **11**, wherein the tine attachment sites of each tine element of the plurality of tine elements are disposed in a common circumference of the lead body, and the tine attachment sites of adjoining tine elements along the lead body are radially offset from one another around the common circumference such that the tine free ends of the tines of each adjacent tine element are configured to engage against body tissue at radially and axially separated points along the lead body.

**18**. A method comprising:

introducing an introducer into body tissue, the introducer defining a lumen extending between a lumen proximal end and a lumen distal end;

advancing a medical lead through the lumen of the introducer, the medical lead comprising:

a lead body extending between a proximal end and a distal end;

a plurality of conductors within the lead body;

a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and

a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending through a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by the lumen of the introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn proximally, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes; and

withdrawing the introducer from the body tissue to deploy the plurality of tine elements.

**19**. The method of claim **18**, wherein introducing the introducer into body tissue comprises percutaneously introducing the introducer through body tissue.

**20**. The method of claim **18**, wherein withdrawing the introducer from the body tissue to deploy the plurality of tine elements comprises withdrawing the introducer from the body tissue to deploy the plurality of tine elements into subcutaneous tissue, wherein the plurality of tine elements engage with the subcutaneous tissue to inhibit axial movement of the lead body and dislodgement of the plurality of electrodes.

**21**. The method of claim **18**, wherein withdrawing the introducer from the body tissue to deploy the plurality of tine elements comprises anchoring, with the plurality of tine elements, the plurality of electrodes in operative relation to a selected stimulation site.

**22**. The system of claim **1**, further comprising a tine mounting band, wherein at least one tine element is mounted to the lead via the tine mounting band.

**23**. The system of claim **11**, further comprising a tine mounting band, wherein at least one tine element is mounted to the lead via the tine mounting band.

**24**. The method of claim **18**, wherein the medical lead further comprises a tine mounting band, wherein at least one tine element is mounted to the lead via the tine mounting band.

* * * * *

US008036756B2

(12) **United States Patent**
**Swoyer et al.**

(10) **Patent No.: US 8,036,756 B2**
(45) **Date of Patent: Oct. 11, 2011**

(54) **IMPLANTABLE MEDICAL ELECTRICAL STIMULATION LEAD FIXATION METHOD AND APPARATUS**

(75) Inventors: **John M. Swoyer**, Andover, MN (US); **Martin T. Gerber**, Maple Grove, MN (US); **Keith Carlton**, Minneapolis, MN (US); **George J. Mamo**, Ellicott City, MD (US); **Michele Spinelli**, Milanno (IT); **Steven David Hartle**, Eden Prairie, MN (US)

(73) Assignee: **Medtronics Inc**, Minneapolis, MN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 101 days.

(21) Appl. No.: **11/352,552**

(22) Filed: **Feb. 13, 2006**

(65) **Prior Publication Data**

US 2006/0129218 A1 Jun. 15, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/004,732, filed on Nov. 9, 2001, now Pat. No. 6,999,819.

(60) Provisional application No. 60/316,582, filed on Aug. 31, 2001.

(51) **Int. Cl.**
*A61N 1/05* (2006.01)

(52) **U.S. Cl.** ......................... **607/117**; 607/116; 607/118

(58) **Field of Classification Search** ........... 607/116–118
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,650,276 A 3/1972 Burghele et al.
3,902,501 A 9/1975 Citron et al.
3,939,843 A 2/1976 Smyth
4,033,357 A 7/1977 Helland et al.
4,044,774 A * 8/1977 Corbin et al. ................ 607/117
4,236,529 A 12/1980 Little
4,262,678 A 4/1981 Stokes
4,269,198 A 5/1981 Stokes
4,289,144 A 9/1981 Gilman
4,301,815 A 11/1981 Doring
4,360,031 A 11/1982 White
4,393,883 A 7/1983 Smyth et al.

(Continued)

FOREIGN PATENT DOCUMENTS

DE 3146182 A1 6/1983

(Continued)

OTHER PUBLICATIONS

Office Action dated Jun. 11, 2009 for U.S. Appl. No. 12/023,817 (11 pgs.).

(Continued)

*Primary Examiner* — Niketa I Patel
*Assistant Examiner* — Joseph Stoklosa
(74) *Attorney, Agent, or Firm* — Shumaker & Sieffert, P.A.

(57) **ABSTRACT**

An implantable medical electrical lead particularly for stimulation of the sacral nerves comprises a lead body extending between a distal end and a proximal end, and the distal end having at least one electrode of an electrode array extending longitudinally from the distal end toward the proximal end. The lead body at its proximal end may be coupled to a pulse generator, additional intermediate wiring, or other stimulation device. A fixation mechanism is formed on or integrally with the lead body proximal to the electrode array that is adapted to be implanted in and engage subcutaneous tissue, particularly muscle tissue, to inhibit axial movement of the lead body and dislodgement of the stimulation electrodes.

**19 Claims, 8 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,402,328 | A | 9/1983 | Doring | |
| 4,402,329 | A | 9/1983 | Williams | |
| 4,407,303 | A | 10/1983 | Akerstrom | |
| 4,409,994 | A | 10/1983 | Doring | |
| 4,414,986 | A | 11/1983 | Dickhudt et al. | |
| 4,419,819 | A | 12/1983 | Dickhudt et al. | |
| 4,432,377 | A | 2/1984 | Dickhudt | |
| 4,437,475 | A | 3/1984 | White | |
| 4,465,079 | A | 8/1984 | Dickhudt | |
| 4,479,500 | A | 10/1984 | Smits | |
| 4,488,561 | A | 12/1984 | Doring | |
| 4,502,492 | A | 3/1985 | Bornzin | |
| 4,506,679 | A | 3/1985 | Mann | |
| 4,506,680 | A | 3/1985 | Stokes | |
| 4,538,624 | A | 9/1985 | Tarjan | |
| 4,564,023 | A | 1/1986 | Hess | |
| 4,569,351 | A | 2/1986 | Tang | |
| 4,577,642 | A | 3/1986 | Stokes | |
| 4,590,949 | A | 5/1986 | Pohndorf | |
| 4,606,118 | A | 8/1986 | Cannon et al. | |
| 4,607,739 | A | 8/1986 | Kaiser | |
| 4,658,835 | A | 4/1987 | Pohndorf | |
| 4,711,251 | A | 12/1987 | Stokes | |
| 4,716,888 | A | 1/1988 | Wesner | |
| 4,739,764 | A | 4/1988 | Lue et al. | |
| 4,771,779 | A | 9/1988 | Tanagho et al. | |
| 4,796,643 | A | 1/1989 | Nakazawa et al. | |
| 4,860,446 | A | 8/1989 | Lessar et al. | |
| 4,883,070 | A | 11/1989 | Hanson | |
| 4,913,147 | A | 4/1990 | Fahlstrom et al. | |
| 4,920,979 | A | 5/1990 | Bullara | |
| 4,922,927 | A | 5/1990 | Fine et al. | |
| 4,945,922 | A | 8/1990 | van Krieken | |
| 4,957,118 | A | 9/1990 | Erlebacher | |
| 5,040,544 | A | 8/1991 | Lessar et al. | |
| 5,207,672 | A | 5/1993 | Roth et al. | |
| 5,231,996 | A | 8/1993 | Bardy et al. | |
| 5,257,634 | A * | 11/1993 | Kroll | 607/122 |
| 5,282,844 | A | 2/1994 | Stokes et al. | |
| 5,282,845 | A | 2/1994 | Bush et al. | |
| 5,300,107 | A | 4/1994 | Stokes et al. | |
| 5,313,953 | A | 5/1994 | Yomtov et al. | |
| 5,336,253 | A | 8/1994 | Gordon et al. | |
| 5,344,439 | A | 9/1994 | Otten | |
| 5,376,108 | A | 12/1994 | Collins et al. | |
| 5,385,577 | A | 1/1995 | Maurer et al. | |
| 5,408,744 | A | 4/1995 | Gates | |
| 5,411,545 | A | 5/1995 | Breyen et al. | |
| 5,423,881 | A | 6/1995 | Breyen et al. | |
| 5,433,744 | A | 7/1995 | Breyen et al. | |
| 5,484,445 | A | 1/1996 | Knuth | |
| 5,562,722 | A | 10/1996 | Racz et al. | |
| 5,562,723 | A | 10/1996 | Rugland et al. | |
| 5,578,068 | A | 11/1996 | Laske et al. | |
| 5,653,742 | A | 8/1997 | Parker et al. | |
| 5,755,767 | A | 5/1998 | Doan et al. | |
| 5,796,044 | A | 8/1998 | Cobian et al. | |
| 5,807,399 | A | 9/1998 | Laske et al. | |
| 5,824,032 | A | 10/1998 | Belden | |
| 5,827,296 | A | 10/1998 | Morris et al. | |
| 5,843,149 | A | 12/1998 | Ebert et al. | |
| 5,849,031 | A | 12/1998 | Martinez et al. | |
| 5,885,258 | A | 3/1999 | Sachdeva et al. | |
| 5,897,585 | A | 4/1999 | Williams | |
| 5,902,330 | A | 5/1999 | Ollivier et al. | |
| 5,902,331 | A | 5/1999 | Bonner et al. | |
| 5,928,277 | A | 7/1999 | Laske et al. | |
| 5,957,965 | A | 9/1999 | Moumane et al. | |
| 5,957,966 | A | 9/1999 | Schroeppel et al. | |
| 5,957,967 | A | 9/1999 | Laske | |
| 5,957,970 | A | 9/1999 | Shoberg et al. | |
| 5,968,086 | A | 10/1999 | Bonner et al. | |
| 5,991,668 | A | 11/1999 | Leinders et al. | |
| 6,006,139 | A | 12/1999 | Kruse et al. | |
| 6,021,354 | A | 2/2000 | Warman et al. | |
| 6,052,625 | A | 4/2000 | Marshall | |
| 6,055,456 | A | 4/2000 | Gerber | |
| 6,104,960 | A | 8/2000 | Duysens et al. | |
| 6,149,678 | A | 11/2000 | DiDomenico et al. | |
| 6,178,355 | B1 | 1/2001 | Williams et al. | |
| 6,185,464 | B1 | 2/2001 | Bonner et al. | |
| 6,240,322 | B1 | 5/2001 | Peterfeso et al. | |
| 6,510,347 | B2 | 1/2003 | Borkan | |
| 6,512,967 | B2 | 1/2003 | Witte | |
| 6,832,115 | B2 * | 12/2004 | Borkan | 607/117 |
| 6,999,819 | B2 | 2/2006 | Swoyer et al. | |
| 7,239,924 | B2 | 7/2007 | Kolberg | |
| 7,330,764 | B2 | 2/2008 | Swoyer et al. | |
| 2004/0230279 | A1 | 11/2004 | Cates et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 3415410 | A1 | 10/1984 |
| EP | 1181948 | | 2/2002 |

OTHER PUBLICATIONS

Office Action dated Jun. 1, 2009 for U.S. Appl. No. 11/589,407 (13 pgs.).

Responsive Amendment dated Aug. 11, 2009 for U.S. Appl. No. 12/023,817 (12 pgs.).

Responsive Amendment dated Sep. 1, 2009 for U.S. Appl. No. 11/589,407 (13 pgs.).

U.S. Appl. No. 12/023,817, filed Jan. 31, 2008, "Implantable Medical Electrical Stimulation Lead Fixation Method and Apparatus,".

Office Action dated Dec. 29, 2009 for U.S. Appl. No. 11/589,407 (9 pgs.).

Office Action dated Oct. 27, 2009 for U.S. Appl. No. 12/023,817 (9 pgs.).

Responsive Amendment dated Jan. 27, 2010 for U.S. Appl. No. 12/023,817 (8 pgs.).

Response dated Feb. 26, 2010 for U.S. Appl. No. 11/589,407 (7 pgs.).

Advisory Action dated Mar. 31, 2010 for U.S. Appl. No. 11/589,407 (4 pgs.).

Final Office Action dated Nov. 16, 2010 for U.S. Appl. No. 11/589,407, 7 pgs.

Request for Continued Examination and Responsive Amendment dated Feb. 16, 2011 for U.S. Appl. No. 11/589,407, 10 pgs.

* cited by examiner


100
105
110
85
80
75
70
65
60
15
55
95
140
135
130
125
120
90
50
40
35
30
20
25
45
10

FIG. 1




FIG. 3

FIG 2

FIG 4

FIG. 5


Superior articular process
Sacral canal
110
200
60
100
10
Promontory
Foramen
Pelvic surface
Foramen
Sacral hiatus
Median sagittal section
Dorsal surface

FIG. 6


Superior
articular
process
Sacral
canal
Promontory
20
200
90
Foramen
Pelvic
surface
Foramen
10
60
100
Sacral hiatus
Median sagittal
section
Dorsal surface

FIG. 7



Superior articular process
Sacral canal
Promontory
Foramen
Pelvic surface
Foramen
Sacral hiatus
Median sagittal section
Dorsal surface
20
90
95
120
200
10
60


 

FIG. 8


Superior
articular
process
Sacral
canal
To IPG
55
10
20
Promontory
90
50
Foramen
95
Pelvic
surface
20
Foramen
Sacral hiatus
Median sagittal
section
Dorsal surface

FIG. 9




Axonics Modulation Technologies, Inc. - Ex. 1001


100
60
105
110
85
80
75
70
65
15
10
55
120
50
20
95
140
135
130
125
90
40
35
0'
25
45

FIG. 10

# IMPLANTABLE MEDICAL ELECTRICAL STIMULATION LEAD FIXATION METHOD AND APPARATUS

## RELATED APPLICATIONS

This application is a continuation of prior application Ser. No. 10/004,732, filed Nov. 9, 2001 for Implantable Medical Electrical Stimulation Lead Fixation Method And Apparatus, by inventor(s) John M. Swoyer et al, which claims benefit from U.S. Application No. 60/316,582, filed Aug. 31, 2001. The entire content of each of the U.S. Application is incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates generally to a method and apparatus that allows for stimulation of body tissue, particularly sacral nerves. More specifically, this invention relates to an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead. Moreover, this invention relates to the method of implantation and anchoring of the medical electrical lead electrodes in operative relation to a selected sacral nerve to allow for stimulation.

2. Description of Related Art

Pelvic floor disorders such as, urinary incontinence, urinary urge/frequency, urinary retention, pelvic pain, bowel dysfunction (constipation, diarrhea), erectile dysfunction, are bodily functions influenced by the sacral nerves. Specifically, urinary incontinence is the involuntary control over the bladder that is exhibited in various patients. Incontinence is primarily treated through pharmaceuticals and surgery. Many of the pharmaceuticals do not adequately resolve the issue and can cause unwanted side effects, and a number of the surgical procedures have a low success rate and are not reversible. Several other methods have been used to control bladder incontinence, for example, vesicostomy or an artificial sphincter implanted around the urethea. These solutions have drawbacks well known to those skilled in the art. In addition, some disease states do not have adequate medical treatments.

The organs involved in bladder, bowel, and sexual function receive much of their control via the second, third, and fourth sacral nerves, commonly referred to as S2, S3 and S4 respectively. Electrical stimulation of these various nerves has been found to offer some control over these functions. Several techniques of electrical stimulation may be used, including stimulation of nerve bundles within the sacrum. The sacrum, generally speaking, is a large, triangular bone situated at the lower part of the vertebral column, and at the upper and back part of the pelvic cavity. The spinal canal runs throughout the greater part of the sacrum. The sacrum is perforated by the anterior and posterior sacral foramina that the sacral nerves pass through.

Neurostimulation leads have been implanted on a temporary or permanent basis having at least one stimulation electrode positioned on and near the sacral nerves of the human body to provide partial control for bladder incontinence. Temporary sacral nerve stimulation is accomplished through implantation of a temporary neurostimulation lead extending through the skin and connected with a temporary external pulse generator as described for example in commonly assigned U.S. Pat. Nos. 5,957,965 and 6,104,960. A permanent neurostimulator is implanted if stimulation is efficacious and it is possible to do so in the particular patient. Permanent implantation is accomplished by implanting a permanent neurostimulation lead, extending the proximal portion of the lead body subcutaneously, and connecting its proximal end with an implantable pulse generator (IPG) implanted subcutaneously.

For example, U.S. Pat. Nos. 4,771,779, 4,607,739 and 4,739,764 disclose implanting an electrode on at least one nerve controlling the bladder and applying nerve stimulation energy to the nerve through the electrode. Electrodes positioned within the sacrum to control bladder function are also disclosed in U.S. Pat. No. 4,569,351.

In one embodiment, a lead bearing a distal stimulation electrode is percutaneously implanted through the dorsum and the sacral foramen (a singular foramina) of the sacral segment S3 for purposes of selectively stimulating the S3 sacral nerve. The lead is advanced through the lumen of a hollow spinal needle extended through the foramen, the single distal tip electrode is positioned adjoining the selected sacral nerve. Stimulation energy is applied through the lead to the electrode to test the nerve response. The electrode is moved back and forth to locate the most efficacious location, and the lead is then secured by suturing the lead body to subcutaneous tissue posterior to the sacrum and attached to the output of a neurostimulator IPG. Despite the suture fixation, sacral nerve stimulation leads having a single discrete tip electrode can be dislodged from the most efficacious location due to stresses placed on the lead by the ambulatory patient. A surgical intervention is then necessary to reposition the electrode and affix the lead.

The current lead designs used for permanent implantation to provide sacral nerve stimulation through a foramen have a number, e.g., four, ring-shaped, stimulation electrodes spaced along a distal segment of the lead body adapted to be passed into or through the foramen along a selected sacral nerve. Each distal stimulation electrode is electrically coupled to the distal end of a lead conductor within the elongated lead body that extends proximally through the lead body. The proximal ends of the separately insulated lead conductors are each coupled to a ring-shaped connector element in a proximal connector element array along a proximal segment of the lead body that is adapted to be coupled with the implantable neurostimulation pulse generator or neurostimulator IPG.

Again, the electrode array is moved back and forth with respect to the sacral nerve while the response to stimulation pulses applied through one or more of the electrodes is determined. The IPG is programmed to deliver stimulation pulse energy to the electrode providing the optimal nerve response, and the selection of the electrodes can be changed if efficacy using a selected electrode fades over time due to dislodgement or other causes.

Electrical stimulation pulses generated by the neurostimulator IPG are applied to the sacral nerve through the selected one or more of the stimulation electrodes in either a unipolar or bipolar stimulation mode. In one unipolar stimulation mode, the stimulation pulses are delivered between a selected active one of the stimulation electrodes and the electrically conductive, exposed surface of the neurostimulator IPG housing or can providing a remote, indifferent or return electrode. In this case, efficacy of stimulation between each stimulation electrode and the neurostimulator IPG can electrode is tested, and the most efficacious combination is selected for use. In a further unipolar stimulation mode, two or more of the stimulation electrodes are electrically coupled together providing stimulation between the coupled together stimulation electrodes and the return electrode.

In a bipolar stimulation mode, one of the distal stimulation electrodes is selected as the indifferent or return electrode. Localized electrical stimulation of the sacral nerve is effected between the active stimulation electrode(s) and the indifferent stimulation electrode.

A problem associated with implantation of permanent and temporary neurostimulation leads involves maintaining the discrete ring-shaped electrode(s) in casual contact, that is in location where slight contact of the electrode with the sacral nerve may occur or in close proximity to the sacral nerve to provide adequate stimulation of the sacral nerve, while allowing for some axial movement of the lead body.

Typically, physicians spend a great deal of time with the patient under a general anesthetic placing the leads due to the necessity of making an incision exposing the foramen and due to the difficulty in optimally positioning the small size stimulation electrodes relative to the sacral nerve. The patient is thereby exposed to the additional dangers associated with extended periods of time under a general anesthetic. Movement of the lead, whether over time from suture release or during implantation during suture sleeve installation, is to be avoided. As can be appreciated, unintended movement of any object positioned proximate a nerve may cause unintended nerve damage. Moreover reliable stimulation of a nerve requires consistent nerve response to the electrical stimulation that, in turn, requires consistent presence of the stimulation electrode proximate the sacral nerve. But, too close or tight a contact of the electrode with the sacral nerve can also cause inflammation or injury to the nerve diminishing efficacy and possibly causing patient discomfort.

Once the optimal electrode position is attained, it is necessary to fix the lead body to retard lead migration and dislodgement of the electrodes from the optimal position employing sutures or a sacral lead fixation mechanism of the types described in the above-referenced '351 patent or an improved fixation mechanism of the type described in commonly assigned U.S. Pat. No. 5,484,445. However, it is desirable to avoid use of complex fixation mechanisms that require surgical exposure large enough to implant the fixation mechanism, in these cases requiring exposure and attachment to the sacrum.

Once fixation is completed, the proximal lead body is typically bent at about 90° and tunneled subcutaneously to a remote site where its proximal connector elements are coupled to the neurostimulator IPG which is then implanted at the remote site. In this process some axial and lateral dislodgement of the stimulation electrodes can also occur.

It is generally desirable to minimize surgical trauma to the patient through surgical exposure of the tissue and sacrum and use of sutures or fixation mechanisms to hold the electrodes in place. It is preferred to employ a minimally invasive, percutaneous approach in a path extending from the skin to the foramen that the neurostimulation lead is extended through.

The above-referenced '965 patent describes one such percutaneous approach for implantation of a temporary neurostimulation lead that extends through the patient's skin and is attached to an external pulse generator. Typically, the external pulse generator and exposed portion of the lead body are taped to the skin to inhibit axial movement of the lead body. When a stimulation time period ends, the lead is removed through the skin by application of traction to the exposed lead body, and the incision is closed. The neurostimulation lead bodies of the '965 patents are formed with surface treatment or roughening in a portion proximal to the neurostimulation electrode expected to extend from the foramen to the patient's skin that is intended to increase the resistance to unintended axial dislodgement of the lead body to stabilize the electrode. A length of the lead body is formed with indentations or spiral ridges or treated to have a macroscopic roughening. These surface treatments or geometries provide some acute fixation against the subcutaneous tissues, but they are necessarily insufficient to resist intentional retraction of the lead to remove it upon cessation of temporary stimulation.

The prior art discloses a number of configurations of implantable medical electrical leads other than neurostimulation leads that employ fixation mechanisms to maintain a stimulation electrode in relation to a body organ or tissue. Cardiac pacing leads are commonly provided with passive fixation mechanisms that non-invasively engage heart tissue in a heart chamber or cardiac blood vessel or active fixation mechanisms that invasively extend into the myocardium from the endocardium or epicardium. Endocardial pacing leads having pliant tines that provide passive fixation within interstices of trabeculae in the right ventricle and atrial appendage are well known in the art as exemplified by U.S. Pat. Nos. 3,902,501, 3,939,843, 4,033,357, 4,236,529, 4,269,198, 4,301,815, 4,402,328, 4,409,994, and 4,883,070, for example. Such tined leads typically employ three or four tines that extend outwardly and proximally from a band proximal to a distal tip pace/sense electrode and that catch in natural trabecular interstices when the distal tip electrode is advanced into the atrial appendage or the ventricular apex. Certain spinal cord stimulation leads have been proposed employing tines and/or vanes as stand-offs to urge the stimulation electrode in the epidural space toward the spinal cord as disclosed in U.S. Pat. Nos. 4,590,949 and 4,658,535, for example, and to stabilize the stimulation electrode in the epidural space as disclosed in U.S. Pat. No. 4,414,986, for example,

In the case of the '843 patent that was directed to the first atrial tined leads, longitudinally extending rows of elongated tines were provided within a 270° arc extending away from a distal tip electrode canted in the remaining 90° section. The multiple rows of tines were intended to lodge in the trabecular interstices and force the canted tip against the atrial endocardial wall. However, it was found in practice that the canted tip is unnecessary and that only three, much shorter, tines in the 270° arc or four tines spaced apart by 90° in a common circumference like a ventricular tined lead, are sufficient. The rows of tines shown in the '843 patent are necessarily closely spaced because of the small area of trabeculae in the right atrium, and more proximal tines simply typically do not engage anything and make it difficult to lodge any of the tines in the interstitial spaces.

Such endocardial tined leads are typically introduced from a puncture site of the venous system to the cardiac site employing a stiffening stylet with a tip that can be formed with a curve extended down the lead lumen to advance it through the venous system and into the heart chamber. Percutaneous lead introducers are used to access the puncture site. The tines fold against the introducer lumen and the vein wall after the lead distal end exits the introducer lumen. However, the above-referenced '070 patent does describe thin, webbed, or scalloped tines adapted to be introduced through an introducer already advanced all the way into a heart chamber.

In certain cases, sensing leads that include electrogram (EGM) sense electrodes are implanted subcutaneously and coupled to implantable cardiac monitors. One such cardiac monitoring system as shown in U.S. Pat. No. 5,313,953, for example, employs elongated electrode supports at the distal ends of leads that are tunneled subcutaneously into a sense electrode array and affixed with sutures sewn through preformed suture holes to subcutaneous tissue. First and second

rows of projections also extend outwardly and proximally from the opposed first and second side walls of the electrode supports whereby the projections are in a common plane with the sense electrode. It is expected that tissue growth will occur around the projections and stabilize the lead. However, it can also be seen that the leads are advanced subcutaneously between tissue layers expanded by tunneling. The projections would likely not engage tissue during the acute phase before they are encapsulated. For this reason, the elongated leads are sutured in place to maintain the electrode position until the projections are encapsulated by tissue ingrowth. Furthermore, it is less critical to maintaining exact positioning of the sense electrodes of such a subcutaneous cardiac monitor than maintaining stimulation electrodes in the implanted positions for cardiac or nerve or muscle stimulation because minute stimulation electrode movement can decrease efficacy and increase battery energy consumption or fail.

Accordingly, there remains a need in the art for a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient's skin to locate stimulation electrodes in casual contact with a sacral nerve, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period.

## SUMMARY OF THE INVENTION

The present invention recognizes and provides a solution to the problems associated with implanting and maintaining electrical leads in body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques. In a preferred embodiment, the present invention maintains one or more sacral nerve stimulation electrode in close proximity or casual contact with discrete nerve fibers of the sacral nerves by providing a unique solution that allows minimally invasive, percutaneous, implantation near to, but avoiding compressive contact with, the sacral nerves and fixation of the lead body in subcutaneous tissues. Additionally, the invention provides apparatus and a method of implanting a medical electrical stimulation lead through the subcutaneous tissue and foramen for stimulating a bundle of nerve fibers of the sacral nerve anterior to the sacral nerve opening through the sacrum.

Briefly, preferred embodiments of the present invention comprise a permanently implantable lead comprising a distal electrode that is maintained at a site in the body by a fixation mechanism that is formed on or integrally with the lead proximal to the electrode that is adapted to be implanted in and engage subcutaneous tissue, particularly muscle tissue, to inhibit axial movement of the lead body and dislodgement of the stimulation electrode. The fixation mechanism comprises a plurality M of tine elements arrayed in a tine element array along a segment of the lead proximal to the stimulation electrode array. Each tine element comprises at least N flexible, pliant, tines, each tine having a tine width and thickness and extending through a tine length from an attached tine end to a free tine end. The attached tine end is attached to the lead body from a tine attachment site and supports the tine extending radially from the lead body and proximally toward the lead proximal end. The M×N tines are adapted to be folded inward against the lead body when fitted into and constrained by the lumen of an introducer such that the tine length is folded up against lead body, and the folded tines do not overlap one another.

A particular embodiment of the present invention comprises a permanently implantable neurostimulation lead adapted to be advanced percutaneously from a skin incision to the selected foramen of the sacrum wherein the tines of the tine elements engage muscle tissue between the incision and the foramen to inhibit retraction of the neurostimulation lead. The neurostimulation lead preferably comprises P distally disposed stimulation electrodes, where P=one or more, arranged in an electrode array spaced apart from one another along a distal segment of the lead body adapted to be inserted into the selected foramen. Each stimulation electrode is electrically coupled to the distal end of a lead conductor within the elongated lead body that extends proximally through the lead body. The proximal ends of the separately insulated lead conductors are coupled to one of P respective connector elements in a proximal connector element array along a proximal segment of the lead body adjacent the lead proximal end that are adapted to be coupled with a neurostimulator IPG. Electrical stimulation pulses generated by the neurostimulator IPG are applied to the sacral nerve through one or more of the P stimulation electrodes in either a unipolar or bipolar stimulation mode.

Preferably, each of the M tine elements comprises a plurality N tines extending from respective attached tine ends disposed apart from one another, preferably, but not necessarily, equally spaced apart, along a common circumference extending around the lead body. The N tine attachment points around the common circumference for a distal tine element are preferably offset radially from the N tine attachment points around the common circumference of the adjacent proximal tine element. This distribution insures that the retention forces exerted against the muscle layers by the tines are distributed more uniformly around the lead body than would be the case if the tines were in parallel rows along the length of the lead body. In this embodiment, the tine lengths can be longer than the distance between the common circumferences of the proximal and distal tine elements along the lead body length. The N tines of each more distal tine element can be interleaved between the N tines of each more proximal tine element when constrained within an introducer lumen.

In another embodiment, each of the M tine elements comprises a tine mounting band encircling the lead body with the N tines extending from respective attached tine ends disposed apart from one another, preferably at equal spacing, around the tine mounting band. The N tines have a tine thickness that enables folding of the tines against the lead body in the space between the tine mounting band and the adjoining proximal tine mounting band.

In accordance with methods of implantation of the present invention, the tines of the tine element array along the length of the lead body are folded against the lead body when the stimulation electrode array and the tine element array are inserted into the lumen of an introducer. Preferably, a stiffening stylet is inserted through a lead body lumen to stiffen the lead as it is advanced into and through the introducer lumen.

The folded tines attempt to resume their unrestrained angle proximally away from the lead body when the lead is released from the distal lumen end opening of the introducer lumen. The tines resist being folded or inverted distally and present a folded cross-section profile that exceeds the lumen diameter inhibiting retraction proximally back through the distal lumen end opening of the introducer lumen.

During introduction, an introducer and an internally disposed element are advanced percutaneously to the foramen at

a selected angle, and the inner element is then removed. The lead, optionally stiffened by a stiffening stylet disposed in the lead lumen, is advanced through the introducer lumen proximal end opening into the introducer lumen. Alternatively, the introducer with the distal segment of the lead body including the electrode array and the tine element array lead disposed within the introducer lumen is advanced percutaneously at a selected angle until the introducer distal end is disposed at the selected foramen. The advancement is optionally over a guide wire previously percutaneously advanced from the skin incision into the foramen to establish the angle of advancement or with a stiffening stylet disposed in the lead body lumen. In either approach, the stimulation electrode array and the tine element array are disposed within the introducer lumen prepositioned to be implanted in relation to the sacral nerve and in the subcutaneous tissue, respectively. Both visual and radiographic markers are optionally disposed along the introducer, the guide wire, and/or the lead body to assist in prepositioning the lead for implantation.

The distal portion of the neurostimulation lead is then advanced distally out of the introducer lumen distal end opening to advance the stimulation electrode array lead through the foramen from the posterior entrance into casual contact with the more anterior sacral nerve. The positioning is observed employing radiographic imaging and visual observation of a proximal marker on the lead body aligned with the introducer proximal hub. The introducer is retracted proximally after electrical testing to establish optimal positioning is completed, whereby the distal-to-proximal tine elements are successively released from the introducer lumen distal end opening. When the tines of each tine element are released in subcutaneous tissue, they bear against the tissue and inhibit proximal retraction of the lead body through the subcutaneous tissue if traction is applied to the lead body since the tines resist inversion in the proximal direction. The introducer and lead stylet, if present, are completely removed, and the proximal portion of the lead body is bent laterally with respect to the distal portion of the lead body and implanted through a subcutaneously tunneled path to the neurostimulator IPG.

The tines engage subcutaneous muscle layers that are penetrated by the introducer, not a pre-existing anatomical structure or a subcutaneously tunneled space overlying muscle layers. The tines are designed specifically to engage the muscle tissue and are relatively short and stiffer than the soft, pliant tines or projections on endocardial leads that get entangled in the trabeculae. Short, stiff tines provide better acute fixation in the muscle layers, and relatively harp, non-tapered, tine edges are provided to “dig into” the muscle.

In an alternative embodiment, one or more or all of the P stimulation electrodes is preferably formed of a flexible elongated mesh or wire coil electrodes that can bend somewhat to fit through a foramen to locate the elongated electrode optimally with respect to a sacral nerve. The elongated electrode surface area of the mesh or coiled wire electrode creates a wider electric field which allows the lead to be placed in a less precise or gross manner while still providing adequate electrical stimulation to the sacral nerve.

Accordingly, the present invention advantageously provides a unique implantable medical neurostimulation lead that provides adequate stimulation of the sacral nerves for control of incontinence and other pelvic floor disorders with the sacral nerves and with less sensitivity to placement and dislodgement. The unique lead simplifies the implant procedure and reduces or eliminates the need to reprogram the implantable pulse generator stimulation levels or re-open the patient to re-position the stimulation electrodes since the electrodes are less likely to move.



The implantation method for implanting the lead of the present invention allows more rapid placement of the electrodes for the treatment of incontinence whereby the lead is placed near the sacral nerves. Implanting the medical electrical lead near the sacral nerves with less specificity as to location near the sacral nerves reduces the time for implantation. Currently, the implantation procedure for existing medical electrical leads stimulating the sacral nerve fibers takes approximately 20-60 minutes. The present invention allows for implantation near the sacral nerve bundle and reduces the time for implantation to approximately 5-10 minutes.

The full range of advantages, and features of this invention are only appreciated by a full reading of this specification and a full understanding of the invention. Therefore, to complete this specification, a detailed description of the invention and the preferred embodiments follow, after a brief description of the drawings, wherein additional advantages and features of the invention are disclosed.

This summary of the invention has been presented here simply to point out some of the ways that the invention overcomes difficulties presented in the prior art and to distinguish the invention from the prior art and is not intended to operate in any manner as a limitation on the interpretation of claims that are presented initially in the patent application and that are ultimately granted.

## BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the invention are illustrated in the drawings, wherein like reference numerals refer to like elements in the various views, and wherein:

FIG. **1** is a plan view of one embodiment of sacral nerve stimulation lead of the present invention having a tine element array and stimulation electrode array in a distal portion of the lead body;

FIG. **2** is an expanded perspective view of the tine element array and stimulation electrode array in the distal portion of the lead body of FIG. **1**;

FIG. **3** is an expanded perspective view of one embodiment of a tine element employed in the lead of FIGS. **1** and **2**;

FIG. **4** is an expanded perspective view of a further embodiment of a tine element employed in the lead of FIGS. **1** and **2**;

FIG. **5** is a cross-section view of the sacrum schematically illustrating an initial step of implanting a sacral nerve stimulation lead of the present invention with tines constrained within an introducer lumen;

FIG. **6** is a cross-section view of the sacrum schematically illustrating a further step of implanting a sacral nerve stimulation lead of the present invention extending the stimulation electrodes through a foramen;

FIG. **7** is a cross-section view of the sacrum schematically illustrating a further step of implanting a sacral nerve stimulation lead of the present invention retracting the introducer to release the tines in subcutaneous tissue;

FIG. **8** is a cross-section view of the sacrum schematically illustrating a further step of implanting a sacral nerve stimulation lead of the present invention subcutaneously routing the proximal portion of the lead body to the implantation site of the neurostimulator IPG;

FIG. **9** is an expanded perspective view of an alternative tine element array that can be substituted for the tine element array depicted in FIGS. **1** and **2**; and

FIG. **10** is a plan view of one embodiment of sacral nerve stimulation lead of the present invention having a tine element

array and stimulation electrode array employing an elongated flexible electrode in a distal portion of the lead body.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIGS. **1** and **2**, an implantable medical lead **10** preferably for sacral nerve stimulation that allows for non-direct contact stimulation of the sacral nerves comprises a lead body **15**, wherein P=four, for example, ring-shaped electrodes **25**, **30**, **35**, and **40** in an electrode array **20** extending proximally from the lead distal end **45**. The lead body outer diameter is preferably in the range of about 0.5 mm to about 2 mm, and the lead **10** is preferably about 28.0 cm long. The electrode array **20** extends proximally longitudinally for a length of about 25.0 mm from the distal end **45**. In one preferred embodiment, the electrodes **25**, **30**, **35** and **40** are made of a solid surface, bio-compatible material, e.g., a tube formed of platinum, platinum-iridium alloy, or stainless steel, of about 3.0 mm in length that does not degrade when electrical stimulation is delivered through it separated by shorter insulator bands.

Each stimulation electrode **25**, **30**, **35**, and **40** is electrically coupled to the distal end of a coiled wire lead conductor within the elongated lead body **15** that extends proximally through the distal portion **50** and through the proximal portion **55** of the lead body **15**. The proximal ends of the separately insulated lead conductors are each coupled to respective ring-shaped connector elements **65**, **70**, **75**, and **80** in a proximal connector element array **60** along the proximal portion **55** of the lead body **15** adjacent the lead proximal end **85**. The conductor wires are preferably formed of an MP35N alloy and are insulated from one another within an insulating polymer sheath such as polyurethane, fluoropolymer or silicone rubber. A typical diameter of the lead body **15** is 1.3 mm but a smaller diameter is also acceptable. The lead conductor wires are separately insulated by an insulation coating and are wound in a quadra-filar manner having a common winding diameter within the outer sheath. The coil formed by the coiled wire conductors defines a lead body lumen of the lead body **15**. It will be understood that a further inner tubular sheath could be interposed within the aligned wire coils to provide the lead body lumen.

The connector elements **65**, **70**, **75**, and **80** are adapted to be coupled with a neurostimulator IPG, additional intermediate wiring, or other stimulation device adapted to be implanted subcutaneously. An example of such an implantable pulse generator is the Medtronic InterStim Neurostimulator Model 3023. Electrical stimulation pulses generated by the neurostimulator IPG are applied to the sacral nerve through one or more of the stimulation electrodes **25**, **30**, **35** and **40** in either a unipolar or bipolar stimulation mode.

The axial lead body lumen (not shown) extends the length of the lead body **15** between a lumen proximal end opening at lead proximal end **85** and a lumen distal end opening at lead distal end **45**. The straight wire **110** attached to the handle **105** of a guide wire or stiffening stylet **100** can be inserted through the lead body lumen to assist in implanting the lead **10** as described further below. The stylet wire **110** is preferably made of solid wire such as tungsten or stainless steel.

A fixation mechanism is formed on the lead body **15** proximal to the electrode array **20** in the distal lead portion **50** that is adapted to be implanted in and engage subcutaneous tissue to inhibit axial movement of the lead body **15** and dislodgement of the stimulation electrodes **25**, **30**, **35** and **40**. The fixation mechanism comprises four tine elements **125**, **130**, **135** and **140** arrayed in a tine element array **120** in the distal lead **15** portion **50** of the lead body **15**. As shown in FIGS. **1** and **2**, the tine elements **125**, **130**, **135**, and **140** are separate from the stimulation electrodes **25**, **30**, **35**, and **40**. In the example shown in FIGS. **1** and **2**, the tine elements **125**, **130**, **135**, and **140** are axially displaced from the stimulation electrodes **25**, **30**, **35**, and **40**.

Exemplary tine elements are depicted in FIGS. **2-4**, where M=4 and N=4, for example. Each tine element **125**, **130**, **135** and **140** comprises at least one flexible, pliant, tine, and four such tines **145**, **150**, **155** and **160** or **145'**, **150'**, **155'** and **160'**, are depicted in these examples. Each tine, e.g., tine **155** in FIG. **3** or **155'** in FIG. **4**, has a tine width and thickness and extends through a tine length from an attached tine end **165** to a free tine end **170**. The attached tine end **165** is attached to the lead body **15** from a tine attachment site and supports the tine extending outwardly of the lead body **15** and proximally toward the lead proximal end **85**. The tines are adapted to be folded inward against the lead body **15** when fitted into and constrained by the lumen of an introducer such that the tine free ends of more distal tines of more distal tine elements are urged toward or alongside the attached tine ends of the adjacent more proximal tines of more proximal tine elements, and the folded tines do not overlap one another.

In the depicted preferred embodiments, the tine elements **125**, **130**, **135** and **140** or **125'**, **130'**, **135'** and **140'** preferably comprise a tine mounting band **175** or **175'** encircling the lead body with the tines extending from respective attached tine ends or roots disposed apart from one another, preferably at equal spacing, around the tine mounting band **175** or **175'**. The four tines **145**, **150**, **155** and **160** or **145'**, **150'**, **155'** and **160'**, have a tine thickness that enables folding of the tines against the lead body in the space between the tine mounting band and the adjoining proximal tine mounting band depicted in FIGS. **1** and **2**.

The mounting band **175**, **175'** is preferably about 0.062 inches in outside diameter and about 0.076 inches long. Each tine is preferably about 0.013 inches thick, is preferably about 0.069 inches long, and is preferably about 0.035 inches wide and extends radially outward and proximally at about 45° to the axis of the lead body and the mounting band **175**, **175'**.

In accordance with the method of implantation of the present invention, the tines of the tine element array **120** along the length of the lead body **15** are folded proximally against the lead body **15** when the stimulation electrode array **20** and the tine element array **120** are inserted into the lumen of an introducer. Preferably, the stiffening stylet **100** is inserted through the lead body lumen to stiffen the lead **10** as it is advanced into and through the introducer lumen. Visual and radiographic imaging bands **90** and **95** are formed around the lead body **15** distal to and proximal to, respectively, the tine element array **120** to be employed in determining the location of the tine element array **120** within the introducer lumen and as the introducer is withdrawn to expose the tine element array **120**. Visual and radiographic markers are optionally disposed along the introducer, and any guide wire used in implantation and the stylet to assist in pre-positioning the lead for implantation.

The folded tines attempt to resume their unrestrained angle as shown in FIGS. **1-4** away from the lead body when the lead is released from the distal lumen end opening of the introducer lumen. The tines resist being folded or inverted distally and present a folded cross-section profile that exceeds the lumen diameter inhibiting retraction proximally back through the distal lumen end opening of the introducer lumen. In one preferred embodiment, the tine elements **125**, **130**, **135** and **140** are formed of a bio-compatible plastic, e.g., medical grade silicone rubber or polyurethane, that can be formulated

to exhibit a desired degree of stiffness or flexibility. In a further preferred embodiment, the tine elements **125**, **130**, **135** and **140** are formed of a superelastic alloy material.

FIGS. **5**-**8** depict the primary steps of implanting the sacral nerve stimulation lead **10** of FIGS. **1**-**4** and variations thereof described herein. An introducer **200** receives the the distal segment **50** of the lead body **15** including the electrode array **20** and the tine element array **120** disposed within the introducer lumen. The stylet **100** is disposed within the lead body lumen so that its distal tip closes the lumen distal end opening. The assembly is advanced percutaneously at a selected angle until the introducer distal end is disposed at the selected foramen as shown in FIG. **5**.

To determine the best location of the stimulation electrodes, an insulated needle with both ends exposed for electrical stimulation is used to locate the foramen and locate the sacral nerve by applying electrical stimulation through the needle using an external pulse generator. The efficacy of the location is tested by evaluating the physiologic response in relation to the electrical threshold energy required to elicit the response. For control of incontinence, the physician preferably implants the medical electrical lead **10** near the S3 sacral nerves. The implantable medical electrical lead **10** may, however, be inserted near any of the sacral nerves including the S1, S2, S3, or S4, sacral nerves accessed via the corresponding foramen depending on the necessary or desired physiologic response.

The advancement of the introducer **200** can be accomplished separately over a guide wire previously percutaneously advanced from the skin incision into the foramen to establish the angle of advancement. Also, a two-part introducer can be employed having an inner introducer element that may be first advanced to the site by itself or over a previously introduced guide wire, and an outer introducer can be introduced over the inner element to dilate the tissue, whereupon the inner element is removed. Any percutaneous introduction tools and techniques may be employed that ultimately provides the introducer **200** in the location depicted in FIG. **5**.

The lead **10**, optionally stiffened by the stiffening stylet **100** disposed in the lead lumen, is advanced through the introducer lumen proximal end opening into the introducer lumen. However it is accomplished, the stimulation electrode array **20** and the tine element array **120** are disposed within the introducer lumen pre-positioned to be implanted in relation to the sacral nerve accessed through the foramen and in the subcutaneous tissue, respectively.

The stylet **100** may be advanced distally through the foramen as depicted in FIG. **5** or the neurostimulation lead **10** and the stylet wire **100** can both be advanced distally out of the introducer lumen distal end opening to advance the stimulation electrode array **20** into or through the foramen from the posterior entrance into casual contact with the more anterior sacral nerve as shown in FIG. **6**.

The introducer **200** is retracted proximally after electrical testing to establish optimal positioning is completed, whereby the distal-to-proximal tine elements **125**, **130**, **135** and **140** or **125'**, **130'**, **135'** and **140'** are successively released from the introducer lumen distal end opening as shown in FIG. **7**. The marker, **90**, can be seen under fluoroscopy. This allows the physician to know that the tines are about to be deployed, as the marker **90** approaches the distal end of the fluoroscopically visible introducer sheath. When marker **95** passes the distal end of the sheath, all of the tines have been deployed. When the tines of each tine element are released in subcutaneous tissue, they bear against the tissue and inhibit proximal retraction of the lead body through the subcutaneous tissue if traction is applied to the lead body since the tines resist inversion in the proximal direction. The introducer **200** and lead stylet **100**, if present, are completely removed in FIG. **7**. As shown in FIG. **8**, the proximal portion **55** of the lead body is bent laterally with respect to the distal portion **50** of the lead body **15** and implanted through a subcutaneously tunneled path to the neurostimulator IPG.

Alternative embodiments of the arrangement of the tines of the tine element array of the sacral nerve stimulation lead are depicted in FIG. **9**. The N tine attachment points around the common circumference of a distal tine element are preferably offset radially from the N tine attachment points around the common circumference of the adjacent proximal tine element. In this embodiment, the tine lengths can be longer than the distance between the common circumferences of the proximal and distal tine elements along the lead body length because the N tines of each more distal tine element can be interleaved between the N tines of each more proximal tine element when constrained within an introducer lumen.

Exemplary tine elements are depicted in FIG. **9**, where M=4 and N=4, for example, mounted on a lead body **15** of lead **10'**. Thus, in FIG. **9**, the tine elements **225**, **230**, **235**, and **240** are formed as described above with respect to tine elements **125**, **130**, **135**, and **140** or **125'**, **130'**, **135'**, and **140'** as individual elements mounted in the tine element array **220** or integrally. The four tine attachment points around the common circumference of a distal tine element, e.g., tine element **240** are preferably offset radially by 45° from the N tine attachment points around the common circumference of the adjacent proximal tine element, e.g., tine element **235**, so that the distal tines fold down interleaved between proximal tines when constrained within an introducer lumen.

Furthermore, alternate stimulation electrodes can be substituted for one or more of the P stimulation electrodes, and P can be equal to one. In FIG. **10**, electrode **30'** of lead **10"** is preferably formed of a flexible elongated mesh or wire coil that can bend somewhat to fit through a foramen to locate the elongated electrode optimally with respect to a sacral nerve. The elongated electrode surface area of the flexible electrode **30'** is preferably in the range of about 10.0 mm to about 38.0 mm and creates a wider electric field which allows the lead to be placed in a less precise or gross manner while still providing adequate electrical stimulation to the sacral nerve. The elongated flexible electrode **30'** preferably comprises a wire coil and a band or ring-shaped electrode connector. The wire coil is formed of a platinum or platinum-iridium alloy wire having a diameter of about 0.1 mm wound over a mandrel. The outer diameter of the wire coil electrode **30'** is preferably about the same as the outer diameter of the outer tubular sheath **15**, the ring electrodes and connector elements and the insulator bands between the electrodes so that the lead **10** has a common outer diameter through its length.

Further variations of the disclosed preferred embodiments will occur to those of skill in the art. It is within the scope of the present invention to form the tine elements **125**, **130**, **135** and **140** or **125'**, **130'**, **135'** and **140'** and **225**, **230**, **235**, and **240** as a single structure with a common tine mounting band extending the length of the tine element array **120** or as an integral section of the outer sheath of the lead body **15** extending through the length of the tine element array **120**. Furthermore, whereas the depicted N tines are equal in number, it will is also within the scope of the invention to make the number N not equal among the M tine elements. For example, in one tine element, N=1, another tine element N=2, a further tine element N=4, etc. Moreover, whereas the M tine elements are depicted as equally spaced in the tine element array, the spacing can be varied. It may be desirable to include one or

more tine element more proximally disposed along the lead body to be disposed proximally to the bend depicted in the lead body in FIG. **8** to aid in securing the lead or preventing dislodgement of the stimulation electrodes.

Accordingly, the present invention advantageously provides a unique implantable medical electrical stimulation lead that provides adequate stimulation of the sacral nerves for control of incontinence and other pelvic floor disorders with the sacral nerves and with less sensitivity to placement. The unique leads simplify the implantation procedure and reduce or eliminate the need to reprogram the stimulation energy level provided by the neurostimulator IPG or to reposition the stimulation electrodes.

The medical electrical leads and procedures of the present invention can be used to stimulate multiple nerves or multiple sides of a single nerve bundle. In addition, the medical electrical lead **10** can also be used as an intramuscular lead where the tines can engage against muscle and assist in preventing dislodgement of the distal electrode(s). This may be useful in muscle stimulation such as dynamic graciloplasty or stomach stimulation for gastroparesis or obesity.

All patents and publications referenced herein are incorporated herein by reference in their entireties.

Although the invention has been described in detail with particular reference to a preferred embodiment and alternate embodiments thereof, it will be understood variations and modifications can be effected within the scope of the following claims. Such modifications may include substituting elements or components which perform substantially the same function in substantially the same way to achieve substantially the same result for those described herein.

We claim:

**1**. A method of providing electrical stimulation of body tissue at a stimulation site employing an implantable pulse generator, the method comprising:

percutaneously introducing an introducer having an introducer lumen extending between an introducer lumen proximal end opening and an introducer lumen distal end opening through body tissue to locate the introducer lumen distal end opening adjacent to the stimulation site;

disposing an implantable medical lead within the introducer lumen, wherein the implantable medical lead comprises:

a lead body extending between a lead proximal end and a lead distal end;

P connector elements formed in a connector array along a first segment of the lead body proximate to the lead proximal end;

P stimulation electrodes arranged in an electrode array extending along a second segment of the lead body proximate to the lead distal end;

P lead conductors extending between the P connector elements and the P stimulation electrodes; and

a plurality of M tine elements formed in a tine element array extending along a third segment of the lead body between the second segment of the lead body and the lead proximal end, each tine element comprising N flexible tines, each tine having a tine width and a tine thickness and extending through a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body at a tine attachment site and supporting the tine extending outwardly of the lead body and toward the lead proximal end, whereby the M×N tines are adapted to be folded inward against the lead body when fitted into and constrained by the introducer lumen, wherein the plurality of M tine elements are separate from and axially displaced from each other and from each of the P stimulation electrodes, and wherein all of the P stimulation electrodes are between the plurality of M tine elements and the lead distal end, and

wherein disposing the implantable medical lead within the introducer lumen comprises disposing the implantable medical lead within the introducer lumen with the M×N tines folded inward against the lead body by constraint imposed by the introducer lumen without overlapping one another;

withdrawing the introducer proximally from the tine element array to successively release the N tines of each of the M tine elements to deploy outward and toward the lead proximal end to engage body tissue and inhibit axial dislodgement of the P stimulation electrodes; and

coupling the P connector elements to the implantable pulse generator.

**2**. The method of claim **1**, further comprising advancing the implantable medical lead from the introducer lumen distal end opening to dispose the P electrodes in operative relation to body tissue to be stimulated prior to withdrawing the introducer proximally.

**3**. The method of claim **2**, wherein disposing the implantable medical lead within the introducer lumen precedes percutaneously introducing the introducer.

**4**. The method of claim **1**, wherein disposing the implantable medical lead within the introducer lumen precedes percutaneously introducing the introducer.

**5**. The method of claim **1**, wherein percutaneously introducing the introducer precedes disposing the implantable medical lead within the introducer lumen.

**6**. The method of claim **1**, wherein the tines of the tine elements are formed of a flexible implantable grade superelastic alloy.

**7**. The method of claim **1**, wherein the tine attachment sites are separated longitudinally along the lead body in the tine element array by a distance that is substantially equal to or exceeds the tine length when folded toward the lead proximal end against the lead body.

**8**. The method of claim **1**, wherein the tine attachment sites of adjacent tine elements along the lead body are radially offset from one another such that the tine free ends of the tines of adjacent tine elements engage against body tissue at radially and axially separated points along the tine array.

**9**. The method of claim **8**, wherein tine lengths and tine widths of tines of a first tine element of the plurality of M tine elements are configured to enable the tines of the first tine element to fold toward the lead proximal end alongside and interleaved with a second tine element of the plurality of M tine elements, the second tine element being located closer to the lead proximal end than the first tine element.

**10**. The method of claim **9**, wherein the N tines of the M tine elements are equal in number.

**11**. The method of claim **1**, wherein the N tines of the M tine elements are equal in number.

**12**. The method of claim **1**, wherein P is greater than 1, and wherein at least one of the P stimulation electrodes comprises an elongated, flexible electrode adapted to assume a curve when implanted in relation to body tissue.

**13**. The method of claim **1**, wherein at least one of the plurality of M tine elements comprises a biocompatible plastic.

**14**. A method comprising:

percutaneously introducing an introducer comprising an introducer lumen extending between an introducer lumen proximal end opening and an introducer lumen

distal end opening through body tissue to locate the introducer lumen distal end opening adjacent to a stimulation site;

disposing an implantable medical lead within the introducer lumen, wherein the implantable medical lead comprises:

a lead body extending between a lead proximal end and a lead distal end;

a plurality of connector elements formed in a connector array adjacent the lead proximal end;

a plurality of stimulation electrodes arranged in an electrode array extending along a first segment of the lead body proximate to the lead distal end;

a plurality of lead conductors extending between the connector elements and the stimulation electrodes; and

a plurality of tine elements attached to the lead body along a second segment of the lead body between the first segment of the lead body and the lead proximal end, each tine element comprising a plurality of flexible tines that are adapted to be folded inward against the lead body when fitted into and constrained by the introducer lumen and adapted to deploy outward to engage body tissue when the introducer is withdrawn, wherein the plurality of tine elements are separate from and axially displaced from each of the stimulation electrodes, and wherein the plurality of stimulation electrodes is between the plurality of tine elements and the lead distal end; and

withdrawing the introducer toward the lead proximal end from the plurality of tine elements to release the plurality of tines.

**15**. The method of claim **14**, wherein each tine of each tine element has a tine length, and the tine elements are attached to the lead body at tine attachment sites, wherein the tine attachment sites are separated longitudinally along the lead body by a distance that is substantially equal to or exceeds the tine length when folded against the lead body.

**16**. The method of claim **14**, wherein the tine elements are attached to the lead body at tine attachment sites, and the tine attachment sites of adjoining tine elements along the lead body are radially offset from one another around a circumference of the lead body.

**17**. The method of claim **14**, wherein at least one of the stimulation electrodes comprises an elongated, flexible electrode adapted to assume a curve when implanted in relation to body tissue.

**18**. The method of claim **14**, wherein at least one of the plurality of tines comprises a biocompatible plastic.

**19**. The method of claim **1**, wherein P equals 1.

* * * * *

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1451, 2022-1452

**Short Case Caption:** Axonics, Inc. v. Medtronic, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,898 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ___________ lines of text.
- [ ] the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 05/20/2022

Signature: /s/ Matthew D. Poweres

Name: Matthew D. Powers