**2022-1451, 2022-1452**

# United States Court of Appeals for the Federal Circuit

AXONICS, INC.,

*Appellant*,

*v.*

MEDTRONIC, INC.,

*Appellee*.

*Appeals from the United States Patent and Trademark Office, the Patent Trial and Appeal Board in Nos. IPR2020–00679, IPR2020–00715*

## RESPONSE BRIEF OF APPELLEE

NAVEEN MODI
STEPHEN KINNAIRD
CHETAN BANSAL
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1700

*Counsel for Appellee*

September 16, 2022

## REPRESENTATIVE CLAIM

**Claim 1 (U.S. Patent No. 8,626,314):**

A system comprising:

an implantable medical lead comprising:

a lead body extending between a proximal end and a distal end;

a plurality of conductors within the lead body;

a plurality of electrodes, wherein each electrode is electrically connected to a conductor of the plurality of conductors; and

a plurality of tine elements extending from the lead body, wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines, each tine having a tine width and thickness and extending a tine length from an attached tine end to a free tine end, the attached tine end attached to the lead body from a tine attachment site and supporting the tine extending outwardly of the lead body and proximally toward the lead proximal end, wherein the plurality of tines of the plurality of tine elements are adapted to be folded inward against the lead body when fitted into and constrained by a lumen of an introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn to release the plurality of tines, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes.

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Appellee Medtronic, Inc. ("Medtronic") certify as follows:

1. The full name of every party represented by us is:

   **Medtronic, Inc**.

2. The name of the real party in interest represented by us is:

   **None.**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

   **None**.

4. The names of all law firms and the partners or associates that have appeared for Medtronic, Inc. in proceedings before the United States Patent and Trademark Office, Patent Trial and Appeal Board or are expected to appear for Medtronic, Inc. in this Court (and who have not or will not enter an appearance in this case) are:

   **None.**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

   ***Medtronic, Inc. v. Axonics Modulation Technologies, Inc.*, No.: 8:19-cv-02115-DOC-JDE (C.D. Cal.) (filed Nov. 4, 2011)**

6. Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

   **Not Applicable.**

Date: September 16, 2022

By: */s/ Naveen Modi*
Naveen Modi
*Counsel for Appellee*
*Samsung Electronics Co., Ltd.*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................................1
INTRODUCTION ........................................................................................1
COUNTER-STATEMENT OF THE ISSUE ........................................................6
COUNTER-STATEMENT OF THE CASE .........................................................6
I. TECHNOLOGY BACKGROUND.............................................................6
A. Sacral Nerve Modulation ....................................................................8
B. Sacral Nerve Modulation Prior to the Tined Lead Invention ..............9
C. The Tined Lead Invention As Described in the ’314 and ’756 Patents..................................................................................13
II. THE PRIOR ART REFERENCES .............................................................19
A. Young ..............................................................................................20
B. Gerber..............................................................................................25
C. Lindegren.........................................................................................29
III. THE PROCEEDINGS BELOW..................................................................31
A. The Board Rejected Axonics’ Modification of Young to Include Additional Electrode(s) Distal to All of the Tines ................33
B. The Board Rejected Axonics’ General Reasons to Combine as Both Legally and Factually Inaccurate ............................................39
SUMMARY OF ARGUMENT ......................................................................41
ARGUMENT .............................................................................................44
I. STANDARD OF REVIEW..........................................................................44
II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD’S FINDING OF A LACK OF MOTIVATION TO COMBINE .....................46
A. The Board’s Rejection of Axonics’ Sole Reason for Modifying Young to Include Additional Electrodes Distal to the Tines Is Supported by Substantial Evidence....................................................47
B. Substantial Evidence Supports the Board’s Finding That the Problem Confronting the Inventors Did Not Provide a

Motivation to Combine the References to Make the Claimed Invention ....................57

1. Axonics Fails to Address the Problems Faced by the Inventor and Improperly Relies on Hindsight Analysis of the Characteristics of the Invention. ....................57

2. A Motivation to Combine Must Be Specific and Tailored to the Proposed Modification of the Prior Art ......64

C. The Board Did Not Ignore Any Prior Art Reference as Not Being Pertinent Art....................66

CONCLUSION ....................68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................66

*Adidas AG v. Nike, Inc.*,
963 F.3d 1355 (Fed. Cir. 2020) ....................52

*Airbus S.A.S. v. Firepass Corp.*,
941 F.3d 1374 (Fed. Cir. 2019) ....................68

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
825 F.3d 1373 (Fed. Cir. 2016) ....................53, 54

*Almirall, LLC v. Amneal Pharms. LLC*,
28 F.4th 265 (Fed. Cir. 2022) ....................44

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................51, 63

*CommScope Techs. LLC v. Dali Wireless Inc.*,
10 F.4th 1289 (Fed. Cir. 2021) ....................50

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)....................46

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) ....................45

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ....................44

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018) ....................50, 63, 64

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................44

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984) ....................38, 52, 53

*In re Gordon*,
733 F.2dat 902 ....................43

*Intelligent Bio-Sys. Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed Cir. 2016) ....................38, 46

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................66

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982)....................50

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ....................45

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................45, 51, 55, 66

*McGinley v. Franklin Sports, Inc.*,
262 F.3d 1339 (Fed. Cir. 2001) ....................55

*Meiresonne v. Google, Inc.*,
849 F.3d 1379 (Fed. Cir. 2017) ....................45

*Mitsubishi Heavy Indus., Ltd. v. United States*,
275 F.3d 1056 (Fed. Cir. 2001) ....................46

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016) ....................57

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................63

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015) ("'Whether such a motivation has been demonstrated is a question of fact' reviewed for substantial evidence." (quoting *Medichem, S.A. v. Roblabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006)))....................46

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ....................42, 50

*In re Sponnoble*,
56 CCPA 823, 405 F.2d 578 (1969) ....................55

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017) ....................45

*Tokai Corp. v. Easton Enters., Inc.*,
632 F.3d 1358 (Fed. Cir. 2011) ....................43, 64

*TQ Delta, LLC v. CISCO Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................45, 51

*Trivascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016) ....................38, 43, 52, 53

*United States v. Great Am. Ins. Co.*,
738 F.3d 1320 (Fed. Cir. 2013) ....................42

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)....................46

*In re Urbanski*,
809 F.3d 1237 (Fed. Cir. 2016) ....................54, 55, 56

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ....................44

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ....................65

*In re Wood*,
599 F.2d 1032 (C.C.P.A. 1979) ....................68

## STATEMENT OF RELATED CASES

This Court ordered consolidation of appeal no. 22-1451 from *Inter Partes* Review ("IPR") No. 2020–00679, challenging U.S. Patent No. 8,626,314 ("the '314 patent"), and appeal no. 22-1452 from IPR2020–00715, challenging U.S. Patent No. 8,036,756 ("the '756 patent"). Neither proceeding has been before this Court or any other court. The pending action in district court, *Medtronic, Inc. v. Axonics Modulation Technologies, Inc.*, No. 8:19-cv-02115-DOC-JDE (C.D. Cal.), may be affected by this Court's decision on appeal.

The following cases have been considered companion cases and assigned to the same merits panel: 22-4151, 22-1532, 22-1534. Appeal No. 22-1532 involves IPR2020-00680, challenging U.S. Patent No. 8,457,758. Appeal No. 22-1534 and Cross-Appeal No. 22-1583 involve IPR2020-00713, challenging U.S. Patent No. 9,821,112. Both patents are asserted in *Medtronic*, Case No. 8:19-cv-02115.

Counsel for Appellee Medtronic is unaware of any other cases pending in this or any other forum that will directly affect or be directly affected by this Court's decision in this appeal.

## INTRODUCTION

The ’314 and ’756 patents describe what is known in the field of sacral nerve modulation (or SNM) as the “tined lead.” The introduction of the tined lead by Medtronic in the early 2000s completely revolutionized the field. As Appellant Axonics’ CEO noted, the “tined lead” was the “initial catalyst that sparked growth in SNM.” Axonics’ Chief Medical Officer described the tined lead as the most notable advance in SNM. This revolutionary invention is the subject of Axonics’ appeal.

SNM is used in the treatment of urinary incontinence and other dysfunctions through the regulation of sacral nerves. The procedure, both before and after introduction of the tined lead, involved a physician inserting a lead into the body to stimulate sacral nerves. The lead is anchored in place and attached to a pulse generator that produces electrical pulses to stimulate the sacral nerves. Both the lead and the pulse generator remain inside the patient’s body for years.

Prior to the introduction of the tined lead by Medtronic in late 2002, SNM therapy suffered from many drawbacks well documented in the literature. For example, to anchor the lead in the body, the physician often had to make an incision and ***cut down*** nearly to the sacral bone with the patient under general anesthesia. Once the lead was optimally positioned, the physician would suture the lead to the

periosteum (a thin, tough membrane adjacent to the sacral bone). This open surgical procedure and anchoring technique continued to be the standard of care for more than a decade—until the introduction of the tined lead.

The tined lead, as described in the ’314 and ’756 patents, allows ***self***-anchoring thereby eliminating the need for suturing and for an open surgical procedure performed under general anesthesia. Specifically, the lead has “tines” (projections) designed to anchor the lead in the body. The lead is inserted percutaneously (*i.e.*, through the skin) through an introducer (a hollow tube similar to a needle). The introducer keeps the tines retracted while the physician finds an optimal location for the lead near the sacral nerves. Once optimally positioned (confirmed by ***real-time feedback from the patient*** who is under local, as opposed to general, anesthesia), the introducer is removed allowing the tines to deploy and engage with the surrounding muscle and fascia, thereby immediately holding the lead in place. This entire procedure can be and is performed in an outpatient setting. The tined lead invention therefore resulted in a completely reimagined SNM procedure and eliminated the need for a cut-down procedure and corresponding administration of general anesthesia. The resulting paradigm shift in SNM therapy was so profound that after introduction of the tined lead, sales of non-tined leads dropped to zero.

A decade after Medtronic introduced its tined lead, Axonics, a new company at that time, introduced its own lead with tines, which mimiced Medtronic's tined lead. After Medtronic sued Axonics for patent infringement, Axonics made a dubious assertion in its IPR petition that the tined lead invention would have been obvious to an ordinary artisan—one which the Board rejected. To purportedly prove obviousness, Axonics cobbled together disparate teachings from three or four unrelated references. Its lead reference involved a study using prior Medtronic lead for treatment of ***facial pain*** (the Young reference), wholly unrelated to SNM. Because Young does not disclose the specific claimed arrangement of electrodes and tines, Axonics turned to a lead for SNM treatment (the Gerber reference) that does not even have tines. Still, it could not find all claimed features. So Axonics turned to a patent publication describing a cardiac lead (the Lindegren reference) and, for some of the claims, to a fourth reference (the Akerström reference), also describing a cardiac lead. After a complete trial, the Board found that a person of ordinary skill in the art would not have been motivated to cherry pick teachings from dissimilar references to arrive at the claimed inventions.

In particular, the Board made a factual finding that a person of ordinary skill in the art would not have a reason to modify Young's lead (that includes a single electrode distal to all the tines) to include additional electrode(s) distal to all the tines, as required by all claims. The Board concluded so for two independently

sufficient reasons after evaluating competing testimony from Axonics and Medtronic's declarants. First, crediting the testimony of Medtronic's expert, a renowned neurosurgeon with extensive knowledge of the trigeminal anatomy at issue in Young, the Board found that Young's disclosure does not suggest adding more electrode(s) distal to the tines. Second, the Board found that adding more electrode(s) distal to ***all of*** the tines in Young's lead would have rendered the tines inoperable for their intended purpose and inhibited the purpose of Young's lead, which is electrical stimulation of the trigeminal sensory root.

On appeal, Axonics does not meaningfully challenge the first reason. Instead, its rebuttal, which is limited to a footnote, ABr., 50 n.6, fails. Indeed, Axonics ignores the substantial evidence standard and simply asks this Court to accept its losing position. As for the Board's second reason, Axonics does not contest that adding electrode(s) distal to the tines in Young' lead would have rendered that lead inoperable for trigeminal root stimulation, which the Board found to be the "purpose" of Young. Appx35. Instead, Axonics contends that the intended purpose of the prior art is legally "irrelevant" to motivation to combine. Axonics' argument conflicts with this Court's precedent, which confirms that a fact finder may find an absence of a motivation to combine when the proposed modification would render that prior art inoperable for its intended purpose.

Finally, Axonics contends implausibly that the motivation to combine three or four disparate references into Medtronic's revolutionary invention would simply arise because they purportedly solve the same problem as the patents-at-issue. As this Court has noted, and the Board observed below, motivation arising from the problems solved by the patent itself is typically relevant to simpler mechanical technologies, not enormously complex problems of implantation of medical devices into uniquely intricate areas of the body. Moreover, Axonics misdefines the problem that confronted the inventors and solved by the '314 and '756 patents. As the Board found, the patents clearly states that the problem confronting the inventors was the need for a permanently implantable electrical sacral nerve stimulation lead that provided acute fixation with muscle and tissue layers posterior to the sacrum to reduce the likelihood of dislodgement, while avoiding the manifold risks associated with prior art techniques. This problem, the Board found, is not same as that solved by the prior art references at issue. Axonics' contention that problem solved by the invention is much broader than that specifically prescribed in the patents is not only illogical; it is imbued with impermissible hindsight. In all events, the Board's finding as to the problem confronting the inventors is supported by ample evidence.

For each of the foregoing reasons, substantial evidence supports the Board's factual finding of no motivation to combine. This court should affirm.

## COUNTER-STATEMENT OF THE ISSUE

Whether substantial evidence supports the Board's factual finding that a person of ordinary skill in the art would not have been motivated to combine the teachings of Young, Gerber, and Lindegren (or those three references and Hauser) to arrive at the invention of claims 1, 2, 4, 7, 10–12, 14, and 18–24 of the '314 patent or the teachings of Young, Gerber, Lindegren, and Akerström to arrive at the invention of claims 1, 2, 5, 7, 13–15 and 18 of the '756 patent.

## COUNTER-STATEMENT OF THE CASE

### I. TECHNOLOGY BACKGROUND

The '314 and '756 patents relate to sacral nerve stimulation (also referred to in the literature as sacral nerve modulation or sacral neuromodulation (SNM)). For example, as stated in the '314 patent, the "invention relates to the method of implantation and anchoring of the medical electrical lead electrodes in operative relation to a selected sacral nerve to allow for stimulation." Appx150 (1:41–44 (describing the field of the invention)). Although the invention may be extendable to certain other body sites with comparable problems in implanting and maintaining electrical leads, Appx156 (13:32–39), the entire specification is directed towards solving problems associated with sacral nerve modulation, *see*, *e.g.*, Appx152 (5:34-44)).

A particular lead embodiment disclosed and claimed in the ’314 and ’756 patents is known in the sacral neuromodulation field as the “tined lead.”[1] *Compare* Appx5131 (Figure 6) *with* Appx143 (Figure 2).




**Fig. 6** Tined lead. The series of four tines allows for anchoring to subcutaneous tissues. The lead also contains four electrodes labeled 0 to 3 to provide variation in the stimulation pattern

Appx5131 (illustrating a commercial embodiment of the tined lead).

[1] The “tined lead” does not refer to just any lead with tines. Instead, it is how people in the SNM field refer to the particular sacral nerve stimulation lead commercialized by Medtronic beginning with FDA approval in 2002. *See* Appx5127-5131.




Appx143 (FIG. 2 (annotated)).

### A. Sacral Nerve Modulation

SNM is intended to treat pelvic floor disorders, such as urinary incontinence and bowel dysfunction (constipation, diarrhea), which are influenced by the sacral nerves. Appx4622–4623 (¶¶ 21–23). The sacrum is a large, triangular bone situated at the lower part of the vertebral column, and at the upper and back part of the pelvic cavity. Appx4618–4622 (¶¶ 17–20). The illustration on the left below shows the sacrum (highlighted in gold) in the context of the human skeleton. The illustration on the right below shows the sacrum, sacral nerves S1, S2, S3 and S4 (which pass through the sacrum) and some of the surrounding skeletal and nervous system structures.







Appx4619.

The organs involved in bladder and bowel function receive much of their control via the second, third, and fourth sacral nerves, commonly referred to as S2, S3 and S4 respectively. Appx150 (1:61–64). Electrical stimulation of certain sacral nerves has been found to offer some control over these functions. Appx150 (1:64–65).

### B. Sacral Nerve Modulation Prior to the Tined Lead Invention

Prior to introduction of the tined lead, SNM therapy often involved a two-step process. Appx4630–4639; Appx3482–3489. The first step involved implanting a temporary neurostimulation lead extending through the skin and connecting it with

a temporary external pulse generator attached to the patient's clothes or belt for a trial period. Appx3482–3484. The temporary lead had an electrode on it through which electrical pulses would emanate to stimulate the sacral nerves. Appx4631. This technique of inserting a trial lead, known as Peripheral Nerve Evaluation (PNE), is depicted below. Appx4631–4632.




Peripheral Nerve Evaluation (PNE)

Percutaneous insertion of a lead

Evaluation of patient response

Appx4631; *see also* Appx5129.

If stimulation proved efficacious during the trial period and long-term therapy was possible in the particular patient, a neurostimulation lead and an implantable pulse generator (IPG) would be ***permanently*** implanted. Appx150 (2:15–17); Appx3484. Permanent implantation was accomplished by anchoring a permanent neurostimulation lead in the body and connecting its proximal end (i.e., the end closest to the physician) with the IPG. Appx3484–3488; Appx4632–4639. The IPG is what provides the electrical pulses to the lead. Appx151 (3:1–21).

The procedure for implantation of the ***permanent*** lead involved making an incision to expose the sacral foramen while the patient is under general anesthesia. Appx4632–4639 (¶¶ 43–52); Appx151 (3:29–33); Appx150 (2:29–36). The lead was inserted into the body to place it in the optimal position for sacral nerve stimulation. Appx4634–4636. To prevent lead migration and dislodgement of the electrodes from the optimal position, the physician would utilize sutures or another sacral lead fixation mechanism. Appx151 (3:47–53); *see also* Appx150 (2:37–41). The picture below on the left depicts the permanent lead with fixation cuff used in pre-tined lead procedures. The picture below on the right shows insertion of the permanent lead and cuff into the open incision. Appx4632–4639.






Permanent Lead Insertion

Confirm the appropriate motor responses with test needle

Inserted permanent electrode with fixation cuff attached in the needle puncture site

Appx4635. An implanted and sutured fixation cuff is depicted below.



Cuff Suturing

Obtain ideal response

Suture fixation cuff onto the periosteum to hold it in place.

Appx4636.

As noted in the ’314 patent, this procedure suffered from numerous drawbacks, including risks of unintended movement, Appx150–151 (2:41–46, 3:35–46, 3:58–63, 4:4–23), problems in maintaining the electrode in close proximity to the sacral nerve, while allowing for some axial movement of the lead body, Appx150 (3:22–28), dangers of general anesthesia, *id*. (3:33–35), and risks associated with an open surgical procedure, *id*. (3:64–4:3). *See also* Appx4638–4639 (¶ 51). Despite various attempts for more than a decade to mitigate against these drawbacks, the prior techniques were unable to satisfactorily remove these drawbacks. Appx4630–4639. The inventors ’314 and ’756 patent sought to solve these problems, explaining:

> there remain[ed] a need in the art for a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient’s skin to locate stimulation electrodes in casual contact with a sacral nerve, that provides acute fixation

> with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period.

Appx152 (5:34–44); Appx170 (5:19–29).

### C. The Tined Lead Invention As Described in the ’314 and ’756 Patents

The ’314 and ’756 patents describe a solution to the above problems, which (as discussed further below) revolutionized SNM therapy. *See* Appx4693–4700. The inventive solution involved implanting a ***tined*** lead in a minimally invasive manner using an introducer. Appx152 (5:48–64); *see also* Appx4496–4501; Appx4644–4647; Appx3418–3420; Appx3399–3404. Specifically, as shown in the figure below, the lead according to one embodiment includes a plurality of electrodes (*e.g.*, 25, 30, 35, 40 in Figure 2 below) at the lead’s distal end (*i.e.*, the end of the of the lead farthest from the physician) and a plurality of tine elements (*e.g.*, 125, 130, 135, 140) separate from and proximal to the electrodes. Appx154–155 (9:25–30, 10:25–29, 12:38-50). Figure 2 depicts a preferred embodiment in which each tine element are separate structures each including four tines. Appx143.




Appx143 (FIG. 2 (annotated)). The lead is designed specifically to be introduced percutaneously and engage subcutaneous muscle layers and tissues that are penetrated by an introducer, as illustrated below. Appx152 (6:20–25); Appx4639–4644.






Appx4641 (excerpted) (left) (depicting a percutaneously inserted introducer), Appx4621 (right) (illustrating tines engaging multifidus muscle and lumbodorsal fascia); *see also* Appx3399–3404.

Instead of an open surgical procedure, an introducer 200 is "advanced percutaneously . . . until the introducer distal end is disposed at the selected foramen

as shown in FIG. 5." Appx155 (11:24–31). As shown in Figure 6 (reproduced below), the tined lead is inserted through the introducer 200 to place the stimulation electrodes in close proximity to the sacral nerve in the sacral foramen. Appx155 (11:54–12:5).




Appx145 (annotated). As shown in Figure 6, the introducer keeps the tines from deploying while the electrodes are optimally positioned near the sacral nerve. Once it is confirmed that the electrodes are in the desired position, the introducer 200 is withdrawn and the tines that had been folded inward in the introducer lumen deploy outward (*see* Figure 7 below) to engage the surrounding muscle tissue, providing the desired acute fixation as shown below. Appx155 (12:6–20).




Appx146 (annotated).

The above exemplary features are recited in the claims of the ’314 and ’756 patents. For example, claim 1 of the ’314 patent recites:

> A system comprising:
> an implantable medical lead comprising:
> a lead body extending between a proximal end and a distal end;
> . . .
> a plurality of electrodes, . . . ; and
> a plurality of tine elements extending from the lead body, wherein ***all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body, each tine element comprising a plurality of flexible, pliant tines***, . . . , wherein the plurality of tines of the plurality of tine elements are adapted to be

> folded inward against the lead body when fitted into and constrained by a lumen of an introducer without overlapping one another and deploy outward to engage body tissue when the introducer is withdrawn to release the plurality of tines, wherein the plurality of tine elements is separate from and axially displaced from the plurality of electrodes.

Appx156 ('314 patent, claim 1) (emphasis added). The emphasized feature makes clear that the lead has a ***plurality*** of electrodes that are ***distal to all*** of the tines. All prior art cited by Axonics lacked this feature.

The tined lead provided a ground-breaking solution that allowed minimally invasive, percutaneous, implantation near to, but avoided compressive contact with, the sacral nerves and acute fixation of the lead body in subcutaneous tissues. Appx152 (5:53–59). The patented technology advantageously provided a unique implantable medical neurostimulation lead that provides stimulation of the sacral nerves for control of incontinence and other pelvic floor disorders with the sacral nerves and with less sensitivity to placement and dislodgement. Appx153 (8:7–12). The tined lead simplified the implant procedure and reduced or eliminated the need to reprogram the IPG stimulation levels or re-open the patient to re-position the stimulation electrodes since the electrodes are less likely to move. Appx153 (8:12–17). The implantation method also allowed more rapid placement of the electrodes for the treatment of incontinence with less specificity as to location near the sacral nerves, which reduced the time for implantation. Appx153 (8:17–30).

In completely obviating the drawbacks of the prior leads and implantation techniques, the tined lead not only addressed long unaddressed needs; it **"revolutionized"** the implantation procedure and **"triggered a paradigm shift in sacral neuromodulation."** Appx4695 (testimony of Dr. Steve Siegel, an expert urologist and early adopter of SNM therapy who has performed over a thousand SNM procedures) (emphases added). When Medtronic released its Model 3889 and 3093 "tined" leads (shown below), it immediately and completely supplanted the then-existing leads and prior techniques. Appx5045–5047 (sales data indicating a **nearly 100% shift in market share** from Medtronic's pre-existing "non-tined" leads to Medtronic's new "tined" leads).







Appx4700-4701; *see also* Appx3418–3420; Appx4163–4179.

Unsurprisingly, the industry widely recognized the tremendous impact of Medtronic's "tined" leads. Appx5314 (Axonics CEO stating the **"initial catalyst that sparked growth in SNM was the advent of the tined lead – 'putting fish**

**hooks on the lead' – that stops the wire from migrating. 'Once that innovation was brought to bear, you saw the market just took off from there.'"**) (emphasis added); Appx5376 (Axonics Chief Medical Officer, Dr. Karen Noblett, explaining that "[s]ince its inception, the therapy has gone through several advances, **most notably the development of the tined lead**. This advancement allowed the procedure to become less invasive and much easier to perform.") (emphasis added); Appx3462–3463 (a **"milestone"** in SNM history) (emphasis added); Appx3394 (**"One of the most significant technical advancements in [sacral nerve stimulation] over the years was the development of the percutaneous, self anchoring, quadripolar tined lead**, approved by the FDA in 2002**. This minimally invasive permanent tined lead offers many advantages over the traditional PNE followed by non tined lead placement**."); Appx5139 (concluding that the tined lead "two-stage" approach **rendered prior "one-stage" techniques obsolete**) (emphasis added); Appx5142 (same).

## II. THE PRIOR ART REFERENCES

Young, Gerber, and Lindegren have the most relevance to this appeal and are considered in greater detail below.

### A. Young[2]

Young describes a clinical study conducted between 1990 and 1993 on 23 patients to investigate the "electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain." Appx2406. As Young states, "[e]lectrical stimulation of the trigeminal ganglion or nerve root has been used to treat chronic facial pain, usually associated with various forms of injury to either the peripheral branches of the trigeminal nerve or the trigeminal nerve root." Appx2405.

To provide some context to Young's study, Dr. Konstantin Slavin, a neurosurgeon with deep neuromodulation experience, explained the trigeminal nerve anatomy. Appx4504–4507 (¶¶ 26–29).[3] Dr. Slavin explained that the trigeminal nerve anatomy is a very important and unique component of the nervous system, vastly different from the sacral anatomy. Appx4504–4508 (¶¶ 26–30). The trigeminal nerve has three branches (ophthalmic ($V_1$), maxillary ($V_2$), and mandibular nerves ($V_3$)), that leave the skull separately from each other, as illustrated below along with the respective regions that they influence. Appx4504 (¶ 26).

---

[2] Ronald F. Young, *Electrical Stimulation of the Trigeminal Nerve Root for the Treatment of Chronic Facial Pain*, Journal of Neurosurgery 83:72–78 (July 1995) ("Young").

[3] Dr. Konstantin Slavin is a renowned neurosurgeon and tenured professor. Appx4949–5028.




Appx4504 (¶ 26). The trigeminal nerve is responsible for the sensory signals that arise from most parts of the face, mouth, nose, meninges, and facial muscles, and also for the motor commands carried to the masticatory muscles. These signals travel through a very complex set of structures illustrated below.[4] Appx4504–4505 (¶ 27).

---

[4] A needle is also shown in this diagram to illustrate the position of the 14-gauge needle in Young.




Appx4505 (¶ 27).

Young's study used a stimulating electrode consisting of "a monopolar platinum-iridium lead with two sets of four 'tines' located 5 and 10 mm from the distal tip of the electrode and a central stylet." Appx2406. Figure 1 of Young showing the tip of the stimulating electrode is excerpted below.



Appx2406. Young states that "[t]he purpose of the tines was to prevent the electrode from becoming dislodged after implantation." *Id*.

Young describes the implantation of a single electrode "percutaneously through a No. 14 needle via a puncture of the foramen ovale." *Id*. Young notes that "[l]ateral puncture of the foramen ovale was specifically avoided to prevent

accidental puncture of the temporal lobe or insertion of the electrode subtemporally rather than ***in the trigeminal cistern***." *Id*. After "***cerebrospinal fluid flow was obtained*** through the needle, the electrode was inserted and advanced under fluoroscopic guidance until paresthesia could be induced in the distribution of the patient's pain by monopolar electrical stimulation between the electrode tip and an indifferent electrode pad attached to the skin of the shoulder." *Id*. The "electrode tip, as observed in the lateral fluoroscopic view, usually lay within a few millimeters of the shadow of the clivus" "and ***in the location of the trigeminal cistern***." *Id*. (Fig. 2 (caption) (emphasis added)).



FIG. 2. Plain x-ray films obtained following implantation of the trigeminal stimulating electrode showing the electrode tip lying just posterior to the shadow of the clivus in the lateral view *(upper)* and in the location of the trigeminal cistern in the anteroposterior view *(lower)*.

Appx2406.

Dr. Slavin explained that Young is describing that the electrode and tines are located fully within the fluid-filled trigeminal cistern containing the nerve rootlets without reaching the nearby brain stem. Appx4512–4513 (¶¶ 37–38). The tines are intended to reduce or prevent electrode migration ***by stabilizing the lead in the fluid filled cavity***. Appx4512–4513 (¶ 38); Appx4530–4531 (¶ 62).

Dr. Slavin also noted that studies such as Young's were rare in a still nascent field. Although the notion of trigeminal neuropathy had existed for many years, its development was slow to advance with relatively few reports in the medical literature. Appx4510–4511 (¶¶ 34–35). And although a statement at the end of Young's study mentions that "provid[ing] multiple activation stimulation sites near the tip . . . would be particularly useful for achieving stimulation-induced paresthesias in patients with pain in all three trigeminal divisions," Appx2410, Dr. Slavin testified that neither Young's suggestion of multiple stimulation sites nor Young's use of tines with a medical lead was adopted by practitioners in the treatment of chronic facial pain. Appx4513–4515 (¶¶ 39–41).[5] Indeed, more than decade after Young's study, the "gold standard" of treatment in trigeminal neuropathy continued to be a lead with a ***single*** electrode and ***without tines***. Appx4514–4515 (¶ 41 (citing Appx5401, Appx5404)); Appx4531–4532 (¶ 63).

**B. Gerber[6]**

Gerber (Appx2426–2432) is directed to an implantable lead that "allows for non-direct contact stimulation of the sacral nerves." Appx2430 (1:7–9). Gerber recognizes that:

[5] Dr. Slavin also testified that at the relevant time no commercially approved lead existed and the study of trigeminal neurostimulation had few researchers and limited knowledge, tools, and techniques. Appx4511 (¶ 35).

[6] U.S. Patent No. 6,055,456 (Apr. 25, 2000) ("Gerber")

> A problem associated with the prior art electrical stimulation to control incontinence is positioning and maintaining the discrete electrode in casual contact or in close proximity to the nerve to provide adequate stimulation of the sacral nerves. Another problem is constant or consistent stimulation. Accordingly, there remains a need in the art for an implantable electrical lead that allows for stimulation of a bundle of nerves and *allows for some movement after implantation*.

*Id*. (2:9–17) (emphasis added). Figure 6 below illustrates a cross-sectional view of the sacral anatomy with the lead inserted.



Appx2429 (rotated by 90 degrees). Gerber discloses that a medical lead is inserted by first making an incision and then splitting the paraspinal muscle fibers to expose the sacral foramen. Appx2432 (5:33–38). The physician then inserts the medical lead into the foramen and anchors the lead in place. *Id.* (5:38–40).

Gerber proposes a modification to the existing leads to accommodate for the anticipated lead migration by greatly lengthening an electrode or electrodes, thereby increasing the area of stimulation. Appx2430 (2:20–30). For example, Gerber

mentions that ***a typical lead used for SNM included four electrodes***, 0.03 inches in length and spaced by 0.03 inches and proposes a lead with at least one electrical contact extending for a length of between 0.10 and 1.50 inches. *Id.* (2:4–6, 2:29–30). Figure 1 below is a plan view showing medical lead 10 having a lead body 15 ***with one electrode*** 20 (*i.e.*, three electrodes *fewer* than the typical SNM lead at the time) at the distal end 15. *Id.* (2:4–5); Appx2431 (3:21–22, 3:40–43).



FIG.1

Appx2427.

Gerber discloses that a single electrode of *increased length* should be used instead, preferably 0.40 inches in length. Appx2431 (3:39–58). According to Gerber, this "generates a larger electric field for stimulating the sacral nerve" and thus makes it "easier to stimulate the nerve bundle" and the "implantation process is simplified." *Id.* (3:59–65).



FIG.2

Appx2427.

Figure 2 is a plane view of implantable medical lead 10 with an anchoring mechanism 50 a molded part, integral to the medical lead 10. *Id*. (3:23–25, 4:13–17). A physician can pass sutures though the molded part to attach the medical lead to the human anatomy. *Id.* (4:17–19). Gerber also discloses that other anchoring mechanisms may be used, such as bone screws, enzyme glues, and natural fibrosis. *Id.* (4:22–31).

In relation to Figure 3, Gerber also discloses another embodiment with a second electrode (*i.e.*, still two electrodes *fewer* than the typical SNM lead at the time). Appx2430 (2:4–5); Appx2431 (4:32–52). Gerber states that the second electrode contact is placed approximately 1.00 inches from the distal end so that it does not overlap with the first electrode and must be large enough that the current density is not at a level that causes damage to the tissue or that may be sensed by the patient. Appx2431 (4:41–52). Thus, Gerber discloses a medical lead having *fewer* electrodes but with at least one electrode *significantly longer* as compared to the typical SNM medical lead to allow for adequate stimulation despite a small amount of lead movement. Appx2430 (2:31–63).

Unlike the Medtronic tined lead disclosed and claimed in the ’314 and ’756 patent, Gerber’s lead does not have tines.

### C. Lindegren[7]

Lindegren (Appx2446–2462) is directed to an "implantable electrode lead (2) whose proximal end is intended for connection to e.g. a pacemaker and whose distal end has an electrode head (6) equipped with external, tine-type anchoring means (12)." Appx2446, Abstract (internal reference numbers omitted). Lindegren discloses that endocardiac leads are usually equipped with some kind of anchoring means, such as tines and fins located immediately behind the contact electrode. Appx2448–2449. According to Lindegren, "[t]he purpose of such anchoring means is to cause *entanglement or wedging of the endocardiac electrode in the trabeculae in the interior of the heart*." Appx2449 (emphasis added). Trabeculae in the heart are illustrated below.




Appx4517–4518.

---

[7] WIPO International Patent Publication No. 98/20933 (May 22, 1998) ("Lindegren")

Lindegren states that removing the entire electrode lead from the heart or retracting the lead can be difficult "because of the problems in detaching the fixation means from the heart tissue in which they have become entangled or stuck." Appx2449. Thus, according to Lindegren:

> [t]he problem upon which the invention is based is to achieve an implantable electrode lead whose electrode head, equipped with an external anchoring means, can be easily detached from the anchoring means when the means are stuck in the interior of the heart and there is a concomitant need to remove the electrode lead from the heart, e.g. to replace the lead with a new electrode lead.

Appx2451. To allow for easier removal of the lead, the ring-shaped anchor unit 10, 12 is detachably mounted to the lead 2 such that the anchor unit can detach when sufficient force is applied.




Appx2459.

## III. THE PROCEEDINGS BELOW

Axonics filed a petition for *inter partes* review ("IPR") (IPR2020–00679) challenging claims 1, 2, 4, 7, 10–12, 14, and 18–24 of the '314 patent as unpatentable based on the following grounds:

| Claims challenged | Statutory Basis | References |
|---|---|---|
| 1, 2, 4, 7, 10–12, 14, and 18–24 | § 103(a) | Young, Gerber, Lindegren |
| 18, 20, 21 | § 103(a) | Young, Gerber, Lindegren, Hauser[8] |
| 1, 2, 4, 7, 10–12, 14, and 18–24 | § 103(a) | Gerber, Hauser, Akerström[9] |

Axonics filed a second petition for *inter partes* review (IPR2020–00715) challenging claims 1, 2, 5, 7, 13–15, and 18 of the '756 patent as unpatentable based on the following grounds:

| Claims challenged | Statutory Basis | References |
|---|---|---|
| 1, 2, 5, 7, 13–15, and 18 | § 103(a) | Young, Gerber, Lindegren, Akerström |
| 1, 2, 5, 7, 13–15, and 18 | § 103(a) | Gerber, Hauser, Akerström |

Relevant to this appeal, both petitions presented largely the same motivation-to-combine analysis for all Young-based grounds, and Axonics does not contend

[8] U.S. Patent No. 5,052,407 (Oct. 1, 1991) ("Hauser")
[9] U.S. Patent No. 4,407,303 (Oct. 4, 1983) ("Akerström")

otherwise.[10] *Compare* Appx206–208, *with,* Appx289–292. After a full trial, including oral argument Appx1284–1344, the Board determined that Axonics failed to prove a rationale to combine the references in each ground. In particular, the Board was not persuaded that a POSITA "would have had a reason to combine Young's lead with Gerber's plurality of electrodes so the plurality of electrodes is distal to all of the lead's tines, as Petitioner propose[d]." Appx36. The Board found so "[e]ven without [considering] Patent Owner's proffered objective indicia of non-obviousness."[11] *Id.*

---

[10] This appeal is limited to the Young-based grounds, *i.e.*, Grounds 1 and 2 in IPR2020–00679 and Ground 1 in IPR2020–00715. Axonics does not challenge the Board's findings that Ground 3 of IPR2020–00679 (proposed combination of Gerber, Hauser, and Akerström) lacked a rationale to combine the references (Appx51–59) or that Ground 2 of IPR2020–00715 (proposing the same combination of Gerber, Hauser, and Akerström) similarly lacked a motivation to combine (Appx118–125). ABr., 24 ("Petitioners do not appeal the Board's decision on Ground 3 [challenging the '314 patent], or on Ground 2 [challenging] the 756 patent.").

[11] The Board's reasoning similarly applied to the Young-Gerber-Lindegren-Hauser combination (Appx37–38) challenging claims 18, 20, and 21 of the '314 patent and the Young-Gerber-Lindegren-Akerström combination challenging claims 1, 2, 5, 7, 13–15, and 18 of the '756 patent (Appx97–105).

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 7, 10–12, 14, 18–24 | 103(a) | Young, Gerber, Lindegren | | 1, 2, 4, 7, 10–12, 14, 18–24 |
| 18, 20, 21 | 103(a) | Young, Gerber, Lindegren, Hauser | | 18, 20, 21 |
| 1, 2, 4, 7, 10–12, 14, 18–24 | 103(a) | Gerber, Hauser, Akerström | | 1, 2, 4, 7, 10–12, 14, 18–24 |
| **Overall Outcome** | | | | 1, 2, 4, 7, 10–12, 14, 18–24 |

Appx 59 (conclusion regarding IPR2020–00679 (challenging the ’314 patent)).

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 5, 7, 13–15, 18 | 103(a) | Young, Gerber, Lindegren, Akerström | | 1, 2, 5, 7, 13–15, 18 |
| 1, 2, 5, 7, 13–15, 18 | 103(a) | Gerber, Hauser, Akerström | | 1, 2, 5, 7, 13–15, 18 |
| **Overall Outcome** | | | | 1, 2, 5, 7, 13–15, 18 |

Appx 126 (conclusion regarding IPR2020–00715 (challenging the ’756 patent)).

The discussion below largely focuses on facts relevant to Ground 1 in IPR2020–00679 (challenging claims 1, 2, 4, 7, 10–12, 14, and 18–24 of the ’314 patent) as illustrative of the issues raised by Axonics’ appeal.

### A. The Board Rejected Axonics’ Modification of Young to Include Additional Electrode(s) Distal to All of the Tines

With respect to Ground 1 in IPR2020–00679, Axonics proposed a combination based on Young’s study of trigeminal nerve rootlet stimulation,

Gerber's sacral neuromodulation lead with lengthened electrode, and Lindegren's cardiac lead with detachably mounted tines. Regarding the individual claim elements, the Petition presented a claim chart, *e.g.*, relying on at least two references for five elements (*i.e.*, 1.c, 1.d, 1.e, 1.f, and 1.h) of claim 1. Appx209–213. Particularly relevant among these is claim element 1.e. (*i.e.*, "***all tine elements*** of the plurality of tine elements ***are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body***").[12]

Axonics did not contend that Young by itself discloses claim element 1.e. Appx210–211. It could not have done so because Young only has a single electrode distal to the tines, whereas 1.e requires a "plurality" of electrodes distal to all of the tines. Appx2406. To purportedly overcome this deficiency, Axonics argued that:

> Young teaches that the single electrode "could be improved to provide multiple active stimulation sites near the tip." [Appx2410] Thus, a POSITA would have been motivated to look for multiple electrodes that provide greater flexibility for electrode placement, such as Gerber which discloses multiple electrodes on implanted leads for sacral nerve stimulation.

Appx207. The Board would find, however, that Axonics' assertion did not address the particular arrangement of tines and electrodes of element 1.e as it did not speak to including electrodes distal to all the tines (as opposed to another arrangement like

[12] The other independent claims challenged by Axonics' IPR petitions include this or similar language.

multiple electrodes overlapping with the tines), as required by the claims. *See* Appx35.

Medtronic also presented weighty counter evidence in the form of testimony from renowned neurosurgeon and neurostimulation expert, Dr. Slavin, Appx4488–4546, and incontrovertible objective indicia of non-obviousness, Appx664–675 (long-felt need, praise of others, and commercial success), Appx1139–1153. First, Dr. Slavin testified that "Young is not suggesting that additional electrode(s) should be included distal to all of the tines in the lead shown in figure 1 of Young." Appx4529 (¶ 61). He explained that the trigeminal anatomy (schematic below) would have made modifying Young's lead to have a plurality of electrodes that are distal to all tines "impractical and infeasible." Appx4530 (¶ 62). In particular, Dr. Slavin explained:

> To begin, recall that the electrode for stimulation of the trigeminal roots must be placed within the fluid-filled trigeminal cistern, measuring roughly 1 cm in length and that within this cavity is a network of rootlets of the three trigeminal branches. That cavity does not have sufficient space to accommodate the claimed arrangement. If, as Mr. Pless appears to assume, that Young is suggesting adding electrode(s) distal to the tines in figure 1, then the tines would have to get pushed back in the proximal direction (i.e., towards the foramen ovale) to accommodate the additional electrode(s). This means the tines would be out of the cistern, but moving the tines outside the cistern would result in them being in contact with, for example, the hard tissue of the trigeminal ganglion. Tines cannot anchor in such hard tissue, which would have prevented

> the tines from performing their intended function of stabilizing the lead electrode within the cistern.

Appx4530 (¶ 62); Appx4504–4507 (¶¶ 26–29). Dr. Slavin further testified that "literature shows that if a person of ordinary skill were motivated to modify the lead in Young, that person would not have been motivated to modify the location of the tines; the person of ordinary skill would have been motivated to avoid tines altogether." Appx4533 (¶ 65).




Appx4531.

Remarkably, after deposing Dr. Slavin, Axonics and its expert, Mr. Pless, ***did not dispute or rebut*** the substance of Dr. Slavin's testimony. Appx962–967.

After due consideration of Axonics' argument and examination of the evidence, the Board was unpersuaded by Axonics' proposed motivation to combine

the teaching of Young, Gerber, and Lindegren. Appx32–35. It made two factual findings in support.

First, the Board found that Young's multiple stimulation site statement relied on by Axonics refers only to "multiple active sites *near* the tip, not at the tip or distal to the tines." Appx35 (emphasis original). The Board explained that:

> Moreover, contrary to Petitioner's argument, Young discloses multiple active sites *near* the tip, not at the tip or distal to the tines. In view of Young simply disclosing multiple active sites near the tip, without any relation to the tines, and Dr. Slavin's testimony that a POSITA would not understand Young to suggest multiple electrodes distal to all of the tines, Petitioner has not persuaded us that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines.

Appx35.

In finding so, the Board weighed the divergent testimony of Axonics' engineer expert, Mr. Pless, and Medtronic's neurosurgeon and neurostimulation expert, Dr. Slavin. Appx33–35. For example, the Board considered Mr. Pless' unsatisfying response on-cross examination stating "at least to me the natural thing would be to add the electrodes where the current electrode in Young is, which is distal to the tines." Appx33 (quoting Appx4421 (168:12–21)). And the Board considered Dr. Slavin's detailed and ***undisputed*** explanation of the complex anatomy of the trigeminal nerve region and why relocating the tines proximally to

accommodate additional electrodes would "mov[e] the tines outside the cistern" and "would have prevented the tines from performing their intended function of stabilizing the lead electrode within the cistern." *See* Appx33.

Second, the Board found that the modification of Young proposed by Axonics in order to arrive at claim 1.e would have rendered Young ***inoperable for its primary purpose*** of "electrical stimulation of the trigeminal sensory root." Appx35. Crediting the ***undisputed*** testimony of Dr. Slavin, the Board found that having plural electrodes distal to the tines in Young's lead, as expressly required by the claims, was infeasible given the trigeminal nerve anatomy and would render Young's lead tines inoperable for trigeminal root stimulation, the stated purpose of Young's lead. Appx35; Appx4528–4533 (¶¶ 58–65). In so doing, the Board rejected Axonics' argument that it should disregard Dr. Slavin's testimony purportedly on legal grounds, Appx962–963; Appx994–995, finding that Axonics' argument conflated the distinct analysis of motivation to combine and reasonable expectation of success, Appx34. The Board explained that "[a]lthough an unclaimed purpose is irrelevant to [reasonable-expectation-of-success analysis], it may be pertinent to [motivation-to-combine analysis]." Appx34 (citing *Intelligent Bio-Sys. Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed Cir. 2016); *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984); *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016)).

### B. The Board Rejected Axonics' General Reasons to Combine as Both Legally and Factually Inaccurate

The Board also considered and rejected Axonics' ***catch-all*** motivation to combine the references purportedly because the references solve the same problem as the '314 and '756 patents. Appx31–32. Axonics alleged that a POSITA would have combined the teachings of Young, Gerber, and Lindegren because the references solve the same problem as the '314 patent in the same field. Appx206. The Board disagreed finding that the references do not solve the same problem as the patent. Appx31.

Regarding the problem faced by the inventors, the Board found that the patents "address[] the need for percutaneously implantable lead that is properly and securely positioned to provide sacral nerve stimulation, whereas the references do not." Appx31. For support, the Board quoted the following passage from the specification:

> there remains a need in the art for *a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient's skin to locate stimulation electrodes in casual contact with a sacral nerve*, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period.

Appx31 (quoting Appx152 (5:34–44)). The Board's finding should have been unremarkable to Axonics considering the Petition and Axonics' own expert identified the same passage as describing the problem faced by the inventors. *See* Appx189–190 (Axonics Petition quoting 5:34–44 of the '314 patent); Appx2150–2151 (¶ 37) (Axonics' expert quoting 5:34–44 of the '314 patent and stating "**This is the problem that the '314 Patent identifies**.") (emphasis added); Appx266 (Axonics Petition quoting the corresponding passage of the '756 patent (5:19–29) and stating "**This is the problem that the '756 Patent identifies**.") (emphasis added); Appx2257–2258 (¶ 38) (Axonics' expert quoting and stating the same).

As to the problems addressed by the prior art references, the Board found them all unrelated. Appx31–32. The Board found that "Young addresses placement of an implanted, percutaneously placed electrode system for electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain." Appx31 (citing Appx2406). For Gerber, the Board determined that "Gerber contemplates the positioning and securement of an electrode that is implanted in the sacral area via a non-percutaneous surgical procedure." *Id*. (citing Appx2430 (2:9–13)). And the Board found Lindegren "addresses the need for a cardiac lead that can be easily detached from the anchoring means and allow the lead to be replaced despite the anchoring means being stuck in the heart." Appx31–32 (citing Appx2451 (4:16–

22)). Thus, the Board determined that no reference solves the same or a related problem as the patents-at-issue.

## SUMMARY OF ARGUMENT

Substantial and compelling evidence supports the Board's factual finding of a lack of rationale to combine the Young-based grounds. After carefully analyzing the record before it, the Board concluded that Axonics failed to demonstrate a legally sufficient rationale to combine. Whether substantial evidence supports the Board's underlying factual findings is the ***sole*** issue on appeal; there is no legal error that taints the Board's conclusions.

1. The Board correctly concluded that a person of ordinary skill in the art would not have a reason to modify Young's lead (that includes a single electrode distal to all the tines) to include additional electrode(s) distal to all the tines, as required by all claims. Appx35. The Board concluded so for two independently sufficient reasons. First, the Board, crediting the testimony of Medtronic's neurosurgeon expert, found that Young's disclosure regarding "multiple active stimulation sites near the tip" does not suggest adding more electrode(s) distal to the tines. Appx35. Second, the Board found that adding more electrode(s) distal to the tines would render Young's tines inoperable for their intended purpose and therefore, inhibit the purpose of Young's lead, which is electrical stimulation of the trigeminal sensory root. Appx33-35.

On appeal, Axonics does not meaningfully challenge the first reason. Instead, its rebuttal, which is limited to a footnote, ABr., 50 n.6, fails. As an initial matter, an argument made only in a footnote is waived. *See United States v. Great Am. Ins. Co.,* 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[M]ere statements of disagreement with the district court as to the existence of factual disputes do not amount to a developed argument.… Further, arguments raised in footnotes are not preserved."). Furthermore, Axonics ignores the substantial evidence standard and simply asks this Court to accept its losing position. Here, the Board expressly credited the testimony of Dr. Slavin finding that placing electrodes "near the tip" does not suggest placing them distal to the tines especially in view of infeasibility of such an arrangement in the trigeminal anatomy. Appx35. This finding rejects the ***sole*** basis Axonics offered below for modifying Young's lead to include additional electrodes distal to all the tines. Appx29–30; Appx964–965.

As for the Board's second reason, Axonics does not contest that adding electrode(s) distal to the tines in Young' lead would have rendered that lead inoperable for trigeminal root stimulation, which the Board found to be the "purpose" of Young. Appx35. Instead, Axonics contends that the intended use of

the prior art is "irrelevant" to motivation to combine. But black-letter law confirms the absence of a motivation to combine when the proposed modification of the prior art in order to arrive at the claim would render that prior art inoperable for its intended purpose. *In re Gordon,* 733 F.2dat 902; *Trivascular*, 812 F.3d at 1068 (finding no motivation to modify the prior art where doing so "would destroy the basic objective" of the prior art).

2. Axonics contends that a motivation to combine the three or four references at issue would arise simply from the problem confronted by the inventors. Appx31. As an initial matter, the Board correctly observed that a motivation to combine arising from the problem itself is more typical of "simple mechanical technologies," and that even if the references addressed the same problem that would not alone be reason to combine their teachings. Appx32 (distinguishing *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1371 (Fed. Cir. 2011)). Regardless, based on express statements in the patent, the Board properly found that problem confronting the inventors was "the need for a percutaneously implantable lead that is properly and securely positioned to provide sacral nerve stimulation." Appx31. Axonics misses the mark by pointing to a statement of the problems *that the invention solves*; that is impermissible hindsight irrelevant to the obviousness inquiry. Not only did the Board correctly define the problem confronted by the inventors as limited to ***sacral neuromodulation***, but Axonics' own expert, Mr. Pless identified the same

express description in the specification that the Board identified as the problem solved by the '314 and '756 patent. *Compare* Appx2150–2151 (¶37) *with* Appx31.

In sum, Axonics has no significant counter to the Board's ***factual*** findings. After presenting a fundamentally flawed obviousness analysis, Axonics failed to rebut persuasive testimony from Medtronic's experienced experts and compelling objective indicia of non-obviousness. It is telling that the Board did not even need to resolve Medtronic's extensive and compelling evidence of objective indicia of non-obviousness before finding that the challenged claims would not have been obvious. Appx37.

This Court should affirm.

## ARGUMENT

### I. STANDARD OF REVIEW

Although this Court reviews the Board's ultimate conclusion of obviousness *de novo*, it reviews the Board's underlying factual findings for substantial evidence. *Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 271 (Fed. Cir. 2022); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). Obviousness is based on multiple underlying factual determinations, including "whether a [person of ordinary skill in the art] would have been motivated to combine the prior art to achieve the claimed invention." *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (quoting *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,

464 F.3d 1356, 1360 (Fed. Cir. 2006)). "The law is clear" that "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Tinnus Enterprises, LLC v. Telebrands Corp.*, 846 F.3d 1190, 1207 (Fed. Cir. 2017) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007)). For this reason, "[i]dentifying a motivation to combine the prior art is important because 'inventions in most, if not all, instances rely on building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.'" *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019) (quoting *KSR*, 550 U.S. at 418–19).

"Rejections on obviousness grounds," in particular, "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Hence, "[o]bviousness may be defeated if the prior art indicates that the invention would not have worked for its intended purpose or otherwise teaches away from the invention." *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017) (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009)).

"[T]he presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact" and therefore reviewed for

substantial evidence. *Intelligent Bio-Sys.* , 821 F.3d at 1366–67 (citations omitted); *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 449 (Fed. Cir. 2015) ("'Whether such a motivation has been demonstrated is a question of fact' reviewed for substantial evidence." (quoting *Medichem, S.A. v. Roblabo, S.L.*, 437 F.3d 1157, 1164-65 (Fed. Cir. 2006))). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Because of the deference paid to the Board as the finder of fact, the substantial evidence standard is "a high barrier to reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING OF A LACK OF MOTIVATION TO COMBINE

On appeal, Axonics challenges the Board's finding that a POSITA would not have been motivated to combine the disclosures of Young, Gerber, and Lindegren (Ground 1 challenging the '314 patent in IPR2020–00679), Young, Gerber, Lindegren, and Akerström (Ground 1 challenging the '756 patent in IPR2020–00715),[13] and Young, Gerber, Lindegren, and Hauser (Ground 2 challenging the '314 patent in IPR2020–00679). With respect to these Young-based grounds,

---

[13] Axoncis refers to Ground 1 as combination of Young, Gerber, and Lindegren. ABr., 30. The Petition in IPR2020–00715, however, presented the combination as additionally including Akerström. Appx280.

Axonics advances two central arguments: (1) the Board purportedly erred in rejecting Petitioner's proposed motivation to combine because "[t]he [Final Written Decision's] finding that the references were directed to different problems, each limited to a specific anatomical site, from different fields of art from the 314 and 756 Patents, was unsupported by substantial evidence"; and (2) the Board purportedly "committed legal error in imposing the requirement that, to show a motivation to combine, the resultant physical combination must be operable for an unclaimed purpose." ABr., 30.

Neither argument has merit.

### A. The Board's Rejection of Axonics' Sole Reason for Modifying Young to Include Additional Electrodes Distal to the Tines Is Supported by Substantial Evidence.

Each of the independent claims require a ***plurality of electrodes*** that are ***distal to all of the tines***. *See*, *e.g.*, Appx156 ('314 patent, claim 1 ("wherein all tine elements of the plurality of tine elements are positioned between a most proximal electrode of the plurality of the electrodes and the proximal end of the lead body")). This can be seen, for example, in figure 2 of the '314 patent.




Appx143 (FIG. 2 (annotated)).

Young's lead, however, has a ***single*** electrode distal to the tines. Appx2406. To overcome this deficiency in its primary reference (Young), Axonics argued that adding an additional electrode distal to the tines in Young would have been obvious based on Young's disclosure that the lead could be improved by "provid[ing] multiple active stimulation sites near the tip." Appx207; Appx290. That was Axonics' ***sole*** rationale for modifying Young to specifically account for the above claim limitation. Appx29–30; Appx964–965.[14] The Board found this rationale insufficient for ***two independently sufficient*** reasons.

---

[14] To be sure, Axonics' general statements that all references solve similar problems or constitute analogous art, *see*, *e.g.*, Appx206, do not qualify as specific reasons to modify Young to arrive at the claim limitation (in this case, plural electrodes distal to all the tines). *See infra* Section II.B.

First, the Board made a factual finding that Young's disclosure cited by Axonics does not suggest adding more electrode(s) distal to the tines. Appx35.

> Moreover, contrary to Petitioner's argument, Young discloses multiple active sites *near* the tip, not at the tip or distal to the tines. In view of Young simply disclosing multiple active sites near the tip, without any relation to the tines, and Dr. Slavin's testimony that a POSITA would not understand Young to suggest multiple electrodes distal to all of the tines, Petitioner has not persuaded us that Young's disclosure of improving its lead to provide multiple active stimulation sites near the tip would have suggested to a POSITA to modify Young's lead to include a plurality of electrodes distal to all of the tines.

Appx35.

In making this finding, the Board weighed the testimony of Axonics' engineer expert, Mr. Pless, and Medtronic's neurosurgeon expert, Dr. Slavin. Appx33–35; Appx100–103. It ultimately found unpersuasive Mr. Pless' testimony that "at least to me the natural thing would be to add the electrodes where the current electrode in Young is, which is distal to the tines." Appx33 (quoting Appx4421 (168:12–21)). Instead, it found more credible Dr. Slavin's testimony, which explained the complex anatomy of the trigeminal nerve region and why relocating the tines proximally to accommodate additional electrodes would "mov[e] the tines outside the cistern" and "would have prevented the tines from performing their intended function of stabilizing the lead electrode within the cistern." *See* Appx33 (quoting Appx4530

(¶ 62)).[15] The Board's factual finding is thus supported by substantial evidence as it based on its evaluation of the reference's teachings and the competing expert testimony. *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1358 (Fed. Cir. 2018) ("The PTAB is entitled to weigh the credibility of the witnesses."); *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact."). This factual finding is ***dispositive*** of Axonics' arguments that there was motivation to combine because it negates the sole reason Axonics offered for modifying Young to meet the relevant claim limitation.

As an initial matter, Axonics' challenge to this factual finding is forfeited. Its only rebuttal to the Board's analysis on this specific point is buried in a footnote. ABr. 50 n.6. "[A]n argument that is only made in a footnote of an appellant's brief is forfeited." *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1296 (Fed. Cir. 2021); *Apotex*, 439 F.3d at 1319–20. Axonics' footnote merely regurgitates what Axonics argued below, which the board rejected in finding that placing electrodes "near the tip" does not suggest placing them distal to the tines especially in view of Dr. Slavin's ***uncontested*** testimony demonstrating the

---

[15] Axonics' misunderstanding of Young's teachings is not surprising given its expert has limited knowledge of trigeminal nerve stimulation and of the anatomy surrounding the trigeminal nerve. *See*, *e.g.*, Appx628–630 (citing Appx4254–4487).

infeasibility of such an arrangement in the trigeminal anatomy. Appx35. Axonics simply ignores Dr. Slavin's testimony, which is clearly substantial evidence.

Moreover, Axonics' allegation that "it had been common practice to add electrodes at the distal tip of the lead for percutaneous implantations before 2001," ABr., 50 n.6, in no way addresses Young's specific statement made in the context of the anatomy at issue in Young. *TQ Delta*, 942 F.3d at 1360 ("Knowledge of a problem and motivation to solve it are entirely different from motivation to combine particular references.") (quoting *KSR*, 550 U.S. at 418). What's more, that statement by Axonics' declarant is a naked assertion with no supporting evidence and entitled to no weight. *Id.* at 1358–59 ("Conclusory expert testimony does not qualify as substantial evidence.") At bottom, Axonics simply asks this Court to accept its losing position when the question on appeal is only whether substantial evidence supports the Board's determination. *See*, *e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) ("[This Court's] job is not to review whether [the appellant's] losing position was also supported by substantial evidence or to weigh the relative strength of [the appellant's] evidence against [the appellee's] evidence.").

Second, the Board found that the modification of Young proposed by Axonics in order to arrive at the relevant claim limitation would have rendered Young inoperable for its primary purpose of "electrical stimulation of the trigeminal sensory

root." Appx35. Crediting the undisputed testimony of Dr. Slavin, the Board found that having plural electrodes distal to the tines in Young's lead, as expressly required by the claims, was infeasible given the trigeminal nerve anatomy and would render Young's lead inoperable for trigeminal root stimulation, the "purpose" of Young's lead. Appx33-35; Appx4528–4533 (¶¶ 58–65). Axonics does not challenge the Board's finding that adding an electrode distal to the tines would have rendered Young's lead inoperable for trigeminal root stimulation because the tines could not hold that lead in place as a result of Axonics' proffered modification. ABr., 41–54. Instead, as discussed below, Axonics attempts to manufacture legal error when none exists.

Axonics is wrong that the Board could not consider Young's intended purpose in its motivation to combine analysis because Young's purpose is unclaimed. ABr., 41–53. There is no legal requirement that the reference's primary objective must be claimed for it to be a consideration in the motivation to combine analysis. To the contrary, it is well established that there cannot be a motivation to combine when the proposed modification in order to arrive at the claim would render the primary reference inoperable for its intended purpose. *In re Gordon,* 733 F.2d at 902; *Trivascular, Inc.*, 812 F.3d at 1068) (finding no motivation to modify the prior art where doing so "would destroy the basic objective" of the prior art); *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1358–59 (Fed. Cir. 2020) (finding substantial evidence

supported the Board's determination that combining the prior art would "require the alteration of the principles of operation" of the art or would render the art "inoperable for its intended purpose").

Axonics' attempt at distinguishing black letter law is meritless. For example, Axonics seeks to distinguish *In re Gordon* because Young purportedly "expressly suggests the desirability of adding multiple active stimulation sites near the tip of the lead." ABr., 51. But the Board expressly found that Young does not suggest adding more electrodes distal to the tines. Appx35. Next, attempting to distinguish *Trivascular*, Axonics grossly mischaracterizes Young's primary objective as "therapeutic stimulation," ABr., 51, when the Board expressly found that Young's purpose is trigeminal root stimulation. Appx35; Appx31 (finding "Young addresses placement of an implanted, percutaneously placed electrode system for electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain.") (citing Appx2406); Appx99 (same).

Axonics' other cited authority is similarly unavailing and does not hold that a primary reference's intended purpose is not relevant to motivation to combine. For example, in *Allied Erecting*, this Court held that a secondary reference's features need not be bodily incorporated into the primary reference for purposes of obviousness. *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016). But this is ***not*** a case of the Board requiring bodily

incorporation of Gerber's electrodes into Young's lead to support obviousness. Instead, the Board simply asked whether adding electrodes in Young's lead distal to all the tines, as expressly required by the claims, ***and as proposed by Axonics to arrive at the claims,*** would have been feasible given Young's primary objective of trigeminal root stimulation. Appx35.[16]

Axonics similarly misreads *In re Urbanski*. Contrary to Axonics' characterization, this Court did not reject a patent owner's contention that "a POSITA would not be motivated to combine the asserted references because the combination would have rendered the modified process inoperable the primary references intended purpose." ABr, 44. Instead, this Court found that the Board properly weighed the evidence and found that the combination would not render the modified process inoperable for its intended purpose. *In re Urbanski*, 809 F.3d 1237, 1243 (Fed. Cir. 2016). The *Urbanski* court notably reaffirmed the long-standing principle that "[i]f references taken in combination would produce a 'seemingly inoperative device,' ... such references teach away from the combination and thus cannot serve as predicates for a *prima facie* case of obviousness." *In re*

[16] According to Axonics, the case held that a POSITA would have been motivated to modify a primary reference "even if it 'may impede the quick change functionality,' which was the central purpose of the primary reference." ABr., 41. *Allied Erecting* does not stand for such a proposition. As this Court noted, the Board found a POSITA could modify the references "*without impacting the quick change functionality*." *Allied Erecting*, 825 F.3d at 1381.

*Urbanski*, 809 F.3d at 1243 (quoting *McGinley v. Franklin Sports, Inc.,* 262 F.3d 1339, 1354 (Fed. Cir. 2001) (quoting *In re Sponnoble,* 56 CCPA 823, 405 F.2d 578, 587 (1969)).

Axonics' attempts at manufacturing legal error by suggesting that the Board assumed a POSITA must "mindlessly graft two references together" (ABr., 44) or "perfunctorily and unthinkingly tack Gerber's electrodes onto the distal end of Young's lead" (ABr., 42) or "categorically reject[ed] any motivation to combine where the physical combination of two embodiments would render that unsuitable for a[n unclaimed] purpose or function" (ABr., 41) or "categorically reject[ed] motivation to combine merely because the combination would require more than the rote assembly of two perfectly fitting puzzle pieces" (*id.*) are hyperbolic and baseless characterizations of the Board's actual analysis. The Board simply agreed with Medtronic that Axonics' proposed combination of references for arriving at the claims would render Young, the primary reference, inoperable for its intended purpose. And because adding electrodes to Young's lead would render it inoperable for Young's purpose, such a modification cannot be one that "simply arranges old elements with each performing the same function it has been known to perform and ***yields no more than one would expect from such an arrangement***." ABr., 32 (citing *KSR*, 550 U.S. at 417) (emphasis added).

As part of its discussion purportedly explaining legal error, and again buried in a footnote, Axonics claims that the Board misinterpreted Axonics' argument for motivation to combine. ABr., 46-47, n.5. Per Axonics, its motivation to combine reasoning was simply that a POSITA would look for multiple electrodes for greater flexibility for electrode placement and Gerber provides multiple electrodes. *Id.* This incoherent formulation of motivation to combine is insufficient because it does not address the placement of plural electrodes ***in relation*** to the tines, which is what the claims recite. That is, while a POSITA could theoretically look for multiple electrodes, and find such a teaching in the prior art (e.g., Gerber), the POSITA would still need to figure out ***where*** they would place those multiple electrodes relative to Young's tines. Would they place them all distal to the tines, as in the claims, or overlapping with the tines, or proximal to the tines? Axonics' theory for why the POSITA would place the electrodes distal to Young's tines relied ***exclusively*** on Young's statement regarding multiple active stimulation sites. Appx207. And that is what the Board rejected. Appx32 (explaining the Board's understanding of Axonics' reasons for modifying Young), Appx33-35 (rejecting Axonics' reading of Young as providing suggestion to place multiple electrodes distal to all of the tines).

Axonics also points to previously unidentified testimony from its expert as allegedly supporting its alleged motivation to combine. *See* ABr., 46 (citing Appx2180–2181 (¶ 90) and Appx2174–2175 (¶ 79)); *see also* ABr., 50 (citing

Appx2180–2181 (¶ 90)); ABr., 52 (citing Appx2861–2862 (¶ 31)). This testimony was not cited in support of the petition's motivation-to-combine analysis (or elsewhere for that matter). Because this testimony and corresponding argument was not relied upon by Petitioner it is waived and it certainly cannot demonstrate any legal error on the part of the Board. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016) (holding that failure to present arguments under the operative legal framework "typically warrants a finding of waiver").

### B. Substantial Evidence Supports the Board's Finding That the Problem Confronting the Inventors Did Not Provide a Motivation to Combine the References to Make the Claimed Invention

Below, Axonics argued that "a POSITA would have been motivated to combine [the] references" because they "solve the same problem as the ['314 and '756 patents] in the same field." Appx206; Appx289. The Board fully considered and properly rejected this argument, and its findings are supported by substantial evidence.

#### 1. Axonics Fails to Address the Problems Faced by the Inventor and Improperly Relies on Hindsight Analysis of the Characteristics of the Invention.

Axonics wrongly faults the Board for "ignor[ing] or brush[ing] aside" the patent's discussion of the invention, in particular this statement in the summary of the invention:

> [t]he present invention recognizes and provides a solution to the problems associated with implanting and maintaining electrical leads in

> body tissue, particularly muscle tissue to maintain one or more lead electrode in relation to a particular body site, through use of minimally invasive implantation techniques.

ABr. 32 (quoting Appx152 (5:48-53) (emphasis removed).

Unlike Axonics, the Board properly identified the problem that the inventors confronted and attempted to solve, which was specific to sacral nerve stimulation. Appx30–32; Appx98–100. The specification discussed at length the problems of prior-art techniques in maintaining casual contact of electrodes with the sacral nerve. Appx169-70 (3:22-5:18). Regarding the ’314 patent, the Board found the problem described in the following passage of the specification:

> there remains a need in the art for *a permanently implantable electrical sacral nerve stimulation lead that is capable of being passed percutaneously over a guide wire, and/or through the lumen of an introducer from the patient's skin to locate stimulation electrodes in casual contact with a sacral nerve*, that provides acute fixation with muscle and tissue layers posterior to the sacrum, and that can be bent to extend subcutaneously to the neurostimulator IPG without disturbing the fixation so that the stimulation electrodes are less likely to be dislodged during the acute recovery phase and the chronic implantation period.

Appx31 (quoting 5: 34-44 of the ’314 patent) (emphasis original). The Board relied on the same language in the ’756 patent. Appx99 (quoting 5:19–29 of the ’756 patent). In both cases, the Board explained that Axonics’ characterization of the problem was overly broad as the inventors sought to solve a ***more specific***

problem—one involving percutaneous lead implantation for sacral nerve stimulation. Appx31; Appx99.

The Board's reliance on the specification's description of the problem faced is well founded. Axonics' own –00715 Petition quoted the *same* passage of the '756 patent identified by the Board and stated, "**This is the problem that the '756 Patent identifies**." Appx266 (citing 5:19–29 of the '756 patent) (emphasis added). Axonics' own expert, Mr. Pless, also quoted the same passage and likewise declared "**This is the problem that the '756 Patent identifies**." Appx2257–2258 (emphasis added). Regarding the '314 patent, the –00649 Petition quoted the same description of the problem faced by the inventors. Appx189–190 (Axonics' Petition quoting 5:34–44 of the '314 patent). And Mr. Pless again testified that the same description "**is the problem that the '314 Patent identifies**." Appx2150–2151 (emphasis added). Beyond these concessions by Axonics and its expert, the testimony of both of Medtronic's experts, Drs. Slavin and Siegel, further buttresses the Board's finding. Appx4494–4495 (¶ 17); Appx4556–4557 (¶ 17); Appx4645–4647 (¶¶ 60–63); Appx4781–4783 (¶¶ 60–63).

The Board also found that "[a]part from a reference to applications outside of sacral neuromodulation [the '314 patent, 13:37–39], the Specification describes the invention with respect to the sacral anatomy," including consideration of the claims and drawings. Appx13–Appx14. The Board concluded that the specification

defines the field of invention as "medical electrical leads for sacral neuromodulation" (Appx13–15; Appx74–76). Support for this was identified in the following passage:

> 1. Field of the Invention
>
> This invention relates generally to a method and apparatus that allows for stimulation of body tissue, *particularly sacral nerves*. More specifically, this invention relates to *an implantable medical electrical lead having at least one stimulation electrode adapted to be implanted near the sacral nerves* for stimulation of a bundle of sacral nerve fibers and a fixation mechanism for providing chronic stability of the stimulation electrode and lead. Moreover, this invention relates to the method of implantation and *anchoring of the medical electrical lead electrodes in operative relation to a selected sacral nerve to allow for stimulation*.

Appx13 (quoting the '314 patent (1:33–44) (emphasis original)); Appx74 (quoting the '756 patent).

The Board then addressed each of the disparate asserted references, and found that they do not solve the same problem as the patents. Appx31–32. The Board found "Young addresses placement of an implanted, percutaneously placed electrode system for electrical stimulation of the trigeminal sensory root for treatment of chronic facial pain." Appx31 (citing Appx2406); Appx99. The Board determined that "Gerber contemplates the positioning and securement of an electrode that is implanted in the sacral area via a non-percutaneous surgical

procedure." Appx31 (citing Appx2430 (2:9–13)); Appx99. The Board found Lindegren "addresses the need for a cardiac lead that can be easily detached from the anchoring means and allow the lead to be replaced despite the anchoring means being stuck in the heart." Appx31–32 (citing Appx2451 (4:16–22)); Appx99. And in the –00715 IPR, the Board further determined that Akerström "addresses the difficulties of inserting an endocardial lead with a voluminous electrode head into a vein." Appx99 (citing Appx2465 (1:20–28)).

Nothing Axonics presented below detracts from that finding. At bottom, Axonics failed to present sufficient evidence or advance persuasive arguments to the Board regarding motivation to combine.[17] The Board's finding regarding motivation to combine is thus well supported by substantial evidence. Despite the literal support for the Board's fact finding and repeated concessions by Axonics, Axonics serially alleges the Board's finding was overly restrictive. Its contentions lack merit.

*First*, even if *arguendo* the Summary of the Invention describes the problems *solved by the invention* in broader terms, Abr., 33–34 (citing Appx152 (5:48–53)), that is irrelevant. The fact that the invention turns out to have broader utility does not undermine the Board's well-supported finding that the problem that the inventors set out to solve was sacral nerve stimulation. Regardless, this passage is fully

[17] Because Axonics failed in this regard, the Board did not even need to address the compelling objective indicia of nonobviousness. Appx36; Appx104.

consistent with the Board's characterization of the problem facing the inventors; it simply states "[t]he invention recognizes and provides a solution to *the problems*," referencing back to "*the* problems" described in the immediately preceding paragraph. Appx152 (5:34–53).

*Second*, Axonics points to a single, isolated mention of a potential application of the invention outside of sacral neuromodulation. ABr., 35 (citing Appx156 (13:32–39)). That too is impermissible hindsight, for obviousness analysis presumes no knowledge of the invention. A *potential application of the invention* is irrelevant to the Board's analysis of *the problem faced by the inventors*. The problems confronting the inventors logically *precedes* the invention itself. Thus, recognition by the inventors of the potential application of the tined lead—*after* invention—does not bear on the issue.

*Third*, Axonics points out that the background section mentions that "the prior art discloses … leads other than neurostimulation leads." ABr., 35 (quoting Appx151 (4:24–28)). Lacking from the background section's discussion of non-neurostimulation lead, however, is a description that the inventors were attempting to solve problems outside of sacral neuromodulation. Rather, with respect to such leads outside the field, the specification explains that these leads could not offer a satisfactory solution to the problems faced in sacral neuromodulation. Appx152 (5:34–44). Nowhere does the specification discuss that the inventors attempted to

solve problems faced by designers of cardiac pacing leads or spinal cord stimulation leads. To the contrary, the spec repeatedly describes problems related to prior SNM techniques. *See*, *e.g.*, Appx150 (2:41–46); Appx151 (3:22–46).

*Fourth*, Axonics contends that "[t]he overwhelming weight of this evidence" could only lead to the "inevitable conclusion" that "the proposed Grounds addressed the same problem as the 314 and 756 Patents." ABr., 36. But, beyond the holes in the arguments discuss above, it is not this Court's job to review whether Axonics' losing position was also supported by substantial evidence or to weigh the relative strength of Axonics' evidence against evidence of the Board. *Apple v. Samsung*, 839 F.3d at 1052. "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence," meaning that "[i]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re NuVasive, Inc.*, 842 F.3d 1376, 1379–80 (Fed. Cir. 2016) (internal quotation marks and citations omitted). "If two 'inconsistent conclusions may reasonably be drawn from the evidence in record, [the PTAB]'s decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *Thales Visionix*, 881 F.3d at 1356.

In light of the above, Axonics cannot credibly complain that substantial evidence does not support the Board's factual finding of the problems confronting

the inventors of the '314 and '756 patents, which are grounded in the express description in the patents.

### 2. A Motivation to Combine Must Be Specific and Tailored to the Proposed Modification of the Prior Art

Not only did Axonics misdefine the problem confronting the inventors, but Axonics utterly failed to supply *any* reasoning in its Petitions as to why lead migration or inclusion as an implantable medical lead would have motivated a POSITA to modify Young's trigeminal nerve root stimulation lead based on Gerber's SNM lead and Lindegren's, Hauser's, or Akerström's various cardiac leads and would result in the particular claimed arrangement of electrodes and tines. Appx206; Appx289. The Petitions cited to this Court's precedent in *Tokai Corp. v. Easton Enters., Inc.* for alleged support of its position that addressing a similar problems will provide a motivation to combine. *Id.*, citing 632 F.3d 1358, 1371 (Fed. Cir. 2011). But *Tokai* does not stand for the proposition that a *post hoc* abstraction of a problem faced by the inventors will necessarily supply a motivation. Indeed, the Board properly rejected Axonics' overbroad assertions and distinguished the facts of *Tokai*, noting that unlike the technology in *Tokai*, "[t]he technologies in this proceeding involve medical devices implanted in the body for neurostimulation, not simple mechanical technologies." Appx32; Appx100.

But Axonics' *post hoc*, abstraction of the field of the invention and a "shared" problem, ABr., 36, does not speak to why a POSITA would have selected *particular*

teachings of the *particular* references such that it would have resulted *in the particular arrangement claimed.* In particular, Axonics' characterization of the problem as "limiting implantable lead migration" and the field as "implantable medical leads" does not remotely explain why a POSITA would arrange all tine elements such that they "are positioned between a most proximal electrode of the plurality of electrodes and the proximal end of the lead body," Appx156 (13:60–63), or that "all of the P stimulation electrodes are between the plurality of M tine elements and the lead distal end," Appx174 (14:3–5), as claimed. Axonics' generalized characterization of the problem addressed and field of endeavor are legally insufficient and, if accepted, would have been inconsistent with this Court's caselaw.[18]

While it is true that a motivation to combine references may be found in a variety of sources, that general principle does not free Axonics from its burden of persuasively demonstrating that a POSITA would combined the specific teachings of Young, Gerber, Lindegren and others to arrive *at the claimed invention*. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016) ("Too often the obviousness analysis is [incorrectly] framed as an inquiry into whether a person of

---

[18] As discussed in the following section, the Board properly found that Axonics' characterization of the field and problem address was not consistent with the fields and problems expressly described by any of the references or the '314 and '756 patents.

skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine . . . the references in a way that renders the claimed invention obvious.") The real question is "why a person of ordinary skill in the art would have combined elements from specific references *in the way the claimed invention does*." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012). Indeed, "[a] reason for combining disparate prior art references is a critical component of an obviousness analysis; 'this analysis should be made explicit.'" *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) (quoting *KSR*, 550 U.S. at 418).

In short, the law does not permit Axonics to fabricate its own formulation of the field of invention or problem faced by the inventors simply to suit its alleged theory of obviousness. Nor does the law permit generalized characterization of a problem—as Axonics' made here—to support the specific modifications proposed in its obviousness challenge. Thus, Axonics' allegations were legally insufficient to support a motivation to combine and the Board was correct to reject them. On this basis alone, Axonics cannot show any harmful error and accordingly this Court should affirm.

### C. The Board Did Not Ignore Any Prior Art Reference as Not Being Pertinent Art

Axonics argues the Board adopted "an improperly narrow scope of the pertinent art" and therefore, erred in its analysis. ABr., 36–41. Per Axonics, the

Board failed to look to the relevant teachings of the prior art because it was purportedly blindsided by its view of what constitutes "pertinent art." ABr., 40. While the Board did make a finding that the "relevant art is medical leads for sacral neuromodulation," it made this finding in the context of determining the level of ordinary skill. Appx15. Nowhere did the Board find that one or more references were not "pertinent art" and exclude them from consideration. To the contrary, the Board applied all the prior art against the claims and found a lack of motivation to combine to arrive at the claimed invention. Axonics' attack on the Board's decisions is thus meritless.

Axonics contends that the Board's definition of the relevant field was purportedly "insupportably narrow" because it was limited the field to sacral neuromodulation. ABr., 36–37. Axonics again points to the background description of other lead types as failing to address the problems in sacral neuromodulation, the lack of an express recitation of the term, "sacral neuromodulation," in the claims, and the mention of another potential application. ABr., 37–38. But there is no evidence that this finding resulted in the Board ignoring the teachings of the prior art or finding the prior art non-analogous. In fact, the Board found a ***non-sacral*** lead in Young as disclosing one of the claim limitations, Appx29, which is clear evidence that the Board's findings regarding the relevant field of the invention did not affect its consideration of the prior art. Axonics' suggestion that the Board's formulation

of the relevant field "necessarily affects" the Board's factual finding with respect to motivation to combine is mere speculation.

Regardless, substantial evidence supports the Board's factual determination as to the relevant field of endeavor. Notably, as part of its analysis as to the relevant field, the Board considered and rejected Axonics' arguments above based on the weight of the full disclosure, including the express description of the "Field of the Invention." Appx13–14; Appx73–74. There is nothing erroneous in the Board relying on the express description of the relevant field in a patent's specification. *In re Wood*, 599 F.2d 1032, 1036 (C.C.P.A. 1979); *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380 (Fed. Cir. 2019).

## CONCLUSION

For the above reasons, this Court should affirm the Board's decision.

Date: September 16, 2022

Respectfully submitted,

*/s/ Naveen Modi*

Naveen Modi
PAUL HASTINGS LLP
2050 M St., N.W.
Washington, D.C. 20036
(202) 551-1700

*Counsel for Appellee*
*Medtronic Inc.*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing motion with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 16th day of September, 2022, and also served a copy on counsel of record via the CM/ECF system.

Date: September 16, 2022

By: *<u>/s/ Naveen Modi</u>*

Naveen Modi
Paul Hastings LLP
2050 M Street, N.W.
Washington, D.C. 20036
Tel.: (202) 551-1700
Fax: (202) 551-1705
Email: naveenmodi@paulhastings.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), as modified by Federal Circuit Rule 32(a).

The brief contains 13,094 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using MS Word 2016 in a 14 point Times New Roman font.

Date: September 16, 2022 By: *\/s/ Naveen Modi*

Naveen Modi
Paul Hastings LLP
2050 M Street, N.W.
Washington, D.C. 20036
Tel.: (202) 551-1700
Fax: (202) 551-1705